```
1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF TEXAS
2                         TYLER DIVISION

3
   CORE WIRELESS LICENSING      :      DOCKET NO. 6:12CV100
4                               :
   VS.                          :      TYLER, TEXAS
5                               :      MAY 1, 2014
   APPLE, INC.                  :      9:30 A.M.
6
                         MOTIONS HEARING
7            BEFORE THE HONORABLE JOHN D. LOVE,
              UNITED STATES MAGISTRATE JUDGE
8
   APPEARANCES:
9
   FOR THE PLAINTIFF:           MR. HENRY CHARLES BUNSOW
10                              BUNSOW, DEMORY, SMITH, ALLISON
                                351 CALIFORNIA STREET
11                              SUITE 200
                                SAN FRANCISCO, CA  94104
12
                                MR. CRAIG Y. ALLISON
13                              BUNSOW DEMORY SMITH ALLISON
                                600 ALLERTON STREET, SUITE 101
14                              REDWOOD CITY, CA  94063

15                              MR. JACK WESLEY HILL
                                WARD & SMITH
16                              1127 JUDSON ROAD, SUITE 220
                                LONGVIEW, TX  75606
17

18
   FOR THE DEFENDANT:           MR. JOSEPH J. MUELLER
19                              MR. TIMOTHY SYRETT
                                WILMER HALE
20                              60 STATE STREET
                                BOSTON, MA  02109
21
                                MR. ERIC M. ALBRITTON
22                              ALBRITTON LAW FIRM
                                111 W. TYLER
23                              LONGVIEW, TX  75606

24

25
```

```
1   COURT REPORTER:          MS. JAN MASON
                             CERTIFIED SHORTHAND REPORTER
2                            221 W. FERGUSON #100
                             TYLER, TEXAS  75702
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

25  PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

1    THE COURT:  All right.  Ms. Morris, you may call the

2  case.

3    THE CLERK:  The Court calls Case Number 6:12CV100,

4  Core Wireless Licensing versus Apple.

5    THE COURT:  Announcements.

6    MR. HILL:  Good morning, Your Honor.  Wesley Hill,

7  Henry Bunsow, lead counsel for Core Wireless, and his partner,

8  Craig Allison, and we're here and ready for the hearing.

9    THE COURT:  All right.  Thank you.  For the

10  Defendant.  Good morning.

11    MR. ALBRITTON:  Good morning, Your Honor.  Eric

12  Albritton for Apple.  With me is Joe Mueller and Tim Syrett, as

13  well as Andy Song from Apple, and we're ready to proceed.

14    THE COURT:  All right.  Thank you.

15    All right.  We're here for a hearing on multiple

16  motions.  Unless counsel has other suggestions, I would

17  intend to take the motions in the order they were filed, so

18  the first motion being Docket Number 124.

19    MR. ALBRITTON:  Your Honor, there has been an

20  agreement on one of the motions, the motion on commercial

21  success.

22    MR. BUNSOW:  That's correct, Your Honor.  We reached

23  a stipulation that we'll be submitting to the Court on that

24  one.

25    THE COURT:  All right.

4

1          MR. ALBRITTON:  And that just happened this morning.

2    Otherwise, we would have notified the Court yesterday, Your

3    Honor.

4          THE COURT:  All right.  Thank you.

5       Mr. Mueller, let me -- before you get into it, my

6    intention would be to take up the first motion but I'm going

7    to move to Core Wireless first on this one, so let me

8    hear -- I want to ask Core some questions about where we are

9    on this.  Who will be responding or arguing the first

10   motion?

11         MR. BUNSOW:  I'll be responding to that, Your Honor.

12         THE COURT:  All right.  Mr. Bunsow, my question on

13   this motion is, you know, both sides have piled a lot into

14   them.  You know, there's a lot of interesting history and

15   background and it goes back and forth and -- but the bottom

16   line is, is what would be improper with permitting you -- how

17   many patents are in this case at this point?

18         MR. BUNSOW:  I believe we have eight left.

19         THE COURT:  Eight left, okay.  Now, as I understand,

20   Apple has brought these counterclaims which say that you've,

21   you know, breached your FRAND obligations and you want to

22   counterclaim and say, well, in actuality it's Apple that has

23   breached theirs.

24      Now, what's wrong with focusing those FRAND type breach

25   of contract allegations on the eight patents at issue here,

1    rather than the -- is it an additional 1300 or something?

2           MR. BUNSOW:  Correct, Your Honor.

3           THE COURT:  In your client's portfolio.  So what

4    would be wrong with that?

5        And I'll say this, there are two options here.  One

6    would be I could sever out your claims as to the contention

7    that Apple has breached its FRAND obligations on the

8    remaining patents in your portfolio.  I could sever them out

9    and put them in another case and stay that case while we

10   address this one, or I could just simply dismiss those

11   claims as to the remaining patents without prejudice.  So

12   what would be wrong with that?

13          MR. BUNSOW:  What's wrong with that, Your Honor, is

14   that it's an unworkable solution, and Apple knows that.  If we

15   had a FRAND determination on these eight patents, then there

16   would have to be a FRAND determination on the next group of

17   patents and the next group of patents after that and the next

18   group of patents after that.

19       And this has been recognized by two courts, and

20   granted, it's an evolving area of the law and courts are

21   struggling with how to deal with standard essential patents

22   because of the portfolio situation.  But it's not a

23   situation that technology companies haven't known about for

24   a long time.

25       For example, the whole purpose of these P.A. Consulting

1    reports that are the subject of our motion for sanctions is

2    that they specifically identify companies that have standard

3    essential patents.  They give percentages of the overall

4    standard essential patents, and then in the database they

5    actually go into extensive detail on the individual patents

6    and what they cover and all those sorts of things.

7         So there is a framework that can allow courts to make

8    the global determination of FRAND rates on a portfolio

9    basis, and that was done in the Microsoft case by Judge

10   Robart.  It was done in the Innovatio case by Judge

11   Holderman.

12            THE COURT:  Now, let me stop you there.  Now, you

13   talk about this was done by Judge so and so and this was done

14   by Judge so and so.  So what -- what you're proposing, what

15   would it look like?  I mean, are you -- is it a legal issue?

16   Is it for the Court to decide?  Is it -- is there something

17   for the jury to decide here?  I mean, what's the ultimate --

18   how is this ultimately presented in such a way --

19        I'll say, you know, it almost seems like we are -- this

20   is almost like a different case than what we're really

21   talking about here.  I mean, you brought an infringement

22   case.

23            MR. BUNSOW:  Correct.

24            THE COURT:  I realize standard essential patents is

25   very important, I understand from an evidentiary standpoint,

1  from a framework standpoint for the fact finder to understand

2  what's going on here, it may be relevant.  But to the level

3  that you're talking about it seems like it's almost a separate

4  case.

5          MR. BUNSOW:  Uh-huh.

6          THE COURT:  And it makes me wonder whether as you

7  describe it that it ought to be severed out into a separate

8  case for a determination that whatever it means to the

9  infringement case that you've brought, the Court could then

10  figure that out.  But it seems very difficult to do what you're

11  describing, to do all that, what you've described as far as

12  these standard essential patents and who has an obligation to

13  do what, and also litigate the infringement issues, the

14  invalidity issues and everything else that typically comes,

15  damage issues that comes along in a typical patent infringement

16  case.

17          MR. BUNSOW:  Sure, and I don't disagree, and that's

18  why it's not in the original complaint and that's why it came

19  up --

20          THE COURT:  Well, so -- well, let me get -- let me

21  ask your position then on that.  I don't know that I can

22  necessarily say that I fault -- if Apple wants to raise that

23  you have somehow improperly brought an infringement claim

24  because -- through some sort of framework on these standard

25  essential patents, you -- basically I think they're saying you

1   shouldn't be doing this, okay?  I don't know that I can fault

2   them from doing that in a case in which they're accused of

3   infringing the patents.  But by doing that, do they necessarily

4   then convert this into -- this seems like a very complex

5   portfolio standard licensing issue that -- I just don't know

6   how it fits.  We're headed to a jury trial on patent

7   infringement, so what's a jury going to do with this?

8           MR. BUNSOW:  Right.  So let's start with how this

9   particular Court has looked at these things, and we have the

10  Ericsson V D-Link case in which Judge Davis made it very clear

11  that FRAND obligations is a two-way street.  It's not a one-way

12  street as Apple would have it.  So it is a two-way street.

13      We have put in our expert report a portfolio analysis

14  that we will rely upon, be it in front of the jury or the

15  Court, and we should talk about whether it's a Court issue

16  or jury issue.  Mr. Allison and I actually had that

17  conversation driving over here this morning.

18      But nonetheless, we have put in Mr. Weinstein's expert

19  report, which we served on Apple a couple of weeks ago, not

20  only an analysis of these eight patents which are a subset

21  of the portfolio, but what we feel is the accurate portfolio

22  analysis based on third party evaluations of the universe of

23  standard essential patents, which is the best evidence

24  that's available to the parties today and that's the type of

25  evidence that indeed the other courts have relied upon in

1    coming to this determination.

2         The -- the portfolio analysis and standard essential

3    patents license issue is something that we feel is before

4    the Court now.  If -- if we had an obligation to grant a

5    fair, reasonable and nondiscriminatory license as to these

6    patents, Apple had an obligation to negotiate the same, and

7    we believe in the context of our portfolio, to negotiate a

8    license in that portfolio.  And we in fact did make what we

9    believed to be fair, reasonable and non-discriminatory

10   offers, but that's I guess going to be a subject of proof,

11   which by the way implicates things like the mediation

12   privilege and other things along the way.

13        But setting those aside, it doesn't make any sense to

14   do it piecemeal because honestly we will be here long after

15   any of us want to be here if we do it on a piecemeal basis,

16   and clearly that's not an appropriate way to deal with

17   standard essential patents.

18        Apple is a member of ETSI.  They undertook that

19   obligation.  Therefore, a portfolio analysis is binding upon

20   them.

21        We believe that we have sufficient evidence for either

22   the judge or the jury to make that determination.  I believe

23   it's a jury issue because I believe that the obligation,

24   while that's a Court issue as a matter of law, the

25   quantification of that obligation I believe is a jury issue.

1         So we would propose to present that to the jury, just

2    like you would present any breach of contract case to the

3    jury.  In the context of this case it dovetails very nicely

4    with the damages claim, because part of the damages claim is

5    going to be for the jury to determine what a FRAND

6    obligation is, and we would like to do this once and be

7    done.  We don't want to have to come back over and over and

8    over and over again for all of the patents involved.

9         There are a hundred U.S. patents.  The rest of them are

10   foreign equivalent patents.  But nonetheless, we think that

11   a jury is suitable to make that determination.  Jurors have

12   found FRAND rates.  They did it in the Ericsson case here.

13   They did it recently in an LSI case in the Northern District

14   of California and then the Court has done it in the two

15   cases I mentioned.

16        So I don't think it's insurmountable.  I think it's

17   properly part of the case.  I think it can be part of the

18   trial, and I wouldn't think that it would -- it's going to

19   be another half hour or so of direct expert testimony

20   because frankly, the FRAND considerations and the

21   obligations are all going to be part of the main case

22   anyway, so the portfolio license part is just going to be

23   some additional -- sort of taking that analysis and

24   transporting it into the portfolio, into the portfolio

25   consideration for the jury.  So it's not an insurmountable

1   situation.

2           THE COURT:  Well, I know, you know, we're quite a bit

3   aways from jury charge time, but you say you think it's for the

4   jury as far as this quantification at least, so what would such

5   a question look like?  And give me a brief synopsis of how you

6   think a jury would be instructed on what they're doing here.

7   They're looking -- I guess what we're talking about is we're

8   talking about a claim that Core is making that Apple breached

9   its contractual obligation.

10          MR. BUNSOW:  Correct.

11          THE COURT:  So it's a type of breach of contract

12  claim.

13          MR. BUNSOW:  Correct.

14          THE COURT:  So what's the question, and briefly, how

15  are they instructed on what they would be answering?

16          MR. BUNSOW:  Sure.  So the question would be what do

17  you find is a reasonable royalty, fair, reasonable and

18  non-discriminatory royalty rate for the portfolio of Core

19  Wireless patents, and the answer would be a percentage.

20          THE COURT:  Now, Apple raises the issue that the

21  problem -- one of the problems with what you're talking about

22  is because the eight patents at issue, the question is are they

23  valid, are they infringed, and the question with the remaining

24  portfolio patents is not are they valid, are they infringed.

