IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| **CORE WIRELESS LICENSING, S.A.R.L** § § § § | | |
| *Plaintiff,* § § | CIVIL ACTION NO. 6:12-CV-100 | |
| v. § § | JURY TRIAL DEMANDED | |
| **APPLE, INC.** § § | | |
| *Defendant.* § § | | |

**SUBSTITUTE MEMORANDUM OPINION AND ORDER**

The Court's previous Memorandum Opinion and Order (Doc. No. 245) is withdrawn and this Opinion is substituted in its place. This Substitute Memorandum Opinion and Order is made due to the Court's inadvertent inclusion of United States Patent Nos. 6,792,277, 6,788,959, and 6,674,860, which have been dismissed per the Court's Order (Doc. No. 186). Additionally, the Court excises the terms located in Claims 18 and 19 of United States Patent 6,978,143, based on Plaintiff Core Wireless Licensing, S.a.r.l.'s ("Core") representation that they "are no longer in suit." Doc. No. 260 at n.3. Accordingly, an additional objection period shall run from the date of this Substitute Memorandum Opinion and Order, and Core's Unopposed Motion for Leave to File Excess Pages (Doc. No. 257) is **DENIED AS MOOT**.

This Substitute Memorandum Opinion and Order construes terms in United States Patent Nos. 7,383,022 ("the '022 Patent"), 7,599,664 ("the '664 Patent"), 6,978,143 ("the '143 Patent"), and 7,804,850 ("the '850 Patent"). Core alleges Defendant Apple, Inc. ("Apple") infringes the '022, '664, '143, and the '850 Patents (collectively, the "patents-in-suit").

## BACKGROUND

Core filed an Opening Claim Construction Brief (Doc. No. 122). Apple filed a Responsive Claim Construction Brief (Doc. No. 127) addressing some of the arguments raised by Core. Thereafter Core filed a Reply to a narrow subset of Apple's arguments (Doc. No. 134). Additionally, the parties submitted a Joint Claim Construction and Prehearing Statement (Doc. No. 108), including a Joint Claim Construction and Chart attached as Exhibit 1 (Doc. No. 108-1). A *Markman* Hearing was held on October 3, 2013 (Doc. No. 142 "10/03/13 Hr'g Tr.").

Additionally, Apple filed a Motion for Partial Summary Judgment of Invalidity of Claim 9 of U.S. Patent No. 6,266,321 is Based On 35 U.S.C. § 112 ¶2 (Doc. No. 126).[1] The Motion for Partial Summary Judgment was denied. *See* Doc. Nos. 182, 196.

## THE PATENTS

The patents-in-suit generally related to cellular communications. The '022 Patent, and its continuation, the '664 Patent, describe filtering the signal of mobile equipment ("ME"), such as a cell phone, to account for the various conditions experienced by a particular ME as it travels through different areas. This is done using a "forgetting factor," which is used to discount the importance of certain older data relating to older conditions, when appropriate. The '022 and '664 Patents disclose two ways for altering the "forgetting factor": (1) "adjusting the default value of [the forgetting factor];" or (2) replacing the forgetting factor by computing a new forgetting factor with ME specific data. '022 Patent col. 6:52–53; *see id.* col. 59–57.

The '143 Patent details the ways in which a cell phone, rather than a base station, may determine whether to use a dedicated channel or a common channel for packet data transfer. *See* '143 Patent col. 3:53–4:18.

---

[1] At the *Markman* hearing Apple represented that "we're content to stand on our papers on indefiniteness." 10/03/13 Hr'g Tr. 117:18-18.

The '850 Patent describes the reduction of congestion on networks using autonomous transmissions. '850 Patent col. 3:26-60–47.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court

understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The patents-in-suit also contain means-plus-function limitations that require construction. Where a claim limitation is expressed in means-plus-function language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112 ¶ 6. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112(f) "mandates that such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (quoting 35 U.S.C. § 112 ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves multiple inquiries. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "[t]he next step is to determine the corresponding structure described in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the

specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Braun*, 124 F.3d at 1424.

