**Tab A: <u>Apple's Proposed Patent FRAND Damages Instructions</u>**

**FINAL INSTRUCTION NO. [   ]**

**(LICENSING & FRAND PATENT DAMAGES – INTRODUCTION)[1]**

If you find that Apple infringed any valid and enforceable claim of the asserted patents, you must then consider what amount of damages to award to Core Wireless.  I will now instruct you about the measure of damages.  By instructing you on damages, I am not suggesting which party should prevail on the issues of infringement or invalidity or unenforceability.  These instructions are provided to guide you on the calculation of damages in the event you find infringement of a valid and enforceable patent claim and, thus, must address the damages issue.

The damages you award must be adequate to compensate Core Wireless for any infringement you find to have occurred.  They are not meant to punish an infringer.  Your damages award, if you reach this issue, should put Core Wireless in approximately the same financial position that it would have been in had any infringement not occurred.

Core Wireless has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that Core Wireless establishes that it more likely than not suffered.

In this case, Core Wireless seeks a reasonable royalty.  As I will instruct you in more detail shortly, a reasonable royalty is the amount of money that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began, for any patents you have found valid, infringed, and enforceable. Core Wireless has agreed that it is under an obligation to license the patents-in-suit on fair, reasonable, and non-discriminatory or FRAND license terms, and so you must ensure that any

---

[1]      Source:  Adapted from Fed. Cir. Bar Ass'n Model Patent Jury Instructions (May 2014), Instruction No. 6.1 ["Damages—Introduction"] and modified to reflect Core Wireless's FRAND commitments.

reasonable royalty determination you make is consistent with, and does not exceed the amounts

permitted under, Core Wireless's FRAND obligations.  I will provide you with additional

instructions on how the FRAND commitment for the asserted patents affects your determination

of a reasonable royalty.

**FINAL INSTRUCTION NO. [   ]**

**(PATENT DAMAGES -- BURDENS OF PROOF)**[2]

Where the parties dispute a matter concerning damages, it is Core Wireless's burden to prove that it is more probable than not that Core Wireless's version is correct.  Core Wireless must prove the amount of damages with reasonable certainty, but need not prove the amount of damages with mathematical precision.  However, Core Wireless is not entitled to damages that are remote or speculative.

---

[2]      Source:  National Jury Instruction Project, Model Patent Jury Instructions (2009), Instruction No. 6.2 ["Damages—Burden of Proof"].

**FINAL INSTRUCTION NO. [   ]**

**(PATENT DAMAGES -- DATE OF COMMENCEMENT OF DAMAGES)[3]**

In determining the amount of damages, you must determine when the damages began.

Damages commence on the date that Apple has both infringed and been notified of the alleged

infringement of any of the patents-in-suit you have found valid, infringed, and enforceable.

If you find that the any of the patents are valid, infringed, and enforceable, then you must

determine whether those patents have been licensed to a licensee that sells a product that

includes the claimed invention, and, if so, whether the licensee has "marked" that product with

the patent number.  "Marking" is placing either the word "patent" or the abbreviation "pat." with

the patent's number on substantially all of the products that include the patented invention.

Core Wireless has the burden of establishing that it substantially complied with the

marking requirement.  This means that Core Wireless must show that it made reasonable efforts

to ensure that any licensee(s) that made, offered for sale, or sold products under the asserted

patents also marked the products.

If you find that one or more licensees to any patents you have found to be valid,

infringed, and enforceable have not marked relevant product with the patent numbers, you must

determine the date that Apple received actual notice of the asserted patents and the specific

product alleged to infringe.  Actual notice means that Core Wireless communicated to Apple a

specific charge of infringement of the asserted patents by a specific accused product or device.

The filing of the complaint in this case qualified as actual notice, so the damages period for the

patents listed in the complaint begins no later than the date the complaint was filed.  Core

Wireless filed its complaint in this case on February 29, 2012.

---

[3]      Sources:  Adapted from Fed. Cir. Bar Ass'n Model Patent Jury Instructions (May 2014),
Instruction No. 6.8 ["Date of Commencement of Damages—Products"].

In addition to these marking or actual notice requirements, for the method claims at issue in this case, any damages would be limited to any instances where all steps of the method have been performed in the United States by Apple or a person acting under Apple's direction or control.

