1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                     TYLER DIVISION

3

CORE WIRELESS LICENSING          )
4   S.A.R.L.                          DOCKET NO. 6:12cv100

5        -vs-                     )
                                     Tyler, Texas
6                                 )   9:25 a.m.
APPLE INC.                       March 9, 2015
7

8

            TRANSCRIPT OF TRIAL - VOIR DIRE
9                    MORNING SESSION
          BEFORE THE HONORABLE RODNEY GILSTRAP,
10             UNITED STATES DISTRICT JUDGE

11

                    A P P E A R A N C E S
12

13

FOR THE PLAINTIFF:
14

15   MR. HENRY C. BUNSOW
MS. DENISE M. DE MORY
16   MR. BRIAN A.E. SMITH
MR. CRAIG Y. ALLISON
17   BUNSOW DE MORY SMITH
      & ALLISON LLP
18   351 California Street
Suite 200
19   San Francisco, California 94104

20

MR. T. JOHN WARD, JR.
21   WARD & SMITH LAW FIRM
P.O. Box 1231
22   1127 Judson Road
Suite 220
23   Longview, Texas  75601-1231

24

25

```
 1   FOR THE DEFENDANTS:

 2
     MR. ERIC M. ALBRITTON
 3   ALBRITTON LAW FIRM
     P.O. Box 2649
 4   Longview, Texas  75606

 5
     MR. JOSEPH J. MUELLER
 6   MS. CYNTHIA D. VREELAND
     WILMER CUTLER PICKERING
 7     HALE & DORR LLP
     60 State Street
 8   Boston, Massachusetts 02109

 9

10

11                       *******************

12

13
     COURT REPORTERS:        MS. SHELLY HOLMES, CSR, TCRR
14                           OFFICIAL COURT REPORTER
                             shelly_holmes@txed.uscourts.gov
15
                             MS. SHEA SLOAN, CSR, RPR
16                           OFFICIAL COURT REPORTER
                             shea_sloan@txed.uscourts.gov
17

18

19

20   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
21

22

23

24

25
```

P R O C E E D I N G S

1

2          (Jury panel in.)

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Good morning.  Please be seated.

5          Good morning, Ladies and Gentlemen.  Thank you for

6   being here.  My name is Rodney Gilstrap, and I'm one of the

7   United States District Judges here in the Eastern District of

8   Texas.  I have responsibility in Marshall, Texarkana, and

9   Tyler.

10         My home is in Marshall.  I've lived there since

11  1981.  I practiced law in Marshall and Harrison County and

12  the adjoining areas for 30 years before I was appointed to

13  the bench.  I've been on the bench as a United States Judge

14  since 2011.

15         I was born in Florida; but as they say, I got to

16  Texas as soon as I could.

17         Went to college and to law school at Baylor

18  University.  I'm married, and I have two grown children.  My

19  wife owns and operates a retail floral shop in Marshall.

20         Now, I tell you all those things, because in a few

21  minutes, I'm going to ask you to give the same type of

22  information to me about each of you.  And I think you're

23  entitled to know as much about me as I'm about to find out

24  about each one of you.

25         We are about to engage in the selection of a jury

1    in a civil case involving patent infringement -- or

2    allegations of patent infringement.

3         However, before we go further, I'd like -- like to

4    briefly review with you how we came to have a jury trial

5    system with regard to civil cases.

6         If you look around the room and around the group

7    that's assembled here this morning, you'll see that it's a

8    diverse mixture of our East Texas community, and that's the

9    way it's intended to be.  That's the way our system is

10   designed.

11        If you looked at the first five books of the Old

12   Testament, the Pentateuch, you'll find that the Hebrew nation

13   impaneled juries to decide issues of property value and

14   property ownership.

15        The Greeks began using a jury system as early as

16   1500 BC.  The Romans adopted the jury system from the Greeks,

17   like they adopted most things from the Greeks.  The Romans

18   brought the jury trial system to England in the 4th century

19   AD.

20        By the 12th century, 800 years later, jury trials

21   had been a part of the judicial system in England for eight

22   centuries.

23        But then in the 12th century came to the thrown of

24   England a tyrannical king named King John, who attempted to

25   do away with the right to trial by jury in England.

1          And that led to a confrontation between the king

2    and his nobles in a meadow at a place called Runnymede.  And

3    from that confrontation, the king backed down, a document was

4    drafted.  And you may have heard of it.  It's called the

5    Magna Carta.  And from that, the right to trial by jury was

6    restored in England.

7          As a matter of fact, 28 of our United States have

8    within their own state constitutions adopted the exact

9    language verbatim from the Magna Carta which provides for the

10   right to a trial by jury.

11         The concept, therefore, of jury trials was well

12   engrained in those British colonists who came to our shores

13   and founded our country both as a colony and later as our own

14   independent nation.

15         As a matter of fact, about that time, another

16   tyrannical king, King George, III, came to the throne of

17   England and tried to again restrict or limit or do away with

18   the right to trial by jury both there and particularly in the

19   colonies here in the United States.

20         Somebody by the name of Thomas Jefferson wrote a

21   document called the Declaration of Independence to tell the

22   king why the colonists felt they must separate from England

23   and form their own independent country.

24         One of the specific reasons Thomas Jefferson listed

25   in the Declaration of Independence mandating separation from

1    England was the restrictions and the attempt to limit and do

2    away with the right to trial by jury.

3          So as we go forward today, remember, we live in one

4    of the few countries in this world that provides and

5    guarantees the right to trial by jury, especially the right

6    to trial by jury in a civil case.

7          It is now incorporated into our Bill of Rights as a

8    part of our United States Constitution and the Seventh

9    Amendment, which provides and guarantees the right to a trial

10   by jury in a civil action such as this.

11         So, Ladies and Gentlemen, by being here this

12   morning, you are in a very real way doing your part to

13   preserve, protect, and defend the Constitution of the United

14   States.  And that is no small thing.

15         I always tell jury panels when a jury is selected

16   like this morning, and I believe it more each time, that in

17   my opinion, jury service is the second highest form of public

18   service that any American citizen can perform.

19         In my opinion, the highest form of public service

20   are those young men and women who serve in our armed forces

21   and put their lives at risk to protect our liberties each

22   day.

23         In a few minutes, the lawyers are going to address

24   the panel, and they will ask various questions of you.  I

25   want you to understand they will not be seeking to pry into

1    your personal affairs unduly.  They are entitled to ask

2    questions for the purpose of securing a fair and an impartial

3    jury to hear this case.

4            I don't know if it will happen this morning.  It

5    rarely does.  But I want the members of the panel to be aware

6    that if you are asked a question that you believe is so

7    personal and private that you are uncomfortable answering it

8    in front of the rest of the members of the panel, then you

9    have the option to say simply in response to that question

10   you'd like to discuss it with Judge Gilstrap.

11           And if you do that, I'll provide an opportunity

12   where you can discuss it with me outside of the presence of

13   the other members of the panel.

14           However, as I say, that rarely comes up, but I do

15   want to let you know it is an option if that should occur.

16           The important thing, Ladies and Gentlemen, is, as

17   you respond to the lawyers' questions, that you give full,

18   complete, and truthful answers to the best of your ability.

19           If you do that, then there are no wrong answers to

20   the questions.

21           The trial in this case will begin later today after

22   we've selected the jury, and in all likelihood, after we've

23   had a break for lunch.  Those of you that are selected to

24   serve on the jury, I want you to understand that I expect

25   that this trial will take all of this week and the first two

1    days of next week.

2            So that will be all of this week and Monday and

3    Tuesday of next week.  That is my best estimation of how long

4    it will take to complete the trial.

5            Now, if there are any of you on the panel that

6    during that period of time, you either have a surgical

7    procedure scheduled, you have paid-for, non-refundable travel

8    tickets to somewhere that you can't get your money back, if

9    you have some serious reason why you could not be available

10   for the remainder of this week and the first two days of next

11   week, if you're selected to serve on the jury, would you

12   raise your hands and let me make a note of that.

13           All right, sir.  And I believe you are No. 18?

14           JUROR ROBERTS:  Yes, sir.

15           THE COURT:  Okay.  We don't need the mic right now,

16   Mr. Blanton.  Thank you.

17           Other than No. 18 -- okay, No. 10.  Thank you.

18           No. 10 and No. 18.

19           Anybody else that I've missed?  Those two.  Thank

20   you.

21           At this time, I'm going to call for announcements

22   in the case of Core Wireless Licensing S.a.r.l. versus Apple

23   Inc.  This is Civil Action No. 6:12-CV-100.

24           And, Counsel, as you introduce yourselves and the

25   members of your trial team, please introduce any corporate

```
1    representatives that you have, as well.  We'll start with the

2    Plaintiff.  What says the Plaintiff?

3              MR. WARD:  Johnny Ward, along with Denise De Mory,

4    Henry Bunsow, Brian Smith, and our corporate representative

5    John Lindgren, and the Plaintiff is ready.

6              THE COURT:  Thank you, Your Honor -- thank you,

7    Mr. Ward.

8              What says the Defendant?

9              MR. ALBRITTON:  Good morning, Your Honor.  Eric

10   Albritton here on behalf of Apple.  With me is Joe Mueller,

11   Ms. Cindy Vreeland, and Frank Casanova, who works at Apple

12   and will be our corporate representative at trial.  And we're

13   ready to proceed.

14             THE COURT:  Thank you, Mr. Albritton.

15             MR. ALBRITTON:  Thank you, Your Honor.

16             THE COURT:  Ladies and Gentlemen, as I've told you,

17   this is a patent case arising under the patent laws in the

18   United States -- United States.

19             What the Plaintiff is claiming in this case is that

20   its patents were infringed by the Defendant, and the

21   Plaintiff is seeking money damages because of that

22   infringement.

23             The Defendant denies that it infringes the

24   Plaintiff's patents and contends that those patents are

25   invalid.
```

1        Now, what I've just told you is a very informal way

2   of describing the case in layman's terms.  I know that you've

3   all seen the patent film this morning, and you probably know

4   more now about patent cases than most -- than most people do

5   when they report for jury service.

6        In addition to the parties' disputes over the

7   Plaintiff's patents, both the Plaintiff, Core Wireless, and

8   the Defendant, Apple, accuse each other also of breaching

9   contractual obligations that arise from their membership in

10  or their commitments to the European Telecommunications

11  Standards Institute, which you'll often hear referred to

12  during this case as ETSI -- E-T-S-I.

13       Now, that -- that also is a part or a layman's

14  explanation of what we have before us in this case.

15       Again, I remind you, Ladies and Gentlemen, as long

16  as your responses to the questions, you'll be asked shortly,

17  are full, complete, and truthful, there are no wrong answers.

18       The lawyers are not trying to pry into your

19  personal affairs, but it is critical that the jury selected

20  in this case be fair and impartial to both sides.

21       Certainly if any of the lawyers ask a question of

22  the members of the panel this morning that I don't think is

23  proper, I will certainly let them know that; but I'm

24  confident that won't be a problem.  These are experienced

25  trial lawyers on both sides, and I do not anticipate that

1    will happen.

2           One thing I do want to call your attention to,

3    because some of the lawyers in the case may ask you about it

4    during their questions in a little bit, is the burden of

5    proof.

6           In a patent case, the jury may be called upon to

7    apply two different burdens of proof -- proof.  The jury may

8    apply the burden of proof known as the preponderance of the

9    evidence, as well as a second burden of proof known as clear

10   and convincing evidence.

11          I need to instruct you that when a party has the

12   burden of proof on any claim or defense by a preponderance of

13   the evidence, that means that you, the jury, must be

14   persuaded by the credible and believable evidence that that

15   claim or defense is more probably true than not true.  I'll

16   say that again, more probably true than not true.

17          Sometimes this is called or talked about as being

18   the greater weight and degree of credible testimony.  I think

19   probably everyone in the room is familiar with the famous

20   statue of the Lady of Justice.  She's blindfolded.  She holds

21   the Sword of Justice in her right hand; and in her left hand

22   she holds raised up, the Scales of Justice.

23          Think of that as an example when we talk about

24   burden of proof, and think of those scales that the Lady of

25   Justice holds.  You'll recall they are completely level and

1    balanced.  They don't tip one way or the other.  They're

2    completely balanced.

3            And during the trial of this case, the jury that's

4    selected is going to hear a lot of evidence.  You should --

5    when you think about the burden of proof, consider that that

6    evidence during the course of the trial is placed on those

7    scales.

8            And when all the evidence is in and when the trial

9    is complete, the jury will have to answer certain questions

10   about the claims and defenses of the party.

11           And if -- the parties -- and if a party has the

12   burden of proof by a preponderance of the evidence and if

13   those scales with all the evidence on both sides tip in favor

14   of the party with that burden of proof, even if they tip ever

15   so slightly, then that party has met the burden of proof of a

16   preponderance of the evidence.

17           Also, Ladies and Gentlemen, there is a second

18   burden of proof that will be applied in this case, and that

19   is called clear and convincing evidence.  And it means that

20   the jury must have an abiding conviction that the truth of

21   the parties' factual contentions are highly probable.

22           I'll say that again:  An abiding conviction that

23   the truth of the parties' factual contentions are highly

24   probable.  That's a higher standard of proof than the

25   preponderance of the evidence.

1          If you think back to the example I just gave you

2     about the Scales of Justice held in that famous statue, when

3     the evidence is all in and it's placed on both sides of those

4     scales and the party who has the burden of proof by clear and

5     convincing evidence meets that burden of proof, if those

6     scales tip definitely in their direction, they must tip more

7     than ever so slightly.  It is a higher burden of proof.

8          Now, neither of these two burdens of proof, a

9     preponderance of the evidence and clear and convincing

10    evidence, neither of these burdens of proof are to be

11    confused with what's called beyond a reasonable doubt.

12         Beyond a reasonable doubt is a burden of proof

13    applied in a criminal case, and it has no application

14    whatsoever in a civil case like this.  You should not confuse

15    clear and convincing evidence with beyond a reasonable doubt.

16    It's not as high as beyond a reasonable doubt, but it is

17    higher than a preponderance of the evidence.

18         I give you these instructions because, as I say, it

19    is possible that some of the lawyers will ask you later if

20    you're able to meet that and follow the Court's instructions

21    as to these two burdens of proof as you evaluate the evidence

22    in this case.

23         Now, before we go further and before the lawyers

24    address you directly, I'm going to ask each member of the

25    panel to stand and give the same information that I gave you

1    when I introduced myself to you.

2           You have, each of you, a sheet with I believe it's

3    nine questions to answer.  And the way we'll do this,

4    Mr. Blanton, our Court Security Officer, has a handheld

5    microphone and he'll start right here on the front row of the

6    jury box with Panel Member No. 1.

7           And when you get the microphone, if you would stand

8    and speak into the microphone and answer those questions,

9    then we'll pass the microphone down and go through all the

10   members of the panel with that process.

11          Also, just for your information, as you are asked

12   questions by the lawyers later this morning as a part of this

13   process, please also wait until you get the handheld

14   microphone from the Court Security Officer; and stand when

15   you give your responses.

16          All right, sir.  We'll begin with Panel Member No.

17   1.

18          JUROR JUNO:  Okay.  My name is Justin Juno, and I

19   live here in Tyler, Texas.  I am 27 years of age and have

20   zero children.

21          I'm currently employed at Mentoring Minds and

22   create educational materials there as a digital production

23   artist.  I also work nights as a chef at Juls Restaurant.  I

24   have worked at both of these places for around one to two

25   years.