25          MR. BUNSOW:  Correct.

1          THE COURT:  So, you know, of course, I run into this,

2   frankly, repeatedly in damages questions where we're trying to

3   get at the value of what the patented invention is, yet in the

4   real world, and of course, we're looking at a hypothetical

5   negotiation, but the real world is in typically non-litigation

6   licenses and litigation licenses, they're on a portfolio basis.

7   So I'm running in -- of course, running into this issue

8   repeatedly about what is the best evidence of the value of the

9   patented invention when you're looking at portfolio licenses.

10      So it's somewhat similar here, but they make the point

11  that these remaining patents, there's no proof of any of

12  this.  Theoretically they could be just complete garbage

13  patents, you know, because we don't have the others

14  presented, they're not -- you know, experts aren't weighing

15  in on them and all that.  So respond to that.

16          MR. BUNSOW:  Sure.  And I don't disagree with that,

17  but that's all subsumed in the analysis that would be done and

18  the jury's royalty rate would reflect that.

19      So what we have is a situation where Apple became part

20  of an organization.  That organization required contributors

21  to offer patents on fair, reasonable and non-discriminatory

22  terms.

23      We're not the only ones that did that.  In fact, we're

24  a large contributor but in the scheme of things it's a

25  fairly small percentage of the overall universe of patents.

1   Apple was obliged to do the same.

2       So we have a situation where the parties have all sort

3   of agreed to share this particular technology, and that

4   is -- that is totally separate from considerations of

5   validity and infringement.  It is a sharing arrangement that

6   Apple is committed to and needs to honor as a member of

7   ETSI, and that's the obligation that Judge Davis says is a

8   two-way street.

9       And the opinion of our expert subsumes that and the

10  jury's determination of a reasonable royalty rate would

11  subsume that as well.

12              THE COURT:  All right.  Anything else at this point?

13              MR. BUNSOW:  Not at this point, Your Honor.

14              THE COURT:  All right.

15              MR. MUELLER:  Good morning, Your Honor.

16              THE COURT:  Mr. Mueller, you know, I kind of wanted

17  to get at what Core's position was on how this would work and

18  why this needed to work here.  What you've heard, what's wrong

19  with that?

20              MR. MUELLER:  So there's a few things, Your Honor,

21  and I would start by saying where you began I think is the

22  place we should end, and that is there could be an analysis of

23  the FRAND rate issues and the breach claims going both ways

24  with respect to the eight patents-in-suit.

25      The case has been narrowed down from 14 to 8 over the

14

1    last few months.  We're moving in the right direction.

2    There's still over 50 claims left in the case.  It's still a

3    large suit, but we are winnowing the issues through a

4    process by both sides, and that's going to arrive at we hope

5    something the jury could deal with in a jury trial with

6    proof by both sides, and the breach claims could be part of

7    that focused on the eight patents-in-suit.

8        So your proposal at the beginning I think is perfectly

9    sensible.  We give them the opportunity to try their breach

10   claims with respect to Apple.  I think they're meritless but

11   they have their claims, and they could make their case with

12   respect to the eight.

13       On the portfolio what they're asking for is something

14   very radical that no court has ever done, that no law

15   supports, and let me explain.  If you unpack what they're

16   saying, what they're saying is Apple is obligated to pay

17   royalties on a portfolio basis without any proof of

18   infringement or validity or enforceability or even what the

19   patents are.  They haven't even produced the patents in the

20   case.  There's no production of the actual issued patents or

21   the file histories.  It's just this abstract concept of the

22   portfolio.

23       Mr. Bunsow just said they could try that in a half

24   hour.  In a half hour you can't get any sense of what we're

25   dealing with, and no court and no standard setting

1    organization has ever said anywhere that a party like Apple

2    or some other company that supplies products is obligated to

3    take a portfolio license as a matter of law.  That's just

4    wrong.

5         The basic principle in the patent system is that you've

6    got to put forward your proof.  You've got to prove your

7    case for infringement and you've got to rebut validity if a

8    challenge is made by the Defendant.  That's equally true for

9    standards patents.

10        The FRAND commitment is intended to be a limit on the

11   rights of the patentholder, given the special circumstances

12   of the standard setting process, and that deals with

13   antitrust issues and all the rest.  It's intended as a

14   safeguard.  What they're doing is turning that into sort of

15   a lottery ticket around the traditional burdens of proof,

16   and no one has ever said that.

17        So let me just give a couple examples.  This Microsoft

18   case with Judge Robart in Seattle, that was a case in which

19   Microsoft agreed voluntarily to pay a FRAND portfolio rate

20   and asked the Court to set it.

21        That's not this case.  In this case Apple has always

22   limited its pleadings to the patents-in-suit, which were

23   originally 14 and now are eight.  We have never made any

24   request for a portfolio claim.

25        The Ericsson case before this Court, Intel and other

1   Defendants made a request for a portfolio adjudication of a

2   smaller portfolio and asked the Court to set a rate.  They

3   voluntarily made that choice, and Judge Davis held a bench

4   trial on that issue following the jury trial in that case.

5   Again, no such claim is being made in this suit.

6        In Innovatio, that's a case in which the Defendants

7   sought a FRAND rate on a group of patents that were asserted

8   by the Plaintiff and the Judge held a bench trial on what

9   the FRAND rate would be.  But interestingly and importantly,

10  the Judge said that rate wouldn't be effective until later

11  trials on infringement and validity.  That's the Court

12  recognizing you can't force someone to pay for something

13  until there has been proof of infringement and a rebuttal of

14  validity.

15       So none of those cases say a word about a Defendant

16  being required and being capable of being coerced by the

17  Plaintiff to pay royalties on the full portfolio without any

18  proof of infringement or validity, and that's really what

19  they're saying.  They're not just asking the Court to set a

20  rate or the jury to set a rate.  They want Apple to pay it.

21  They want Apple to pay for a portfolio of patents without a

22  shred of proof or shred of evidence as to what those patents

23  are, whether they're actually being used, whether they're

24  valid, whether they're enforceable.

25       No court has ever said that, and it's counter to basic

1    principles in the patent system.  Not just standards patents

2    but every patent.  You have to prove your case, and they're

3    trying to do a shortcut around that.

4         If they were right, why didn't they assert this claim

5    at the very beginning?  There's no need to prove

6    infringement on eight patents if they're right and they can

7    just come forward and ask the jury to force Apple to pay

8    royalties on the entire portfolio.  It doesn't make any

9    sense.  They never would have brought their case in the

10   first place on particular patents if they were right about

11   this portfolio claim.

12        And this is a portfolio claim that they unveiled

13   for the first time last -- in July of 2012 after having

14   multiple opportunities to amend their pleadings.  It just

15   doesn't make any sense.

16        So, again, what I would suggest is Your Honor's

17   proposal at the beginning is the right proposal.  They can

18   try their breach claims with respect to the eight

19   patents-in-suit.  The jury is going to have the evidence on

20   those eight patents-in-suit.  We can deal with separately

21   whether there's any issues that the Court needs to resolve

22   outside the presence of the jury.

23        We haven't briefed that issue, and frankly, I want to

24   consider it a bit further.  But I think the bottom line is

25   wherever we arrive at, bench versus jury, this should be a

1   case about eight patents, or hopefully fewer if they drop

2   more along the way.

3        It makes no sense as a matter of law and no sense as a

4   matter of procedure to inject 1300 patents that haven't been

5   produced, that haven't been the subject of any meaningful

6   evidence in this case, and that there's no legal basis

7   for the claim they're trying to assert.  It makes no sense

8   to inject that claim into this case.

9        So we would respectfully request that Your Honor

10  dismiss the portfolio piece and let them try whatever theory

11  they want to try on the actual patents-in-suit.

12           THE COURT:  Okay.  Thank you.

13       All right.  What I'm going to do on this is I'll give

14  Core some options here.  What I'm going to do is we're going

15  to go forward here with these FRAND assertions going both

16  ways, if that's the way the parties want to do this, on the

17  patents that are in-suit that are going to be set up, teed

18  up for trial.

19       The remaining FRAND obligations that relate to the

20  portfolio I can do a number of different ways.  I can just

21  simply dismiss them without prejudice.  I can sever them out

22  into a new cause number and stay that.  I can just simply

23  leave it in this case but tell you we're just going to try

24  the FRAND breach of contract claims related to whatever

25  patents are in-suit teed up for infringement.  And then the

1    Court can look at, as we get closer, what, if anything, the

2    Court needs to do.  Does the Court need to take some action

3    on the remaining portfolio based upon what the jury found?

4    Does the Court need to do something prior or as part of the

5    trial?  Does the Court need to do nothing and just

6    ultimately dismiss them and let it be done, you know,

7    refiled and handled in a different way and at a different

8    time?

9         I can do that I think a number of different ways, but

10   we're going to go forward with the patents that are in-suit

11   that are alleged to be infringed.  So, Mr. Bunsow.

12             MR. BUNSOW:  We'll take door three.

13             THE COURT:  Okay.

14             MR. BUNSOW:  And let me explain why.  I believe that

15   if we go forward with just the eight, clearly FRAND

16   considerations are going to be part of that analysis and there

17   could very well be collateral estoppel issues that the Court

18   could apply post-verdict, as you've suggested, that could

19   impact the obligation of either party in terms of an

20   over-arching royalty to the portfolio.

21        We think that's the way the law is going.  I think

22   we'll have some more guidance maybe even from the CAFC on

23   that by the time of trial in January and certainly by the

24   time post-trial motions are resolved and the like.

25        So our preference would be to keep it in the case.  You

20

1   can sever that issue as you've suggested, which I'll state

2   my objection to it, but nonetheless, I understand the

3   procedure, and I think that makes the most sense if we're

4   not going to go forward in the main case with it.

5            THE COURT:  All right.  That's what I will do then is

6   I'll keep these within the case but they will not be on course

7   for trial.  And then as things develop, the parties can put

8   forward their various positions on them.

9        You know, ultimately obviously it's my hope that, you

10  know, and I think it would be beneficial to everyone that

11  this be rolled -- of course rolled into these issues and

12  ultimately resolved pre-trial, post-trial.  You know, I

13  don't know that continuing to fight this out is beneficial

14  to anyone.

15       But with that said, that's the way we're going to

16  proceed.

17            MR. MUELLER:  Can I ask one practical question?

18            THE COURT:  Yes.

19            MR. MUELLER:  So we're in the midst of expert reports

20  right now and the next round is due in the next few days

21  actually.  I take it from Your Honor's ruling that we would not

22  be addressing those portfolio claims in expert reports and we

23  would wait until any follow-on proceeding after the jury trial?

24            THE COURT:  Correct.

25            MR. MUELLER:  Thank you, Your Honor.

1          THE COURT:  All right.  Let's move to the next

2   motion, which is the motion to compel production of

3   non-privileged documents from Third Party Mosaid Corporation.

4          MR. SYRETT:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. SYRETT:  As Your Honor is aware, Mosaid, which is

7   now known as Conversant, is the parent company of Core Wireless

8   and it acquired Core Wireless along with the asserted patents

9   and the others that we've been discussing this morning, Nokia,

10  which was the original owner of the patents, and Microsoft, and

11  it's the documents relating to that negotiation that are at

12  issue here.

13     I want to be very clear about the time frame we're

14  discussing relating to those documents.  They all predate

15  any final agreement between the parties.  There is a

16  securities filing from 2011 that we've attached as Exhibit

17  15 to our opening brief that is from Mosaid where they

18  described that Mosaid began discussions with Microsoft and

19  Nokia about this transaction in March, 2011, and that a deal

20  wasn't reached until September, 2011, following, quote,

21  extensive negotiations.

22     Now, the documents that we're seeking here all fall

23  within that period, from March, 2011 when the discussions

24  began and then prior to September, 2011 when a final

25  agreement was reached and when the parties, by Mosaid's

1   admission at the time, were conducting extensive

2   negotiation.

3       And Microsoft and Nokia now have an economic interest

4   in the outcome of this case and in Core Wireless's business,

5   but the patents were transferred, as Core Wireless has pled,

6   outright to Core Wireless so they now, following the

7   transaction, are the sole owners of those patents.

8       We think the documents during the negotiations are

9   quite likely to be very relevant to our defenses here.  They

10  may show, for example, Nokia's valuation of the patents.

11  They may show Nokia's understanding of the scope of the

12  claimed inventions.  And so we set about trying to obtain

13  the documents through a subpoena to Mosaid and it has been a

14  moving target to try to get the documents.

15      The first justification for the privilege was that

16  there may have been strategic discussions.  Then that was

17  sharpened to suggest that there were discussions of

18  offensive patent assertion between the parties.  And then

19  finally there has been a suggestion that there was a claimed

20  defensive interest with respect to antitrust issues.