## CLAIM CONSTRUCTIONS

"**modifying the default forgetting factor**" ('022 Patent, claims 1, 13 and 17);

"**modify the default forgetting factor**" ('022 Patent, claim 7);

"**modifying the default forgetting factor**" ('664 Patent, claims 5 and 18); and

"**modifying the default factor**" ('664 Patent, claims 11 and 24)

The central issue with these terms is the meaning of "modify." 10/03/13 Hr'g Tr. at 37:3-6. Core proposes the "[p]lain and ordinary meaning / no construction [is] necessary." Doc. No. 108-1 at 20-22. Apple alleges that the "claims at issue are tied in concrete ways to the modification approach" such that the "factor" can never be replaced outright. Accordingly, Apple proposes "adjusting the default forgetting favor upwards or downwards by an amount determined by the application of a mathematical computation based on the received indication of signal quality." 10/03/13 Hr'g Tr. at 37:22-23; Doc. No. 108-1 at 20-22.

First, Apple argues that the patents both provide for a modification based approach and a replacement based approach. '022 & '664 Patents col. 7:14-21 (describing "correct or refine" allegedly in contrast with "discarded").[2] Additionally, Apple alleges that the prosecution history of the '022 Patent demonstrated a difference between "modify" and "replace." Doc. No. 127 at 13 (citing the abandoned parent application of the '022 Patent, Apple identifies claim 13 which recited "modify" and contrasts it with claim 14 which recited "replace," arguing that "the inventors intended these as alternative techniques"). Based on these two arguments Apple contends that the claims at issue are directed only to the "modify" embodiment. *Id.* at 14.

---

[2] The '664 patent is a continuation of the '022 patent, and as a result they share substantially identical specifications.

6

Core contends that the plain meaning of "modify" includes "replacing" because modification includes "changing," and "changing" necessarily includes replacing as a subtype of replacing. Doc. No. 134 at 4-5 (explaining that the language of the abandoned parent application of the '022 Patent provides "no evidence that the applicants intended the terms ['modify' and 'replace'] to be mutually exclusive alternatives). Core bolsters its position with an array of citations to the specification demonstrating that many different terms were used to describe "changing" the "factor." Doc. No. 134 at 4; '022 Patent cols. 3:26 ( "modify"), 7:3 ("modified or replaced forgetting factor"), Fig. 4 ("adjust or replace"), 1:57 ("replace"), 3:29 ("replace"), 2:2 ("adjusted"), 6:48 ("adjust"), 4:11 ("change"), 6:52 ("refined"), 7:17 ("correct or refine"), 6:65 ("revised"); '664 Patents cols. 3:34 ( "modify"), 7:3 ("modified or replaced forgetting factor"), Fig. 4 ("adjust or replace"), 1:61 ("replace"), 3:37 ("replace"), 2:7 ("adjusted"), 6:48 ("adjust"), 4:17 ("change"), 6:51 ("refined"), 7:16 ("correct or refine"), 6:66 ("revised").

Accordingly, in view of the absence of any evidence which clearly establishes "modify" and "replace" are mutually exclusive, and in view of the myriad of uses of "modify," "replace," "adjust," "change," refine," "correct," and "revise" in the specification of the '664 and '022 Patents, no construction is necessary.

"**means for sending uplink packet data to the system using a selected channel, wherein the selected channel is either a common channel (RACH) or a dedicated channel (DCH)**" ('143 Patent, claim 17)

At the hearing, the parties agreed to the function and structure for this term. Accordingly, the function is "sending uplink packet data to the system using a selected channel;" the structure is "antenna 801, switch 802, control unit 803, burst generator 822, modulator RF transmitter 823, as shown in Fig. 8 and in Fig. 6, steps 670 and 690, and as described in the Patent at 7:4-13; 7:17-20; 7:24-28; and statutory equivalents thereof." *See* 10/03/13 Hr'g Tr. at 55:18-56:13.

"**means for comparing said threshold value of the channel selection parameter to a current value of the channel selection parameter for basis of said channel selection**" ('143 Patent, claim 17); and

The parties agree that these terms are means-plus-function limitations governed by 35 U.S.C. § 112(f), and agree that the claimed function for the first term is "comparing said threshold value of the channel selection parameter to a current value of the channel selection parameter for basis of said channel selection," and the function for the second term is "comparing a current value of the last channel selection parameter sent to the mobile station to said calculated value of the channel selection parameter." Doc. No. 108-1 at 15-17.