**FINAL INSTRUCTION NO. [   ]**

**(PATENT DAMAGES -- FRAND REASONABLE ROYALTY)[4]**

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty is the amount of royalty payment that a patent holder and the infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began for any patents you have found valid, infringed, and enforceable.  In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.  In determining this, you must assume that both parties believed the patent was valid and infringed and the patent holder and infringer were willing to enter into an agreement.  The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.  Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.  Although evidence of the actual profits an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

---

[4]      Sources:  Adapted from Fed. Cir. Bar Ass'n Model Patent Jury Instructions (May 2014), Instruction Nos. 6.6 ["Reasonable Royalty – Definition"] and 6.7 ["Reasonable Royalty – Relevant Factors"], and modified to reflect FRAND obligations attendant to patents-in-suit, as set forth in *In re Innovatio IP Ventures, LLC Patent Litig.*, MDL No. 2303, 2013 WL 5593609 at *5-6 (N.D. Ill. Oct. 3, 2013) (relying on *Microsoft Corp. v. Motorola, Inc.*, No. C 10-1823JLR, 2013 WL 2111217 (W.D. Wa. Apr. 25, 2013)); *Realtek Semiconductor, Corp.v. LSI Corp.*, Case No. C-12-3451-RMW, Dkt. No. 296 (Jury Instructions), at 17 [Inst. No. 14 "RAND Determination—Determining a RAND Royalty Rate"] (N.D. Cal., Feb. 23, 2014).

7

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  In particular, because Core Wireless has agreed that it is under an obligation to license the patents-in-suit on FRAND terms, you must take into account how this FRAND commitment would have affected the hypothetical negotiation in determining a reasonable royalty.  Parties would examine the reasonableness of a royalty under the FRAND commitment based on the value of the patented technology alone— including in light of technical alternatives—not any value associated with the standard.  For example, there may have been alternatives to the patented technology available before the standard was set, but if the technology is incorporated in the standard and the standard is widely adopted by the industry, switching to those alternatives may no longer be viable or would be too expensive.  In that circumstance, FRAND patent holders cannot demand more simply because their patented technology was standardized.  FRAND commitments are designed to prevent hold-up, which refers to an attempt to use the alleged standardization of a patent to capture value beyond the inherent value of the patent-in-suit.

Similarly, parties attempting to reach an agreement consistent with FRAND obligations would take into account the overall amount of royalties that a party would need to pay all holders of patents relevant to a standard, often referred to as a "royalty stack," when assessing the reasonableness of the patent holder's requested royalty rate.  If there are a large number of owners of declared-essential patents for a given standard, and they demand unreasonable royalties, then the total royalty payments or royalty stack might make the product too expensive to make or sell.

A FRAND commitment also requires non-discrimination by the patent holder.  That is, the patent holder must treat parties in a similar way, in terms of the royalties the patent holder seeks and how it conducts the license negotiations.

I will now list for you a number of factors you may consider in determining a reasonable royalty for any patents you find to be valid and infringed.  This is not every possible factor, but it will give you an idea of the kinds of things to consider in setting a reasonable royalty.

1.  The royalties received, if any, by the patentee for the licensing of the patents in other circumstances comparable to FRAND–licensing circumstances. [Corresponding to *Georgia-Pacific* Factor 1]

2.  The rates paid by the licensee for the use of other patents comparable to the patents.  [Corresponding to *Georgia-Pacific* Factor 2]

3.  The nature and scope of the license. [Corresponding to *Georgia-Pacific* Factor 3]

4.  The effect of the patented invention in promoting sales of other products of the licensee and the licensor, taking into account only the value of the patented technology and not the value associated with incorporating the patented technology into the standard.  [Corresponding to *Georgia-Pacific* Factor 6]

5.  The established profitability of the products made under the patent, their commercial success and current popularity, taking into account only the value of the patented technology and not the value associated with incorporating the patented technology into the standard.  [Corresponding to *Georgia-Pacific* Factor 8]

6.  The utility and advantages of the patent over alternatives that could have been used instead of the patented technologies in the period before the standard was adopted.  [Corresponding to *Georgia-Pacific* Factor 9]

7.  The importance of the patents-in-suit to the standard as a whole, the technical contribution of the patents-in-suit compared to the technical contributions of other patents essential to the standard, and the technical contribution of the patents-in-suit to the licensee and the licensee's products, taking into account only the value of the patented technology and not the value associated with incorporating the patented technology into the standard.  [Corresponding to *Georgia-Pacific* Factors 10&11]

8.  The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the inventions or analogous inventions that are also covered by FRAND-committed patents.  [Corresponding to *Georgia-Pacific* Factor 12]

9.  The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, significant features or improvements added by the infringer, or the value of the patent's incorporation into the standard.  [Corresponding to *Georgia-Pacific* Factor 13]

10. The opinion testimony of qualified experts.  [Corresponding to *Georgia-Pacific* Factor 14]

11. The amount that a licensor and a licensee would have agreed upon (at the time the infringement began) if both were considering the FRAND commitment and its

purposes, and had been reasonably and voluntarily trying to reach an agreement.

[Corresponding to *Georgia-Pacific* Factor 15]

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors.  The framework which you should use in determining a reasonable royalty is a hypothetical negotiation between normally-prudent business people.

**FINAL INSTRUCTION NO. [    ]**

**(PATENT DAMAGES -- SMALLEST SALABLE UNIT)**[5]

In any case involving multi-component products, such as smartphones and tablet computers, it is generally required that royalties be based not on the entire product, but instead on—at most—the "smallest salable patent-practicing unit."  You may need to further apportion the smallest salable patent-practicing unit to isolate the portion of the realizable profits that should be credited to the asserted patents, as distinguished from elements in the smallest salable patent-practicing unit that are not attributable to the asserted patents in this case.