1          I have completed some college and am married to

2    Lindsey Maner.  She currently works for Maximus in Athens,

3    Texas, and has worked there for about a year.

4          I have not served on a jury panel before.

5          THE COURT:  Thank you, sir.

6          Let's go to Ms. Ray, Panel Member No. 2.

7          JUROR RAY:  My name Pamela Ray, and I live in

8    Bullard, Texas.  I have two young children.

9          I work at East Texas Medical Center in Tyler, and

10   I'm a registered nurse.  I've worked there for about

11   five-and-a-half years.  I graduated from Whitehouse High

12   School, then Texas A&M, and UT Tyler to get my nursing

13   degree.

14         My husband's name is Shawn Ray.  He works at

15   Mewbourne Oil Company in Tyler in human resources.  He's

16   worked there for about 10 years.

17         And I've never served on a jury.

18         THE COURT:  Thank you, ma'am.

19         All right.  Panel Member No. 3.

20         JUROR WINSHIP:  My name is Nathan Winship.  I have

21   two children.

22         I'm employed with the City of Jacksonville as the

23   nighttime sergeant for the police department.  I've been

24   there for about eight years.  And other than high school,

25   I've completed the East Texas Police Academy.

1          My wife's name is Sarah Winship, she's a homemaker

2    and stay-at-home mother.  So she has a big job.

3          And I have not served on a jury panel before.

4          THE COURT:  Thank you, sir.

5          Next member of our panel.

6          JUROR SHIFLET:  Yeah, my name is Terry Shiflet.  I

7    have two children.

8          I work -- I am retired.  I did work at an air

9    conditioning company, installer.  I worked there for

10   36 years.  My educational background is high school only.

11         Joann Shiflet is my spouse's name.  She works at

12   Athens as a -- she does work for a doctor, and she has worked

13   there for a year-and-a-half.

14         And I haven't ever served on a jury.

15         THE COURT:  Thank you, sir.

16         Mr. Woodard.

17         JUROR WOODARD:  Roddy Woodard is my name.  I live

18   in Longview, Texas.  I have five children.

19         I'm 50 percent owner of Wolf Prints there in

20   Longview, and I've worked there for -- well, owned it for

21   20 years.  Educational background, I have an associate's in

22   electronic engineering.

23         My spouse's name is Donna.  We've been married for

24   36 years.  She's the other half of the owner of the business.

25   And I have served on both civil and criminal juries.

1          THE COURT:  Thank you, sir.

2          Mr. Rogers.

3          JUROR ROGERS:  My name is William Rogers from

4   Palestine, and I've got four children.

5          I work at Bacon Autoplex as a car salesman, and

6   I've worked there for 11 years.  I've just got a high school

7   education, and I'm single.

8          And I don't have any previous civil or criminal

9   jury duty.

10          THE COURT:  Thank you.

11          Now we'll take the microphone and bring it around

12   here to Ms. Corley, Panel Member No. 7.

13          JUROR CORLEY:  My name is -- excuse me -- my name

14   is Laura Corley.  I do not have any children.  I'm from

15   Chandler, Texas.

16          I work at Brownsboro High School.  I'm the college

17   and career readiness coordinator and career and technology

18   education director there.  I've worked there for four years.

19          I was homeschooled K through 12, graduated from

20   East Texas Baptist University with a bachelor's degree in

21   2007 and will graduate with a master's degree in educational

22   leadership from SFA this May.

23          I'm not married, and I've never served on a jury.

24          THE COURT:  Thank you, ma'am.

25          Mr. Gatlin, No. 8.

1              JUROR GATLIN:  My name is Russell Gatlin.  I have

2    in Longview, Texas.  I have two small children.

3              I work at Triumph Structures East Texas.  It's in

4    Kilgore.  It's a machine shop.  I work in quality control

5    there.  I've worked there for a little over four years.  I

6    have a high school education and some college, about 30

7    hours, I guess.

8              I'm married to Deanna Gatlin.  She's a stay-at-home

9    mother.  And before that, she worked in insurance and some

10   law enforcement.

11             I have never served before.

12             THE COURT:  Thank you.

13             Panel Member No. 9.

14             JUROR HIEBING:  My name is Charlene Hiebing.  I'm

15   from here in Tyler, Texas.  I have no children.

16             I'm self-employed as a reflexologist, and I started

17   my business 14 years ago.  After graduating high school, I

18   completed an associate degree in general business.

19             I am not married, and I have no prior jury service

20   experience.

21             THE COURT:  Thank you.

22             Mr. Childress.

23             JUROR CHILDRESS:  My name is James Childress.  I

24   live in Bullard, Texas.  I have two daughters.  One is still

25   at home.  She's a brittle diabetic.  I help my wife with her

1  transport three times a week to and from dialysis.  She's

2  lost one leg, and that's why I help transport.  She's fairly

3  heavy.

4          I was employed as an in-house investigator with the

5  Grainger Law Firm for 12 years.  After that, I was out on my

6  own, a private investigator for 18 years.

7          I graduated from Stephen F. Austin in Nacogdoches.

8          My wife is Marie.  She was in retail sales until

9  our daughter got worse.  She worked there many years.

10          I did serve on a civil jury for one day, Judge

11  Shamburger's court in Winona, last year.

12          THE COURT:  Thank you.

13          Mr. Neal.

14          JUROR NEAL:  I'm Lynn Neal.  I live in Grand

15  Saline.  I have three children.

16          I'm employed with Morton Salt Company.  I've worked

17  there for 42 years.  I have a high school education.  I'm a

18  machinist mechanic for Morton.

19          My wife's name is Hilda, and my spouse worked for

20  Mineola Community Bank.  Been there for one year.

21          And I've served on both juries.

22          THE COURT:  Thank you, sir.

23          Panel Member No. 12.

24          JUROR SCOTT:  Yes.  My name is Robert Scott.  I do

25  not have any children.  I also live in Mineola where I work

1    at Southern Star DISH Network.  I've worked there for two

2    years.  My education is some college.

3              I'm not married, and I have not served prior jury

4    cases.

5              THE COURT:  Thank you.

6              Now we'll go to the first row of the gallery with

7    No. 13.

8              JUROR URBINA:  My name is Irma Urbina.  I live in

9    Palestine, Texas.  I have three children.

10             I work at the Texas Health and Human Services.

11   I've been there for 10 years.  A little bit of college.

12             My spouse's name is Juan Urbina, and he works for

13   the NKS Well Services in Palestine.  He's been there for four

14   years.

15             And no prior jury.

16             THE COURT:  Thank you, ma'am.

17             Ms. Hannah, No. 14.

18             JUROR HANNAH:  My name is Gail Hannah.  I live in

19   Tyler, Texas.  I have two grown children.

20             I work at Trane Company in Tyler.  I've worked

21   there for 20-and-a-half years in the extended warranty

22   department.  I have a high school education.

23             I'm not married, divorced.  And I did serve on a

24   criminal jury one time.

25             THE COURT:  Thank you, ma'am.

1          Ms. Vandergriff.

2          JUROR VANDERGRIFF:  I'm Carolyn Vandergriff, and I

3   live in Tyler, Texas.  I have three grown children.

4          I worked for 24 years for State Farm Insurance as a

5   sales representative.  I have a high school education.

6          My spouse is Jerry Vandergriff.  He was a plumber

7   for 41 years.  He's retired.

8          And I have served on a civil -- I mean, a criminal

9   jury.

10          THE COURT:  Thank you.

11          No. 16.

12          JUROR GOWIN:  My name is Toby Gowin.  I live in

13   Jacksonville, Texas.  I have two children.

14          Am currently director of construction and

15   facilities at Southern Multifoods in Jacksonville.  I've been

16   there about three-and-a-half years.  I graduated from

17   Jacksonville High School and the University of North Texas.

18          My wife's name is Niki, and she's a homemaker.

19          And also I have no prior jury experience.

20          THE COURT:  Thank you.

21          No. 17.

22          JUROR SAUCIER:  My name is Nan Saucier.  I'm from

23   Winnsboro, Texas.  I have two sons that are grown.

24          I am a retired junior high principal.  Before I was

25   a principal, I taught literature and special education.  I

1    was a principal/teacher for 39 years before I retired.  I

2    have a Bachelor of Science degree and a Master of Education

3    degree.

4              My husband's name is Dave Saucier.  He was a

5    football coach and high school science teacher.

6              No prior jury services.

7              THE COURT:  Thank you, ma'am.

8              Mr. Roberts.

9              JUROR ROBERTS:  Yes.  My name is Gary Roberts.  I

10   have no children.

11             My last -- I'm retired.  My last employment was

12   Sterilite in Ennis, Texas.  I worked there for eight years.

13             A 9th grade education.

14             Not married.

15             I've been on both a civil and criminal jury.

16             THE COURT:  Thank you, sir.

17             Mr. Freeman, No. 19.

18             JUROR FREEMAN:  Yes.  My name is Dan Freeman.  I

19   live here in Tyler, Texas.  I have two grown daughters.

20   I am an agent -- have an agency, and my wife also works in

21   that agency for the last 18 years.  I graduated high school,

22   very little college.

23             And the last jury was a civil case.

24             THE COURT:  All right, sir.

25             No. 20, Ms. Strickland.

1          JUROR STRICKLAND:  Yes.  My name is Elizabeth

2   Strickland.  I have three grown children.

3          And I'm employed at Truman West Smith Children's

4   Center.  And I've been there 11 years.  And I have a high

5   school education.

6          I don't have no spouse, and I have never served as

7   a jury service.

8          THE COURT:  All right.  If you'll hand that

9   microphone to Mr. Blanton, he'll take it to our next member,

10   which is Ms. Williams, No. 21.

11          JUROR WILLIAMS:  Yes.  My name is Lynda Williams.

12   I have two grown children.

13          I work at Stepping Stone School with

14   pre-kindergarten children.  I've been there 15 years.  Have

15   been working with children for 33 years.  I have a college

16   degree and teaching certificate.

17          My husband's name is Ricky Williams.  He worked --

18   he is currently retired, but he worked 44 years with the U.S.

19   Postal Service and was postmaster at Brownsboro when he

20   retired.

21          And I have not served on a jury.

22          THE COURT:  Thank you, ma'am.

23          Mr. Armstrong.

24          JUROR ARMSTRONG:  My name is Freddy Armstrong.  I'm

25   from Carthage, Texas.  I've got two grown children.

1          I work for Sunland Construction there in Carthage,

2    Texas.  I've worked there for four years.  I've completed 12

3    years high school -- or 12 years school.

4          My -- I was married 29 years before my wife passed

5    away in 2004, and she was a stay-at-home wife.

6          And I've never served on a criminal or a civil

7    case.

8          THE COURT:  All right, sir.  Thank you.

9          No. 23, Mr. White.

10          JUROR WHITE:  My name is Larry White.  I live here

11   in Tyler, Texas.  I have two grown kids.

12          I work for an oilfield company called Baker Hughes.

13   I'm the district manager out of Kilgore.  And I've been there

14   34 years.

15          Let's see, my educational background is I have a

16   bachelor's from Texas A&M Commerce and a master's from

17   University of Texas at Tyler.

18          My spouse's name is Margaret, and before she was

19   retired, she was in retail sales.  She worked there 20 years.

20          And I have no prior jury service.

21          THE COURT:  Thank you, sir.

22          No. 24 is next.

23          JUROR DENT:  Hi.  My name is Lance Dent from Tyler.

24   I have four children.

25          I'm with DKT Investments in Tyler.  Have been there

```
 1    over eight years.  Some college.
 2              My wife's name is Amanda, and she's an electrician,
 3    and she's been there like eight or nine years.
 4              And I've been on both civil and criminal.
 5              THE COURT:  Thank you.
 6              No. 25, Ms. Cox.
 7              JUROR COX:  I'm Vanessa Cox, and I'm from Flint,
 8    Texas.  I have two boys still at home.  I am a stay-at-home
 9    mom at this time.  I have a degree in education.
10              My husband is Jim Cox.  He works at ChemTreat as a
11    chemical sales rep.
12              And I've had criminal experience.
13              THE COURT:  All right.  No. 26 is next.
14              JUROR KROLCZYK:  My name is Michael Krolczyk.  I'm
15    from Bullard, Texas.
16              I've worked for Farmer's Insurance Agency in
17    Palestine, Texas for four years.  I just completed some
18    college.
19              And I have no jury experience.
20              THE COURT:  No. 27, Ms. Hill.
21              JUROR HILL:  I'm Judy Hill.  I'm from Palestine.
22    Recently moved to Tyler.  Divorced, two grown children.
23              Been in the insurance industry for 24 years, and I
24    have served on a criminal case before.
25              THE COURT:  All right.  28, our last panel member.
```

1              JUROR BERRY:  Yes.  My name is Luvena Berry.  I

2    live in Whitehouse, Texas.  I have three grown children.

3              I'm retired.  But before that, I worked in a

4    wholesale plant nursery for 17 years.  My education, I

5    graduated high school.

6              My husband's name is Tommy Berry.  He works at

7    Matheson Tri-Gas.  He is the regions operation manager of the

8    district.  He's been there 37 years.

9              And I have served on a criminal case before.

10             THE COURT:  Thank you.

11             Thank you, Ladies and Gentlemen.  I need to say

12   just a couple more things to you before I turn the

13   questioning over to the lawyers.

14             The jurors who are selected actually will serve in

15   this case as the judges of the facts.  And those judge --

16   those jurors who are selected to serve in this case will make

17   the sole determination about what the facts are in this case.

18             Now, my job as the Judge is to rule on questions of

19   law, evidence, procedure, and to maintain the flow of the

20   trial and the decorum of the courtroom.

21             Also, I want to say a couple of things to you about

22   our judicial system that I hope will put things in a proper

23   perspective.

24             In addition to the actual parties, in every jury

25   trial, there are always three participants:  The jurors, the

1    judge, and the lawyers.

2           Now, with regard to the lawyers, it's important for

3    each of you to understand that our judicial system is an

4    adversary system, which means simply that during the trial,

5    the parties are going to present their respective cases to

6    the jury in the very best light possible.

7           Now, I know that lawyers are frequently discussed

8    and sometimes criticized in the public and in the media, and

9    the Court has observed that this criticism often is the

10   result of a basic misunderstanding of our adversary system in

11   which the lawyers act as advocates for the competing parties.

12          As an advocate, a lawyer is ethically and legally

13   obligated to zealously assert his or her client's position

14   under the rules of our adversary system; and by presenting

15   the best case possible on behalf of their clients, the

16   lawyers, hopefully, will enable the jury to better weigh the

17   relevant evidence and determine the truth and arrive at a

18   just verdict based on that evidence.

19          This system -- this adversary system of justice has

20   served our country well for over 200 years, and America's

21   lawyers continue to be an integral and a critical part of

22   that process.

23          So as we go forward during the trial, even though I

24   may occasionally frown or grumble at the lawyers from time to

25   time, it's just because I'm trying to make sure that they

1   stay within the boundaries of our adversary system and that

2   their advocacy doesn't get outside of those boundaries and

3   our rules of procedure.

4           But keep in mind, they are simply doing their jobs,

5   and it's important for all of you to be aware of that as we

6   go forward.

7           Additionally, Ladies and Gentlemen, throughout the

8   entire trial process, I am going to do my very best to make

9   sure that the jurors that are actually selected and who serve

10  in this case, have absolutely no idea about how I feel about

11  the evidence in this trial, because evaluating the evidence

12  and determining what the facts are based upon that evidence,

13  is the job of the jury.  It is not my job.

14          So the jury selected should take no expressions

15  they see or they think they see from me as something to

16  consider or a factor to take into consideration in

17  determining what the ultimate facts are in this case.

18          At this time, I will recognize the counsel for the

19  respective parties, who will begin their questioning of the

20  jury panel.