21      But if you look at the -- if Your Honor looks at the

22  description of the documents that have been withheld,

23  for the most part that third explanation about the antitrust

24  issues is not reflected.  It's not the basis on which Mosaid

25  has withheld these documents as set forth in its privilege

1    log.

2        So there are two separate bases they claim for

3    withholding these, the common interest and the work product

4    protection, and I'll start with the common interest.  And on

5    this record there's no showing that these documents were the

6    subject of a common legal interest during this period when

7    again they were beginning discussions and extensively

8    negotiating their rights and their relationships.

9        The Fifth Circuit in the Santa Fe case that we've cited

10   says common interest can apply when your co-defendant or

11   potential co-defendant is under a palpable threat of

12   litigation and it's one that the privilege must be construed

13   narrowly, and there's no way to do that here consistent with

14   what Mosaid has suggested.

15       They have offered two explanations of the common

16   interest.  The first is that there were discussions of

17   offensive patent assertion.

18       And with Your Honor's permission, some of the

19   discussions at issue here are from confidential or

20   deposition transcripts that have been designated

21   confidential, and with Your Honor's permission, I'll get

22   into the details but I would ask Mr. Song from Apple to

23   leave and would seek leave later to seal this portion of the

24   transcript.

25           THE COURT:  Okay.

24

1          MR. SYRETT:  Or I'm happy to point Your Honor to

2    pages and do it at a more general level.

3          THE COURT:  Well, it's up to you.

4          MR. SYRETT:  Okay.

5          THE COURT:  Whatever -- I think that if you're, you

6    know, making a request to seal this part of the transcript, you

7    know, let me know.  Is that the --

8          MR. SYRETT:  Yes, that is the request, yes, Your

9    Honor.

10          THE COURT:  All right.  Yes, if Mr. Song would depart

11    then.  Thank you.

12          MR. SYRETT:  Thank you, Your Honor.

13                    (Mr. Song leaves the courtroom.

14                    (Excerpt redacted by order of the Court.

15                    (MR. Song re-enters the courtroom.

16          MR. ALLISON:  Core Wireless thinks this is exactly

17    the kind of case that the common interest privilege and the

18    work product doctrine apply to.

19       On March 13th the companies, Nokia, Microsoft and

20    Mosaid, got together to discuss the enforcement of a large

21    set of patents.  They immediately signed an agreement for

22    confidentiality, which is the first basis of a common

23    interest privilege.  They knew that there was going to be

24    confidential information discussed and they made sure that

25    it was going to stay confidential.

25

1      They started the discussions.  They -- and later on as

2  the discussions got more deeply into the patents, they

3  signed a common interest agreement, which was -- which was

4  signed to be effective April 28th, and that's the point at

5  which some very detailed documents were exchanged about the

6  patents.

7      The discussions during that time period, between March

8  13th and September 1st of 2011, included discussions about

9  the value of the patents, which of course includes whether

10  the patents are going to be found valid or infringed, how

11  strong the patents are, how strong the portfolio is, the

12  sort of legal issues that are required to make this sort of

13  deal.

14      And also the intent of this deal was to -- was to

15  enforce a very large patent portfolio of about 2000 patents,

16  and there's -- of course any rational person making a deal

17  like that would realize that litigation is a distinct

18  possibility when you take a broad enforcement campaign

19  against a number of potential licensees, so this is in the

20  minds of the participants from the very beginning, that

21  there was a high likelihood of litigation.  And that wasn't

22  an irrational belief because litigation did occur quite

23  shortly after the deal was made.

24      The second thing that was on their minds as they were

25  having these discussions was potential antitrust and

1    regulatory issues, because when you transfer several

2    thousand patents, sometimes regulators of various

3    jurisdictions are interested and they want to inquire about

4    that.  Again, that was not an irrational belief on the part

5    of the people because shortly after the deal was done,

6    Google filed a complaint with the European union and there

7    was an investigation done of this deal, and I think that

8    investigation is continuing on.

9        So the parties rationally believed that there was a

10   palpable threat of litigation of one type or another, and in

11   fact, that did occur.  So this seems to be exactly the case

12   that the common interest privilege is designed to protect,

13   the case when parties have discussions about the merits of

14   legal issues in the context of potential litigation that is

15   likely to occur and in fact did occur.

16       The same thing with the work product doctrine.  This

17   is -- all the parties were under the assumption that

18   litigation was likely to occur and in fact it did occur, so

19   the same considerations would apply there.

20       Mr. Syrett has talked about the Santa Fe case, the

21   Fifth Circuit case here.  The facts are quite different from

22   this case.  In the Santa Fe case there were -- basically

23   some parties got together.  General counsel made a memo

24   about antitrust issues that he circulated among various

25   companies.  Basically apparently the memo was about how not

1    to get yourself in trouble with the antitrust law.  There

2    was no threat of litigation at all at the time.  In fact, it

3    was five or ten years later that litigation arose that this

4    document was even related to, so there was no real palpable

5    threat of litigation at the time.

6         That's quite different from the case we have here where

7    the enforcement campaign was going to start immediately

8    after the deal was done and that's what in fact happened.

9    And they were talking about litigation that would likely

10   occur very shortly thereafter.

11        THE COURT:  Now, when you say -- were there specific

12   targets discussed, specific target licensees or potential

13   litigation targets?

14        MR. ALLISON:  There were -- the kind of documents, in

15   a broad scope -- obviously I want to avoid revealing privileged

16   information in open court.

17        THE COURT:  Right.  I'm just trying to get a general

18   sense if that's the type of thing that may have been discussed.

19        MR. ALLISON:  Yes.  My understanding is they were the

20   sort of documents that are -- a part of this group of documents

21   would be documents regarding the actual merits of the patents,

22   you know, are they infringed or not, and documents related to

23   damages issues, which was what sort of license revenue could

24   possibly be obtained from various target -- various potential

25   licensees.  So I -- there were documents of that sort here, and

1   of course if there were documents, there were likely

2   discussions about those documents.

3           THE COURT:  Okay.  Now, Apple points to Mr. Shaer's

4   testimony.  They rely on that heavily as indicating there were

5   not any type of strategic discussions, it was all, you know,

6   the nuts and bolts of a business deal is what I think they're

7   getting at through his testimony.  So how do you kind of fit

8   what he said with your position that these documents are

9   privileged?

10          MR. ALLISON:  Sure.  Let me say two things about

11  that.  First of all, we said that some of the quotes were taken

12  out of context.  One thing we meant by that was some of the

13  quotes were dealing with the very early days of the discussion.

14  Obviously when Mr. Shaer and Mr. Lindgren showed up in London

15  on March 13th, I believe it was, to talk about the deal, that

16  was -- there were other people that Microsoft and Nokia were

17  talking to.  That was the point at which -- the very early days

18  of the deal.  So of course at that point the discussions would

19  have been more business oriented.

20          But as the time progressed, of course, then -- and this

21  common interest agreement was signed, of course the

22  discussions got more substantive than that.  So some of the

23  quotes that we have were really talking about very early,

24  the very first conversations.

25          The second thing is that Mr. Shaer is not the only

1   evidence here.  We submitted a declaration of Mr. Lindgren

2   who was also present at every single one of these meetings,

3   and his declaration clearly said that there were legal and

4   strategic discussions that took place during those -- that

5   period of time between March and September of 2011.

6          THE COURT:  What is -- what is his name again?

7          MR. ALLISON:  John Lindgren.

8          THE COURT:  How do you spell that?

9          MR. ALLISON:  L-I-N-D-G-R-E-N, I believe.

10         THE COURT:  Lindgren, okay.

11         MR. BUNSOW:  He's the CEO.

12         MR. ALLISON:  Right, he's the CEO, and again, he was

13   at every single meeting with Microsoft and Nokia as far as I

14   know.

15         THE COURT:  Okay.  Well, here's where I am on this

16   motion.  I think the Court's intention would be to review these

17   documents in camera that are at issue.  I understand I believe

18   from Core's response you don't have any objection to that.

19         MR. ALLISON:  Right.

20         THE COURT:  Don't see any problem with that.  Well,

21   then can you give me those documents presented to chambers for

22   in camera review by say a week from today?

23         MR. ALLISON:  Sure.

24         THE COURT:  So by May 8th deliver to chambers

25   documents raised in Apple's motion, specifically raised, log

1    entries, those are to be presented to the Court in chambers on

2    or before May 8th.

3        Okay.  Anything else on this motion?  I'll look at

4    those and then I'll make a ruling on the motion at that

5    time.  If I need any further briefing on it, then I'll

6    invite briefing at that time after I've had a chance to

7    review the documents.

8            MR. ALLISON:  Let me just for your -- it might help

9    you in your review, there actually are a couple of periods of

10   time here that are sort of different.  There's before and after

11   the application of the common interest agreement.  Most of the

12   documents are after that, after April 28th.  Those are the

13   large group of documents.  Before that there's really only

14   about -- I think we found 16 documents that are actually

15   separately --

16           THE COURT:  Okay.  Do also present, if we don't have

17   it already, your privilege log.

18           MR. ALLISON:  Okay, sure.

19           THE COURT:  With the documents, present the log that

20   you provided to Apple for me to look at.

21           MR. ALLISON:  Okay.  We'll do that.

22           MR. MUELLER:  Your Honor, before you move on, can I

23   raise one question for you?

24           THE COURT:  Sure.

25           MR. MUELLER:  On the first motion, just to make sure

1  we all have it straight as we work on expert reports and the

2  rest, the procedural posture, as I understand Your Honor's

3  ruling with respect to portfolio claims, Your Honor would be

4  staying the motion to dismiss as to the portfolio claims?

5        THE COURT:  Well, what I would really like to do is

6  based on what I've said is I'm not going to dismiss them at

7  this point.  I'm going to essentially set them aside.  I'm not

8  going to sever them out into a separate case.  I'll set them

9  aside, stay the case as to that portfolio claim.  So my

10  intention was to deny the motion as moot based on my ruling.

11       Ultimately, you know, of course, I'll have to see --

12  like I had said, if y'all can work it out, great.  If the

13  Court has to ultimately decide what to do with them, they

14  may ultimately be dismissed, but I would like to handle

15  Docket 124 denied as moot, set those aside.

16       MR. MUELLER:  Sure enough.  We just wanted to make

17  sure there's no prejudice to our ability to argue legal

18  problems with those claims at some later date when they're

19  taken up.

20       THE COURT:  No.  Everything is still on the table

21  with regard to them.  I want to set them aside and let's get

22  this case tried as to what's teed up for infringement.

23       MR. MUELLER:  Okay.  Just two final questions, Your

24  Honor, or one note and one question.  We understand we will not

25  be addressing these claims in the expert reports, but the one

1    other question -- this did not come up in the argument and I

2    just made a note of it after I sat down and I omitted it

3    earlier.  I didn't hear a word about the unjust enrichment

4    claims.

5        We would request that even as to the eight

6    patents-in-suit, there's just so many problems with those as

7    a matter of law -- and I don't think Core Wireless is really

8    even vigorously defending them at this point -- that they be

9    dismissed.  They're preempted.  They're improper as a matter

10   of Texas state law.  They are time barred.

11       So even if the contract claims, which is what the focus

12   of the arguments were, went forward on the eight, there's

13   just no plausible, from a legal perspective, unjust

14   enrichment claim even as to those eight.

15           THE COURT:  All right.  Core's position on unjust

16   enrichment as to the eight patents that are in the case, breach

17   of contract, what's the position?

18           MR. BUNSOW:  Our belief, having researched this

19   recently, is that the -- that if there is an express breach of

20   contract, there cannot be unjust enrichment.

21           THE COURT:  All right.  So based on that, I will as

22   to -- well, are you withdrawing your unjust enrichment claim,

23   Mr. Bunsow?

24           MR. BUNSOW:  It's in the alternative on the portfolio

25   license aspect of it, Your Honor, so the answer is no.  I think

33

1    it should be handled the same way as you were handling the

2    portfolio license determination.

3           THE COURT:  Well, what would -- okay.  I mean, what

4    you typically get, I guess, if you're going to get a question

5    on the eight patents as related to FRAND obligations,

6    alternatively the jury would be asked about unjust enrichment I

7    guess.  Is that what you're saying?  Is that what you're asking

8    for?  You're saying it's in the alternative but you're still

9    wanting to pursue it as a matter of a jury question?

10          MR. BUNSOW:  Right.  So if Apple said that there was

11   a contractual obligation, that would moot the unfair

12   competition, but we're not there.  If the jury found that there

13   was a contractual obligation, that would moot the unfair

14   competition claim.