With respect to the structure for both, Core proposes:

> A control unit 803 wherein the control unit 803 is programmed to control the comparison of the threshold value of the channel selection parameter to the current value of the channel selection parameter in accordance with the algorithm shown in Fig. 6, step 650, and described in 6:20-39; 7:17-20; and 7:24-28 of the '143 specification.

*Id*. For the first term Apple proposes:

> A control unit 803 programmed to compare the threshold value of a channel selection parameter to a current value of the channel selection parameter and provide the comparison result to a channel selection function within the mobile station, wherein the control unit 803 is programmed to control the comparison of the threshold value of the channel selection parameter to the current value of the channel selection parameter in accordance with the algorithm shown in Fig. 6, steps 650-660, and described in 6:20-39; 7:17-20; and 7:24-28 of the '143 specification.

*Id*. For the second term Apple proposes:

> A control unit 803 programmed to compare a current value of the data packet size to the computed value of the maximum allowed RLC-PDU size for the RACH channel and provide the result to a channel selection function within the mobile station, wherein the control unit 803 is programmed to control the comparison of the current value of the data packet size to the computed value of the maximum allowed RLC-PDU size for the RACH channel and provide the result to a channel selection function within the mobile station in accordance with the algorithm described in 6:22-47; 7:17-20; and 7:24-28 of the '143 specification.

*Id*.

The central dispute between the parties is whether the "control unit" structure proposed in both Core and Apple's constructions falls within the rule of *WMS Gaming*, such that the "control unit" is a general purpose processor necessitating an algorithm to further define the structure performing the "comparing" function. *See WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."); *see also U.S. Ethernet Innovations, LLC v. Ricoh Americas Corp.*, 6:12-cv-235, Doc. No. 283 at 12 (E.D. Tex. Aug. 20, 2013) (This Court has previously found "that [a] comparator [] is a corresponding structure for [a] 'comparing function.'").

Apple argues *WMS Gaming* applies because the "control unit" is a "general purpose processor involving specialized software." 10/03/13 Hr'g Tr. at 61:23-25. Specifically, Apple points to a portion of the specification which provides that "the control unit that controls the other blocks executes the block control functions according to specialized software." '143 Patent col. 7:25-26.

It appears that Core essentially agrees with Apple regarding the structure, except that Core seeks to avoid a finding that the "control unit" falls within the rule of *WMS Gaming*, and therefore does not require reference to an "algorithm" within the construction. *See* 10/03/13 Hr'g Tr. at 67:14-18 (Mr. Allison, for Core, argued that "the dispute is a fairly narrow one we're having here. We have agreed that that's the description of the particular control unit 803, and we're not contesting that and are content to say that's what we should show the jury. I guess the slight disagreement that we have remaining is that we – we are concerned that because casting this *WMS Gaming* language, that the jury might think that it has to be some sort of exact replica

9

of an algorithm in the specification and not allow the full scope of the invention."). Additionally, Core does not object to the Court's removal of references to figures and the specification which Core intended as mere examples of the things which the "control unit" controls. *See* 10/03/13 Hr'g Tr. at 59:25-60:2, 66:3-4 (Core indicating agreement with the Court's proposed construction).

Specifically, Core argues that language describing how "the control unit that controls the other blocks executes the block control functions according to special software" does not place "control unit" within the scope of *WMS Gaming* because "it [does not] say that the control unit is a general purpose processor, [only that it] use[s] software." '143 Patent col. 7:25-26; 10/03/13 Hr'g Tr. at 58:16-22. Core also contends that the claim language at issue does not invoke *WMS Gaming* because the specification makes a merely "technical point" "that [the] 'special' means that the control unit controls [are] sending, . . . receiving, and [also] comparing." 10/03/13 Hr'g Tr. at 58:25-59:5.

Given Core's general agreement with the structure identified by Apple, and the examples provided with respect to that structure in the specification, the Court finds that the rule of *WMS Gaming* is applicable to the "control unit" because the "control unit" "controls" as directed by "special software." '143 Patent col. 7:25-28 (referring to Figure 8, the specification provides that "the ***control unit that controls the other blocks*** executes the block control functions according to ***special software***, thus realizing the above-described block functions according to the invention.") (emphasis added); *see also* '143 Patent cols. 7:4-42 (describing how the control unit, using "special software," controls other blocks such as "block 833 [which] performs signal processing and block 820 [which] encrypts the processed signal [and] block 821 [which]

interleaves the signal [and] block 822 [all of] which are modulated and amplified into a RF signal in block 823 [which is] transmitted [by the] antenna 801 by means of switch 802").