The entire market value rule is a narrow exception to this general rule.  Under the "entire market value" rule, a patent owner may recover a reasonable royalty based on the value of an entire apparatus or product containing several features, even though only one feature is patented.  However, the "entire market value" rule only applies where the patent owner proves that the consumer demand for the entire product is attributable to the patented feature.

---

[5]     <u>Sources</u>:  *LaserDynamics, Inc. v. Quanta Computer. Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012)  ("We reaffirm that in any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable patent-practicing unit, without showing that the demand for the entire product is attributable to the patented feature."); *WhitServe, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 27 (Fed. Cir. 2012) ("When a hypothetical negotiation would have yielded a running royalty, the classic way to determine the reason-able royalty amount is to multiply the royalty base, which represents the revenue generated by the infringement, by the royalty rate, which represents the percentage of revenue owed to the patentee."); *Lucent Techs., Inc. v. Gateway, Inc.* 580 F.3d 1301, 1336 (Fed. Cir. 2009); *Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1549 (Fed. Cir. 1995); *In re Innovatio IP Ventures, LLC Patent Litig.*, MDL No. 2303, 2013 WL 5593609 at *38-43 (N.D. Ill. Oct. 3, 2013).

**FINAL INSTRUCTION NO. [   ]**

**(PATENT DAMAGES -- LUMP SUM ROYALTY)**[6]

Another way to calculate a royalty is to determine a one-time lump sum payment that the infringer would have paid at the time of the hypothetical negotiation for a license covering all sales of the licensed product both past and future.  This differs from payment of an ongoing royalty where a royalty rate is applied against future sales as they occur.  When a one-time lump sum is paid, the infringer pays a single price for a license covering both past and estimated future infringing sales.  It is up to you, based on the evidence, to decide what type of royalty is appropriate in this case.

---

[6]     Source:  Excerpted from Model Patent Jury Instructions for the Northern District of California (2011), Instr. No. 5.7 [Reasonable Royalty—Definition].

**Tab B: <u>Apple's Proposed Breach of Contract Instructions</u>**

**FINAL INSTRUCTION NO. [   ]**

**(BREACH OF CONTRACT -- APPLE'S CLAIM)**[7]

I will now instruct you regarding Apple's claim that Core Wireless has breached certain contractual obligations related to the asserted patents.

Core Wireless and the company that owned the asserted patents prior to Core Wireless, Nokia Corporation ("Nokia"), submitted declarations to the European Telecommunications Standards Institute ("ETSI"), identifying the asserted patents, or related patents, as Intellectual Property Rights ("IPRs") for which they were "prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ('FRAND') terms."

Core Wireless does not dispute that under the ETSI IPR Policy, it has a contractual obligation to be prepared to grant irrevocable licenses on FRAND terms to Apple for the asserted patents.  Apple alleges that Core Wireless has breached its contractual obligations in one or more of the following three ways:

First, by filing this lawsuit against Apple without first negotiating with Apple and/or making an offer to Apple to license the asserted patents on FRAND terms;

Second, by not offering FRAND license terms for the individual asserted patents; and/or

Third, in discriminating against Apple by selectively suing Apple prior to initiating license negotiations.

---

[7]     Sources: Adapted from *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823-JLR, Tr. Trans., 106-08  (W.D. Wash. Aug, 26, 2013); *Apple Inc. v. Samsung Elecs. Co.*, No. 5:11-CV-01846-LHK, Dkt. No. 1901 (Final Jury Instructions) (N.D. Cal., Aug 21, 2012); Expert Report of Professor Vernon Valentine Palmer Regarding French Contract Law (April 4, 2014).

If you conclude, by a preponderance of the evidence, that Core Wireless has (1) engaged in any of the conduct described above, you must then consider, (2) whether such conduct constitutes a breach of Core Wireless's contractual obligations.

To determine whether Core Wireless's conduct constitutes a breach of its contractual obligations you must consider whether Core Wireless took reasonable steps to meet its obligation of being prepared to grant irrevocable licenses to Apple on fair, reasonable, and non-discriminatory terms for each of the asserted patents.[8]

If you conclude that Core Wireless breached its contractual obligations, you must then consider whether Apple has been harmed by this breach.

If you conclude that Apple has been harmed by Core Wireless's breach, you must consider whether an award of damages to Apple is appropriate.

---

[8]    Section 6.1 of the ETSI IPR Policy requires that members declaring patents or patent applications as potentially essential to a technical standard must make an "irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory terms and conditions."

**FINAL INSTRUCTION NO. [   ]**

## (CONTRACT DAMAGES -- APPLE'S CLAIM)[9]

It is the duty of the court to instruct you as to the measure of damages.  By instructing you on damages the court does not mean to suggest for which party your verdict should be rendered.  In order to recover damages, Apple has the burden of proving that Core Wireless breached its contractual obligations, and that Apple incurred damages as a result of the breach, and the amount of those damages.