21          Mr. Ward, you may proceed on behalf of the

22  Plaintiff.

23          MR. WARD:  Thank you, Your Honor.

24          THE COURT:  Would you like a warning on your time?

25          MR. WARD:  Yes, sir.  If I could have a five-minute

1    warning.

2              THE COURT:  All right.

3              MR. WARD:  May it please the Court.

4              THE COURT:  You may proceed.

5              MR. WARD:  Good morning.

6              As I told you when I stood up and said this party

7    is ready, my name is Johnny Ward.  I'm going to talk to you

8    about some of your feelings and your life experiences; but

9    before I do that, I want to tell you a little bit more about

10   this case.

11             And Judge Gilstrap gives us three minutes to tell

12   you about the case, so it's going to be pretty brief.

13             As you all have learned, this is a patent case.  It

14   involves an allegation by my client, Core Wireless, that

15   Apple is infringing on these five patents.  You think of it

16   as trespassing.  We say Apple trespasses on our property.

17             The inventors on the patents are -- were all former

18   employees of Nokia, which is a company y'all have probably

19   heard about it, and y'all saw it on the jury questionnaire.

20             That's why you were asked about Nokia.

21             And you also saw a question about Microsoft.

22   Microsoft and Nokia formed Core Wireless to seek licensing

23   fees for these patents.

24             Ultimately, a company called Conversant was brought

25   in to actually go out and fight on behalf of these companies,

1    and they've taken over that fight.  And so Conversant and

2    Core Wireless, you're going to find out, are related to each

3    other.

4           There was a 20,000-dollar exchange between

5    Conversant and Nokia and Microsoft, and you might hear in

6    this case, although I'm not sure they'll make this

7    allegation, but Apple might say Conversant only paid $20,000

8    for these patents.  There's 1300 of them, although we're only

9    asserting five of them here.

10          You'll learn that Conversant has spent over

11   $30 million in prosecuting the patents at the Patent Office

12   and in litigation expenses and in salaries.  So there's a lot

13   more here than just that $20,000.

14          Conversant is an expert in licensing; and when they

15   put their $20,000 down and spent all this money prosecuting

16   these patents, they knew what they were buying.  They were

17   buying a fight.  And they were buying a fight with Apple.

18          So if you like a good fight, it will be a fight

19   that's fought by the rules; but those of you that make it on

20   the jury are going to get to watch that fight.

21          You'll learn about what these patents cover, but

22   generally for this morning, understand that they cover

23   cellular technologies that are present -- Core Wireless

24   alleges that are present in Apple's products, the iPhone,

25   iPad, and the iPod Touch.  It's been a product -- the

1    iPhone's been selling since 2007.

2            Those of you who make it on the jury will learn

3    that Nokia has been in this business since the '80s, and they

4    actually manufactured the first cell phone in the late

5    '80s -- I believe 1987.  So they've been at this a long time.

6            So while Apple has some innovative products, not in

7    the cellular technology that's covered by these patents, and

8    that's what this lawsuit is about.

9            They've sold over 130 million units that we say

10   infringe our patents, and we seek to recover $101 million.

11           That's the number that our -- our expert will put

12   up.  So you can understand there's a lot at stake, and that's

13   why there's so many people present in this courtroom.

14           Now, I've told you we allege that Apple is

15   trespassing on our property.  That's the easiest way to think

16   of a patent case.  They say they don't trespass.  They say

17   even if they do trespass, these patents are invalid, they're

18   worthless, and they don't owe us any money.

19           All right.  So that's -- that's the patent fight.

20           There's also this contract fight that you'll hear a

21   little bit about.  I won't get into it too much because it --

22   it's going to confusing if I try to get too deep into it.

23           But that's basically what the dispute is about

24   between these parties.

25           There are a lot more facts that will come out

1    during the trial.  This isn't the time that I'm going to tell

2    you about those -- those facts.  Mr. Bunsow will do that

3    during the opening statement, and you'll hear from him.

4              THE COURT:  Let's move on with specific questions.

5              MR. WARD:  All right.

6              So voir dire.  This is an opportunity for you-all

7    to speak to us.  It's kind of unique.  It's the only time

8    that we get to speak to you directly.  So I do want you to

9    speak up.  I am going to ask you questions.  I'll call on

10   some of you individually.

11             You were kind enough to fill out these

12   questionnaires and that gave us a lot of information, and

13   that will speed this process along.  And I'm going to follow

14   up on some of those questions.

15             And as Judge Gilstrap told you, there are no wrong

16   answers.  You can't give a wrong answer during voir dire.

17   The only wrong answer is the answer that you don't give,

18   okay?  So we do want you to speak up.

19             How many of you, when you found out that you were

20   coming here for jury service and you -- you've now learned

21   that there's a dispute involving a lot of money between these

22   parties, want to be fair?  Does everyone want to be fair to

23   both sides?

24             Is there anyone who says I don't want to be fair?

25   That would be something we'd want to know.

1              And we all come to court wanting to be fair, right?

2     But would you agree with me that we all have different life

3     experiences, things that have shaped our lives and our

4     beliefs as we -- as we go through life and we come to the

5     courtroom with those beliefs.  Everyone agree with me?  And

6     those beliefs can influence how you view evidence.

7              I -- I can imagine, if I was sitting on a jury,

8     there are certain cases -- or on a jury panel, there are

9     certain cases that I shouldn't hear because I've got

10    leanings.  And we want to find out if you have leanings.  And

11    leaning is natural.  And leaning does not disqualify you from

12    being on this jury.

13             The leaning that will disqualify you is the one

14    that is -- you lean so far that you can't be fair to both

15    sides, regardless what the facts are, regardless of what the

16    law is, you can't set that aside.  And that's what we want to

17    find out about.

18             So let me start off by asking if anybody knows Mr.

19    Albritton.  Mr. Albritton is seated behind me.  He's a lawyer

20    who's got a practice over in Longview, Texas.  There's a

21    couple of lawyers that work with him, Jason Cassel and

22    Michael Benefield.  Does anyone know Mr. Albritton, his law

23    firm, or ever been represented by him?

24             All right.  Nobody.

25             Let's talk about lawsuits.  That's what we're

hearing, right?  Is there anyone who has for political

beliefs, religious beliefs, personal beliefs -- they say, you

know what, I just don't think it's right to file lawsuits.

Even though our laws provide for it, I don't agree with --

with filing lawsuits.

        And I made eye -- eye contact with Mr. Woodard, how

do you feel about that?

        JUROR WOODARD:  I agree with it.

        MR. WARD:  Okay.  Anybody feel like you shouldn't

be able to file a lawsuit, for whatever reason?

        How many of you feel like there are too many

lawsuits?  It's okay.  Raise your hand.  There are no wrong

answers.

        All right.  Anyone feel like there's not enough

lawsuits?  Besides the lawyers in here, anyone feel like

there's not enough?

        All right.  Everyone -- everyone agrees there's --

there's too many lawsuits.

        Everyone agree there's too many frivolous lawsuits?

All right.  We hear about frivolous lawsuits a lot, don't we?

And there are a lot of lawsuits, and those lawsuits slow down

cases.

        You'll learn that this case, because of the -- the

burdens on the court system and other things, took three

years to get here.  So we've been waiting and Apple's been

1    waiting for its day in court, as well.

2            So let me talk to you about your -- your feelings

3    about lawsuits.

4            Is there anyone that feels like because there's so

5    many lawsuits, that our legislature, our Congress should do

6    something to limit the number of those lawsuits?

7            I'm going to start over here.  Yes, sir, Mr.

8    Shiflet.

9            THE COURT:  If you'd stand up and use the

10   microphone, please, sir.

11           JUROR SHIFLET:  Yeah.  To me, it's really way too

12   many frivolous lawsuits in this country.

13           MR. WARD:  All right.  And because you feel that

14   way -- obviously Core Wireless had to bring this lawsuit, you

15   understand that?

16           JUROR SHIFLET:  Yes.

17           MR. WARD:  Because you feel like there's too many

18   frivolous lawsuits and that Congress should do something

19   about it or our legislature, do you start out leaning in

20   favor of Apple simply because they're a Defendant in this --

21   in this lawsuit.

22           JUROR SHIFLET:  No.  I -- from what I've heard

23   today, this is not a frivolous lawsuit here.

24           MR. WARD:  Okay.  So even though you have that --

25   that feeling, that's something you could set aside?

 1              JUROR SHIFLET:  Sure.

 2              MR. WARD:  Have you ever had any involvement in a

 3   lawsuit that might affect your -- your views on this case?

 4              JUROR SHIFLET:  No, sir.

 5              MR. WARD:  Okay.  Thank you, Mr. Shiflet.

 6              Mr. Woodard, while he's got the microphone next to

 7   you, how about you?

 8              JUROR WOODARD:  Nothing that would affect me.

 9              MR. WARD:  Do you feel like there's too many

10   frivolous lawsuits?

11              JUROR WOODARD:  Yeah, I do, but I don't think

12   it's -- put in the government's hands, no.

13              MR. WARD:  All right.  It's between the government

14   and a jury, leave it up to the jury?

15              JUROR WOODARD:  Leave it up to the jury.

16              MR. WARD:  All right.  Thank you, sir.

17              Mr. Rogers, how about you, sir?

18              JUROR ROGERS:  Yes.  There are too many lawsuits

19   frivolously, but I don't think this is one of them.

20              MR. WARD:  Okay.  It's not your -- your belief in

21   that isn't going to cause you to lean one way or the other in

22   this case?

23              JUROR ROGERS:  No.

24              MR. WARD:  All right.  Juror No. 3, Mr. Winship?

25              JUROR WINSHIP:  I believe there most likely are too

```
 1   many frivolous lawsuits, but it's not going to affect any --
 2   anything here.
 3          MR. WARD:  And I notice you're a police officer; is
 4   that right?
 5          JUROR WINSHIP:  Yes, sir.
 6          MR. WARD:  Have you ever been involved in a claim
 7   by a prisoner or an excessive force, one of those types of
 8   lawsuits?
 9          JUROR WINSHIP:  Fortunately not.
10          MR. WARD:  Fortunately not.  Well, good.  All
11   right.  Thank you, sir.
12          Mr. Juno, how about you?
13          JUROR JUNO:  I believe that there are a lot of
14   frivolous lawsuits.
15          MR. WARD:  Okay.  And your belief that there are a
16   lot of frivolous lawsuits, what would you -- what do you
17   think we should do about that?
18          JUROR JUNO:  Personally, I don't think that the
19   judicial system can necessarily do anything about that
20   because people are always going to have a reason to try to
21   find what they think they deserve, or what they do deserve.
22   So I don't really think there's anything that we can
23   necessarily do about that.
24          MR. WARD:  All right.  And you heard my question
25   earlier, the fact that you believe that, does that start you
```

```
 1    leaning one way or the other knowing that Core Wireless had

 2    to bring this lawsuit against Apple?

 3              JUROR JUNO:  No, it does not.

 4              MR. WARD:  Okay.  Thank you, sir.

 5              And right next to you, I want to hit everybody on

 6    the first row.  Ms. Ray, how about you?

 7              JUROR RAY:  I agree, there's a lot of frivolous

 8    lawsuits, but I don't feel like it's going to sway me in this

 9    case.

10              MR. WARD:  All right.  Doesn't start you leaning

11    one way or the other?

12              JUROR RAY:  No.

13              MR. WARD:  All right.  And I'll go to the back row

14    while we're close there.  Ms. Corley, how about you?

15              JUROR CORLEY:  I do believe there are too many

16    frivolous lawsuits, and I think that some reform is in order.

17              MR. WARD:  What -- what type of reform would you

18    suggest?

19              JUROR CORLEY:  I don't really feel like I'm in a

20    position to make suggestions.

21              MR. WARD:  Okay.  The fact that you feel that way,

22    you've heard my questions, does that start you leaning in

23    favor of Apple simply because they're a Defendant in this

24    case?

25              JUROR CORLEY:  No, sir, because without knowing
```

```
 1   more about the case, I don't think it's fair to deem it
 2   frivolous at this point.
 3            MR. WARD:  All right.  And when you say that it's
 4   not fair to deem it frivolous at this point, are you leaning
 5   that way that you think it might be frivolous?
 6            JUROR CORLEY:  No, sir.
 7            MR. WARD:  Okay.  And next to you, No. 8,
 8   Mr. Gatlin, how about you?
 9            JUROR GATLIN:  Yeah, I agree with most that's been
10   said, that there is some privileged lawsuits; but, I mean,
11   everybody -- you know, that's kind of a hard line to draw.  I
12   mean, if someone thinks they have a legitimate argument, it
13   might not seem frivolous to them, so I don't know.
14            MR. WARD:  Okay.  You indicated on your
15   questionnaire that you had some training or experience with
16   wireless technologies?
17            JUROR GATLIN:  It's been many years ago.  I was
18   just a sales rep for T-Mobile, and so I got just a little bit
19   more hands-on, just learning some of their products.
20            MR. WARD:  And how long ago was that?
21            JUROR GATLIN:  Probably 11, 12 years ago.
22            MR. WARD:  Okay.  So been awhile back?
23            JUROR GATLIN:  Yes.
24            MR. WARD:  Before -- before the iPhone came out?
25            JUROR GATLIN:  Yes.
```

1            MR. WARD:   Okay.  Thank you, sir.

2            And just -- if you'd hand the microphone next to

3  you to Ms. Hiebing?

4            JUROR HIEBING:  That's correct.

5            MR. WARD:  How about you?  Where do you come down

6  on this issue?

7            JUROR HIEBING:  It does seem like there are a lot

8  of lawsuits.  I, at this point, feel like there's nothing

9  that would make me lean one way or the other.

10            MR. WARD:  All right.  Thank you.  Fair enough.

11            If you'd pass it to your neighbor there,

12  Mr. Childress.

13            JUROR CHILDRESS:  I feel like there probably are,

14  even though I've worked with a defense law firm for several

15  years and mostly did defense investigations when I was out on

16  my own.  They helped pay my salary, so there you go.

17            MR. WARD:  That was with Mr. Grainger?

18            JUROR CHILDRESS:  That's correct.

19            MR. WARD:  And anything about your experience

20  working with law firms or your beliefs on lawsuits start you

21  leaning one way or the other in this case?

22            JUROR CHILDRESS:  No, not really.

23            MR. WARD:  All right.  Thank you, sir.

24            Mr. Neal.

25            JUROR NEAL:  It don't make any difference one way

1    or the other to me.

2              MR. WARD:  All right.

3              JUROR NEAL:  I don't have enough information to

4    decide that.

5              MR. WARD:  All right.  Thank you, sir.

6              And next to you, Mr. Scott?

7              JUROR SCOTT:  Okay.  I agree with him right here.

8    It's just not -- it's not going to make me lean either way.

9    I'm just going to give the right answer.

10             MR. WARD:  Okay.  I've got a question.  Did you

11   indicate you had some training with wireless technology as

12   well?

13             JUROR SCOTT:  Yes.  I installed Internet for DISH

14   Network, and I installed like the wireless routers and all

15   that, so...

16             MR. WARD:  On-the-job training, so to speak?

17             JUROR SCOTT:  Yes, sir.

18             MR. WARD:  Anything about that that starts you

19   leaning one way or the other?

20             JUROR SCOTT:  No, sir.

21             MR. WARD:  All right.  And I'll speed it up a

22   little bit.

23             On the front row here, anyone have strong feelings

24   about there's too many lawsuits and Congress needs to do

25   something about it?  Anybody on the front row here?

1    Mr. Freeman, No. 19.

2            JUROR FREEMAN:  Yes, sir.  I think there is too

3    many.

4            MR. WARD:  All right.

5            JUROR FREEMAN:  And as far as what can be done

6    about it, I'm not sure I can answer that question.