15          THE COURT:  Well, here's what I'm going to do.  I'm

16   going to deny the motion as moot as a whole at this point.  I

17   think that I want to -- let's let this progress for awhile

18   longer.  I think some of this may -- y'all need to just kind of

19   get your positions kind of set more clearly on what you're

20   going to say on the eight patents, okay?  Then later on,

21   depending on that, let me look at it as we get closer, maybe

22   other issues get teed up.  You know, I don't know that it will

23   ever become an issue, but if it does, then let me look at it at

24   that point.

25          MR. BUNSOW:  That's fine, Your Honor.  Thank you.

1           MR. MUELLER:  Thank you, Your Honor.

2           THE COURT:  All right.  So Docket Number 183, I'll

3    deny that motion as moot based upon the stipulation the parties

4    have reached today.

5        So let's go to Docket Number 188.  Who will be arguing

6    that for Core, 188, the motion to compel discovery and

7    discovery sanctions, Apple's late incomplete production of

8    P.A. Consulting reports and databases?

9           MR. BUNSOW:  I'm prepared to argue that, Your Honor.

10           THE COURT:  All right.  Go ahead.

11           MR. BUNSOW:  This case began with a very detailed

12    complaint that made two points as strongly as we could make

13    them.  The first is that the patents-in-suit cover the

14    standards that are applicable to certain ETSI standards, and

15    the second was through the specification of 2000 paragraphs we

16    identified the particular standards sections that we believe

17    Apple products practiced and allege that those products met

18    those particular standard requirements.

19           THE COURT:  Okay.  Mr. Bunsow, let me just ask this.

20    You know, this motion is a motion to compel discovery and seek

21    discovery sanctions.  Now, what is it that you're seeking to

22    compel at this point?  What do you not have that you believe

23    you're entitled to?

24           MR. BUNSOW:  We believe we're entitled to some

25    additional discovery on Apple's knowledge of the P.A.

1    Consulting reports, and let me give you two examples.

2        Before this came up we had subpoenas out to take the

3    depositions of Boris Teksler and Mr. Chip Lutton.

4    Mr. Teksler had the position that Mr. Risher has now and

5    Mr. Lutton was the chief intellectual property counsel at

6    Apple, and both of them were engaged in the negotiations

7    with Nokia for the earlier license.  They were very involved

8    in the subject matter of this case.

9        We agreed not to take their deposition in return for

10   Apple agreeing not to call them at trial, because so far as

11   we could tell, the issues that we knew about at that time

12   were probably hearsay-based, and apparently Apple agreed.

13       But in any event we withdrew the subpoenas.  They no

14   longer work for Apple, either one of them.  We withdrew the

15   third party subpoenas and agreed not to take their

16   depositions.

17       Subsequently we learned through Mr. Risher's first

18   deposition that the P.A. Consulting reports are used by

19   Apple in their FRAND determinations.  They're used by Apple

20   to drive their negotiations.

21       We have never seen them.  They were not produced with

22   their Rule 26 disclosures that were due in October of 2012,

23   and it was now about 14 months later in January of 2014 we

24   asked Apple why they hadn't produced them and demanded that

25   they be produced and we got a lot of push back and a lot of

1   delay and they were finally produced after the close of

2   discovery for the first time, along with the databases.

3        So one area of discovery that we would like is the

4   opportunity to take reasonable discovery of Apple, including

5   potentially Mr. Teksler and Mr. Lutton, on knowledge and use

6   of the P.A. Consulting reports.

7        After we brought this issue to Apple's attention, there

8   were many meet and confers, and at the 11th hour Apple said

9   that they would produce Mr. Risher for a limited two hour

10  deposition on the subject.  We've quoted from that

11  deposition fairly extensively in our papers and I won't go

12  over that, other than to say that basically Mr. Risher said

13  he had a late night short conversation with Mr. Teksler

14  where Mr. Teksler told him he didn't rely on the reports.

15  But I think it's fair to say that Mr. Risher was unable to

16  represent the universe of people that could have had access

17  to these reports that would have known about it.

18       Basically these reports cost $50,000.  They're

19  extensive.  The database goes on and on and on, identifies

20  individual particular patents, identifies several of the

21  patents-in-suit, and we don't believe that a technology

22  company like Apple would buy these just to let them sit

23  around with -- to no purpose.

24       So we would ask for limited discovery, and that may be

25  as simple as a 30(b)(6) witness and a short deposition of

1    Mr. Teksler and possibly Mr. Lutton if it turns out that

2    people further identify Mr. Lutton as having knowledge about

3    the reports.

4         THE COURT:  So you mention a 30(b)(6) on this topic,

5    so obviously you're dissatisfied with Mr. Risher.

6         MR. BUNSOW:  I think that's fair to say, Your Honor,

7    and we quoted from Mr. Risher's deposition.  And I'm not here

8    to slam Mr. Risher.  I've known him for a long time, and I

9    think given the limited time that he had to look into this, he

10   did the best he could, frankly.

11       But I think he was told the night before he had to

12   appear, at least that's what he said in the deposition.  He

13   made a phone call to Mr. Teksler, who is no longer an

14   employee of Apple, and that was pretty much the sum and

15   substance of his information.  So I think we need a more

16   fulsome analysis.

17        THE COURT:  Okay.  Now, so this 30(b)(6) would be --

18   characterize for me the topic that you would want to discuss in

19   the 30(b)(6).  What would you be asking Apple to put up a

20   witness to talk about?

21        MR. BUNSOW:  Right.  The topic would be access by

22   Apple employees to the P.A. Consulting report.  That's where we

23   would start.  We want to know everybody who had access to it,

24   and then as to those who had access to it, we would want to

25   know what use they made of it.  And we would like to be able to

1    challenge the proposition that's been put forth that even

2    though they pay a substantial amount of money for these, they

3    don't do anything with them, it sits in a file somewhere and

4    nobody looks at them.  We simply don't think that's the case.

5            THE COURT:  And as far as Teksler and Lutton, they

6    don't work for Apple any longer, so are you asking leave to

7    extend the discovery period to subpoena Mr. Teksler and

8    Mr. Lutton so you may --

9            MR. BUNSOW:  I would prefer to do this on a stage

10   basis.  I would like to know who from Apple could respond to

11   the 30(b)(6) notice, and if there was nobody available or the

12   only people available said, as Mr. Risher at least in part

13   said, that Mr. Teksler had seen the reports, then we may very

14   well need to renew the 30(b)(6) or the third party depositions,

15   but at this time I'm hoping that's not necessary.

16           THE COURT:  All right.  Now, I guess the second part

17   of your motion is for sanctions for Apple -- I guess for

18   Apple's late and incomplete production.  You say -- basically

19   what I understand you're saying is ultimately we did receive

20   the reports, the database, but this was late and it was on an

21   incomplete basis.  They finally completed production on this

22   and you're wanting sanctions for that failure, is that correct?

23           MR. BUNSOW:  We've -- we've received some of the

24   reports.  We have not received the LTE reports at all.

25           THE COURT:  So are you asking for an order to --

1          MR. BUNSOW:  Yes, we are.

2          THE COURT:  Now, let me ask you specifically on the

3    LTE.  Okay.  Are there any other reports that you have not

4    received?

5          MR. BUNSOW:  Those are the only ones we know of.

6          THE COURT:  Okay.  On the LTE reports, Apple's

7    position is in part on those that they're irrelevant to this

8    litigation.

9          MR. BUNSOW:  I understand that.

10          THE COURT:  What's your position on that?

11          MR. BUNSOW:  Our position is that LTE analysis is

12    relevant to this, and in particular, because in our own expert

13    reports LTE is part of the analysis that goes into reasonable

14    royalty rates and damages and the like.  So we think it clearly

15    could lead to the discovery of admissible evidence and LTE

16    considerations are in our expert's damages report.

17          THE COURT:  So --

18          MR. BUNSOW:  I agree that LTE per se is not in the

19    eight patent case, but I believe the analysis and the

20    information could be relevant.

21          THE COURT:  So the way Apple looks at LTE type

22    patents related to the FRAND type negotiation is relevant in

23    your expert's mind to how these royalty rates would be

24    calculated on the eight patents-in-suit?

25          MR. BUNSOW:  In order -- yes.  So to be clear, what

1   our expert has said is that LTE rates are relevant to rates

2   under the other standards.

3            THE COURT:  Okay.  And does he say that just on the

4   basis that there's similarities in the technology and in the

5   way technology is viewed in the industry, that correlation can

6   be drawn from the LTE negotiations to the types of negotiations

7   that would be involved with the eight patents?

8            MR. BUNSOW:  It's all of the above.  It's the same

9   companies.  It's the next stage of the technology, and there

10  are some published figures for FRAND royalty rates, depending

11  on quantities of patents, for example.  There is -- there are

12  published articles about regression analysis and the like,

13  depending on numbers of patents.  And his position is that

14  what's happening in the LTE world is instructive in the other

15  areas as well.

16           THE COURT:  Okay.  So what I'm hearing from you is

17  what you're asking the Court to do is compel production of LTE

18  reports and a 30(b)(6) deposition from Apple on the topics that

19  you just outlined?

20           MR. BUNSOW:  That's correct, and sanctions.

21           THE COURT:  Okay.  Now, the sanctions issue, what

22  Apple says in part to that is that you were aware of these

23  reports early on and they heard nothing about them for months.

24  Now, you may have outlined why -- as I understand you were

25  going to depose these witnesses.  They said, you know, we're

41

1    not going to call them at trial so we'll withdraw our

2    subpoenas.  Then I think you got some information that Apple

3    did use the reports in FRAND negotiations.  Is that what

4    prompted you to pursue these?  Because they say there's this

5    big huge seven month gap where if we're late producing them, we

6    didn't know we were late because you never -- you knew about

7    them and you never said anything.

8           MR. BUNSOW:  Okay.  They were late producing them

9    from the day their Rule 26 disclosures were due.  That was

10   several months after they were found in the Motorola case to

11   have improperly delayed production of similar reports in that

12   case.

13      They had them when the Rule 26 reports were due.  They

14   knew standard essential nature of these patents was a

15   critical issue in this case and they should have produced

16   them then.

17      They subsequently produced some expert reports from

18   other litigation that referred to P.A. Consulting reports,

19   but there was nothing that said that in this case that Apple

20   had these reports or would use them in FRAND negotiation.

21   It was Mr. Risher's deposition in which he identified the

22   P.A. Consulting reports as something that Apple uses in

23   coming up with the FRAND protocol.

24      Let me give you a little background on that.  So we

25   have been wrestling with Apple to try and figure out what

1   kind of FRAND protocol we can possibly agree upon to come up

2   with a number in this case, and Apple had said, well, you

3   know, we do it -- this is kind of in the context of

4   mediation so I'm not going to get into very much detail.  We

5   do it this particular way, and we said, well, we'd like to

6   do it this particular way.  Obviously the numbers are

7   different.

8        In his deposition when we asked Mr. Risher the type of

9   information that Apple used in order to make FRAND

10  determinations, he referred to these P.A. Consulting

11  reports.  And I don't remember the actual date of his

12  deposition but it was late 2013, if I remember correctly.

13  That's when we started asking for them.  We asked for them

14  in early January of 2014 and we were denied on the basis

15  that these are confidential and the property of P.A.

16  Consultants and we don't have permission to disclose them.

17       We pursued that.  We had a conversation with P.A.

18  Consulting.  The gentleman inside P.A. Consulting didn't

19  realize that there was a protective order in this case,

20  wasn't told that apparently, and ultimately said fine, you

21  know, as long as they're protected, the confidentiality is

22  protected, you can have them.

23       Then they imposed the additional restriction that we

24  had to treat them like source code.  We could come look at

25  them and designate portions.  That was the first time when

1    we went and looked at them to designate portions, that was

2    the first time that we realized that there was this database

3    that specifically identified some of the patents-in-suit as

4    standard essential patents.  And we renewed our demand that

5    they produce them, and we got further push back until after

6    the close of discovery.

7         That's the chronology, all right?  So if you want to

8    talk about delay, delay starts with the Rule 26 requirement,

9    and they had been told by another Court that they shouldn't

10   delay in producing these.  That's the delay.

11        THE COURT:  All right.  Now, so you made a motion for

12   sanctions.  You've outlined why.  What's the -- I know it's in

13   the motion or at least at that stage when the motion was

14   drafted this was the sanction you were seeking.  What is the

15   sanction you're seeking at this point?

16        MR. BUNSOW:  That Apple had notice as a result of its

17   possession of these reports that the identified patents-in-suit

18   were standard essential patents, and we have specified the

19   particular language in the -- excuse me, in the motion papers.