Thus, in view of the agreement between Core and Apple, as well as the disclosure of "special software," the algorithm provided in Figure 6, and the vague description of "control unit," the Court finds that the structure disclosed in the specification which performs the claimed function includes an algorithm executed by "control unit" 803. '143 Patent col. 7:25-26 ("[T]he control unit that controls the other blocks executes the block control functions according to special software."); *id.* Fig. 6; *id* col. 5:58-60 ("FIG. 6 shows a flow chart of a method according to the invention for transferring packet data."); Doc. No. 108-1 at 15-17 (both Core's and Apple's proposed construction reference "Fig. 6" with respect to how the "control unit 803" controls); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d at 1348 ("The instructions of the software program that carry out the algorithm electrically change the general purpose computer by creating electrical paths within the device. These electrical paths create a special purpose machine for carrying out the particular algorithm") (citing *In re Alappat*, 33 F.3d 1526, 1545 (Fed. Cir. 1994)).

Accordingly, the Court construes the means-plus-function limitation as follows: the function for the first term is "comparing said threshold value of the channel selection parameter to a current value of the channel selection parameter for basis of said channel selection;" the function for the second term is "comparing a current value of the last channel selection parameter sent to the mobile station to said calculated value of the channel selection parameter;" the structure for the first terms is:

> A control unit 803 wherein the control unit 803 is programmed to control the comparison of the threshold value of the channel selection parameter to the current value of the channel selection parameter in accordance with the algorithm

>shown in Fig. 6, step 650, and described in 6:20-39; 7:17-20; and 7:24-28 of the '143 specification; and statutory equivalents thereof; and

the structure for the second term is:

>A control unit 803 wherein the control unit 803 is programmed to control the comparison of the current value of the last channel selection parameter sent to the mobile station to said calculated value of the channel selection parameter, in accordance with the algorithms shown in Fig. 6, steps 650, and described in 6:20-39; 7:17-20; and 7:24-28 of the '143 specification; and statutory equivalents thereof.

"**means for receiving a threshold value of a channel selection parameter from the system**" ('143 Patent, claim 17)

The parties agree that this term is a means-plus-function limitation governed by 35 U.S.C. § 112(f), and agree that the claimed function is "receiving a threshold value of a channel selection parameter from the system." Doc. No. 108-1 at 14-15

With respect to the structure, Core proposes:

>An antenna 801, switch 802, control unit 803, RF receiver 811, and detection demodulator 812, as shown in Fig. 8, for receiving a threshold value of a channel selection parameter from the system, where the control unit 803 controls the reception blocks in accordance with the description in 6:56-62; 7:1-3; 7:14-17; and 7:24-28 of the '143 specification.

*Id*. Apple proposes:

>An antenna 801, switch 802, control unit 803, RF receiver 811, and detection demodulator 812, as shown in Fig. 8, for receiving a threshold value of a channel selection parameter from the system, where the control unit 803 is programmed to control the reception blocks in accordance with the algorithm described in 6:56-62; 7:1-3; 7:14-17; and 7:24-28 of the '143 specification.

*Id*.

The central issue and arguments are the same as with "means for comparing said threshold value of the channel selection parameter to a current value of the channel selection parameter for basis of said channel selection," above. '143 Patent col. 9:5-16, 10:1-10; 9:17-20; *see* 10/03/13 Hr'g Tr. at 78:6-11 (Core noted that it agreed to the Court's proposed construction

for "means for storing said threshold value of the channel selection parameter" except that "it look[ed] like there may be the same issues with algorithms on 'means for receiving a threshold value of a channel selection parameter from the system'"); *id*. 80:8-13 ("For ['means for receiving a threshold value of a channel selection parameter from the system' Apple offered that it] absolutely could agree [to the Court's 'preliminary proposal'], [a]nd [reiterated that it] believes the algorithm references are correct.").