If your verdict is for Apple on its breach of contract claim, and if you find that Apple has proved that it incurred damages and the amount of those damages, then you shall award damages to Apple.  The burden of proving damages rests with Apple.

Apple claims that is has been injured as a result of Core Wireless's contractual breaches because it has incurred expenses in defending against this lawsuit, including retaining experts to defend against Core Wireless's infringement claims.

If you find that Core Wireless breached its contractual obligations and that Apple was harmed as a result, but you find that Apple has failed to prove damages as defined in these instructions, you must award nominal damages.  Nominal damages must be greater than zero and may not exceed $1.00.

It is for you to determine what damages, if any, Apple has proven.  Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

---

[9]     Sources: Adapted from *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823-JLR, Tr. Trans., 106-08  (W.D. Wash. Aug, 26, 2013); *Apple Inc. v. Samsung Elecs. Co.*, No. 5:11-CV-01846-LHK, Dkt. No. 1901 (Final Jury Instructions) (N.D. Cal., Aug. 21, 2012).

**FINAL INSTRUCTION NO. XX**

**(BREACH OF CONTRACT -- CORE WIRELESS'S CLAIMS)**[10],[11]

I will now instruct you regarding Core Wireless's claims that Apple has breached

contractual obligations related to the asserted patents.  Core Wireless has two such claims.

      1.     <u>Breach of Contract (Apple/Core Wireless License)</u>.

Core Wireless alleges that Apple has entered into a license agreement with Core Wireless

based on the fact that Nokia and Core Wireless have declared the asserted patents as potentially

essential to the GSM and UMTS standards and because Apple sells products that operate on

GSM and UMTS networks.  Apple disputes that it has entered into a license agreement with

Core Wireless, and that any such license exists.  The parties agree that Apple and Core Wireless

have not signed a written agreement with each other that constitutes a license agreement for the

asserted patents.  In determining whether or not a license agreement for the asserted patents

exists between Apple and Core Wireless, you should consider that in order for a contract to be

formed, each party must have understood the nature of the agreement and agreed to enter into it.

You should also consider in light of the testimony of expert witnesses you have heard during this

trial and my instructions to you, whether Core Wireless has proven that its contract theory has a

proper basis in the laws of France, which govern the ETSI IPR Policy.

---

[10]    <u>Sources</u>: Adapted from *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823-JLR, Tr. Trans., 106-08  (W.D. Wash. Aug, 26, 2013); *Apple Inc. v. Samsung Elecs. Co.*, No. 5:11-CV-01846-LHK, Dkt. No. 1901 (Final Jury Instructions) (N.D. Cal., Aug. 21, 2012); Expert Report of Professor Vernon Valentine Palmer Regarding French Contract Law (April 4, 2014) (citing Article 1108 of the French Civil Code).

[11]    As noted in its cover pleading, Apple's submission of proposed instructions for Core Wireless's contract claims is not a waiver of Apple's position that the jury should not be instructed on these legally deficient claims, and that the claims should be dismissed as a matter of law.  But to the extent the Court does not resolve these claims as legal issues before trial and the jury is so instructed, it should be required to find the factual predicates that would support such claims if they were legally viable (and they are not)—including the threshold predicate of an actual binding contract..

If you determine that there is no license agreement between Apple and Core Wireless for the asserted patents, you may stop deliberating this claim.

If you conclude that there is a license agreement between Core Wireless and Apple for the asserted patents, you must consider whether Apple has breached the terms of that license agreement.  Core Wireless bears the burden of establishing what the terms are in the agreement in order to establish that Apple breached them.  Core Wireless alleges that the license agreement requires Apple to pay Core Wireless FRAND royalties—even without proof that Apple is even using the Core Wireless patents, or that they are valid and enforceable.  If you conclude that a license agreement exists but does not include such obligations, you may stop deliberating this claim.

Core Wireless alleges that Apple has breached the alleged agreement in one or more of the following three ways:

First, Apple has refused to negotiate a FRAND royalty with Core Wireless for the asserted patents;

Second, Apple did not respond sufficiently quickly to correspondence from Core Wireless;[12] and

Third, Apple has refused to pay a FRAND royalty for Core Wireless's asserted patents.

If you conclude, by a preponderance of the evidence, that Apple has (1) engaged in any of the conduct described above, you must then consider, (2) whether such conduct constitutes a breach of Apple's alleged agreement with Core Wireless, if any such agreement exists.

If you conclude that such conduct is a breach of Apple's license agreement with Core Wireless, you must then consider whether Core Wireless has been harmed by this breach.

---

[12]     In providing this instruction, Apple does not concede—and expressly reserves its right to object to—the jury hearing evidence regarding the parties' discussions.

If you conclude that Core Wireless has been harmed by Apple's breach, you must consider whether an award of damages to Core Wireless is appropriate.