7            MR. WARD:  All right.  Anything about that belief

8    that you have that starts you leaning one way or another in

9    this case?

10           JUROR FREEMAN:  No, sir.

11           MR. WARD:  All right.  You indicated, when -- when

12   you spoke earlier, that you have an agency.

13           JUROR FREEMAN:  Yes.

14           MR. WARD:  What agency is it?

15           JUROR FREEMAN:  My wife and I have a transportation

16   agency that supplies trucks for freight movement.

17           MR. WARD:  Okay.  Ever been in a lawsuit, plaintiff

18   or defendant, in connection with your business?

19           JUROR FREEMAN:  No, sir.

20           MR. WARD:  All right.  Thank you, sir.

21           JUROR FREEMAN:  Uh-huh.

22           MR. WARD:  Now, we all agree that there's --

23   there's too many lawsuits, right?

24           Anyone think that there might be frivolous defenses

25   put up by defendants in lawsuits?  Anyone think that that's

1    an impossibility?

2          Based upon this perception that there's too many

3    frivolous lawsuits, anyone think it's impossible that a

4    defendant might put up a defense that has no merit?   Anyone

5    thinks that's impossible?

6          Let me talk to you about Core Wireless.   As I told

7    you, Core Wireless and Conversant knew they were signing up

8    for a fight when they acquired these patents, right?

9          You'll hear -- you'll learn more about Core

10   Wireless.   Core Wireless is a subsidiary of another Core

11   Wireless, but the Core Wireless in this case, Core Wireless,

12   LLC, is located in the Eastern District of Texas.   It was

13   formed back in 2011.

14         And it doesn't make any products.   What it does is

15   it licenses patents.   And as part of that licensing, it files

16   lawsuits like it did in this case.   It sued Apple back in

17   2012, February of 2012, and this lawsuit's been going since

18   that time up until today.

19         Now, nothing wrong with that business.   It's

20   perfectly legal.   But would y'all agree with me that there's

21   laws and things that you might not agree with, that our

22   Congress passes?   Everyone agrees with that?

23         Whether it's the gun laws or the right of the NSA

24   to look at our telephone messages, those types of things, we

25   might not agree with them, right?

1          What I need to know is, I've told you that there's

2     nothing wrong with what Core Wireless does, but someone might

3     be sitting there saying:  You know what?  It might be

4     perfectly legal, Mr. Ward, but I don't like it.  I don't like

5     the notion of a company that doesn't make any products that

6     is in business to license its property.

7          Let me go over here to the first row.

8          Mr. Winship, how do you feel about that?  You got

9     feelings one way or the other about what I've told you?

10         JUROR WINSHIP:  No.

11         MR. WARD:  Okay.  Anybody in the first row that

12    says:  You know what; that might be perfectly legal, but I

13    don't agree with it; I don't like it?

14         Yes, sir.  Mr. Juno, tell me about that.

15         JUROR JUNO:  Before, I guess, working as a digital

16    production artist, I worked for several years as a graphic

17    designer and market -- marketing director for several local

18    businesses; and when doing that, I got the chance to work

19    with a lot of different clients.

20         And there were times that I just didn't necessarily

21    care for some of the ways people went about designing

22    products and how they did design products.

23         And then it was even worse whenever I would create

24    original work and then have people claim that I infringed on

25    something that didn't exist.

1          MR. WARD:  Okay.

2          JUROR JUNO:  And so...

3          MR. WARD:  Does that experience, knowing that we're

4    accusing Apple of infringing our patents here, your past

5    experience, does that start you leaning towards Apple?

6          JUROR JUNO:  If I were picked for the jury, I would

7    do -- I'd be fair.  I'd look at the evidence presented.

8    First notion, I will say yes.

9          MR. WARD:  Okay.  So before we get started, you're

10   telling me -- and there's nothing wrong with that, and I

11   appreciate you telling me that -- you would start out leaning

12   in favor of Apple?

13         JUROR JUNO:  Probably so --

14         MR. WARD:  All right.

15         JUROR JUNO:  -- in all honesty.

16         MR. WARD:  And so here's -- and I appreciate that.

17         I told you, you don't get in trouble for giving

18   what you believe.  And that's exactly what we're talking

19   about, your life experiences affect how you view things, and

20   that's -- that's what we're here to find out about.

21         That leaning, is it something that you feel like

22   you can set aside if the Court instructs you that you need to

23   set it aside, or is it always going to be in the back of your

24   mind regardless of what the Court instructs you?

25         JUROR JUNO:  Oh, no.  I mean, if I were picked, I'd

```
 1    put -- I'd put it aside and just look at the evidence
 2    presented.  I would be a fair juror in the case.
 3                MR. WARD:  All right.  Do you use Apple products?
 4                JUROR JUNO:  Heavily, actually.
 5                MR. WARD:  Heavily?
 6                Do you own an iPhone?
 7                JUROR JUNO:  Yes, I do.  And the company I
 8    currently work for is an entire Mac environment.
 9                MR. WARD:  All right.  So I saw an ad this morning
10    for the Apple iWatch.  Did you see that?  They're launching
11    it today.
12                JUROR JUNO:  I did see that.  I don't wear the
13    watches, but...
14                MR. WARD:  Well, they're coming out, and they said
15    the Apple nuts are going to be lining up.
16                Are you -- are you an Apple nut?
17                JUROR JUNO:  I wouldn't say I'm an Apple nut.
18                MR. WARD:  Okay.
19                JUROR JUNO:  I still use an iPhone 5, so...
20                MR. WARD:  But you like their products?
21                JUROR JUNO:  Yes.
22                MR. WARD:  Anything about the fact that you work
23    for a company that uses Apple products, that's going to start
24    you leaning in favor of Apple before we get started in this
25    case?
```

1          JUROR JUNO:  No.  As stated, I'd be fair in this

2   case, so...

3          MR. WARD:  You can set that aside.

4          JUROR JUNO:  Uh-huh.

5          MR. WARD:  Okay.  Thank you, Mr. Juno.

6          Anybody on this back row that starts out, you know,

7   I've got a -- that feels like:  I don't like what you've told

8   me about Core Wireless's business, that they're in the

9   business of licensing patents, and associated with that is

10  filing lawsuits?  Anyone on the back row feel that way; they

11  don't like what I've told you?

12         Ms. Corley, you're looking at me like maybe you're

13  feeling that way.  Tell me -- tell me what's happening.

14         JUROR CORLEY:  I don't really have strong feelings

15  either way.  I just am unfamiliar with companies like that

16  coming from an educational background.

17         MR. WARD:  Okay.  Anything about that that starts

18  you leaning one way or the other, or is this something you

19  want to learn more about if you're on the jury?

20         JUROR CORLEY:  Probably just learn more about

21  why -- why the company is in business to not produce a

22  product.  And I understand that some companies are in

23  business to provide a service; and I am okay with that, but I

24  just don't know a lot about it.

25         MR. WARD:  Okay.  Thank you.

```
 1              Anybody else on the back row?

 2              Yes, sir.  Mr. Gatlin.

 3              JUROR GATLIN:  I guess just to clarify, I mean,

 4   Core Wireless -- I mean, their customer would be, what, Nokia

 5   and Microsoft, so --

 6              MR. WARD:  Correct.

 7              JUROR GATLIN:  -- they're defending their -- their

 8   products.

 9              MR. WARD:  They're -- they've got to recoup the

10   money that they spend on these cases, and then those proceeds

11   would then be divided between Conversant, Nokia, and

12   Microsoft.

13              JUROR GATLIN:  So as a clarification, that mean --

14   so although they're not producing product, they are -- you

15   know, they're protecting --

16              MR. WARD:  That -- that is what they're -- that's

17   what Core Wireless and Conversant do.

18              JUROR GATLIN:  Okay.  That's all.

19              MR. WARD:  All right.  Thank you, sir.

20              Anybody else on this back row?

21              And over here in the front row, what I've told you

22   about Conversant -- Conversant -- about Core Wireless.

23              Ms. Hannah, how about you?  Do you start out

24   leaning one way or the other based on what you've heard so

25   far?
```

```
 1                JUROR HANNAH:  No, sir.

 2                MR. WARD:  All right.  And you -- you --

 3                JUROR HANNAH:  Nothing you've said.

 4                MR. WARD:  I'm sorry?

 5                JUROR HANNAH:  Nothing you've said has made me lean

 6     one way or the other.  I would have to hear all the facts.

 7                MR. WARD:  All right.  Thank you.

 8                You've worked at Trane for 20-and-a-half years; is

 9     that right?

10                JUROR HANNAH:  Yes, sir.

11                MR. WARD:  As a warranty claims specialist?

12                JUROR HANNAH:  Yes, sir.  Well, I didn't start out

13     there.  I've been in -- this is my third department, but I've

14     been in this department for 12 years.

15                MR. WARD:  And I believe you indicated that you

16     were a proofreader --

17                JUROR HANNAH:  At Liberty Mutual Insurance years

18     ago.  Not the whole policy.  We had certain aspects they

19     would give us to proofread to make sure there were no

20     misspellings.

21                MR. WARD:  You actually read those insurance

22     policies.

23                JUROR HANNAH:  We did have to.

24                MR. WARD:  Okay.  Anything about that history that

25     starts you leaning one way or another in this case?
```

1          JUROR HANNAH:  Oh, no, sir.

2          MR. WARD:  Okay.  Thank you, ma'am.

3          Mr. Gowin, how about you?  Anything that I've told

4   you so far start you leaning one way or the other in this

5   case?

6          JUROR GOWIN:  Not at all, no, sir.

7          MR. WARD:  All right.  You can be fair to both

8   sides?

9          JUROR GOWIN:  Absolutely.

10          MR. WARD:  All right.  Thank you, sir.

11          Let me ask the rest of the panel about iPhone

12   products.  How many folks own either a MacBook, an iPhone,

13   iPod Touch, or an iPad?  And if you would just keep your hand

14   up, I'm going to call them out so folks can write it down.

15          1, 2, 4, 6, 12, 10, 9, 8, 7, 15 -- is that right?

16          I'm starting over here -- yeah -- 13, 15, 16, 17,

17   19, and 20, 21, 24, 25.

18          Anyone own two or more products?

19          Same folks?

20          How about three or more Apple products?

21          All right.  That's No. 1, No. 10, 15, 16, 17, 19.

22          Those of you that own multiple products, the fact

23   that you own multiple products -- maybe you don't want to

24   confess you're an Apple nut, but do you start out leaning in

25   favor of Apple because you like their products, that you'd

```
 1    have -- that we wouldn't start out equal?
 2              Anyone that raised their hand, whether it's one,
 3    two, or three, in the jury box?
 4              And over here?
 5              All right.  And I -- I think one person indicated
 6    they owned stock in Apple.
 7              Mr. Childress?
 8              JUROR CHILDRESS:  (Nods head affirmatively.)
 9              MR. WARD:  Is that right?
10              And I'm sorry.  I've got to get you on the record
11    saying that you do own Apple stock.
12              JUROR CHILDRESS:  That's correct.
13              MR. WARD:  All right.  Thank you, sir.
14              Anybody else own stock in Apple?
15              How am I doing on my time, Your Honor?
16              THE COURT:  You're about 10 minutes away from your
17    warning.
18              MR. WARD:  Okay.  Thank you, sir.
19              All right.  I've told you all that we seek to
20    recover up to $101 million in damages, right?  His Honor
21    talked to you about the burden of proof.  And to -- we've got
22    to prove infringement, and we've got to prove that they
23    trespass on our property, and we've got to do that by a
24    preponderance of the evidence.
25              And then Apple has a burden of proof.  They've got
```

1    the burden of proving that these patents are invalid.  And

2    it's a higher burden.  And they've got that higher burden

3    because the Patent Office has already passed on the validity

4    of these patents, and they're saying the Patent Office made a

5    mistake.  So they've got a higher burden of proof.

6            But on damages, we've got that lower burden again.

7    We've got to prove by the greater weight of credible evidence

8    that our position is correct.

9            In trying these cases, I've talked to folks like

10   y'all on jury panels, and they say:  You know what?  That

11   might be the burden of proof in a car wreck case or a simple

12   breach-of-contract case, but if you're seeking to recover

13   over a hundred million dollars, you're going to have to prove

14   it to me by more than a preponderance of the evidence, okay?

15           Anyone on the front row feel like:  You know what;

16   for that kind of money, you ought to have to satisfy a higher

17   burden of proof than a preponderance of the evidence?

18           Anybody on the front row?

19           Second row, anybody feel that way?

20           All right.  How about over here, the front row?

21           I'm going to pick on you, Mr. Freeman.  How about

22   you?  Do you feel like we ought to satisfy a higher burden of

23   proof or you're going to be able to apply the law as a far as

24   a preponderance of the evidence if -- if that's what the

25   Judge instructs you the law is?

1              JUROR FREEMAN:  That's a stinking lot of money.  I

2      think you ought to have a whole lot of evidence there.

3              MR. WARD:  Okay.  You think we ought to meet a

4      higher burden of proof?

5              JUROR FREEMAN:  I do.

6              MR. WARD:  All right.  And remember what I said

7      earlier, there's no wrong answer, so I appreciate you telling

8      me that.

9              The fact that you feel that way -- and understand

10      that the Court's going to instruct you that you are to apply

11      the preponderance of the evidence -- are you telling me that

12      you'd have difficulty following the Court's instruction if

13      that's what he instructs you to apply?

14              JUROR FREEMAN:  No, sir.

15              MR. WARD:  You can set that personal belief aside?

16              JUROR FREEMAN:  Yes.

17              MR. WARD:  All right.  Thank you, sir.

18              Anyone agree with what Mr. Freeman says, that we

19      ought to have to meet a much higher burden of proof if we

20      seek to recover that amount of money?

21              Ms. Saucier?  All right.

22              JUROR SAUCIER:  I can tell you, I agree with him.

23      That's a lot of money.

24              MR. WARD:  It's a lot of money.

25              JUROR SAUCIER:  A lot of money.  And I know people

1   that are in this room right now, no one makes that kind of

2   money, and especially where I'm coming from.

3          But I'd have to see all the facts.  I'm like -- you

4   can tell the ones of us that have been in education.  I've

5   got to have the facts --

6          MR. WARD:  Right.

7          JUROR SAUCIER:  -- before any decisions are made.

8   But that's a lot of money.

9          MR. WARD:  And we have the burden of proof, and

10  we're -- we gladly accept it.  My question to you is a little

11  different, though.  Because it's so much money, would we have

12  to satisfy a higher burden of proof?

13         JUROR SAUCIER:  I'm afraid you will for me.

14         MR. WARD:  All right.  And I appreciate that.

15         Regardless of what the Court instructs you on the

16  law that you're supposed to apply, because it's so much

17  money, you're saying:  I hear you on what the law is; it's

18  one of those laws I don't agree with, and you'd have to meet

19  a higher burden?

20         JUROR SAUCIER:  I know y'all are a big corporation.

21  I know y'all are much bigger than what people like us have

22  dealt with.  But that is still a lot of money.

23         MR. WARD:  And I agree with you.

24         And so are you telling me, since you've got this --

25  this view -- and there's nothing wrong with it --

1           JUROR SAUCIER:  Uh-huh.

2           MR. WARD:  -- that you would hold us to a higher

3   burden regardless of what the Court instructs you?

4           JUROR SAUCIER:  I feel like I probably would.

5           MR. WARD:  Thank you.  I appreciate you telling me

6   that.

7           Anyone agree with what Ms. Saucier has told me?

8           Yes.  Yes, sir.  Mr. Juno, do you agree with what

9   she said?