20        THE COURT:  All right.  Thank you.  Response.

21        MR. MUELLER:  So there's a lot to address there, Your

22   Honor, and there's a lot in the briefing as well.  I'm going to

23   focus on the facts.  I think that their briefing has been

24   characterized by very reckless allegations of lying by me,

25   lying by Mr. Risher, lying by another attorney that represents

44

1    Apple.  Really allegations that are unbecoming an officer of

2    the Court that have no evidence to support any of them.

3         What I'm going to do is to not focus on these

4    inflammatory allegations, which are just wrong, but on the

5    factual record.  I'm going to start with what we're talking

6    about here, the reports themselves.

7         These are third party materials generated by a British

8    firm called P.A. Consulting.  They are available to anyone

9    who wants to purchase them.  As Mr. Bunsow said, they are

10   available for purchase for a fee.  I presume that Core

11   Wireless has paid that fee.  They have a copy of the reports

12   themselves and have had them for some undetermined amount of

13   time.  We've asked how long they've had them.  They've never

14   told us.

15        They produced their copy of them in February, over a

16   month after the close of document production in December.

17   So, you know, what we're really talking about here is a

18   motion to compel and for sanctions for materials generated

19   by a group called P.A. Consulting that they had a copy of

20   and that they produced within weeks of the production by

21   Apple.  It's a remarkable position they're taking.

22        But the short of it is they have a copy of P.A.

23   Consulting materials.  It's no secret to anyone.  It's a

24   third party, and they produced two different forms of

25   documents.  They produced narrative reports that describe in

1    prose certain trends in the cellular industry with respect

2    to declared essential patents, and some of those trends

3    would include companies declaring more patents as essential

4    than are actually essential and they have attempted to study

5    that phenomenon in certain ways.

6         So that's one part are these narrative reports.  Those

7    have been used by Apple over the years repeatedly.  They

8    have been used by Apple in license negotiations.  They've

9    been used by Apple in litigation, and that is no secret.

10        We produced materials, Your Honor, in June of 2013,

11   nearly a year ago, pursuant to this Court's order requiring

12   production of materials from other litigations, and those

13   included a large number of expert reports and deposition

14   transcripts.

15        And if I could respectfully direct Your Honor to

16   footnote four in Core Wireless's opening brief on this

17   motion, in that footnote they cite to some of the materials

18   that we produced in June of 2013.

19        Now, Mr. Bunsow just said the first they heard of

20   Apple's use of P.A. Consulting was Mr. Risher's deposition.

21   That's wrong.  That footnote shows it's wrong.  That

22   footnote quotes deposition testimony that we produced in

23   June of 2013 that refers by name to P.A. Consulting and

24   describes how Apple used those narrative reports.

25        So there has been no hide the ball here.  These are

1    materials that were produced a long, long time ago that

2    spelled out exactly how Apple uses these third party

3    reports.

4        Now, distinct from those narrative reports are a second

5    category of information that P.A. Consulting makes available

6    as a subscription, and that is this Microsoft access

7    database, which has some underlying data.  The licensing

8    department doesn't use that for various reasons, but they

9    don't use it and Mr. Risher explained that they don't use it

10   at his 30(b)(6) deposition on these issues.

11       We didn't know they even had it, the litigation team,

12   the in-house counsel working on this case, until the motion

13   was -- or until the request was brought, at which point we

14   did a search of e-mail archives and discovered a copy of it

15   and produced it.

16       So there's this conspiracy theory about me lying and

17   Jeff Risher lying and Ann Cappella from Weil Gotshal lying.

18   It's wrong and it's reckless and it's incorrect.  There's

19   been no lying, no hiding the ball, nothing of the sort.

20       Again, we made clear in June of 2013 that Apple had

21   used the narrative reports by P.A. Consulting.  They were

22   named by name in those materials that went to Core Wireless.

23   So they received notice of Apple's use of these materials

24   nearly a year ago.  They apparently had their own copy of

25   P.A. Consulting materials, yet never made any follow-up

1   request that they be given the full materials that Apple had

2   copies of.

3        That request was made in January of 2014.  When it was

4   made, within a matter of weeks we went through the back and

5   forth with P.A. Consulting to give them notice.  We arranged

6   for an inspection of the materials.  Core Wireless came and

7   selected the ones that they wanted produced formally.  We

8   did.  We produced the reports that they wanted in their

9   entirety, the one exception being LTE, which I'll get to.

10  We produced the segments of this Microsoft access database

11  that no one had looked at, but we nonetheless made it

12  available for inspection.  They reviewed it, identified

13  portions to be produced, and we produced them.  Then we made

14  Mr. Risher available for a 30(b)(6) deposition on those

15  issues.

16       So even though they had waited until January, despite

17  knowing about these materials over a year ago or nearly a

18  year ago, we really bent over backwards to give them

19  everything they were asking for to try to eliminate any

20  issue on this.

21       Mr. Bunsow referred to meet and confers, and there

22  were.  There were meet and confers on this issue and over

23  time we tried to give them as much as we thought they

24  reasonably could have need for.  But not once during those

25  phone calls was any mention made of sanctions, okay?  The

48

1    first we heard about that was an e-mail following one of our

2    telephone conferences where they referred to sanctions, and

3    we said what do you mean by sanctions.  And this whole

4    sideshow came about at the end of the meet and confer

5    process, without any proper vetting with us.

6         Had they asked questions like did you, meaning me, know

7    about this database from the Motorola litigation, I could

8    have explained to them this briefing they're referring to

9    predated my time on that case.  They didn't even ask.  They

10   didn't even make an attempt to find out the basic facts, and

11   instead, rushed to court and made reckless allegations that

12   turned out to be false.

13        The other point I'll mention is this, Your Honor.  This

14   P.A. Consulting database, you have the narrative reports

15   which have been used by Apple, this Microsoft access

16   database that has not.  They're trying to characterize the

17   database as some sort of smoking gun, and it really, if you

18   look at it, Your Honor, and look at the substance of the

19   entries, is hardly that.

20        There are now eight patents in the case.  Five of them

21   are not mentioned.  Three of them are mentioned, and I don't

22   want to reveal any confidential information about those

23   three, but you have before Your Honor in the briefing the

24   entries for those three and the entries describe one of them

25   as not essential, okay?  So now we're down to two.  And

1   for the remaining two the descriptions include critiques of

2   the patents and the technologies that I think are actually

3   quite unhelpful to Core Wireless.

4        So this notion that we've been sort of hiding this

5   smoking gun is really belied by the actual text of these

6   three entries in the database.

7        So at the end of the day what you have is a third party

8   hearsay report that would never be admissible in any trial

9   to establish liability.  It's a third party report.  There's

10  no authentication of it, no explanation of the methodology

11  used to generate that database, no attempt to subpoena P.A.

12  Consulting, for that matter, despite the fact that they had

13  their own copy of the report and surely knew about it.

14       So this document is not one that could be admitted at

15  trial, and yet they're trying to turn it into something that

16  it really is not.

17            THE COURT:  When you refer to a report, what report

18  is that?

19            MR. MUELLER:  Sure.  So again, there's two things

20  here and I think it's important to keep them -- the distinction

21  in mind.  There are narrative reports, and if you read them,

22  it's a description of trends in the industry and what the over

23  declaration rate is for the industry as a whole and for

24  particular companies.  That's the part that Apple has relied on

25  over the years.  And again, the particular ways in which Apple

1    has used it, we produced a lot of material about that very

2    subject in June of 2013.  So that's category one.

3         Category two is this Microsoft access database that we

4    found in an electronic archive in response to their specific

5    request.  As Mr. Risher testified truthfully, by the way, at

6    his deposition, it's not used by the licensing folks at

7    Apple.  They use the narrative reports, not the access

8    database.

9         Now, they do have a copy of it, okay?  They do have a

10   copy and we found it when they asked for it and we produced

11   it, and so they have had it.  But it's not the portion of

12   the P.A. Consulting reports that are used.

13        The last -- I'm sorry, Your Honor.  Please.

14             THE COURT:  Well, here's what this comes down to is

15   that you had -- you had certain disclosure obligations as part

16   of this case and Core Wireless points these out, and what I

17   just need to get to the bottom of is whether you, and by you of

18   course I mean Apple --

19             MR. MUELLER:  Sure.

20             THE COURT:  -- produced -- obviously this is a

21   standards case.  It's a standard essential patent case.  It's

22   what Apple's procedures, processes for, first of all, obviously

23   particularly with regard to these patents-in-suit, but

24   generally how do they -- this is obviously the allegation.

25   This is what Core says.  Look, we couldn't have been more

1   clear.  This is standard essential, you know, on and on.  So

2   did you, as of those obligations coming -- arising, produce

3   what you had in a timely fashion?

4            MR. MUELLER:  And we did, and let me be specific.

5   This is at page three of our opposition brief to the motion,

6   Your Honor.

7        So before this P.A. Consulting issue arose, we had

8   produced over 4,000 pages of documents describing this

9   subject, how Apple values FRAND patents, including 26 expert

10  reports, 23 transcripts of expert or fact witness

11  depositions, 18 responses to interrogatories and requests

12  for admission and six transcripts of trial testimony of

13  expert and fact witnesses.

14       We also produced a series of letters and policy

15  statements that we had submitted to ETSI and the

16  International Telecommunication Union regarding Apple's

17  position on FRAND.

18       We had also produced Mr. Risher for an earlier

19  deposition at which he was deposed all day, not for two

20  hours but all day, on how Apple values FRAND patents.

21       This material was more than sufficient to show how

22  Apple goes about the process of valuing FRAND patents and

23  amply met our disclosure obligations.

24       There are a million documents in the world that refer

25  in some way or relate in some way to standards patents, and

1    I'm sure there's many more that Core Wireless has that they

2    haven't produced to us.  What the parties are obligated to

3    do is to make productions that are sufficient to show how

4    they approach these issues, and we did that.  Really, Your

5    Honor, we did I think much more than was necessary to

6    establish how Apple values FRAND patents.

7        What they're doing is plucking on one thread of that

8    production and saying, well, you should have given us more

9    on that one thread.  But that one thread was no secret.  If

10   they wanted more, they could have asked for it.

11       But we had more than met our obligation.  To the extent

12   they wanted us to go above and beyond it, which is really

13   what they wanted, we did that too when they finally asked in

14   January of 2014.

15       So the answer to your question, Your Honor, is we

16   absolutely met our obligations and we did so in a timely

17   fashion.

18       And if I could just say a few words, Your Honor, about

19   sanctions.  I don't think there's any motion to compel here

20   because there's nothing really left.  We've given them the

21   reports.  We've given them a deposition of Mr. Risher.  You

22   asked about the topics of another 30(b)(6) deposition.

23   Those are exactly the topics they've already asked

24   Mr. Risher about and about which he testified truthfully.

25       The only thing concrete I can see that they are seeking

1    in the motion to compel are these LTE reports, and the only

2    basis they used to defend that request is the portfolio

3    claims.  Well, those are now moot or stayed or whatever the

4    status is, but they're not going to trial next January so

5    there's no need for them to go into another cellular

6    standard and take discovery into it when it's not -- it

7    holds no relationship to the eight patents-in-suit.  I think

8    Mr. Bunsow conceded that.  It's not comparable technology

9    with respect to those eight patents-in-suit.  Those deal

10   with older, more primitive technologies, and I think any

11   attempt to use LTE to analogize an LTE royalty rate to those

12   patents would be defective on that basis.  And they really

13   haven't even tried to make that defense until just today.

14        So the LTE reports are the only thing concrete that I

15   can see they're seeking and there's no ground for that

16   request.  So I think at the end of the day they have what

17   they need and they received it before expert reports.  Their

18   damages expert has cited to some of the P.A. Consulting

19   materials.  Whatever mileage they can get out of them

20   they'll get, but there's really nothing left here to compel.

21        On sanctions the cases are so far removed from this

22   fact pattern, I think it's remarkable they're even making

23   the request.  Those cases are about deceptive conduct, you

24   know, an intentional failure to abide by a court order,

25   misrepresentations to the Court.

54

1        There's nothing of the sort here, Your Honor.  I have

2   not lied to the Court or Core Wireless.  Jeff Risher has

3   not.  Other Apple counsel have not.  There's not a shred of

4   evidence to suggest otherwise.  We've met our obligations at

5   every turn in this case and we've done our best to abide by

6   every court order the Court has entered.

7        THE COURT:  All right.  Thank you.  Mr. Bunsow,

8   anything else on this?