In view of the Courts construction for "means for comparing said threshold value of the channel selection parameter to a current value of the channel selection parameter for basis of said channel selection," the Court accordingly construes the means-plus-function limitation as follows: the function is "receiving a threshold value of a channel selection parameter from the system;" the structure is:

> An antenna 801, switch 802, control unit 803, RF receiver 811, and detection demodulator 812, as shown in Fig. 8, for receiving a threshold value of a channel selection parameter from the system, where the control unit 803 is programmed to control the reception blocks in accordance with the algorithm described in 6:56-62; 7:1-3; 7:14-17; and 7:24-28 of the '143 specification; and statutory equivalents thereof.

"**means for storing said threshold value of the channel selection parameter**" ('143 Patent, claim 17)

At the hearing, the parties agreed to the function and structure for this term. Accordingly, the function is "storing said threshold value of the channel selection parameter," and the structure is "a memory 804 for storing said threshold value of the channel selection parameter, as described in 5:60-62 and 6:64-7:1 of the '143 specification; and statutory equivalents thereof." *See* 10/03/13 Hr'g Tr. at 79:22-24 (Core agreeing with the Court's proposed construction for "means for storing said threshold value of the channel selection parameter"); *id* at 80:11-13 ("For . . . 'means for storing said threshold value of the channel selection parameter' . . . Apple]

absolutely could agree, your Honor. And again, we believe the algorithm references are correct.").

"**predetermined period**" ('850 Patent, claims 1, 11, 21)

The Court finds that the parties have not presented a meaningful claim scope dispute. Accordingly, the Court finds no construction of this particular term is necessary at this time.

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in Appendix A, attached to this opinion.

**So ORDERED and SIGNED this 7th day of August, 2014.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

# APPENDIX A

| Term | Construction |
|---|---|
| **U.S. Patent Nos. 7,383,022 & 7,599,664** | |
| "**modifying the default forgetting factor**" ('022 Patent, claims 1, 13 and 17); <br><br>"**modify the default forgetting factor**" ('022 Patent, claim 7); <br><br>"**modifying the default forgetting factor**" ('664 Patent, claims 5 and 18); and <br><br>"**modifying the default factor**" ('664 Patent, claims 11 and 24) | No construction is necessary. |
| **U.S. Patent No. 6,978,143** | |
| "**means for sending uplink packet data to the system using a selected channel, wherein the selected channel is either a common channel (RACH) or a dedicated channel (DCH)**" ('143 Patent, claim 17) | As agreed at the hearing: <br><br>**Function:** Sending uplink packet data to the system using a selected channel <br><br>**Structure**: Antenna 801, switch 802, control unit 803, burst generator 822, modulator RF transmitter 823, as shown in Fig. 8 and in Fig. 6, steps 670 and 690, and as described in the patent at 7:4-13; 7:17-20; 7:24-28; and statutory equivalents thereof. |
| "**means for comparing said threshold value of the channel selection parameter to a current value of the channel selection parameter for basis of said channel selection**" ('143 Patent, claim 17); and | **Function:** Comparing said threshold value of the channel selection parameter to a current value of the channel selection parameter for basis of said channel selection <br><br>**Structure:** A control unit 803 wherein the control unit 803 is programmed to control the comparison of the threshold value of the channel selection parameter to the current value of the channel selection parameter in accordance with the algorithm shown in Fig. 6, step 650, and described in 6:20-39; 7:17-20; and 7:24-28 of the '143 specification; and statutory equivalents thereof. |

| | |
|---|---|
| "**means for receiving a threshold value of a channel selection parameter from the system**" ('143 Patent, claim 17) | **Function:** Receiving a threshold value of a channel selection parameter from the system;"<br><br>**Structure:** An antenna 801, switch 802, control unit 803, RF receiver 811, and detection demodulator 812, as shown in Fig. 8, for receiving a threshold value of a channel selection parameter from the system, where the control unit 803 is programmed to control the reception blocks in accordance with the algorithm described in 6:56-62; 7:1-3; 7:14-17; and 7:24-28 of the '143 specification; and statutory equivalents thereof. |
| "**means for storing said threshold value of the channel selection parameter**" ('143 Patent, claim 17) | As agreed at the hearing:<br><br>**Function:** Storing said threshold value of the channel selection parameter<br><br>**Structure:** A memory 804 for storing said threshold value of the channel selection parameter, as described in 5:60-62 and 6:64-7:1 of the '143 specification; and statutory equivalents thereof. |