2.      Core Wireless's Breach of Contract (Apple/ETSI Agreement).

Core Wireless alleges that by virtue of its membership in ETSI, Apple has agreed to pay FRAND royalties to all standard essential patent owners for the use of their patents that are implemented in the GSM and/or UMTS standards, including the patents-in-suit.  Core Wireless alleges that it is a third party beneficiary of Apple's membership in ETSI.

Apple disputes that its membership in ETSI requires it to pay royalties for any of the asserted patents without proof that Apple is actually using the patent and that it is valid and enforceable.  Apple also disputes that it has used the Core Wireless asserted patents, and denies that they are valid and enforceable.  Finally, Apple disputes that Core Wireless is a third-party beneficiary of Apple's membership in ETSI.

You must first conclude whether or not membership in ETSI creates a contractual obligation to pay royalties without proof of infringement, validity, and enforceability.  You should also consider in light of the testimony of expert witnesses you have heard during this trial and my instructions to you, whether Core Wireless has proven that its contract theory has a proper basis in the laws of France, which govern the ETSI IPR Policy.  If you determine that no such obligation exists, you may stop deliberating this claim.

If you determine that membership in ETSI does create a contractual obligation to pay royalties, you must then consider whether Apple is using the patents in suit, whether they are actually essential to a GSM or UMTS standard, and whether they are valid and enforceable.  If you conclude that Apple is not using the asserted patents, that they are not actually essential to a

GSM or UMTS standard, and/or that the patents are not valid and enforceable, you may stop deliberating this claim.

If you determine that Apple is using the asserted patents and that the patents are valid and enforceable, you must consider whether Core Wireless is a third-party beneficiary of Apple's membership in ETSI.

If you conclude that Core Wireless is a third-party beneficiary, you must then consider whether Apple has breached a contractual obligation.  Core Wireless alleges that Apple has breached in one or more of the following three ways:

First, Apple has refused to negotiate a FRAND royalty with Core Wireless;

Second, Apple did not respond sufficiently quickly to correspondence from Core Wireless[13]; and

Third, Apple has refused to pay a FRAND royalty for Core Wireless's asserted patents.

If you conclude that such conduct is a breach of Apple's agreement with ETSI, you must then consider whether Core Wireless has been harmed by this breach.

If you conclude that Core Wireless has been harmed by Apple's breach, you must consider whether an award of damages to Core Wireless is appropriate.

---

[13]    In providing this instruction, Apple does not concede—and expressly reserves its right to object to—the jury hearing evidence regarding the parties' discussions.

**FINAL INSTRUCTION NO. XX**

**(CONTRACT DAMAGES -- CORE WIRELESS'S CLAIMS)**[14]

      I have instructed you on the measure of damages with respect to Apple's breach of contract claim, and will now instruct you on the measure of damages with respect to Core Wireless's breach of contract claims.  You will recall that by instructing you on damages the court does not mean to suggest for which party your verdict should be rendered.  In order to recover damages, Core Wireless has the burden of proving that Apple was under a contractual obligation to Core Wireless with respect to the asserted patents, that Apple breached its contractual obligations, and that Core Wireless incurred damages as a result of the breach, and the amount of those damages.

      If your verdict is for Core Wireless on one or more of its breach of contract claims, and if you find that Core Wireless has proved that it incurred damages and the amount of those damages, then you shall award damages to Core Wireless.  Core Wireless must prove the amount of damages for Apple's alleged contractual breach with reasonable certainty, but need not prove the amount of damages with mathematical precision.  However, Core Wireless is not entitled to damages in excess of any losses it sustained as a direct result of Apple's alleged breach with respect to the asserted patents, or to damages that are remote or speculative.

      It is for you to determine what damages, if any, Core Wireless has proven.  Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

      However, the sole method by which a patent holder is entitled to a reasonable royalty for the use of its patents is through an award of patent damages after a finding of patent

---

[14]    <u>Sources</u>: Adapted from *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823-JLR, Tr. Trans., 106-08  (W.D. Wash. Aug, 26, 2013); *Apple Inc. v. Samsung Elecs. Co.*, No. 5:11-CV-01846-LHK, Dkt. No. 1901 (Final Jury Instructions) (N.D. Cal., Aug 21, 2012).

infringement.  Accordingly, to the extent that you award any damages to Core Wireless for its breach of contract claims, the amount of such damages should reflect only Core Wireless's proven damages directly resulting from Apple's contractual breach.  Moreover, to the extent that you award Core Wireless any damages on its infringement claims, you must ensure that you are not giving Core Wireless a "double recovery" by also awarding damages on its contract claim for alleged use of the Core Wireless asserted patents.

**FINAL INSTRUCTION NO. [   ]**

**(CONTRACT DAMAGES – DUTY TO MITIGATE)**[15]

A party that claims damages resulting from a breach of contract by another party has a duty under the law to use reasonable diligence to mitigate—in other words, avoid—those damages.