10          JUROR JUNO:  I'm just agreeing with her.  It's a

11  lot of money.  And I don't know.  Just -- I'd have to see a

12  lot of evidence.

13          MR. WARD:  We'd need to bring you more evidence

14  than this preponderance of the evidence?

15          JUROR JUNO:  Yes.

16          MR. WARD:  All right.  I appreciate you telling me

17  that.

18          And even if His Honor says:  I'm going to tell you

19  what the law is, and you're to apply the law, are you telling

20  me, in the back of your mind, you're going to be going:  I'll

21  try to do that, but I think I'm going to hold you to a higher

22  burden?

23          JUROR JUNO:  Truthfully, yes.

24          MR. WARD:  All right.  That's -- that's what --

25  what we need to know.

          1            Anybody else -- I'll give you one more chance in

          2    the jury box -- that answered that question would answer it

          3    differently -- or I'm sorry -- the same as Mr. Juno, that

          4    you'd hold us to a higher burden?

          5            All right.  Anyone over here in the front row?

          6            Ms. Hannah, would you hold us to a higher burden

          7    since it's so much money?

          8            THE COURT:  Let's wait until we get the microphone.

          9    He's on his way.

         10            JUROR HANNAH:  No, sir.  It -- it is a lot of

         11    money, but I haven't heard any facts in the case, and I -- I

         12    think I -- it would be too soon to say that I would --

         13            MR. WARD:  But -- and I guess my question is a

         14    little different.  Would you apply the law as His Honor

         15    instructs you?

         16            JUROR HANNAH:  I would.

         17            MR. WARD:  All right.  Thank you, ma'am.

         18            JUROR HANNAH:  Uh-huh.

         19            MR. WARD:  Anybody feel like -- for personal

         20    reasons, they're sitting there going:  You know what, I don't

         21    think I can do that?

         22            And I haven't talked to everybody on the back row

         23    back there.

         24            Mr. White, how about you?

         25            JUROR WHITE:  No, I wouldn't have any problem with

```
 1   that.  I understand that, from a research standpoint, because

 2   my company's into that, that you have to recoup your money at

 3   some point in time, whether you produce the product or not.

 4   So I can set that aside.

 5        MR. WARD:  And -- and apply the law as His Honor

 6   gives it to you?

 7        JUROR WHITE:  Yes, sir.

 8        MR. WARD:  All right.  Thank you, sir.

 9        As you can tell, there's lots of questions that I

10   can ask you and try and get information from you that is

11   important to my client, but I can't think of everything, and

12   I don't have unlimited time.

13        So my last question to you is this:  Is there

14   anyone sitting there right now going:  You know what, if

15   Mr. Ward had asked me this question, he would know that I'm

16   leaning in favor of Apple and that I'm not the right juror

17   for this case?

18        Anyone sitting there feeling that way right now?

19   This is your chance.  And if it's something you want to talk

20   about at the bench, we can do it at the bench after we finish

21   voir dire.

22        Anyone at the front row?

23        Yes, sir.  Mr. Childress.

24        JUROR CHILDRESS:  Having done defense work for 30

25   years, investigations, I'm sitting here -- it's just going to
```

1    be real hard for me.

2              MR. WARD:  Okay.

3              JUROR CHILDRESS:  I'm biased just a little bit.

4    Thirty years is a long time.

5              MR. WARD:  Right.

6              JUROR CHILDRESS:  I didn't work on that many

7    plaintiff's cases --

8              MR. WARD:  All right.

9              JUROR CHILDRESS:  -- and I want to be honest with

10   you.

11             MR. WARD:  Well, but, look, that's what we're here

12   for, to find out -- your life experiences have shaped the way

13   that you would view this evidence, fair?

14             JUROR CHILDRESS:  Yes, sir.

15             MR. WARD:  And are you telling us you'd start out

16   leaning in favor of Apple because of your experience of

17   working on defense cases?

18             JUROR CHILDRESS:  Yes, sir.

19             MR. WARD:  Regardless of what I tell you or His

20   Honor tells you about applying the law and setting that bias

21   aside, you'd have difficulty doing it?

22             JUROR CHILDRESS:  Yes, sir.

23             MR. WARD:  All right.  Thank you, sir.

24             Anybody else?  Anyone sitting there saying you need

25   to know this because I'm leaning against your client, you

1   just hadn't asked the right question?

2          All right.  Thank you all for your time.  For those

3   of you who are selected to the jury, we look forward to

4   presenting our case to you.

5          All right.  The Defendant may now address the

6   panel.

7          MR. ALBRITTON:  Thank you very much, Your Honor.

8          THE COURT:  Would you like a warning on your time,

9   Mr. Albritton?

10          MR. ALBRITTON:  Yes, sir, please, five minutes.

11          THE COURT:  All right.

12          MR. ALBRITTON:  May it please the Court.

13          THE COURT:  Proceed.

14          MR. ALBRITTON:  Thank you very much, Your Honor.

15          Good morning, folks.  As Mr. Ward told you, my name

16   is Eric Albritton.  My law firm is over in Longview.  And the

17   Judge told you a little bit about himself and y'all told us

18   about yourselves

19          So I'm married.  I've got a junior in high school.

20   We're starting to look at colleges.  And I've got an 8th

21   grade boy.  My oldest is a girl.  My wife is a child

22   psychologist, but she hasn't worked outside the home.  She's

23   been just raising babies for the last 17 years.

24          I went to college at Baylor, like His Honor, and so

25   did actually Ms. Vreeland.  We're Baylor Bears.  So that's a

1  little bit.

2          Mr. Ward spent some time talking to you about sort

3  of an overview of the case, and I'm really not going to do

4  that right now, and let me tell you why.

5          I agree wholeheartedly with what Mr. Ward said, and

6  that is this is the opportunity we get to hear from you guys.

7  That's what's unique about this.  So I want to hear from you.

8  You don't need to hear from me right now.  You're going to

9  hear from Joe Mueller who, right after lunch, is going to get

10  to tell you our opening statement.

11          And I can tell you this:  Apple's got a very, very,

12  very different view of the world than Core Wireless does.

13  Apple does not infringe these patents, and Core Wireless is

14  not entitled to any money.  But I'm going to focus on

15  questions.

16          And I wanted to follow up with Mr. Juno first.

17  Mr. Ward asked you -- I'm sorry, he picked on you, so I'm

18  going to pick on you, too.

19          JUROR JUNO:  All right.

20          MR. ALBRITTON:  Mr. Ward asked you this question

21  about the burden of proof and asked you if you were leaning

22  and you expressed that that would be difficult for you,

23  right?

24          JUROR JUNO:  Yes.

25          MR. ALBRITTON:  But -- but the real question is

1   this:  His Honor is going to instruct you.  He's going to

2   give you the law in the case, and he's going to say that all

3   Core Wireless has to do is prove damages by a preponderance

4   of the evidence.

5           Now, you'll be actually able to follow the Judge's

6   instructions in this case, right?

7           JUROR JUNO:  As stated before, I would do my very

8   best to judge fairly, but I do have a preconceived notion

9   basically where I would lean.

10          MR. ALBRITTON:  I understand.  You're leaning that

11  way, but do you think you could follow his instructions and

12  set aside that leaning?

13          JUROR JUNO:  I mean, to the best -- I would do to

14  the best of my ability, yes.

15          MR. ALBRITTON:  Okay.  Great.  Thank you very much,

16  Mr. Juno.

17          How about you, Ms. Saucier?  I have the same

18  question for you.

19          JUROR SAUCIER:  Well, because I was a principal,

20  I'll do what I'm told by the Judge.  I can tell you I'll do

21  it --

22          THE COURT:  Good.  We'll get along just fine.

23          JUROR SAUCIER:  We will.  Because I can't stand

24  somebody not doing what they're supposed to be doing, and

25  I'll try to be fair -- very, very fair.  But it's like I said

1    while ago, it is hard.  It is in the back of my mind, that's

2    a lot of money.

3              MR. ALBRITTON:  I understand it.

4              JUROR SAUCIER:  You understand that.

5              MR. ALBRITTON:  Yes.

6              JUROR SAUCIER:  But what he tells me to do, I will

7    do, and I will do it to the best of my ability.

8              MR. ALBRITTON:  Thank you very much.  So you'll

9    follow his instructions?

10             JUROR SAUCIER:  Whatever he tells me to do, I'm

11   going to do.

12             MR. ALBRITTON:  Thank you very much.

13             All right.  Mr. Ward -- we got to hear your voices

14   a bunch, and this is unusual because there are going to be

15   eight of you ultimately picked to be on this jury.  And we're

16   not going to ever hear your voices until after a verdict is

17   rendered.  So it's important that we hear your voices right

18   now, okay?

19             Because interestingly enough, and all the lawyers

20   know this and His Honor, of course, knows this better than

21   all of us, but the folks who don't talk are the folks who

22   actually end up on juries, okay?  So I'll really encourage

23   you to talk to us and talk to us about how you really feel.

24             I agree with something else that Mr. Ward said, and

25   that is, you know, we're all fair people, okay?

```
 1              Now, I told you, I've got two kiddos.  I've got a
 2   junior and an 8th grader.  I would be entirely the wrong
 3   person to sit on a jury where somebody was accused of hurting
 4   a -- a teenage girl, for instance.  That would just -- that
 5   would be far too close to home for Eric Albritton because
 6   that's where I live as a person, okay?
 7              So even though I'm a fair person, generally
 8   speaking, I wouldn't be the right kind of person for that
 9   case.
10              So that's what we're trying to find out here.  Not
11   if you're fair, because I'm sure you're all fair.  It's just
12   do you have life experiences?  Do you have ideas that affect
13   your ability to be the right kind of juror for this kind of
14   case in particular?
15              And the great thing about America -- and we got to
16   read your questionnaires, right?  One of the beautiful things
17   about this country, and His Honor talked to us about the
18   history, okay, the thing that makes us great as a people is
19   we're all entitled to our own opinions, okay?
20              Nobody can tell you, Eric Albritton, you're wrong
21   and you have to change your mind.  So what Ms. Corley thinks,
22   for instance, or what Ms. Berry thinks, everybody is entitled
23   to their own opinions.
24              So let me give you a few examples, okay?  Some
25   people think that the government is doing too much.  Okay.
```

1    They're too involved.  Some people think that what the

2    government's doing is just right.  And some people think that

3    the government is just not doing enough.

4            So like, for instance, let's see, who thinks, raise

5    your hand if you think that the government should be doing

6    more?  Anybody feel that way?  Anybody over here in the jury

7    box feel like the government ought to be doing more?  How

8    about here to my right -- anybody feel like that the

9    government ought to be doing more?  All right.  Thank you.

10           Let me ask you another question.  So this is a

11   lawsuit.  Mr. Ward told you they're asking for oodles and

12   oodles of money.  Lots -- lots of money.  Does anybody think

13   that fact that you've got all these lawyers sitting here,

14   you've got the three of us, you've got Frank Casanova all the

15   way from Apple, all these suits are involved in this --

16   obviously lots of effort put into this, money spent, here we

17   are taking time out of your busy day, anybody feel like the

18   fact that we're to this point, there must be something to

19   these claims?

20           Okay.  So let me ask you, for instance, Ms. Urbina,

21   do you feel like the fact that the -- the simple fact that we

22   got here and that we're at a jury trial, does it make you

23   think at least a little bit, you know, there must be

24   something to these claims of Core Wireless?  Do you feel that

25   way?

1           JUROR URBINA:  No.

2           MR. ALBRITTON:  You don't feel that way.  Okay.

3     Great.  Thank you, Ms. Urbina.

4           How about -- let me ask you, Ms. Vandergriff.  I'm

5     going to try to pick on some different people maybe,

6     Ms. Vandergriff.  Ms. Vandergriff, do you feel like, you know

7     what, there are lots of suits here.  Lots of people are

8     spending money, taking time out of His Honor's day.  Do you

9     feel like the fact that we're here that that means that Apple

10    probably did something wrong?

11          JUROR VANDERGRIFF:  No, not necessarily.

12          MR. ALBRITTON:  You don't feel that way?

13          JUROR VANDERGRIFF:  Huh-uh, not that Apple did

14    something wrong necessarily.

15          MR. ALBRITTON:  Okay.  All right.  Anybody feel

16    differently?

17          For instance, let me ask you, Ms. -- or what

18    about -- let's see here, Mr. Winship, you feel like the fact

19    that we're here, that means Apple must have done something

20    wrong?

21          JUROR WINSHIP:  Not necessarily, not without

22    hearing the -- both sides of the case.

23          MR. ALBRITTON:  Great.  Thank you, Mr. Winship.

24          All right.  Ladies and Gentlemen, had -- before you

25    got that invitation to come down here today, had any of you

 1   ever heard anything about this case, Core Wireless versus

 2   Apple?  No.

 3          All right.  Mr. Ward mentioned a second ago that

 4   Apple came out with a watch, and that was in the -- in the

 5   press, okay?  Companies sometimes are in the press.  Has

 6   anybody in the last two weeks seen any articles or heard any

 7   talk or anything about Apple?  Anything negative?

 8          Now, I'm not asking you what you heard, for

 9   instance.  I'm just saying has anybody in the last two weeks

10   seen something on TV, read it on the Internet, read it on the

11   paper, anything negative about Apple?  No?  Nobody has done

12   that?  All right.  Great.

13          All right.  So Mr. Ward introduced me, and he

14   introduced himself.  He practices law, just like me, over in

15   Longview.  In fact, we used to practice law together a number

16   of years ago.  His partners are a fellow named Wesley Hill

17   who's a lawyer -- he lives here in Tyler, and he's from over

18   in Murchison.

19          I think I pronounced that right for you --

20   Henderson people -- Henderson County people.  He practices

21   with his father, who is also named John Ward, and he

22   practices with a woman named Claire Henry, who's married to a

23   lawyer named David Henry, who is also here from Tyler.  They

24   live over in Longview.  She's an Abernathy.

25          Have any of you ever had any experience with Johnny

```
 1    Ward, his dad, John Ward; Wesley Hill; or Claire Henry?

 2    Nobody?  Has anybody ever heard of those lawyers?

 3              All right.  Thank you very much.

 4              There are also some lawyers from here -- they're

 5    from out of town.  Mr. Bunsow, Ms. De Mory.  Does anybody

 6    know Mr. Smith, Mr. Bun -- Mr. Bunsow, and Ms. De Mory?

 7              All right.  Thank you.

 8              Oh, Johnny's -- Mr. Ward also has one other partner

 9    named Bruce Smith who lives in Longview.  Anybody ever had

10    any involvement, dealings with, know Bruce Smith?  Nobody?

11              All right.  Thank you.

12              Now, as you know, Apple is a California company,

13    and you've heard that there are -- they sell products and

14    lots of you own them.  And I can tell you for the company,

15    thank you, okay?

16              I have slightly a different question.  Has anybody

17    ever had any negative experiences with Apple?  You didn't

18    like your iPhone, okay?  You didn't like your iPad?  You

19    talked to somebody at customer service, and you thought that

20    they were ugly to you?

21              I'm going to ask here on the first row, Mr. Juno's

22    row?  Has anybody had any negative experiences with Apple in

23    any way?

24              Okay.  What about on Ms. Corley's row, that's the

25    second on row.  Anybody had any negative experiences with
```

1    Apple in any way?

2            All right.  How about on Ms. Urbina's row?  That's

3    the first row over here.  Anybody have any negative

4    experiences with Apple?

5            And lastly, on Ms. Williams's row, which is the

6    last row, anybody have --

7            Would you give me my water, please, Mr. Mueller?

8            Anybody ever had any negative experiences with

9    Apple?  All right.  So nobody ever has, right?

10           All right.  Now, I notice -- we read these

11   questionnaires, and some people said that they had a negative

12   impression of some companies.