9        MR. BUNSOW:  Yes, Your Honor, briefly.

10        THE COURT:  All right.  Go ahead.

11        MR. BUNSOW:  First of all, I would refer Your Honor

12   to pages 10 and 11 of our opening brief which recounts the

13   testimony from Mr. Risher as the 30(b)(6) testimony we have so

14   far.  It was woefully inadequate in terms of identifying who

15   had access to the reports and when they had access to the

16   reports.

17        This is a really what did you know and when did you

18   know it inquiry.  This goes to willful infringement.  We're

19   not offering these third party reports as proof of standard

20   essential nature.  We're offering them as proof that Apple

21   knew that they may be using standard essential patents and

22   they knew that, and we should have been given these reports

23   with the Rule 26 disclosures, not after we had to badger

24   them for it beginning in January of 2014.

25        Yes, they gave us some expert reports from other cases

1    and those expert reports did refer to some P.A. Consulting

2    reports.  In the Motorola case they were different P.A.

3    Consulting reports.  But nonetheless, it was Mr. Risher's

4    first deposition testimony where they were clearly

5    identified as something that would be pertinent in this

6    case, this case for setting FRAND royalty rates.

7         In addition, they talk about our having P.A. Consulting

8    reports, but what you weren't told are a couple of things.

9    We found out after we gleaned the significance of these

10   reports.  When we couldn't get them from Apple, we canvased

11   all our people, what do you know about these reports, how

12   can we get them and does anybody have access to them.  One

13   of our employees over in Europe said at another job I had

14   access to them.  I have an old copy.  It was from 2006-2007,

15   and it was only the narrative portion.  It wasn't the

16   database, and it's the database that specifically identifies

17   the patents-in-suit as being within these standard essential

18   categories.

19        So that's what we have.  That doesn't say anything

20   about what Apple had, when they had it, and that they had

21   notice of the potential standard essential nature of these

22   very patents that are in this case.

23        That's the problem.  That's why we're asking for

24   sanctions.  That's why they should have been produced.  I

25   would submit that's likely why they weren't produced.

1    That's probably why they weren't produced in the Motorola

2    litigation either until the eve of the filing of the summary

3    judgment motions, and they were criticized about that.

4         I believe Mr. Mueller when he says he didn't know about

5    it from his participation in that earlier case.  I believe

6    him.  I think that's probably true.  But anybody at Apple

7    who was involved in that case -- and we know Apple closely

8    watches its cases.  Mr. Song is here today.  Undoubtedly

9    somebody inside Apple was at the Motorola case as well.

10   Given the strong language the Court used in that case, Apple

11   knew about it.  Apple is the real party in interest here.

12   Apple knew about those reports.  And if they didn't make

13   them available to litigation counsel to meet their Rule 26

14   requirements, that's bad on Apple.

15        And it's one or the other.  There's simply no

16   justification for not producing them.

17             THE COURT:  Well, from what I'm understanding, what

18   Mr. Mueller just got up and just told me was there are reports

19   from P.A. Consulting that talk about trends in the industry

20   and, yes, we use those, but we never use -- and there's sworn

21   testimony I think to this effect -- this database that

22   specifically references the patents, some of the

23   patents-in-suit.

24        Now, I agree with you.  It's what did Apple know and

25   when did they know it, but it has been represented to me

57

1     that yes, we use these reports.  We think you knew about

2     them.  When you asked about them, we gave them to you.  But

3     this database, the sworn testimony is we didn't use it,

4     didn't even know about it.  So that's just sort of where we

5     are.

6          I don't know really, you know, what else other than,

7     you know, this second 30(b)(6) deposition that you want.  I

8     guess the question is, is there enough here to compel me to

9     order another 30(b)(6) deposition on this.

10             MR. BUNSOW:  Right, and I would -- as I said, I would

11     refer you to pages 10 and 11 where we talk about Mr. Risher's

12     testimony.  For example, in the first paragraph he admitted

13     that many employees at Apple had access to the P.A. Consulting

14     databases, including the entire patent development and IP

15     transaction groups.

16             MR. MUELLER:  Your Honor, I'm sorry to interrupt, but

17     if we're going to read deposition testimony --

18             MR. BUNSOW:  This is not testimony.  It's --

19             MR. MUELLER:  It's under seal.

20             MR. BUNSOW:  I understand.

21             THE COURT:  So is there a request for Core to --

22             MR. MUELLER:  If we could, Your Honor, if we're going

23     to read this testimony.

24             THE COURT:  All right.  If we could have Core's

25     representative please leave the courtroom.  Thank you.

58

1              (Mr. Smetana left the courtroom.

2              (Excerpt redacted by order of the Court.

3              (Recess.

4          THE COURT:  All right.  The final motion is Docket

5   Number 190, Apple's motion to preclude or alternatively compel

6   Core Wireless to produce Nokia employees for deposition.

7          MR. MUELLER:  Thank you, Your Honor.

8      So this motion really comes down to a basic issue of

9   just wanting a fair playing field and a level playing field

10  for both sides.

11     Your Honor has before you in the briefing the

12  procedural history that led us to this point on the Nokia

13  discovery, and it goes through all the twists and turns in

14  the case.  But I want to sort of cut through that a little

15  bit, although I'm happy to answer any questions Your Honor

16  has on the details, and really arrive at the bottom line,

17  and the bottom line is Core Wireless has a relationship with

18  Nokia, is entitled to cooperation from Nokia, and certainly

19  in important respects Nokia stands to benefit from any

20  successful outcome in this case by Core Wireless.

21     In light of that relationship, point one, and point

22  two, our inability to get any discovery from Nokia at the

23  same time that Core Wireless is getting apparently whatever

24  they want, we think there's a real fairness issue.

25     We were told for many months that Core Wireless did not

1   intend to call any Nokia witnesses.  When they changed their

2   position, which was their right to do, but when they changed

3   their position and said, no, we do intend to call Nokia

4   witnesses, almost immediately they were put on calendar for

5   deposition without any formal subpoena.

6        In contrast, we have been seeking through multiple

7   different ways and multiple different procedural vehicles to

8   get Nokia witnesses, none of whom have been offered for

9   deposition.

10       On the document side, even with respect to these

11  depositions that are -- that have been offered by Nokia for

12  the Core Wireless witnesses, we've asked, you know, will we

13  receive the technical documents for those witnesses in

14  advance, will we receive certain licenses that we've

15  requested many, many times in advance of their licensing

16  witness's deposition.  No response.  No commitment.

17       At the same time Core Wireless has produced certain

18  Nokia documents that it obtained from Nokia, invention

19  disclosure records, for example.

20       So on both the document side and the witness side, you

21  have a situation where one party in this case is getting

22  what they want.  The other party is getting nothing, and

23  that's not fair.

24       Our proposal to the Court really is either we should be

25  entitled to reciprocal discovery and we should have a level

60

1    playing field, or they should be precluded from using this

2    one-sided discovery that we have received to date.  It's

3    just not fair or right or procedurally proper for a party to

4    get what it wants and not to offer anything in return.

5         THE COURT:  Okay.  Well, setting aside all the

6    circumstances that led us to this point, but -- so let's take

7    the Nokia witnesses that you want to depose.  Now, where do we

8    stand on that?  I mean, how many are there, who are they, and

9    what -- where do we stand on scheduling those depositions?

10        MR. MUELLER:  Sure.  There's really -- there's three,

11   three witnesses, Your Honor, that we've sought, and I think

12   with respect to those three we might even be willing to

13   withdraw our request for one of them, leaving two.

14        The two people would be, one, an inventor on a named

15   patent-in-suit, and second, a person who's an inventor on

16   another Core Wireless patent but has been involved in

17   standard setting processes for Nokia, and we have reason to

18   believe that he has knowledge of relevant events for the

19   patents-in-suit, although he's not a named inventor.  So two

20   witnesses.

21        THE COURT:  Now, are these the witnesses that Core

22   contends are not within the control of Nokia?

23        MR. MUELLER:  Correct, Your Honor.  They have told us

24   that they can't make them available, and the major argument is

25   they're employees of Nokia Solutions Networks, which is a

1    wholly owned subsidiary of Nokia that Nokia controls, whose

2    employees Nokia lists as its own employees for purposes of

3    certain securities filings.  It's a false corporate distinction

4    and it's not a proper roadblock to discovery.

5        So it's two witnesses.  Then, Your Honor, we have also

6    sought and targeted a very specifically crafted request for

7    documents, both technical documents for these witnesses and

8    for the ones that they're going to depose and a subset of

9    Nokia licenses, and those are relevant for lots of reasons

10   in this case but they're also relevant to help us question

11   one of the witnesses that Core Wireless is offering for its

12   own purposes, who is the head of licensing at Nokia.

13       So our position is that we've made very narrowly

14   targeted document requests and narrowly targeted witness

15   requests.  Again, we're really talking about two people at

16   this point, and at most three, and that's reasonable.

17            THE COURT:  So again, these -- well, let me tell you,

18   you've got to either tell me two or three.

19            MR. MUELLER:  Sure.

20            THE COURT:  Who do you want?

21            MR. MUELLER:  We can say right now, Your Honor, two,

22   and I can give you the names if you like.

23            THE COURT:  Okay.  Give me the names.

24            MR. MUELLER:  So the two names, Your Honor -- let me

25   make sure I spell these correctly -- would be Mika M-I-K-A

1   Forssell F-O-R-S-S-E-L-L, and Karri Ranto Aho.  I'll spell that

2   as well.  It's three names, three words:  K-A-R-R-I, middle

3   name R-A-N-T-O, last name A-H-O.

4       So those are two people, Your Honor, that we believe

5   are important material witnesses that have not been tendered

6   for deposition.  And in addition to those two people,

7   documents for those two and the witnesses that they intend

8   to depose.

9           THE COURT:  Okay.  And -- and the importance of Mika

10  Forssell is what?

11          MR. MUELLER:  Named inventor.

12          THE COURT:  Named inventor on one of the

13  patents-in-suit?

14          MR. MUELLER:  Correct.

15          THE COURT:  Employed by NSN, which you contend is a

16  wholly owned subsidiary of Nokia?

17          MR. MUELLER:  Correct.  And the second, Mr. Aho,

18  is -- has knowledge of Nokia standardization technologies

19  relating to the patents-in-suit, although he's not a named

20  inventor.  So we are seeking him for discovery that's pertinent

21  to the eight patents-in-suit, and in particular, his work on

22  standard setting organizations.

23          THE COURT:  All right.  Response.  Let me ask first,

24  there's this contention that you're going to depose Nokia

25  employees and you've not produced relevant documents related to

1    their knowledge that Apple contends they need to depose these

2    individuals.  What's your position on that?

3              MR. ALLISON:  At the first of the case we asked Nokia

4    to give us documents related to the technical aspects of the

5    patents, conception, reduction to practice, whatever the sort

6    of normal things you get in a patent case.  Nokia produced

7    documents.  They gave documents to us.  Our understanding is

8    they gave us what they had.  We produced all those documents a

9    year ago, year and a half ago.

10         I'm not aware -- I mean, we've gone through that with

11   Nokia.  They asked for the documents.  They provided them to

12   us and we produced them.  I'm not aware that there are any

13   more documents on conception or reduction to practice or

14   those sorts of things that -- related to the patents that

15   Nokia would have.

16              THE COURT:  Okay.  Mr. Mueller.

17              MR. MUELLER:  Sure.  I mean, respectfully, that's not

18   the extent of what we asked for.  We've also asked -- I'll give

19   you two examples.  One would be specific documents and we've

20   actually listed by date meetings at ETSI where these witnesses

21   were present and we asked for their notes and files from those

22   standardization meetings, which are directly relevant to the

23   issues in this case.  That's one category, standardization

24   related work from these witnesses.

25         Second is these licenses, and we've asked over and over

64

1    and over again for Nokia's licenses with chip suppliers that

2    supply the chips in these mobile devices, Qualcomm being one

3    example.  We've also asked for Nokia's licenses with

4    infrastructure providers like Ericsson that make the base

5    stations.  Those could be relevant to liability in so far as

6    they may have licensed technology that's now being accused.

7    It could also be relevant to damages.

8         With Mr. Melin's deposition as head of licensing

9    scheduled for two weeks from now, we've not received a

10   single license from Nokia and those are documents we've

11   requested for many, many, many months.

12             THE COURT:  Okay.  Response.

13             MR. ALLISON:  Licensing -- this is the first we've

14   heard why they're relevant at all.  I've never heard that this

15   was for the Melin deposition before.  We asked several times

16   why they're relevant and we didn't get an answer.

17        Nokia has not given us their licenses.  Nokia does not

18   feel that Core Wireless needs to see its other licenses in

19   other cases.  We simply don't have them.  Nokia has

20   indicated no willingness to provide those documents to us.