In this case, both Apple and Core Wireless assert that the other party has breached a contractual obligation, and that this breach warrants an award of damages.

If you conclude that either Apple or Core Wireless proved a breach of contract that warrants an award of damages, you must also consider whether Apple or Core Wireless could have mitigated those damages.

If you find by a preponderance of the evidence that Apple or Core Wireless unreasonably failed to take advantage of an opportunity to lessen its damages, you should deny it recovery for those damages that it could have avoided had it taken advantage of the opportunity.  For example, Core Wireless alleges that Apple has refused to pay Core Wireless FRAND royalties for the asserted patents.  You may consider whether Core Wireless's alleged failure to offer Apple license terms for the individual asserted patents as requested by Apple mean that Core Wireless did not mitigate its purported damages.

The requirement that a prevailing party in a breach of contract dispute mitigate damages does not require that it exercise unreasonable efforts or incur unreasonable expenses in mitigating the damages.  The breaching party has the burden of proving the damages that the non-breaching party could have mitigated.  In deciding whether to reduce any award of damages

---

[15]     Fifth Circuit Pattern Jury Instructions—Civil (2006) Instruction No. 15.15 ["Mitigation of Damages"].

because of a failure to mitigate, you must weigh all the evidence in light of the particular

circumstances of the case, using sound discretion in deciding whether the breaching party has

satisfied its burden of proving that the non-breaching party's conduct was not reasonable.

# Tab C: <u>Apple's Proposed Unenforceability And Authority To Practice Instructions</u>

**FINAL INSTRUCTION NO. [   ]**

**(APPLE'S WAIVER DEFENSE)**[16]

In this case, Apple has raised the affirmative defense to Core Wireless's infringement claims that Nokia waived the right to enforce four of the asserted patents: the '850, '022, '664, and '143 patents. I will refer to these four patents as the "allegedly unenforceable patents."

In order to prove waiver, Apple must show by clear and convincing evidence that Nokia, the prior owner of the asserted patents, had an obligation to speak or otherwise take action to notify ETSI of the allegedly unenforceable patents and knowingly failed to do so. Detrimental reliance on the part of Apple or prejudice suffered by Apple is not an element of waiver.

Nokia was under an obligation to speak or otherwise take action because of its membership in ETSI and its participation in standard-setting activities. The ETSI Intellectual Property Rights Policy requires that members:

> submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of the MEMBER'S IPR [Intellectual Property Rights] which might be ESSENTIAL if that proposal is adopted. (ETSI IPR Policy, Section 4.1)

This provision requires members submitting a technical proposal for a standard to disclose its patents or patent applications that might be essential to the standard before the standard is adopted. The purpose is to ensure that when selecting technologies for standardization, ETSI members understand which technologies have been patented and might be

---

[16]     Sources: *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1347-48 (Fed. Cir. 2011); *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1019-1022 (Fed. Cir. 2008); *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F.Supp.2d 1061, 1086 (W.D. Wis. 2012); *Apple Inc. v. Samsung Elecs. Co.*, No. 5:11-CV-01846-LHK, Dkt. No. 1901 (Final Jury Instructions) (N.D. Cal., Aug. 21, 2012); *Qualcomm Inc. v. Broadcom Corp.*, No. 05-CV-1958-B (BLM) Tr. Trans. Vol. X at 8-9 (S.D. Cal., Jan. 26, 2007).

the subject of royalty claims.  That could be a factor in their decision as to which technology to select for standardization.

Core Wireless does not dispute that Nokia made technical proposals related to the allegedly unenforceable patents.  It is for you to determine whether Nokia failed to disclose one or more of the allegedly unenforceable patents to ETSI or its sister organization, 3GPP, before the relevant standard was adopted.

Nokia's subsequent transfer of the patents to Core Wireless does not affect whether Nokia's standard-setting conduct rendered the patents unenforceable.

**FINAL INSTRUCTION NO. [   ]**

## (APPLE'S EQUITABLE ESTOPPEL DEFENSE)[17]

The owner of a patent may forfeit its right to any relief from an alleged infringer where: (1) the patent holder communicates something in a misleading way to the infringing party about the lack of infringement or about not being sued, (2) the infringer relies upon the misleading communication from the patent holder, and (3) the infringer will be materially harmed if the patent holder is allowed to assert a claim relating to the issue that is inconsistent with the patent holder's prior misleading communication.  This is referred to as an "equitable estoppel" and it is a defense that Apples contends precludes any recovery by Core Wireless in this lawsuit for its infringement claims as to the allegedly unenforceable patents.  Apple must prove each of these elements by a preponderance of the evidence, but even if all these elements are proven, equitable estoppel need not be found if such a finding would be unfair in light of the conduct of the parties.

Specifically, Apple contends that before Core Wireless filed this lawsuit, Nokia, the former patent holder for the patents at issue here, made misleading communications to the European Telecommunications Standards Institute about whether the allegedly unenforceable patents (or members of those patent families) might be essential to the GSM and UMTS standards.  A communication may be made through written or spoken words, conduct, silence, or a combination of words, conduct, and silence.  Conduct may include action or inaction.