13           So let me ask you, Mr. -- and I'm going to butcher

14   this, I'm quite certain.  But Mr. -- I wrote it down

15   phonetically -- Krolczyk.  Did I say that pretty closely?

16           JUROR KROLCZYK:  Yes, sir.  That was adequate

17   pronunciation.

18           MR. ALBRITTON:  Good.  At least I did something

19   right.  Have you had -- do you have a negative impression or

20   negative feelings about Apple in any way?

21           JUROR KROLCZYK:  Not necessarily.  Just -- did I

22   answer so?

23           MR. ALBRITTON:  I believe you did.  I wasn't sure

24   if that was a mistake or if that's --

25           JUROR KROLCZYK:  Maybe just that -- I don't know,

```
 1    their products are expensive and everyone has them and talks

 2    about them, so that's kind of annoying.

 3              MR. ALBRITTON:  Okay.

 4              JUROR KROLCZYK:  All my friends.

 5              MR. ALBRITTON:  All right.  I hear you.

 6              What about Ms. Strickland, No. 20?  Ms. Strickland,

 7    I notice that you had indicated some negative feeling towards

 8    all of the companies involved in this case.  Do you have

 9    negative feelings with respect to Apple?

10              JUROR STRICKLAND:  No.

11              MR. ALBRITTON:  You don't?

12              JUROR STRICKLAND:  No, sir.

13              MR. ALBRITTON:  Okay.  Is it just you don't like

14    big companies generally or?

15              JUROR STRICKLAND:  I don't have no problem with

16    them.

17              MR. ALBRITTON:  No problems at all?  Okay.  Thank

18    you very much.

19              Now, Mr. Woodard, Mr. Ward mentioned the NSA, and,

20    you know, do you have -- you know, there's been press about

21    some companies like Microsoft, I think, cooperating with the

22    NSA.  And, I mean, do you have any negative impressions of

23    Apple because you might believe they've done something in

24    that regard?

25              JUROR WOODARD:  Not any more so than any of the
```

 1    others.

 2              MR. ALBRITTON:  Okay.  So you think all big

 3    companies are in bed with the government?

 4              JUROR WOODARD:  Yes.

 5              MR. ALBRITTON:  Okay.  Well, thank you very much.

 6              Now, Mr. Ward told you about these companies.  So

 7    you've got Core Wireless that's owned by this company called

 8    Conversant, and that's who Mr. Lindgren works for.

 9              Conversant is owned by a private -- largely by a

10    private equity firm called Sterling Partners.  Conversant is

11    a Canadian company.

12              Does anybody have an experience with Sterling

13    Partners or Conversant in any way?

14              Okay.  Just like Mr. Ward asked you about stock,

15    does anybody on the jury panel own Microsoft stock?  See a

16    show of hands of anybody that owns Microsoft stock?

17              What about Nokia stock?  Does anybody own any Nokia

18    stock?

19              All right.  Thank you very much.

20              Let me see a show of hands of anybody that's ever

21    either themselves or somebody that was close to them or one

22    of their family members ever filed a lawsuit?  That means

23    they were the Plaintiff in a lawsuit?

24              How about on Mr. Juno's row, anybody that was ever

25    a Plaintiff, either you or somebody very close to you that

1    was a Plaintiff in a lawsuit?

2            How about on Ms. Corley's row?  Yes, ma'am, that's

3    Ms. -- Ms. Hiebring (sic)?

4            JUROR HIEBING:  Hiebing.

5            MR. ALBRITTON:  Hiebing.

6            JUROR HIEBING:  Hiebing is correct.

7            MR. ALBRITTON:  I'm sorry.  I mispronounced it.

8    Tell us about that.

9            JUROR HIEBING:  I know someone who has a business

10   that they manufacture and distribute athletic gear, and they

11   produced a number of products that they got patents on.  And

12   subsequently, other companies seeing that they were selling,

13   decided to try and make those; and so they filed suit because

14   of infringement on their patents.

15           MR. ALBRITTON:   Okay.  And do you know where that

16   happened?

17           JUROR HIEBING:  Where the --

18           MR. ALBRITTON:  Was that here in East Texas, for

19   instance?

20           JUROR HIEBING:  No.  I mean, the company is a

21   Longview company, but I don't believe the cases were handled

22   locally.

23           MR. ALBRITTON:  Okay.  But the Longview company was

24   the company that actually filed the lawsuit?

25           JUROR HIEBING:  Yes.

```
 1              MR. ALBRITTON:   What was the name of that company?

 2              JUROR HIEBING:   IAD.

 3              MR. ALBRITTON:   IAD?

 4              JUROR HIEBING:   Yes.

 5              MR. ALBRITTON:   Now, how close are you affiliated

 6     with them?  Are you personal friends with the folks that own

 7     that company or work at that company, or what's your

 8     relationship with them?

 9              JUROR HIEBING:   Yes, yes.

10              MR. ALBRITTON:   Okay.  Did your involvement in the

11     matter, the fact that your friends were involved in a patent

12     infringement lawsuit, would that start you out leaning in

13     this case a little bit in favor of Core Wireless because

14     they're in a situation similar to the situation that your

15     friends were in?

16              JUROR HIEBING:   No, sir.

17              MR. ALBRITTON:   Okay.  So that wouldn't affect your

18     ability to serve in any way?

19              JUROR HIEBING:   No.

20              MR. ALBRITTON:   Great.  Thank you, Ms. Hiebing --

21     Hiebing.

22              All right.  How about on Ms. Urbina's row?  Anybody

23     ever been involved in a lawsuit either directly or a close

24     family friend or relative that was a Plaintiff in a lawsuit?

25              All right.  Thank you very much.
```

```
 1            Let me ask you a slightly different question, okay?

 2   And that's this:  Has anybody ever thought they were wronged

 3   and they wanted to file a lawsuit but weren't able to file a

 4   lawsuit for some reason?

 5            All right.  I see a hand that went up back here.

 6            That's Mr. Armstrong.  You -- I'll wait until

 7   Mr. Jordan (sic) hands that to you.

 8            You were in a situation where you wanted to file a

 9   lawsuit, but you were unable to for some reason?

10            JUROR ARMSTRONG:  Yes.  My house caught fire April

11   of last year, and a fellow had clear cut the land back there

12   behind it; and as he had fire going, it caught my house

13   afire.

14            And I've got with the Fire Marshals and everything,

15   and they say that I would have to go within the benefit of

16   the doubt, you know, showing that he started the fire.  But

17   the fire started on his place, but yet it's still hard to --

18   to come up with that.

19            MR. ALBRITTON:  Yes, sir.

20            JUROR ARMSTRONG:  And the man's got money, and it's

21   kind of hard to fight a man that's got money.

22            MR. ALBRITTON:  Yes, sir.  Okay.  Thank you very

23   much, Mr. Armstrong.

24            Anybody else, particularly over here on Mr. Juno's

25   row?  Anybody ever wanted to file a lawsuit but couldn't for
```

1    some reason?

2             How about on Ms. Corley's row?

3             How about on Ms. Urbina's row?

4             And anybody back on Mr. Armstrong's row?  Thank you

5    very much.

6             Now, we noticed that there were a number of

7    people -- well, let me ask you this, Ms. Hiebing.  We saw on

8    your questionnaire that you were -- either you or somebody

9    that you were close with was involved in the development for

10   the marketing of a product.  Is that what you were just

11   telling us about?

12            JUROR HIEBING:  Yes.

13            MR. ALBRITTON:  Great.  Thank you very much,

14   Ms. Hiebing.

15            Lots of folks said on their questionnaire that they

16   were leaders, okay?  And so I want to ask a few questions

17   about that.

18            So, Ms. Cox, for instance, you said that you

19   identify yourself as a leader.

20            She's No. 25, Mr. Jordan.

21            THE COURT:  Blanton -- it's Blanton.

22            MR. ALBRITTON:  Blanton, I mean.  Goodness,

23   gracious.  Of course.  Mr. Blanton and I have known each

24   other for years and years, and I apologize.

25            THE COURT:  All right.  Let's continue.

 1            MR. ALBRITTON:  Yes, ma'am, did you ever -- you

 2  said that you -- you identify yourself as a leader; is that

 3  right?

 4            JUROR COX:  I guess.  I didn't realize I did that,

 5  but okay.

 6            MR. ALBRITTON:  Okay.  Well, is that the way you

 7  would describe yourself?

 8            JUROR COX:  I have two boys so I -- you know, I --

 9  I'm the football mom at our local school.  You know, I get

10  parents involved in helping with boosters and stuff, so,

11  okay.

12            MR. ALBRITTON:  Okay.  Great.  Thank you very much.

13            So let me ask a broader question instead of calling

14  on all of you.  Let me see a show of hands if you're the type

15  of person that you're usually the first person to give your

16  opinion.

17            So if you're in a group of people and you're

18  talking about some subject, you know, who ought to make the

19  college football playoff or whatever it would be, okay,

20  get -- let us see a show of hands if you're one of the people

21  that typically -- you're the kind of person that typically

22  you're the first one to give your opinion.

23            Ms. Corley.  That's No. 7, right?

24            Thank you very much.

25            What about -- Mr. Juno, you're the same way?

1          All right.  That's No. 1, Mr. Juno.

2          How about anybody else on Mr. Juno's row?

3          How about anybody else on Ms. Corley's row?

4          Yes, sir.  That's you, Mr. Scott.  You're one of

5    the people that typically gives your opinion first?

6          JUROR SCOTT:  Yes, sir.

7          MR. ALBRITTON:  All right.  How about over here on

8    Ms. Urbina's row?

9          Yes, ma'am.  That's Ms. Saucier, No. 17.

10         All right.  Anybody else on Ms. Urbina's row?

11         And how about on our last row?

12         That's right.  That's Mr. Krolczyk, 26.  You're the

13   same.

14         All right.  Thank you.

15         Mr. Roberts, we noticed from your questionnaire

16   that you previously were on a jury, and you were actually the

17   foreman; is that right?

18         JUROR ROBERTS:  Correct.

19         MR. ALBRITTON:  If you would -- thank you.

20         I'm not asking how y'all voted, but I'm curious.

21   Was the ultimate verdict -- did it come out the way that you

22   voted first; that is, when you went in the room and you voted

23   and you voted yea or nay, okay --

24         JUROR ROBERTS:  Yes, it did.

25         MR. ALBRITTON:  -- it came out the way that you

1    voted originally?

2              JUROR ROBERTS:  Yes.

3              MR. ALBRITTON:  All right.  Thank you very much.

4              Now, we're all different kinds of folks.  Of

5    course, we've got our backgrounds.  And so like some people

6    really love technology.  So like at my house, when we buy a

7    new electronic device, my wife will sit down and read the

8    manuals.  I'll confess.  I've never read a manual in my

9    entire life, okay?

10             So my question for you is:  Let me see a show of

11   hands if you're the type of person like Eric Albritton, that

12   is, you never read the manuals to your new devices?

13             Anybody on Mr. Juno's row?

14             So we've got Mr. Juno.  We've got Ms. Ray.  We've

15   got Mr. Winship.  We've got Mr. Rogers.

16             Ms. Corley, you raised your hand?

17             Okay.  Anybody else?

18             Yes, sir.  Then we've got Mr. Neal and Mr. Scott.

19             How about over here on Ms. Urbina's row?

20             Mr. Gowin.  Or is it Gowin (pronouncing)?

21             JUROR GOWIN:  Gowin.

22             MR. ALBRITTON:  Gowin.  Okay.

23             And yes, sir, that's Mr. Freeman.  You're the same

24   way.

25             All right.  Well, let me ask you this:  It's a

```
 1   related question, and that is, raise your hand if this
 2   describes you.  I know less about technology than most
 3   people, okay?
 4            Yes, ma'am.  So we've got -- on our second there,
 5   we've got Ms. Hiebing, and then we've got Mr. Neal.  Okay.
 6   And we've got Mr. Winship.
 7            All right.  And we've got Mr. Rogers, No. 6.
 8            All right.  How about over here?
 9            We've got Ms. Hannah.  We've got Ms. Vandergriff.
10            We've got Mr. Roberts and Mr. Freeman.  And then on
11   our back row, we've got Ms. Williams.
12            All right.  Thank you very much, folks.
13            Now, there was a question asked on the
14   questionnaire that said something to this nature:  Has
15   someone ever taken something important or valuable to you?
16            Okay.  Y'all remember that question?
17            Well, I'm going to ask a slightly different
18   question, okay, but it falls within the same category.  And
19   we're going to go row by row starting with Mr. Juno's row.
20            That is, has anybody ever taken an idea from you or
21   something that you've created?
22            Okay.  Anybody -- Mr. Juno feels that way.
23            Okay.  Anybody else on Mr. Juno's row?
24            All right.  Ms. -- how about on Ms. Corley's row?
25            Anybody ever felt like somebody took an idea or
```

```
 1    something that you created, from you wrongfully?

 2              Okay.  Nobody there?

 3              How about over here on Ms. Urbina's row?  Does

 4    anybody feel like anybody ever took an idea or something that

 5    you created wrongfully from you?

 6              Nobody on Ms. Urbina's row.

 7              And then how about on Ms. Williams' row?

 8              Nobody's had that experience?

 9              All right.  Thank you very much.

10              His Honor talked to you about the burden of proof.

11              So the burden of proof, as Mr. Ward said and His

12    Honor told you, lies on Core Wireless to prove infringement.

13    That means that they have to show you that Apple actually

14    uses these patents.

15              THE COURT:  You're going to need to speak up, Mr.

16    Albritton, when you're not into the microphone.

17              MR. ALBRITTON:  Oh, I apologize, Your Honor.

18              It is -- it's Core Wireless's burden to prove what

19    they allege, that is, that Apple uses these patents.

20              Now, Apple, of course, as you've heard, says that

21    that's not true, okay?  But does anybody feel like the fact

22    that we're here in court, again, all these people, all of

23    this involved; that, you know what, Core Wireless shouldn't

24    really have to prove that Apple did something wrong, but that

25    actually Apple should have to prove that it didn't do
```

```
 1   anything wrong?
 2             Does anybody feel that way?
 3             Ms. Corley, how about you?  Do you feel that way?
 4             JUROR CORLEY:  No, sir.
 5             MR. ALBRITTON:  Okay.  Thank you.
 6             How about over here?
 7             Ms. Hannah, do you feel that Apple ought to have to
 8   prove that it didn't do anything wrong in this case?
 9             THE COURT:  Let's use the microphone, please.
10             JUROR HANNAH:  No, sir.  I haven't heard any of the
11   facts yet.
12             MR. ALBRITTON:  Okay.  Of course.  And that's
13   exactly right.  But -- but as we go through this trial, do
14   you think that Apple ought to have to prove that it didn't do
15   something wrong, or do you think that Core Wireless ought to
16   have to -- have to prove that Apple did something wrong?
17             JUROR HANNAH:  I would think Core would need to
18   prove, and -- and the Judge would read the charge and -- and
19   let us know what we need to go by.
20             MR. ALBRITTON:  Yes, ma'am.  I agree.  Thank you
21   very much.
22             Let's talk to Ms. Vandergriff.
23             Ms. Vandergriff, do you feel like Apple ought to
24   have to prove it did nothing wrong?
25             JUROR VANDERGRIFF:  Well, I -- from what I'm
```

1   gathering is Core is bringing the suit against you, so I

2   would think that they would have to prove that you were doing

3   something wrong.

4          MR. ALBRITTON:  Great.  Thank you.

5          Does anybody feel differently?  That is, anybody

6   feel like Apple ought to -- since we're here at court, okay,

7   in this beautiful federal courthouse, that Apple really ought

8   to have to prove it did nothing wrong?