21        Apple has asked for -- has gone to the Hague Convention

22   to get certain documents from Nokia, their own confidential

23   documents that we would not have and would not be expected

24   to have.  If it takes awhile -- apparently it's been very

25   slow.  They started about a year ago with these discussions.

1  They're still continuing on with them.  It seems to be

2  taking quite a long time.  We don't have any objection if it

3  takes longer as long as we get it before trial.

4      But, you know, I don't know how Core Wireless can tell

5  Nokia what it's supposed to produce and what it's not

6  supposed to produce.

7          MR. MUELLER:  Your Honor, if I may respond briefly.

8          THE COURT:  Yes.

9          MR. MUELLER:  Respectfully, this is the problem is

10  that if we were just seeking Nokia discovery ourselves and Core

11  Wireless were not seeking any form of discovery from Nokia,

12  that would be one thing.  But what's really unfair is for them

13  to be able to call as a witness, without even a formal

14  discovery request, the head of licensing from Nokia and then

15  for Core Wireless and Nokia to tell us but you're not going to

16  get any documents in advance of the deposition.

17      And respectfully, we have made clear why we need those.

18  In the last week we sent two more reminders to Nokia's

19  counsel asking if we could receive the licenses before the

20  deposition.  Not a word in response.

21      So whether it's Core Wireless or Nokia behind the

22  scenes who stands to benefit from this case, this is why

23  preclusion would be an appropriate remedy if all we get is

24  one-sided discovery.  That can't be the right way to conduct

25  discovery in this case.  Either we get the documents and

1    have fair notice of what they say and are allowed to

2    question the witnesses about them or preclusion would be

3    appropriate.

4            THE COURT:  Okay.  So you're talking about there are

5    depositions upcoming that you're saying Core is going to take

6    and one of them is Mr. Melin?

7            MR. ALLISON:  M-E-L-I-N.

8            THE COURT:  Okay.

9            MR. MUELLER:  Correct.

10           THE COURT:  And are there others set?

11           MR. MUELLER:  There's two depositions of witnesses

12   that Core Wireless wants that Nokia has offered.  There's two

13   that have been scheduled for May 13th and 14th I believe, in

14   about two weeks.

15           MR. ALLISON:  Right.  Mr. Melin is the 13th and

16   there's an inventor named Esa Malkamaki, who's on the 13th, and

17   so we have asked for Nokia's cooperation and they have given us

18   that.

19           MR. ALBRITTON:  You might want to spell that for Ms.

20   Mason.

21           MR. ALLISON:  M-A-L-M-A-K-I.  I think I did that

22   wrong. M-A-L-K-A-M-A-K-I.  First name is Esa, E-S-A.

23           MR. MUELLER:  So for the inventor what we seek would

24   be the technical documents that that person has knowledge of.

25   We haven't received one.  For Mr. Melin we would ask for the

1    licenses.

2            MR. ALLISON:  For -- let me respond to that comment.

3    For the technical documents, as far as I know there's nothing

4    else to be produced.  We have actually made that inquiry and

5    we've got what they have.  I'm not aware there are any

6    technical documents --

7            THE COURT:  Okay.  So as to Mr. Malkamaki, inventor

8    deposition, you provided all the technical documents that

9    you're aware of relevant to that deposition?

10           MR. ALLISON:  Yes.

11           THE COURT:  All right.  Now, Mr. Melin.  Now,

12   Mr. Mueller, you gave me two categories of documents you

13   believe you're entitled to and have not been produced.  Now,

14   one of these you mention -- one of the categories is licenses,

15   Nokia licenses.  Now, you're talking about -- well, briefly

16   tell me again the relevance of these.

17           MR. MUELLER:  Absolutely.  And just very, very

18   briefly, for the first witness, in addition to the conception

19   and reduction to practice documents, again we've asked for ETSI

20   participation documents from that witness.

21           THE COURT:  Let me stop you.

22           MR. MUELLER:  Sure.

23           THE COURT:  ETSI participation documents as to

24   Mr. Malkamaki.

25           MR. ALLISON:  I have not received a request for that

1    from Mr. Mueller and apparently -- was this in some sort of

2    document from Nokia that --

3          MR. MUELLER:  Well, it was and we've requested this

4    from Nokia, who presumably would have possession of them, but

5    you've been copied on all this correspondence.  This would

6    be -- one place we have requested it, not the only, would be

7    the Hague Convention schedule.

8        And one quick side note on that, Your Honor, we

9    actually went to Nokia and Core Wireless last year, months

10   before we came to the Court, and gave them a draft of the

11   Hague Convention request and said can you take a look at

12   this.  Maybe we can work this out.  We also wanted them to

13   review it for confidentiality.  So we've really bent over

14   backwards to try to do this in a collegial way and we

15   haven't received anything.

16       But the ETSI documents are one category.  The second is

17   the licenses.  And to Your Honor's question on that, there's

18   two subsets.  One would be licenses with chip suppliers for

19   mobile devices and second would be licenses for

20   infrastructure providers for cellular systems.  And one

21   example would be someone like Ericsson to the extent there

22   were licenses with Ericsson.

23          THE COURT:  And the relevance of those is what?

24          MR. MUELLER:  Two types of relevance, Your Honor.  To

25   the extent that Nokia licensed some of the patents-in-suit

1   which originally belonged to Nokia before they were transferred

2   to Core Wireless, there could be patent exhaustion arguments or

3   implied license or express license defenses that we could make

4   by virtue of their having license components in Apple devices

5   or in the networks that those devices use.  So there is a

6   liability piece.  These could provide outright defenses to any

7   form of liability.

8        The second form of relevance is damages.  To the extent

9   that they have licensed certain chip makers, that could be

10  probative of what a reasonable royalty would be.  We would

11  have to look at the particulars to see that for sure, but

12  certainly it would be a place we want to look.

13       Now, I'll note that we're not seeking every Nokia

14  license.  We're not asking for every license with handset

15  providers, for example.  We believe the patents that are

16  being asserted in this case are directed to chip level

17  technology and so we have asked for chip level licenses,

18  plus licenses to infrastructure that relates to the devices,

19  systems in which the devices run, and that's it.

20            MR. ALLISON:  Okay.  First of all, I have never heard

21  these arguments before this moment from Apple.  We have -- in

22  the last few weeks we have received e-mails and we've asked

23  repeatedly why they want licenses.  We don't understand the

24  relevance, and we've received no response other than the

25  general response that we think they're relevant.  I have never

1  heard these specific arguments before today, so we're -- to be

2  honest, it's a little hard to respond to them.

3      I don't see why licenses for other -- these generally

4  tend to be cross licenses between Nokia and other players,

5  and of course, the patents-in-suit would be a very small

6  part of those licenses and there would also be cross

7  licenses.  So I'm not sure how those relate to damages, but

8  it doesn't appear to us that these licenses have much

9  relevance.

10     That's not the purpose we're asking to speak with

11  Mr. Melin.  We were going to ask him about issues about

12  Nokia in general and research and development and FRAND

13  issues, those sorts of things.  We were not going to ask

14  questions about specific licenses.

15         MR. MUELLER:  I don't want to get into a he said/she

16  said, but we did make this clear multiple times over the

17  course.

18         MR. ALLISON:  The second thing is I also don't recall

19  any e-mails about ETSI documents.  As far as I know, most ETSI

20  documents are public documents.  These things are done in the

21  public.  There are many notes that are made publicly.  The

22  specifications are public.  The final documents are public.

23  There's lots of information that you can get on the Website

24  about what happened at ETSI and who was at what meeting and all

25  that.  I'm not sure there are relevant private documents

1   around.

2       Again, this is another thing that I haven't been asked

3   for and I -- whether there are any private, non-public

4   documents about any of these witnesses, you know, we haven't

5   looked into it.

6           THE COURT:  Well, let me say this.  We're talking now

7   about -- so, Mr. Allison, the two deponents, Nokia employees,

8   are Mr. Melin and Mr. Malkamaki.  These are the two that you're

9   going to depose.  Are there any others?

10          MR. ALLISON:  Yeah, there's actually four in total.

11  There's Mr. Toskala, who's an inventor, T-O-S-K-A-L-A.  He's

12  already had his deposition taken last week.

13          THE COURT:  All right.

14          MR. ALLISON:  Then there's Harri Lilja.  L-I-L-J-A is

15  his last name, H-A-R-R-I.  He's an inventor and we haven't set

16  the date yet but Nokia has agreed to have his deposition -- to

17  have him sit for deposition, and those are -- then there's

18  Mr. Malkamaki and there's Mr. Melin and I'm missing -- who am I

19  missing?  Mr. Jukka Vialen, last name V-I-A-L-E-N, Jukka

20  J-U-K-K-A, another inventor, and he's an employee of Cassidian

21  and we have contacted him.  He agreed to cooperate with us and

22  he agreed to have his deposition taken.

23          THE COURT:  Well, let me say this about these.  Let's

24  just take these deponents.  What does concern me greatly is the

25  idea that -- and this is what Mr. Mueller says, that there's

1    cooperation between Nokia and Core Wireless that misaligns the

2    playing field here and that Apple is not able to get the

3    information that it needs to defend the testimony that you're

4    eliciting from these Nokia people.

5        Now, on these licenses, I think what I'm going to do

6    is -- I don't know that there's a point in trying to gather

7    all these up and produce them at this point.  What I'm going

8    to say is that I'm going to -- Mr. Melin's deposition is

9    going to go forward and Apple can ask the questions of the

10   person presumably who knows about licensing practices and

11   how all this stuff works at Nokia.  If it arises out of it

12   that the questions appear to call into question these

13   licenses and raise their relevance and make them important,

14   then I'll look at a further motion if you can't work

15   something out.

16       And I would encourage with my comments this to be

17   worked out, that is, that Core get with Nokia and produce

18   relevant documents.  In other words, if Apple raises the

19   relevance, shows the relevance through deposition, y'all get

20   together and agree on a reasonable set or a grouping of

21   licenses that should be produced.

22       If Apple gets in the deposition and doesn't get

23   anything out of it, then it may go away.

24       I don't want -- I mean, I want Apple to -- to the

25   extent this is a real issue and really something your expert

73

1    is going to hone in on, they may be relevant.  But just to

2    go on a big fishing expedition for every Nokia license, I

3    don't want to do that.

4         So I'm going to put that off, let the deposition go

5    forward.

6         Now, on this ETSI stuff, I am going to order that

7    produced.  Whatever Nokia has, whatever Mr. Malkamaki has,

8    his involvement with ETSI, I'm going to order Nokia and Core

9    Wireless to search for that and produce that.  I don't think

10   that is that -- that would be that difficult to do.

11        If y'all can discuss it and come to some accommodation

12   on that, that's fine, but I do think that if you're going to

13   depose him on that issue that was raised, those documents to

14   the extent they exist ought to be produced, in Nokia's

15   possession.

16        The same goes for any other deposition.  Again, if Core

17   Wireless is going to take the deposition, I want reasonable

18   discovery to be accomplished through -- if it takes going

19   through Nokia, it does, and that's just going to have to

20   happen.

21        So any questions on these at this point?

22             MR. ALLISON:  Yes, I think for -- we have four

23   witnesses who are inventors basically and so those are -- with

24   Mr. Melin I think it's clear what Your Honor is saying.  With

25   the four inventors, I think as far as I know we produced all

74

1    technical documents related to the inventors.  It appears

2    there's these ETSI documents, and to be quite honest, I'm not

3    sure what Apple is asking for.  Does it -- are there ETSI

4    documents with respect to all four inventors you believe or --

5            MR. MUELLER:  Your Honor, to be clear, I think one

6    good place to look would be the Hague Schedule which Core

7    Wireless does have, and we can work with them after this

8    hearing is over to make sure they understand which ones map to

9    which witness.  We have been very, very specific about the ETSI

10   documents and what we're seeking, and I'm happy to share that.

11           THE COURT:  Okay.  Y'all work through that, but my

12   order is that Core is to work with Nokia to get whatever ETSI

13   association documents these particular witnesses have, look for

14   those and produce whatever they have.

15      I appreciate you produced the technical documents as to

16   the inventors, that's great, but I'm also going to order the

17   ETSI documents produced but I'm going to hold off on the

18   license issue.

19           MR. ALLISON:  Okay.  And that -- it may well be --

20   because again, I'm doing this in real time.  It could be those

21   documents were collected by Nokia and whatever they had was

22   produced to us.  I just don't know the answer to that.

23           THE COURT:  That's fine.  Look at them.  Look at what

24   the requests are, get with Nokia and see what was produced.