---

[17]     Sources: Adapted from The Federal Circuit Bar Association, *Model Patent Jury Instructions* (May 2014) § 5.3; *see also Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1086 (W.D. Wis. 2012); *Barnes & Noble, Inc., v. LSI Corp.*, 849 F. Supp. 2d 925, 940-41 (N.D. Cal. 2012).

Nokia was under an obligation to speak or otherwise take action because of its membership in ETSI and its participation in standard-setting activities.  The ETSI Intellectual Property Rights Policy requires that members:

> submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of the MEMBER'S IPR [Intellectual Property Rights] which might be ESSENTIAL if that proposal is adopted.  (ETSI IPR Policy, Section 4.1)

This provision requires members submitting a technical proposal for a standard to disclose its patents or patent applications that might be essential to the standard before the standard is adopted.  The purpose is to ensure that when selecting technologies for standardization, ETSI members understand which technologies have been patented and might be the subject of royalty claims.  That could be a factor in their decision as to which technology to select for standardization.

Apple alleges that Nokia failed to disclose the allegedly unenforceable patents or the applications that led to the issuance of those patents before the GSM and UMTS standards were adopted.

Whether in fact Nokia made such an omission, and whether in fact that omission, if you find there to have been any, was misleading, are questions that must be answered by considering the facts and circumstances as they existed at the time.

Material harm to Apple can be economic in form.  Whether Apple suffered economic prejudice is a question that must be answered by evaluating whether Apple changed its economic position as a result of its reliance on any misleading communication from Nokia about the allegedly unenforceable patents, resulting in losses beyond merely paying for infringement (such as if ETSI could have adopted other technology or Apple could have switched to a non-infringing product if Nokia had disclosed the allegedly unenforceable patents before the standard

was adopted) and whether losses as a result of any change in economic position could have been avoided.

In making your assessment of whether Apple relied on Nokia's alleged omissions and whether Apple suffered harm as a result, you may consider the requirements of the ETSI Intellectual Property Rights Policy for disclosing intellectual property rights, how Nokia's alleged omissions may have affected the standard-setting process, and Apple's reliance on the Policy and process.

Nokia's subsequent transfer of the patents to Core Wireless does not affect whether Core Wireless should be equitably estopped from asserting the allegedly unenforceable patents against Apple.

**FINAL INSTRUCTION NO. [   ]**

## (APPLE'S UNCLEAN HANDS DEFENSE)[18]

The owner of a patent may be barred from enforcing the patent against an infringer where the owner of the patent acts or acted inequitably, unfairly, or deceitfully towards the infringer in a way that has immediate and necessary relation to the relief that the patent holder seeks in a lawsuit.  This is referred to as "unclean hands," and it is a defense that Apple contends precludes any recovery by Core Wireless in this lawsuit.

Specifically, Apple contends that Nokia, the former patent holder for the patents at issue here, failed to disclose to the European Telecommunications Standards Institute that the allegedly unenforceable patents (or members of those patent families) might be essential to the GSM and UMTS standards.  Nokia was under an obligation to speak or otherwise take action because of its membership in ETSI and its participation in standard-setting activities.  The ETSI Intellectual Property Rights Policy requires that members:

> submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of the MEMBER'S IPR [Intellectual Property Rights] which might be ESSENTIAL if that proposal is adopted.  (ETSI IPR Policy, Section 4.1)

This provision requires members submitting a technical proposal for a standard to disclose its patents or patent applications which might be essential to the standard before the standard is adopted.  The purpose is to ensure that when selecting technologies for standardization, ETSI members understand which technologies have been patented and might be

---

[18]     Sources:  Adapted from The Federal Circuit Bar Association, *Model Patent Jury Instructions* (May 2014) § 5.5; *see also Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1086 (W.D. Wis. 2012); *Barnes & Noble, Inc., v. LSI Corp.*, 849, 942 F. Supp. 2d 925 (N.D. Cal. 2012).

the subject of royalty claims.  That could be a factor in their decision as to which technology to select for standardization.

You must consider and weigh all the facts and circumstances to determine whether you believe that, on balance, Nokia acted in such an unfair way towards Apple in the matters relating to the controversy between Core Wireless and Apple that, in fairness, Core Wireless should be denied the relief it seeks in this lawsuit.  Apple must prove unclean hands by a preponderance of the evidence.

In making your assessment of whether Nokia acted unfairly toward Apple, you may consider the requirements of the ETSI Intellectual Property Rights Policy for disclosing intellectual property rights, how Nokia's alleged omissions may have impacted the standard-setting process, and Apple's reliance on the Policy and process.

Nokia's subsequent transfer of the patents to Core Wireless does not affect whether Nokia's standard-setting conduct rendered the patents unenforceable.