9          Ms. Saucier, you feel that way?

10          JUROR SAUCIER:  Yes, I do.  I feel like, you know,

11   you're suing him.  We need to hear your facts, and you need

12   to defend yourself, and we need to hear, you know, what

13   you've got, too.

14          MR. ALBRITTON:  Okay.  So -- so let me ask it to

15   you this way, okay?  His Honor is going to instruct you that

16   it's their burden of proof.

17          JUROR SAUCIER:  Uh-huh.

18          MR. ALBRITTON:  They have to prove infringement by

19   a preponderance of the evidence.

20          JUROR SAUCIER:  Right.

21          MR. ALBRITTON:  And Apple, His Honor is going to

22   tell you, has no burden of proof at all with respect to

23   infringement.

24          So the way that it works is, if they don't prove it

25   by a preponderance, then you have to find Apple did nothing

 1    wrong, okay?  That's what the Judge is going to instruct you.

 2              Based on how you feel and -- and where you come

 3    into this case, is it going to be hard for you to follow that

 4    instruction, and are you going to feel like that Apple really

 5    needs to prove that it did nothing wrong?

 6              JUROR SAUCIER:  Yes, I do.

 7              MR. ALBRITTON:  Okay.  So no matter what the Judge

 8    says or anybody says -- and I understand His Honor just wants

 9    a fair jury like the rest of us.

10              JUROR SAUCIER:  I -- you know, I will do what you

11    tell me to do, but in the back of my -- I would want to hear

12    what y'all had to say.

13              MR. ALBRITTON:  Okay.  All right.  Thank you very

14    much.

15              Does anybody else feel the same way as Ms. Saucier?

16    How about you, Ms. Hiebing?  Do you feel that way a little

17    bit?

18              JUROR HIEBING:  (Shakes head negatively.)

19              MR. ALBRITTON:  You're shaking your head that you

20    do not.

21              JUROR HIEBING:  No.

22              MR. ALBRITTON:  Okay.  Great.

23              Mr. Ward talked to you about the -- they had to

24    spend money involved to get to court, okay?  Does anybody

25    feel like merely because of the fact that there was a lawsuit

1    filed, that Core Wireless ought to at least get some money

2    out of the end of this case?  Does anybody feel that way?

3            What about you, Ms. Berry?  Do you feel that way?

4            JUROR BERRY:  No.

5            MR. ALBRITTON:  She said no.

6            Okay.  Thank you, Ms. Berry.

7            What about you, Mr. -- what about you,

8    Ms. Vandergriff?  Do you feel like since we've gotten here,

9    they must -- "they" being Core Wireless must be entitled to

10   some amount of money?

11           JUROR VANDERGRIFF:  Not necessarily.  If they don't

12   win the case, they don't deserve it.

13           MR. ALBRITTON:  Thank you very much.

14           Ms. Strickland, how about you?  Right here on the

15   end.

16           THE COURT:  Mr. Albritton, I'm going to let this

17   panel member answer, but this is the third time you've just

18   asked just because we got here.

19           JUROR STRICKLAND:  No.

20           THE COURT:  So we need to move on to another

21   question.

22           MR. ALBRITTON:  Thank you, Your Honor.

23           All right.  That actually -- fortunately for all of

24   y'all, that was my last substantive question.

25           So I'm going to ask you a follow-up question, and

```
 1    that is, does anybody -- is somebody sitting there thinking:

 2    You know what, if Mr. Albritton had just asked me something

 3    else, I would have told him something that he really would

 4    want to know or that if I were in his shoes, I would want to

 5    know.

 6              So I'm going to go through on Mr. Juno's row.  Is

 7    there something on -- that any of you are thinking that,

 8    goodness gracious, if Mr. Albritton had told me this, I would

 9    have told him this, and this is something he really ought to

10    know?

11              Anybody on Mr. Juno's row?

12              How about on Ms. Corley's row?

13              Yes, sir.  That's Mr. Neal?

14              JUROR NEAL:  I may be out of -- out of order here.

15              Your technology on cell phones, is this what this

16    is going --

17              MR. ALBRITTON:  Yes, sir.

18              JUROR NEAL:  I hadn't got a clue on a cell phone or

19    anything.

20              MR. ALBRITTON:  Okay.

21              JUROR NEAL:  I don't own one.  Don't even know how

22    to operate one.

23              MR. ALBRITTON:  Okay.

24              JUROR NEAL:  And I want to be clear on that fact.

25              MR. ALBRITTON:  I very much --
```

1          JUROR NEAL:  I have no idea what you're talking

2     about.

3          MR. ALBRITTON:  I very much appreciate that.

4          How about over here on Ms. Urbina's row?

5          Anybody -- yes, ma'am.  Ms. Hannah.

6          JUROR HANNAH:  Well, I would say like him on the

7     technology.  I have a little flip phone.  As my children say,

8     I need to get with the world.  I don't -- I don't -- I work

9     on a computer all day at work, so I don't have one at home.

10    Don't care to be involved in all that.

11         MR. ALBRITTON:  Yes, ma'am.

12         JUROR HANNAH:  And -- but that wouldn't, I don't

13    think, make me not be able to make a fair decision.

14         MR. ALBRITTON:  Great.  Thank you very much,

15    Ms. Hannah.

16         Anybody else on Ms. Hannah's row?

17         And then finally how about Ms. Williams' row?

18         All right.  Folks, thank y'all very much.  We

19    appreciate you answering our questions.  I know that we're

20    all, you know, asking you about some personal things, and

21    we're not trying to pick on anybody in particular; we're just

22    trying to find out if you're the right kind of person to sit

23    on this jury.

24         And I'm going to sit down, and then Mr. Mueller

25    will talk to you after lunch about Apple's positions in this

```
 1   case and why -- what Apple thinks.

 2            Thank y'all very much.

 3            All right.  Counsel, approach the bench, please?

 4            (Bench conference.)

 5            THE COURT:  All right.  Let's all speak into this

 6   as you speak, one at a time.

 7            Mr. Ward, does the Plaintiff have any challenges

 8   for cause?

 9            MR. WARD:  Yes, Your Honor.

10            No. 1, No. 10, No. 17.

11            THE COURT:  All right.  1, 10, 17, Plaintiff's

12   challenges for cause.

13            Does Defendant have any more?

14            MR. WARD:  I'm sorry.  That was --

15            THE COURT:  Sure.

16            Mr. Albritton, does Defendant have any challenges

17   for cause?

18            MR. ALBRITTON:  No, we do not, Your Honor.

19            THE COURT:  All right.  All right.  Then take your

20   places, and we'll bring them up here to talk to them.

21            (Bench conference concluded.)

22            THE COURT:  All right.  Ladies and Gentlemen, I'm

23   going to excuse most of you for just a few moments.  And

24   those of you that I do not excuse, I'm going to ask you to

25   stay in your places after the rest of the panel exits the
```

1    courtroom.

2            I'm not excusing right now, though you'll be

3    joining the group shortly, Panel Member No. 1, Mr. Juno;

4    Panel Member No. 10, Mr. Childress; Panel Member No. 17, Ms.

5    Saucier; and Panel Member No. 18, Mr. Roberts.

6            The rest of you I'm going to excuse you at this

7    time with these instructions:  You'll have to wait outside

8    the courtroom, but take this opportunity to visit the

9    restroom, the water fountain, stretch your legs, but stay

10   close to this area.  Don't wander throughout this whole

11   building, because it is a big building.  Stay in this general

12   area.  Don't go outside.  Don't leave the building.

13           And I want to remind you that you shouldn't discuss

14   anything that's happened in the courtroom this morning.  And

15   that's in part because you haven't heard any evidence at all.

16           What you've heard this morning is not evidence in

17   this case.

18           However, I'm instructing you, talk about the

19   weather, talk about what's going on with your kids, talk

20   about where you're going for vacation this summer, talk about

21   anything you want to talk about except anything that's

22   happened in the courtroom this morning.

23           So with the exceptions of Panel Members No. 1, No.

24   10, No. 17, and No. 18, and with those instructions, the rest

25   of you are excused at this time.

```
 1                COURT SECURITY OFFICER:  All rise for the jury
 2   panel.
 3                (Jury panel out.)
 4                THE COURT:  All right.  Be seated, please.
 5                Counsel, if you'd approach the bench.
 6                (Bench conference.)
 7                MR. WARD:  Your Honor?
 8                THE COURT:  Let's save a spot for all the people
 9   we're going to bring up.
10                MR. WARD:  I found myself in the same shoes as Mr.
11   Albritton.  I didn't tell you about somebody, No. 19.  He
12   said he'd hold us to a higher burden on damages.  Mr.
13   Freeman.
14                THE COURT:  Yeah, he did say he could set it aside.
15   I've already sent him out.
16                Defendant have any objection to his challenge for
17   cause as untimely?
18                MR. ALBRITTON:  No, we don't.
19                (Open court.)
20                THE COURT:  All right.  Mr. Blanton, would you come
21   forward?
22                (Discussion off the record.)
23                THE COURT:  Mr. Juno, would you come around and
24   join us up here, please, sir?
25                (Bench conference continued.)
```

1          THE COURT:  This is the microphone, Mr. Juno.  If

2    you'll just kind of whisper into it, and I'll talk toward it

3    as well.

4          During the questioning this morning, you indicated

5    that people had claimed you had infringed before and that you

6    probably leaned toward the Defendant, in all honesty; but you

7    did say that you'd be fair, and you did say that you felt

8    like perhaps there might need to be more than a preponderance

9    of the evidence required by the Plaintiff.

10          So I guess my question to you is this:  Do you

11    think you can be fair and impartial and base any decision you

12    make in this case as a part of the jury, solely and only on

13    the evidence having listened to all the evidence in the case?

14    Do you have any question in your mind that you can do that?

15          JUROR JUNO:  No, I can do that.

16          THE COURT:  All right.  And if I instruct you that

17    you are to apply a preponderance of the evidence standard in

18    deciding how to answer those questions, can you do that, even

19    if you might personally think that there should be more or

20    less required of the parties?

21          JUROR JUNO:  I can do that.

22          THE COURT:  Okay.  Do you have any question that

23    you can do what I tell you to do if you're on this jury?

24          JUROR JUNO:  No.

25          THE COURT:  All right.  Mr. Ward, do you have any

1    questions of Mr. Juno?

2         MR. WARD:  Very briefly.

3         When I was questioning you, you indicated that you

4    would have difficulty with that.  I understand that the Judge

5    has asked that question.

6         How will you do that?  How is it that you'll now be

7    able to set it aside and follow His Honor's instructions when

8    earlier you told me that you wouldn't be able to do that.

9         You had some more time to think about it?

10        JUROR JUNO:  And that's why I'm here.  I'm supposed

11   to judge, I guess, and be fair and do what I'm supposed to do

12   and what's required of me as a juror.  And it would be

13   something that I -- like I said, would have been hard or

14   would be hard for me to do; but if it's what I'm supposed to

15   do on here, then I can do it, so...

16        THE COURT:  You can follow my instruction?

17        JUROR JUNO:  Yes.

18        THE COURT:  Okay.

19        MR. WARD:  Nothing further.

20        THE COURT:  Anything, Mr. Albritton?

21        MR. ALBRITTON:  No, sir.

22        THE COURT:  All right.  Mr. Juno, I'm going to let

23   you join the rest of the group outside.

24        JUROR JUNO:  Okay.

25        THE COURT:  Just don't discuss anything that's

1    happened in here.

2                JUROR JUNO:  I won't.

3                THE COURT:  Thank you.

4                JUROR JUNO:  Thank you.

5                (Juror Juno leaves the courtroom.)

6                (Open court.)

7                THE COURT:  Mr. Childress, would you come forward?

8                (Bench conference continued.)

9                MR. ALBRITTON:  I think we'll agree that he's

10   disqualified if he owns Apple stock, Your Honor.

11               THE COURT:  Mr. Childress, did you tell the Court

12   this morning that you do own Apple stock?

13               JUROR CHILDRESS:  That's correct, Your Honor.

14               THE COURT:  Okay.  You own that in your name

15   personally?

16               JUROR CHILDRESS:  That's correct.

17               THE COURT:  Any questions for Mr. Childress?

18               MR. WARD:  No, sir.

19               MR. ALBRITTON:  No, sir.

20               THE COURT:  Mr. Childress, I'm going to let you

21   join the rest of the group outside.  Just don't discuss

22   anything that happened in here.

23               JUROR CHILDRESS:  All right.

24               THE COURT:  Thank you.

25               (Juror Childress leaves the courtroom.)

```
 1              THE COURT:  All right.  I'm going to excuse
 2   Mr. Childress.  And I'm not going to excuse Mr. Juno.
 3   Mr. Juno remains on the panel.
 4              (Open court.)
 5              THE COURT:  All right.  Ms. Saucier, would you come
 6   forward, please?
 7              (Bench conference continued.)
 8              THE COURT:  Good morning.  If you'd step up here.
 9              And I'm sorry.  It may be Saucier or Saucier
10   (pronouncing).
11              JUROR SAUCIER:  It's Saucier (pronouncing), but we
12   have to say Saucier (pronouncing) here in Texas.
13              THE COURT:  You won't believe how many times
14   Gilstrap has been butchered --
15              JUROR SAUCIER:  I understand.
16              THE COURT:  -- so I'm sensitive to that.
17              JUROR SAUCIER:  I understand.
18              THE COURT:  All right.  I have a question for you.
19              JUROR SAUCIER:  Okay.
20              THE COURT:  You indicated that the Plaintiff might
21   need a higher burden of proof, if it were up to you
22   personally, than a preponderance of the evidence; and then
23   you made it very clear that you think what the Plaintiff is
24   asking for is an awful lot of money.
25              JUROR SAUCIER:  Uh-huh, I do.
```

```
 1              THE COURT:  And that's -- that's perfectly --
 2   that's perfectly okay.
 3              JUROR SAUCIER:  See, I don't know how they got to
 4   that amount.  I mean, who gets what?
 5              THE COURT:  Well, that's what the trial will be
 6   about.
 7              JUROR SAUCIER:  Uh-huh.
 8              THE COURT:  My question is:  Can you treat both of
 9   these parties the same starting out, equal in your mind?  Can
10   you listen to all the evidence; and only after you've heard
11   all the evidence, make any decisions about any of the issues
12   in this case?
13              JUROR SAUCIER:  I would be fair.
14              THE COURT:  And can you -- can you be fair and
15   impartial?
16              JUROR SAUCIER:  I can be fair, uh-huh.
17              THE COURT:  And even if you might personally think
18   this ought to require more or less proof, whatever I instruct
19   you, if you're on the jury, as to the level of proof and the
20   burden of proof, you can follow those instructions?
21              JUROR SAUCIER:  I would do exactly what you told me
22   to do.
23              THE COURT:  Okay.  I appreciate that.  My mother
24   was a schoolteacher.
25              JUROR SAUCIER:  You understand.
```

1          THE COURT:  I do understand.

2          Mr. Ward, do you have any questions?

3          MR. WARD:  Just briefly.

4          I understand you'll follow His Honor's

5     instructions; but regardless of that, do you start out

6     leaning in favor of Apple based upon --

7          JUROR SAUCIER:  I don't -- neither one of them.  I

8     don't lean toward either one of them.

9          MR. WARD:  You don't lean either way?

10          JUROR SAUCIER:  Huh-uh.

11          MR. WARD:  All right.  Thank you.

12          THE COURT:  Mr. Albritton?

13          MR. ALBRITTON:  No questions, Your Honor.

14          JUROR SAUCIER:  Okay.

15          THE COURT:  Ms. Saucier, you can join the rest of

16     the group outside.