25           MR. ALLISON:  Understood.

1          THE COURT:  Now, as to these remaining two witnesses,

2    Forssell and Aho, I guess, Mr. Allison, your position is that

3    they're employed by NSN and therefore you and Nokia are under

4    no obligation to produce these witnesses, is that right?

5          MR. ALLISON:  Right.  I guess I'm in a little bit of

6    an awkward position because I don't represent Nokia.  All I

7    represent is Core Wireless.

8          Apple asked us to inquire of Nokia, and we have no

9    problem producing these witnesses.  Core Wireless is not

10   against taking the depositions.  We asked Nokia to do that.

11   They have been very cooperative with us with respect to

12   their employees but they basically said they didn't feel

13   they had the obligation to produce witnesses who are not

14   employees.

15         Basically there's no outstanding request from the Hague

16   Convention against them.  They're a foreign company.  They

17   have lots of requests all the time.  The sense I get is

18   perhaps they're worried about setting a precedent that

19   people can come in and get -- you know, make some sort of

20   allegation that they are in fact controlling Nokia NSN and

21   they don't want to make that.  That's my speculation.

22   That's not Nokia's -- I don't know what Nokia lawyers would

23   say about that.

24         So basically they said that they don't feel they have

25   the obligation to do so.  So they're not employed by us.  We

1    don't -- we can't control NSN.  In fact, separately we

2    actually contacted the counsel for NSN and asked them to

3    provide the witnesses to see if they would do it themselves,

4    so we directly contacted them and we have not received a

5    response from NSN yet.

6                THE COURT:  Well, in part, one of my issues is

7    that -- so Forssell is a named inventor?

8                MR. ALLISON:  Right.

9                THE COURT:  Now, I will say I sometimes question the

10   import of the inventor testimony, but that's -- I understand a

11   deposition of an inventor is typically done and, you know, may

12   have some importance.  The ultimate import at trial sometimes I

13   question, but a deposition, that's something else.

14       But why -- you know, how can that person -- I

15   understand, you know, there are I guess -- I assume Apple is

16   going through the Hague Convention to try to obtain the

17   deposition.  I understand going through that, but it's like

18   they're -- the problem is you're getting certain cooperation

19   from Nokia.  That's the way it looks.  And this is a named

20   inventor and this is a subsidiary of Nokia.  I don't

21   really --

22                MR. ALLISON:  Right.

23                THE COURT:  The relevance is they're a named

24   inventor.  If this was just somebody tangentially related,

25   that's one thing, but I don't really -- it's hard for me to see

1    how this person should not or could not be produced.

2           MR. ALLISON:  Again, you're talking to the wrong

3    lawyer here.  Basically we have asked Nokia for cooperation.

4    They are willing to give us their employees.  They apparently

5    aren't willing to give us non-employees, and that's about what

6    we can do.  We don't control Nokia.  We don't control their

7    actions.  And we in fact tried -- earlier in the case we

8    actually -- all the non-Nokia inventors we tried to contact to

9    see if we could get them.  Our position is we like to have as

10   many inventors at trial as we possibly can, and we would be

11   very happy to have Mika Forssell at trial if he were available.

12          THE COURT:  Okay.  Let me --

13          MR. ALLISON:  We called him and he didn't --

14          THE COURT:  So what am I supposed to do with this,

15   Mr. Mueller?

16          MR. MUELLER:  Here's what I suggest, Your Honor.  I

17   guess one note and one suggestion.

18      If you look at page seven, Your Honor, of our

19   opposition brief, we have a chart -- I'm sorry.  Page seven

20   of our opening brief we have a chart that lists the various

21   witnesses that are in play, and Mr. Sebire is not in play

22   anymore, but it lists the remainder and it shows the

23   employer for each one.  Two of the witnesses that are being

24   made available to Core Wireless are at NSN.

25          MR. ALLISON:  That's not correct.

1    MR. MUELLER:  Well, in any event, Mr. Toskala was at

2  NSN?

3    MR. ALLISON:  He's currently at NSN.

4    MR. MUELLER:  So at least one of them is at NSN.

5  Moreover, as we sort of laid out in our reply brief, this is a

6  company, NSN, that Nokia says in securities filings to the SEC

7  it effectively directs and controls, lists its employees as

8  part of its corporate organization.  It's a wholly owned

9  subsidiary.

10    You know, if Nokia were here, you could ask them what's

11  the basis and there really is none.  But I think what you

12  can do, and this is my suggestion, Your Honor, if you were

13  to say to Core Wireless that the Court would preclude the

14  Nokia witnesses unless we get access to the ones we've

15  requested as well, that will create a very strong incentive

16  for Nokia, who's behind the curtain in this case, to make

17  available those witnesses.  I think we would in short order

18  see them produced.  And that's a remedy Your Honor has the

19  power to issue, preclusion unless they produce the witnesses

20  that we've requested as well, and that's the way to level

21  the playing field.

22    THE COURT:  Mr. Allison, Mr. Toskala is NSN and he is

23  being produced?

24    MR. ALLISON:  He was -- basically we called

25  Mr. Toskala ourselves early in the case when we were trying to

1   call all non-Nokia employees, and he agreed to cooperate with

2   us.  He's one of the few that did agree to cooperate with us.

3   We did not get him through cooperation of Nokia.  We got him

4   because he was a person that was interested in cooperating.

5       Mr. Vialen was the same thing.  He works at a different

6   company as well.  We called him and he seemed amenable to

7   working with us and appearing for deposition.

8           THE COURT:  So your position on the SEC filings, NSN,

9   subsidiary of Nokia, they rely on that and say look, it's one

10  and the same, they control these people, it's just a shell game

11  here.

12          MR. ALLISON:  Well, first of all, Nokia -- it was

13  Nokia Siemens.  In 2007 Nokia Siemens was formed.  It was a

14  joint venture between Nokia and Siemens.  It was run as a

15  completely separate company and it ran that way for many years.

16  Last year apparently Siemens withdrew from that grouping and

17  Nokia became the sole owner again.

18      Again, I'm not a Nokia lawyer, but my understanding is

19  these are run as completely separate companies.  They're the

20  same as they were when it was Nokia Siemens.  They have

21  different legal counsel.  They have different officers.

22  They have different product lines.  They're just not the

23  same company.  That seems to be the issue we're getting.

24  Again, this what we're getting from public information and,

25  you know, discussions with Nokia.

1      THE COURT:  Well, here's what I'm going to do.  My

2  preliminary order on this is that those associated with Nokia,

3  in other words, what I think it boils down to is Melin,

4  Malkamaki, Toskala and Lilja, I'm going to preclude them from

5  testifying at trial.  Now, that's preliminary.  In other words,

6  it's not final or anything, but I need to see the way the rest

7  of this case goes.

8      Now, Apple is making a push to depose two people,

9  Forssell and Aho.  They say Forssell is a named inventor and

10  they say Aho has knowledge of Nokia standards related to

11  these patents-in-suit.  If they are produced for deposition,

12  these other witnesses will testify, if that's the desire.

13  If they are not, then I'm going to look at it further.  In

14  other words, I'm not going to prevent you from taking the

15  depositions, but as far as whether they're going to be

16  admitted at trial will depend on the conduct between now and

17  then.

18      MR. ALLISON:  Right.

19      THE COURT:  Again, if they're produced, Forssell and

20  Aho, no problem.  If they're not, then I'm going to need to

21  look and see what happened between now and then and see whether

22  I'll keep my preliminary order in place precluding these other

23  witnesses from testifying or whether I'll lift that order and

24  permit them to testify.

25      But the conduct has got to be -- again, I'm concerned

1    about Nokia's cooperation with Core in bringing this action.

2    They're Nokia patents.  Nokia, Mosaid, Core, they've all

3    kind of come up with this system where we're going to assert

4    these patents.  And that's fine, but you've got some

5    cooperation no doubt from them, but to a limited extent.

6    I'm not going to let Apple just, you know, depose every

7    Nokia employee until the end of time, but on a reasonable

8    basis I think these witnesses could be produced leveling the

9    playing field and permitting everyone to testify and get

10   their cards on the table.

11       Who knows?  None of this may ultimately come in.  I

12   don't know.  Depends on what's said.  Depends on how it

13   goes.  But as a discovery matter, I think to level the

14   playing field, this is going to be my preliminary order.

15   Any questions?

16           MR. ALLISON:  We will convey that to Nokia.

17           THE COURT:  All right.

18           MR. MUELLER:  Thank you, Your Honor.  Nothing

19   further.

20           THE COURT:  All right.  Anything further on any of

21   these motions?  Anything further from Core Wireless?

22           MR. BUNSOW:  No, Your Honor.

23           MR. MUELLER:  No, Your Honor.

24           THE COURT:  Let me before we conclude, just to get --

25   I know we're a ways off from trial but let me ask a couple of

82

1   questions.  What is the length of trial that the parties are

2   now looking at at this point?  Can you give me a ballpark

3   estimate?  Mr. Bunsow, first for the Plaintiff.

4          MR. BUNSOW:  Yes, Your Honor.  From the Plaintiff,

5   ten days.

6          THE COURT:  All right.  Apple?

7          MR. MUELLER:  I think that's about right, Your Honor,

8   within a couple days, plus or minus, but that's about right to

9   me.

10          THE COURT:  How is the -- we've narrowed it to eight

11   patents.  How is the invalidity side of the case going?  In

12   other words, are y'all working well to get this narrowed down

13   to some reasonable numbers?  We have eight patents to deal

14   with.  I presume, I don't know, but eight sets of prior art.

15   How's that going?

16          MR. MUELLER:  Yes, Your Honor, that's right, and I

17   would say two things.  One is the parties entered into a

18   stipulation a few months ago pursuant to which Core Wireless

19   agreed to reduce the number of claims, and they did, and we

20   agreed to reduce the number of prior art references, and we

21   did.

22      I think there will be some further narrowing on both

23   sides with respect to the asserted claims and the prior art,

24   but we're certainly moving in the right direction on both

25   fronts.

83

1              THE COURT:  All right.

2              MR. BUNSOW:  We've just received their expert reports

3    on validity.  Our rebuttal reports are due on Monday, and I

4    think at that time both sides can sort of step back with a view

5    toward simplifying things going forward.

6              THE COURT:  All right.  Good.

7              MR. BUNSOW:  And we're also -- we think the Court's

8    claim construction could have an impact on that as well.

9              THE COURT:  Right.  We're working on that.  We'll get

10   that as soon as we can.

11        Are there any other trial issues out of the ordinary

12   here that the Court can be made aware of?  Anything from the

13   Plaintiff's perspective, any trial issues?

14             MR. BUNSOW:  I can't think of any.

15             THE COURT:  Okay.

16             MR. BUNSOW:  But I haven't had a long time to think

17   about it.

18             THE COURT:  I know it's a ways off.

19             MR. MUELLER:  I think that's right.  I can't think of

20   any, Your Honor.  I do think today was very helpful in

21   providing guidance in the portfolio piece, which really would

22   have been a big wild card.  But if we're limiting to the eight

23   patents-in-suit I think there's nothing I can think of right

24   now that would be outside the realm of ordinary trial practice.

25             THE COURT:  All right.  And I think from what I

84

1    heard, y'all have mediated the case?

2           MR. BUNSOW:  We had a first mediation.  I believe

3    there is in the schedule a second mediation.

4           MR. MUELLER:  I think that's right.

5           MR. BUNSOW:  September?

6           MR. MUELLER:  I'm not sure of the date but I believe

7    that's right.

8           MR. BUNSOW:  Judge Infante oversaw the first

9    mediation.  I assume that he'll oversee the second, although

10   we're certainly open if you want somebody else.  But he is

11   knowledgeable of the case and he's a pretty darn good mediator.

12          MR. MUELLER:  I agree.

13          THE COURT:  All right.  Well, sounds like y'all are

14   on course to continue mediation and I appreciate the time

15   estimates.  Just trying to get an idea at an early stage of

16   what we'll be looking at for scheduling purposes.

17          MR. BUNSOW:  And the parties are talking too as well,

18   Your Honor, independently.

19          THE COURT:  Very good.  Continue to do that.

20       All right.  Anything further?

21          MR. BUNSOW:  No, Your Honor.

22          MR. MUELLER:  No, Your Honor.

23          THE COURT:  All right.  Thank you for your arguments

24   and we're adjourned.

25          MR. MUELLER:  Thank you.

1        MR. BUNSOW:   Thank you.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   I certify that the foregoing is a correct transcript from

22   the record of proceedings in the above-entitled matter.

23

24   _____        _____

     Jan Mason                           Date

25