**FINAL INSTRUCTION NO. [   ]**

## (APPLE'S AUTHORITY TO PRACTICE DEFENSE)[19]

If you find that Core Wireless has authorized (either by express or implied license or other agreement) the sale of components or the practice of steps that it now accuses of infringement, you must find that Apple does not infringe the patents for which Core Wireless relies on such components or steps for its infringement claims.

---

[19]     <u>Source</u>:  *See generally Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008).

**Tab D: <u>Apple's Proposed Sample Verdict Form</u>**

**APPLE'S PROPOSED SAMPLE VERDICT FORM ON**:

- **PATENT FRAND DAMAGES**
- **BREACH OF CONTRACT/DAMAGES**
- **APPLE'S UNENFORCEABILITY DEFENSES**

**Instructions**:  When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form.  Your answer to each question must be unanimous.  Please refer to the Jury Instructions I have provided to you for guidance on the law applicable to each of the questions in this Verdict Form.

## I.  FINDINGS ON FRAND PATENT DAMAGES (IF APPLICABLE)

If you found at least one of Core Wireless's asserted claims infringed and not invalid, proceed to answer the following question.  Otherwise, do not answer the following question, and proceed to Section II.

1.  Has Core Wireless proven that it is entitled to damages for any infringement you have found and, if so, what is the amount so proven:

$_____

## II.  FINDINGS ON APPLE'S BREACH OF CONTRACT CLAIM

2.  Has Apple proven that it is more likely than not that Core Wireless breached a contractual obligation to Apple?

Yes \_\_\_          No \_\_\_

If your answer to Question 2 is "yes," go on to Question 3.  If your answer to Question 2 is "no," go to Section III.

3.  What is the amount of damages attributable to Core Wireless's breach of contract:

$_____

### III.    FINDINGS ON CORE WIRELESS'S BREACH OF CONTRACT CLAIMS

4.      Do you find the existence of a license agreement between Apple and Core

Wireless requiring that Apple pay royalties for the Core Wireless asserted

patents—regardless of whether Apple is actually using these patents, or whether

the patents are valid and enforceable?

Yes ____          No ____

5.      Do you find the existence of a contract between Apple and ETSI requiring that

Apple pay royalties for the Core Wireless asserted patents—regardless of whether

Apple is actually using these patents, or whether the patents are valid and

enforceable?

Yes ____          No ____

If your answer to either Question 4 or Question 5 is "yes," go on to Question 6.  If

your answer to both Question 4 and Question 5 is "no," go to Section IV.

6.      Has Core Wireless proven that it is more likely than not that Apple breached a

contractual agreement?

Yes ____          No ____

If your answer to Question 6 is "yes," go on to Question 7.  If your answer to

Question 6 is "no," go to Section IV.

7.      What is the amount of damages attributable to Apple's breach of contract:

$_____

### IV.    FINDINGS ON APPLE'S UNENFORCEABILITY DEFENSES

8.      Do you find that the right to assert the patents in suit has been waived?

a.   Patent No. 7,804,850 ('850 patent)

37

Yes ____        No ____

    b.  Patent No. 7,383,022 ('022 patent)

Yes ____        No ____

    c.  Patent No. 7,599,664 ('664 patent)

Yes ____        No ____

    d.  Patent No. 6,978,143 ('143 patent)

Yes ____        No ____

9.  Do you find that Core Wireless has engaged in unclean hands?

    a.  Patent No. 7,804,850 ('850 patent)

Yes ____        No ____

    b.  Patent No. 7,383,022 ('022 patent)

Yes ____        No ____

    c.  Patent No. 7,599,664 ('664 patent)

Yes ____        No ____

    d.  Patent No. 6,978,143 ('143 patent)

10.  Do you find that Core Wireless should be equitably estopped from asserting the patents in suit against Apple?

    a.  Patent No. 7,804,850 ('850 patent)

Yes ____        No ____

    b.  Patent No. 7,383,022 ('022 patent)

Yes ____        No ____

    c.  Patent No. 7,599,664 ('664 patent)

Yes ____        No ____

d.  Patent No. 6,978,143 ('143 patent)

Yes ____        No ____

## IV.    FINDINGS ON APPLE'S AUTHORITY TO PRACTICE DEFENSE

11.    Do you find authority to practice for the asserted patents?

a.  Patent No. 7,804,850 ('850 patent)

Yes ____        No **___**

b.  Patent No. 7,383,022 ('022 patent)

Yes ____        No **___**

c.  Patent No. 7,599,664 ('664 patent)

Yes ____        No **___**

d.  Patent No. 6,978,143 ('143 patent)

Yes ____        No ____

e.  Patent No. 7,447,181 ('181 patent)

Yes ____        No **___**

f.  Patent No. 7,529,271 ('271 patent)

Yes ____        No **___**

g.  Patent No. 6,266,321 ('321 patent)

Yes ____        No **___**

h.  Patent No. 8,259,689 ('689 patent)

Yes ____        No **___**