17          JUROR SAUCIER:  Okay.

18          THE COURT:  Just don't discuss anything that

19     happened in here.

20          JUROR SAUCIER:  Okay.  Thank you.

21          (Juror Saucier leaves the courtroom.)

22          THE COURT:  All right.  She's not excused.  She

23     remains on the panel.

24          (Open court.)

25          THE COURT:  Mr. Roberts, would you come forward?

```
 1                    (Bench conference continued.)

 2              JUROR ROBERTS:  Yes, sir.

 3              THE COURT:  Mr. Roberts, you indicated very early

 4    that you had a scheduling problem.

 5              JUROR ROBERTS:  Yes, sir.

 6              THE COURT:  What's that scheduling problem?

 7              JUROR ROBERTS:  Monday, VA, for getting this

 8    operated on (indicating).

 9              THE COURT:  Okay.

10              JUROR ROBERTS:  And they'll inject an acid form.

11              THE COURT:  And this is a real sensitive

12    microphone, so don't touch it, please.

13              Your hands are going to be operated on?

14              JUROR ROBERTS:  This one's already done, and so

15    they're going to correct this one (indicating).

16              THE COURT:  I see.

17              JUROR ROBERTS:  And Monday they'll inject the acid,

18    and Tuesday they'll straighten it.

19              THE COURT:  And that's Monday of next week?

20    And where will that be?

21              JUROR ROBERTS:  VA hospital there in Dallas.

22              THE COURT:  In Dallas.

23              Okay.  How long have you had that appointment?

24              JUROR ROBERTS:  It's been going on now

25    two-and-a-half years trying to get this done.
```

1          THE COURT:  Okay.  All right.  Well, I'm not going

2     to ask you to reschedule that, and this trial is definitely

3     going to go through Monday of next week.  But I am going to

4     ask you to join the rest of the group outside and not discuss

5     anything about what's been discussed here in the courtroom.

6          JUROR ROBERTS:  Yes, sir.

7          THE COURT:  Thank you, sir.

8          (Juror Roberts leaves the courtroom.)

9          THE COURT:  All right.  I'm going to excuse Mr.

10    Roberts.

11         MR. ALBRITTON:  I don't think we're going to get

12    through 19.

13         MR. WARD:  No.

14         MR. ALBRITTON:  We're just going to be striking

15    through 17, it looks like.

16         THE COURT:  All right.  You're both satisfied we

17    need Mr. Freeman?

18         MR. WARD:  16, 17.

19         MR. ALBRITTON:  Yeah.  Strike through 17.

20         THE COURT:  Okay.

21         (Open court.)

22         THE COURT:  No.  Mr. Freeman, you can -- you can

23    join the rest of the group outside.  We don't need you after

24    all.  Thank you, though.

25              (Juror Freeman leaves the courtroom.)

```
 1              THE COURT:  All right.  Counsel, how long do you

 2   need to strike your list?

 3              MR. WARD:  15 minutes.

 4              MR. ALBRITTON:  Yes, sir, please.

 5              THE COURT:  All right.  It's almost 20 after.  I'll

 6   give you until 35 after.

 7              MR. ALBRITTON:  Thank you very much, Your Honor.

 8              THE COURT:  All right.

 9              (Bench conference concluded.)

10              THE COURT:  All right.  The Court is going to stand

11   in recess until counsel exercise their peremptory challenges

12   which should be 10:35 this morning.  Until such time, the

13   Court stands in recess.

14              COURT SECURITY OFFICER:  All rise.

15              (Recess.)

16              (Jury panel out.)

17              COURT SECURITY OFFICER:  All rise.

18              THE COURT:  Be seated, please.

19              Counsel, approach the bench, please.

20              (Bench conference.)

21              THE COURT:  Is there some -- is there some issue

22   that's arisen before we finalize your strikes?

23              MR. WARD:  I do not believe so, Your Honor.  We

24   were going to preserve what we believe is error not striking

25   No. 1; but that puts No. 19 in play which we'd burn a strike
```

1  on him, so it -- if it was error, it would be harmless error.

2  So we don't have anything we need to put on the record.

3         THE COURT:  Anything from the Defendant?

4         MR. ALBRITTON:  No, sir.

5         THE COURT:  All right.  Wait a minute before you

6  leave.

7         During -- during the preliminary instructions and

8  while you were introducing your counsel, I inadvertently was

9  looking in the direction of Mr. Ward but looking at his

10  father over his shoulder and I said thank you, Your Honor, on

11  the record.  You all may not have caught it.

12         MR. WARD:  I missed that.

13         THE COURT:  But I did because I've called your dad

14  Your Honor for 13 years.  If anybody has a problem with that,

15  speak now and I'll instruct the panel to disregard that

16  comment.

17         MR. ALBRITTON:  We have no objection, Your Honor.

18         THE COURT:  Anybody have an objection?  I don't

19  want to see it in the post-trial briefing.

20         MR. ALBRITTON:  No, sir.  No objection whatsoever.

21         THE COURT:  All right.  Thank you.  All right.

22         Take your places.

23         MR. ALBRITTON:  It's hard for me, as well, Your

24  Honor.

25         (Bench conference concluded.)

```
 1              COURT SECURITY OFFICER:  All rise for the jury.

 2              (Jury in.)

 3              THE COURT:   All right.  Please be seated.

 4              Ladies and Gentlemen, if you will listen carefully

 5    as your name is called.  When your name is called, please

 6    come forward and take your seat in the jury box.  We're going

 7    to seat eight jurors in this case.

 8              We, obviously, have a jury box that holds 12, so

 9    this is the way I'd like you to sit in the box when your

10    names are called.

11              The first four jurors, I'd like to sit on the front

12    row of the jury box.  The second four jurors sit on the

13    second row of the jury box.

14              And if Juror No. 1 who's called, if you would come

15    into the box from the far end from where I'm seated where Mr.

16    Blanton is standing, if you'd come into the front row and

17    stand in front of the fourth chair, leaving the last two

18    chairs, for me, vacant.

19              The second row do the same thing, and that way the

20    four on the front and the four on the back will be the

21    furthest toward where you are now, and that will better

22    position you in the courtroom to see the exhibits and hear

23    the testimony as we go into the trial.

24              So with those instructions, Ms. Lockhart, if you

25    will call the names of our eight jurors.
```

1            COURTROOM DEPUTY:  Yes, sir.

2            Pamela Ray, Terry Shiflet, William Rogers, Derrell

3    Neal, Robert Scott, Irma Urbina, Gail Hannah, and Toby Gowin.

4            THE COURT:  All right.  All of you who have been

5    here this morning as part of the panel that were not selected

6    in this case, I'm about to excuse you; but as I excuse you, I

7    want to tell you in the most sincere terms I can call forward

8    how much the Court appreciates you being here.

9            It's a rainy, messy morning.  It was not easy to

10   get here from your homes.  I know that every one of you have

11   other places that are important for you to be at and other

12   things that you needed to do.  The Court is very well aware

13   that you've made a sacrifice to be here, and you have the

14   sincere thanks and appreciation of the Court.

15           Even though you weren't selected to serve on this

16   jury, you have done very real public service by being here.

17           Had you not been here, had we not had everyone

18   present this morning when we began, we would not have been

19   able to select this jury.  And without this jury, we would

20   not able to try this case.  So you have, as I say, performed

21   very valuable and significant public service.

22           You have the thanks of the Court, the thanks of

23   counsel, the thanks of the parties, and the thanks of the

24   Court's staff.

25           The only thing I can ask is in the future, if

1    you're selected for jury service again, just show up with the

2    same positive and constructive attitude that I've seen from

3    each one of you this morning.

4              Again, thank you very much.  You are excused at

5    this time.

6              COURT SECURITY OFFICER:  All rise for the jury

7    panel.

8              (Jury panel out.)

9              THE COURT:  All right.  If everyone except the

10   members of the jury would be seated, please.

11             Ms. Lockhart, will now administer the oath to each

12   of the members of the jury.

13             (Jurors sworn.)

14             THE COURT:  Be seated, please.

15             Ladies and Gentlemen of the Jury:  We're about to

16   recess for lunch.

17             One of the things that I want to make you aware of

18   is that lunch is going to be provided for you today and each

19   day during the trial.  Both sides together are bearing the

20   cost of providing lunch to the jury.

21             That's so that you will not have to leave the

22   courthouse, find a place to have lunch, and then return.  It

23   will save us time.  We'll be able to take less time for lunch

24   breaks.  It will be convenient for you.  You won't have to

25   get out in the weather, and it will move the process more

1    efficiently forward.

2         So I want you to know that that will be something

3    you can look for each day that you're here in trial.

4         Before you leave today sometime, I would like you

5    to make sure that either the Clerk's Office or Ms. Lockhart

6    has a good cell phone number for you, so if anything were to

7    come up that we needed to reach you, say, after you're

8    excused one evening and before you report the next morning,

9    that we can get ahold of you.

10        No emergency, but just before you leave the

11   building today, see that we have a good-working, accurate

12   cell phone number that we can communicate with you if, in the

13   unlikely event, we need you afterhours so we'll be able to.

14        Now, before we do break for lunch, I have just a

15   couple more instructions that I want to go over with you; and

16   the first one is probably the most important one, although

17   they're all important.

18        Do not discuss this case with anyone.  And I

19   promise you, Ladies and Gentlemen of the Jury, you're going

20   to hear that same instruction from me throughout the next

21   seven or eight days more times than you care to hear it

22   because it is absolutely vital and essential to the entire

23   process that we're about to begin that the jury make its

24   decision after the close of the trial based solely and only

25   on the evidence that comes into this courtroom under oath

1  from witnesses on that witness stand and from the documents

2  and other exhibits that the Court admits into evidence.

3         Those must be the only two sources of information

4  that you base your decisions on.  Therefore, it is absolutely

5  vital that you not communicate with anyone about this case.

6         Also, and in very much the same way, it is

7  absolutely essential that you not communicate with each other

8  about this case.  Only after all the evidence is in and I

9  instruct you to retire to the jury room to deliberate on your

10  verdict, only then may you discuss the case among yourselves.

11        So you cannot discuss the case with each other and

12  you cannot discuss the case with anyone.

13        When you go home tonight, that will be one of the

14  most vulnerable times because wherever you live, if there's

15  somebody there when you walk in the door, the first question

16  you're going to get is, well, what happened in federal court

17  today?

18        Don't try to answer that question because if you

19  even try to answer it, you're almost invariably going to

20  violate my instruction to you.  Just say that Judge Gilstrap

21  told me not to discuss the case with anyone, and I don't want

22  him to be angry at me.  I'm going to follow his instructions,

23  so I just can't answer that question.  Just don't even go

24  there.

25        Also, Ladies and Gentlemen, when I tell you not to

1  talk about the case with anyone or communicate about the case

2  with anyone, that means not only verbal communications, but

3  that means electronic communications, emails, instant

4  messages, tweets, Facebook postings.  Any of you that are on

5  social media, do not post or comment online in any shape,

6  form, or fashion about your jury service or this case at all.

7       Communication means any and all forms of

8  communication:  oral, written, electronic.  Any way that you

9  can communicate, do not communicate about the case.  That is

10  absolutely critical and important.

11       If for any reason any of you receive any

12  information that does not come solely and only from the sworn

13  testimony of the witnesses and the exhibits that I admit into

14  evidence, then we risk having wasted all the time that's been

15  put into this case.  That's why this is so critical and why I

16  emphasize it so much.

17       And that's why every time you get up to have a

18  recess, every time you get up to go to lunch, every time you

19  get up to go home over the next several days we try this

20  case, you're going to hear that same instruction from me.

21       And I do it because it is absolutely vital and

22  critical, and I want to stress the importance of it every way

23  I can.

24       Also, you're not at any time to attempt to do any

25  research about any of the parties, any of the issues,

1    anything at all related to this case.  Don't go home at night

2    and get on your computers and Google Core Wireless or Apple

3    or any of these lawyers.  Do not attempt to do any research

4    at all.

5           And if you don't -- if you don't Google, don't go

6    to the public library and look it up in an encyclopedia.

7    Don't do it the old-fashioned way.  Don't do any research

8    whatsoever about anything or anybody related to this lawsuit.

9    That, too, would jeopardize everything that we've done so

10   far.

11          Also, I don't think this will happen, but this is

12   an important case and it is a possibility.  Now, that you are

13   the selected and sworn as the jury in this case, it is

14   possible -- though I think it's not likely -- it is possible

15   some third party could approach you at someplace and try to

16   influence you or encourage you or communicate with you about

17   what decision you might ultimately reach in this case.

18          That, if it happens, is highly improper and very

19   well may be criminal.  So though I say it's unlikely, if at

20   any time before you've been discharged by me as jurors in

21   this case, if anybody tries to influence you in any way or

22   you even perceive that they may be trying to influence you in

23   any way, then I'm instructing you to advise the Court

24   immediately through the Clerk's Office and the staff here and

25   I will deal with it.

1          Again, I don't think it's likely, but it is within

2     the realm of possibility.  And now that you're the jury in

3     this case, you need to be aware of it.

4          And lastly, Ladies and Gentlemen, during this week

5     and a few days it's going to take to try the case, there will

6     be times when you are on recess that you are in the building,

7     and there are also at the beginning of each day and the end

8     of each day, you'll be coming and going through the building.

9          There invariably are going to be times that in

10    hallways, on the front steps, in the parking lot you're going

11    to pass or come close to one or more of the lawyers in this

12    case, one or more of the witnesses in this case, one or more

13    of the corporate representatives in this case.

14         What I'm instructing you to do is just don't talk

15    to them at all.  And by the same token, I want you to

16    understand that I've instructed them not to attempt to talk

17    to you.

18         So if you come in one morning and one of these

19    lawyers walks right by you and doesn't smile, doesn't nod,

20    doesn't say good morning, doesn't say how are you, doesn't

21    say it's a pretty day outside today, do not think they're

22    being rude.  Do not think they're being mean or -- or

23    thoughtless or -- or anything else negative.  They are simply

24    doing what the Court has instructed them to do.

25         So when they walk by you in the hallway or in the

1   front steps or anywhere else and they don't engage in any

2   conversation or communicate in any way, that's simply because

3   I've instructed them to do that and they are simply doing

4   what I've told them to do.  So don't hold that against them

5   in any way, shape, form, or fashion.

6           All right.  Ladies and Gentlemen, with those

7   instructions, I'm going to allow you to recess.  Lunch will

8   be served to you in the jury room.

9           It is right at 12:00 o'clock noon.  We'll attempt

10  to have you back in here in about 40 or 45 minutes, and then

11  we'll begin with my preliminary instructions and opening

12  statements from the attorneys.

13          With those instructions, Ladies and Gentlemen,

14  you're excused for lunch at this time.

15          COURT SECURITY OFFICER:  All rise for the jury.

16          (Jury out.)

17          THE COURT:  All right.  Counsel, we stand in recess

18  for lunch.  We'll convene at a quarter until 1:00.  Court's

19  in recess.

20          (Lunch recess.)

21

22

23

24

25

1                           CERTIFICATION

2

3               I HEREBY CERTIFY that the foregoing is a true

4    and correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of our

6    abilities.

7

8

9    /s/_____
     SHEA SLOAN, CSR, RPR                      March 9, 2015
10   Official Court Reporter
     State of Texas No.:  3081
11   Expiration Date:  12/31/16

12

13

14   /s/_____
     SHELLY HOLMES, CSR, TCRR
15   Deputy Official Court Reporter
     State of Texas No.:  7804
16   Expiration Date  12/31/16

17

18

19

20

21

22

23

24

25