```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       TYLER DIVISION

 3
     CORE WIRELESS LICENSING     )
 4   S.A.R.L.                              DOCKET NO. 6:12cv100

 5        -vs-                   )
                                           Tyler, Texas
 6                               )  11:17 a.m.
     APPLE INC.                            March 16, 2015
 7

 8
                          TRANSCRIPT OF TRIAL
 9            BEFORE THE HONORABLE RODNEY GILSTRAP,
                    UNITED STATES DISTRICT JUDGE
10

11                       A P P E A R A N C E S

12

13   FOR THE PLAINTIFF:

14
     MR. HENRY C. BUNSOW
15   MS. DENISE M. DE MORY
     MR. BRIAN A.E. SMITH
16   MR. CRAIG Y. ALLISON
     BUNSOW DE MORY SMITH
17     & ALLISON LLP
     351 California Street
18   Suite 200
     San Francisco, California 94104
19

20   MR. T. JOHN WARD, JR.
     WARD & SMITH LAW FIRM
21   P.O. Box 1231
     1127 Judson Road
22   Suite 220
     Longview, Texas  75601-1231
23

24

25
```

```
 1   FOR THE DEFENDANTS:

 2
     MR. ERIC M. ALBRITTON
 3   ALBRITTON LAW FIRM
     P.O. Box 2649
 4   Longview, Texas   75606

 5
     MR. JOSEPH J. MUELLER
 6   MS. CYNTHIA D. VREELAND
     WILMER CUTLER PICKERING
 7     HALE & DORR LLP
     60 State Street
 8   Boston, Massachusetts 02109

 9

10

11                   ********************

12

13
     COURT REPORTERS:        MS. SHELLY HOLMES, CSR, TCRR
14                           OFFICIAL COURT REPORTER
                             shelly_holmes@txed.uscourts.gov
15
                             MS. SHEA SLOAN, CSR, RPR
16                           OFFICIAL COURT REPORTER
                             shea_sloan@txed.uscourts.gov
17

18

19

20   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                (Jury out.)

 3                COURT SECURITY OFFICER:  All rise.

 4                THE COURT:  Be seated, please.

 5                All right.  Are the parties prepared to read into

 6    the record those items from the pre-admitted exhibits used

 7    during the last portion of the trial?

 8                MR. MUELLER:  Yes, Your Honor.

 9                THE COURT:  All right.  Defendant may proceed with

10    their list.

11                MR. MUELLER:  Defendant -- the Defendant's list is

12    DX 29, DX 49, DX 56, DX 60, DX 61, DX 102, DX 103, DX 153,

13    DX 165, DX 166, DX 171, DX 182, DX 239, and PX 243.

14                THE COURT:  All right.  Is there objection from the

15    Plaintiff as to that rendition from the Defendant?

16                MS. DE MORY:  No objection, Your Honor.

17                THE COURT:  All right.

18                MS. DE MORY:  And I would like to introduce

19    Ms. Curtis, who will be speaking on the jury instructions for

20    us.

21                THE COURT:  All right.  Does Plaintiff have any

22    additional exhibits to read into the record?

23                MS. CURTIS:  We do.  Just one additional exhibit,

24    Your Honor, on Monday.  PX 23 was read into the record or

25    introduced to the jury through Dr. Malkamaki; and we've
```

1  conferred with the Defendants on that, and they have no

2  objection.

3           MR. MUELLER:  No objection.

4           THE COURT:  All right.  All right.  Then we'll

5  proceed with the formal charge conference.  As counsel is

6  aware, the Court's previously met with representatives of

7  both of the parties and conducted a lengthy and informal

8  charge conference in which the last joint submission from the

9  parties as to the final jury instructions and verdict form

10  were reviewed in detail.

11           Each side was given a full opportunity to express

12  themselves, offer any comments both as to matters included in

13  that joint submission and any matters that were late arising

14  and might not have been submitted that they wish to include.

15           The Court's considered the comments and input from

16  both Plaintiff and Defendant and has generated its final jury

17  instructions, which you now have and have had an opportunity

18  to review.

19           We'll now conduct a formal charge conference on the

20  record wherein a representative of both sides will address

21  the Court with any formal objections that either side wishes

22  to offer with regard to the instructions and the verdict form

23  as you now have them.

24           If whoever is going to speak for both Plaintiff and

25  Defendant will go to the podium, we'll proceed with the

1   formal charge conference at this time.

2          All right.  We'll start with the final jury

3   instructions.  Page 1 is just simply the title with the style

4   of the case.  Actually, the cover sheet is numbered as Page 1

5   and the first sheet is not numbered.  So I'll change that,

6   and we'll take the one off the cover sheet and make the first

7   page inside Page 1.

8          And with that, are there any objections from either

9   party with regard to anything on Page 1 of the jury

10  instructions?

11         MS. CURTIS:  No objections from the Plaintiff, Your

12  Honor.

13         MS. VREELAND:  No objections for Apple either.

14         THE COURT:  We'll turn to Page 2.  Any objections

15  from either party?

16         MS. CURTIS:  No objections for Plaintiff.

17         MS. VREELAND:  No objection for Apple.

18         THE COURT:  Page 3, any objections from either

19  party?

20         MS. CURTIS:  No objection, Your Honor.

21         MS. VREELAND:  No objection.

22         THE COURT:  Turning then to Page 4 of the final

23  jury instructions, any objection from either Plaintiff or

24  Defendant?

25         MS. CURTIS:  I noticed on this page, actually, Your

```
 1   Honor -- and this a comment throughout in the beginning -- or

 2   in the middle of the page -- the beyond a reasonable doubt is

 3   in quotes.  There's several other quotes and brackets and

 4   formatting that's --

 5             THE COURT:  And those are going to be -- quotes are

 6   all going to be removed in what I give to the jury.  That's

 7   just -- I didn't have time to do that.

 8             The footnotes that you cited in your joint

 9   submission have been removed.  The quotation marks that were

10   given rise to in those footnotes, haven't come out yet; but I

11   will take them out in the final version that the jury

12   receives.

13             MS. CURTIS:  Understood.  Thank you.

14             MS. VREELAND:  And, Your Honor, Apple objects to

15   what I think may have been an inadvertent error on Page 4 in

16   the fourth to last paragraph that begins:  The Plaintiff Core

17   Wireless has the burden of proving patent infringement and

18   damages by a preponderance of the evidence.

19             The next sentence begins:  Both Core Wireless, the

20   Plaintiff, and Apple, the Defendant, have the burden of

21   proving breach of contract by a preponderance of the

22   evidence.

23             We believe that the reference to Core Wireless

24   should come out, since it appears that Your Honor is only

25   instructing on the Apple breach-of-contract claim.
```

```
 1              THE COURT:  All right.  Then I'll change that

 2    sentence to Apple, the Defendant, also has the burden of

 3    proving breach of contract by a preponderance of the

 4    evidence.

 5              MS. VREELAND:  Thank you, Your Honor.

 6              THE COURT:  Anything else on Page 4 from either

 7    Plaintiff or Defendant?

 8              MS. CURTIS:  No, Your Honor.

 9              THE COURT:  Turn then to Page 5.  Any objections

10    from either party on Page 5?

11              MS. CURTIS:  No objection, Your Honor.

12              MS. VREELAND:  No objection.

13              THE COURT:  All right.  Turning then to Page 6, any

14    objection from either party to anything on Page 6 of the jury

15    instructions?

16              MS. CURTIS:  No objection, Your Honor.

17              MS. VREELAND:  No objection.

18              THE COURT:  Page 7.

19              MS. CURTIS:  Yes, Your Honor.  The -- right before

20    the very last sentence on Page 7, we believe that there was

21    an omission to agreed language in the parties' proposed jury

22    instruction, which was Docket 395; and that was on Page 11 of

23    that docket entry.

24              And there was a sentence that started -- or that

25    read:  Claims are presumed to cover one or more embodiments
```

1   described in the specification.

2          And the parties did not dispute that language.

3          We also object to the omission of the sentence that

4   followed in the Docket 395, which we proposed a sentence that

5   started:  A reading that would exclude the preferred

6   embodiment is rarely, if ever, correct and would require a

7   highly persuasive evidentiary support.

8          As an alternative proposal to that, Plaintiff would

9   also propose:  A reading that would exclude the description

10  or examples in the specification as rarely, if ever, correct

11  and would require highly persuasive evidentiary support.

12         MS. VREELAND:  And, Your Honor, we would object to

13  that language for the reasons previously stated.

14         THE COURT:  Well, the Court determined that the

15  objected-to language should not be included; and without

16  that, the preceding sentence seemed inappropriate.  And

17  that's why the Court intentionally took out that sentence,

18  even though the parties had not previously disputed it.

19         So I'll overrule the Plaintiff's objection as to

20  that matter on Page 7.

21         Anything else before we go to Page 8?

22         MS. CURTIS:  Nothing further.

23         MS. VREELAND:  Nothing from Apple.

24         THE COURT:  Then turn to Page 8, if you will.  Are

25  there any objections from either party to anything on Page 8

1   of the instructions?

2           MS. CURTIS:  No objection, Your Honor.

3           MS. VREELAND:  No objection.

4           THE COURT:  Page 9?

5           MS. CURTIS:  No objection.

6           MS. VREELAND:  No objection.

7           THE COURT:  Page 10?

8           MS. CURTIS:  No objection, Your Honor.

9           MS. VREELAND:  No objection.

10          THE COURT:  Page 11?

11          MS. CURTIS:  No objection.

12          MS. VREELAND:  No objection.

13          THE COURT:  Page 12?

14          MS. CURTIS:  No objection, Your Honor.

15          MS. VREELAND:  No objection, Your Honor.

16          THE COURT:  Page 13?

17          MS. CURTIS:  Yes, Your Honor.  Plaintiffs object to

18  the last two paragraphs on Page 13 that carries over into

19  also the first paragraph on Page 14, which was Apple's

20  proposal on multiple alleged infringers.

21          We believe this is not an issue in this case, as

22  Core Wireless has never alleged that multiple parties

23  infringe the claims.

24          THE COURT:  Well, the Court believes that

25  instruction is appropriate, and the objection by the

1    Plaintiff is overruled.

2         MS. VREELAND:  Your Honor, Apple also had an

3    objection to Page 13, and that is the second full paragraph

4    that begins:  Core Wireless alleges that all of the claims of

5    the '022, '664, '143, and '850s patents recite the capability

6    to perform a function.

7         We object to that sentence and the complete

8    paragraph after it on the ground that this principle does not

9    apply to our case.  The claims in issue use the language

10   adapted to, and -- and configured to.

11        And under the cases previously cited to the Court,

12   including Phoenix v. West and Aspex v. Marchon, because of

13   the language "adapted to," the -- the capability issue is not

14   appropriate for the instructions.

15        And, Your Honor, we also -- so we would object to

16   the inclusion.

17        And, Your Honor, we also would propose additional

18   language if this is concluded -- if this is included.

19        THE COURT:  Well, this is a matter we discussed in

20   the informal charge conference.  Apple made its objections to

21   this paragraph then and offered additional or alternative

22   language.

23        The Court has determined that this language is

24   appropriate and accurate and will overrule for the record

25   Apple's objection, as well as any other offering by Apple in

1   this regard.

2           MS. VREELAND:  And may we, Your Honor, just state

3   what our additional language was for purposes of the record?

4           THE COURT:  It's the same language that was in your

5   joint submission that's previously been filed, is it not?

6           MS. VREELAND:  Yes, Your Honor.

7           THE COURT:  Are you not satisfied that that

8   preserves the point?

9           MS. VREELAND:  As long as it's clear that the

10   language on Claim -- Page 18 of our prior submission is the

11   language that we are proposing be added.

12           THE COURT:  Duly noted.

13           MS. VREELAND:  Thank you, Your Honor.

14           THE COURT:  All right.  Anything else before we

15   move on on this page?

16           MS. CURTIS:  Nothing further from Plaintiffs, Your

17   Honor.

18           THE COURT:  We'll turn to Page 14 of the final jury

19   instructions.  Any objection from either party on Page 14?

20           MS. CURTIS:  Only the objection previously noted,

21   Your Honor, in the first paragraph.

22           THE COURT:  Duly noted.  Anything --

23           MS. VREELAND:  No --

24           THE COURT:  -- from Defendant?

25           MS. VREELAND:  No objection from Defendant.

 1          THE COURT:  All right.  Turn then to Page 15, if

 2   you will.  Any objection from either party here?

 3          MS. CURTIS:  Yes, Your Honor.  At the end of the

 4   second full paragraph, I believe that there was an

 5   agreed-upon sentence in the prior submission at Page 21.

 6            Previously, Apple noted an objection to the last

 7   sentence of that paragraph; but I believe this morning at the

 8   informal charge conference they stated that they were

 9   agreeable to the last sentence, which is:  Further, the same

10   element or method step of the accused product or method may

11   satisfy more than one element of a claim.

12          THE COURT:  And you're suggesting that go at the

13   end of the second paragraph; is that correct?

14          MS. CURTIS:   That's correct, Your Honor.  The

15   second paragraph that starts "in deciding whether."

16          THE COURT:  What's Apple's position on that?

17          MS. VREELAND:  We would have no objection, Your

18   Honor.

19          THE COURT:  All right.  Plaintiff's counsel, give

20   me that wording again --

21          MS. CURTIS:  Certainly.

22          THE COURT:  -- slowly enough for me to write it

23   down.

24          MS. CURTIS:  You got it.  Further, comma, the same

25   element or method step of the accused product or method may

1    satisfy more than one element of a claim.

2              THE COURT:  Of a claim?

3              MS. CURTIS:  Correct.

4              THE COURT:  All right.  Without objection, I'll add

5    that language at the end of Paragraph 2.

6              MS. CURTIS:  Thank you, Your Honor.

7              THE COURT:  Anything else on Page 15 from either

8    party?

9              MS. CURTIS:  Nothing further.

10             MS. VREELAND:  No objections from Apple, Your

11   Honor.

12             THE COURT:  All right.  Then turn to Page 16, if

13   you will.  Are there any objections from either party as to

14   anything included on Page 16?

15             MS. CURTIS:  No objection from Core Wireless.

16             MS. VREELAND:  Your Honor, we had one objection --

17   well, two objections, one which would be a request for the

18   inclusion of additional language.

19             So our first objection would be for the inducement

20   instructions that end midway through the page.  We object to

21   the absence of the statement that evidence of a good-faith

22   belief of non-infringement can be evidence that Apple lacks

23   the required intent for induced infringement.

24             THE COURT:  And that objection is overruled.

25             MS. VREELAND:  And, secondly, Your Honor, we would

1    just like to preserve our objection on the willfulness

2    instruction.

3              We object to will -- to the jury being instructed

4    on willfulness on the grounds that the Plaintiffs have not

5    established an objective basis for willfulness.

6              THE COURT:  Why don't we do this, Ms. Vreeland:

7    The Court will recognize that anything that the Defendant

8    included in its last joint submission on proposed jury

9    instructions and verdict form that are not included in what

10   the Court adopts and gives to the jury, are objected to by

11   the Defendant; and that objection is not waived.

12             MS. VREELAND:  Thank you, Your Honor.

13             THE COURT:  Will that satisfy you?

14             MS. VREELAND:  Yes.  Thank you, Your Honor.

15             THE COURT:  All right.  Anything else on Page 16?

16             MS. CURTIS:  Nothing further from Plaintiff.

17             THE COURT:  Then we'll turn to Page 17.  Any

18   objection from either party to anything on Page 17 of the

19   jury instructions?

20             MS. CURTIS:  No objection, Your Honor.

21             MS. VREELAND:  No -- well, the objection previously

22   stated to the willfulness instructions, but Your Honor has

23   already considered that.

24             THE COURT:  All right.  Then we'll turn to Page 18.

25             Anything from either party on Page 18?

```
 1              MS. CURTIS:  No, Your Honor.

 2              MS. VREELAND:  No objections other than the

 3   addition of language that Your Honor already recognized the

 4   objection for.

 5              THE COURT:  Okay.  Next is Page 19.  Any objection

 6   from either party to anything on Page 19?

 7              MS. CURTIS:  No objection for Plaintiff, Your

 8   Honor.

 9              MS. VREELAND:  No objection from Defendants, other

10   than the additional language, Your Honor, which you've

11   already recognized.

12              THE COURT:  All right.  And I'll note for the

13   record, for the benefit of both parties, any language or text

14   offered by either Plaintiff or Defendant in the last joint

15   submission of the proposed final jury instructions and

16   verdict form from either party that's not included in the

17   Court's final adopted jury instructions and verdict form,

18   I'll note that you object to my failure to include it or my

19   modification of it, and that objection is not waived as part

20   of this formal charge conference.

21              MS. VREELAND:  Thank you, Your Honor.

22              THE COURT:  All right.  Let's turn to Page 20.

23              Any objection from either party to anything on Page

24   20 of the verdict -- of the final jury instructions?

25              MS. CURTIS:  No objection, Your Honor.
```

1           MS. VREELAND:  No objection.

2           THE COURT:  Page 21?

3           MS. CURTIS:  No objection.

4           MS. VREELAND:  No objection.

5           THE COURT:  Page 22?

6           MS. CURTIS:  No objection.

7           MS. VREELAND:  No objection.

8           THE COURT:  Page 23?

9           MS. CURTIS:  No objection.

10          MS. VREELAND:  No objection.

11          THE COURT:  Page 24?

12          MS. CURTIS:  May I just have one moment to confer?

13  I apologize, Your Honor.

14          THE COURT:  Take a moment.

15          MS. CURTIS:  I apologize.  No objection on 24, Your

16  Honor.

17          THE COURT:  Any objection from the Defendant on 24?

18          MS. VREELAND:  No objection.

19          THE COURT:  Then we'll turn to Page 25.  Any

20  objection here from either party?

21          MS. CURTIS:  Yes, Your Honor.  We object to the

22  second to last sentence in the first paragraph, which is:  In

23  deciding what amount of -- is a FRAND royalty, you may

24  consider any evidence of patent hold-up and royalty stacking

25  as previously stated in our submission yesterday following

```
 1   the jury instructions.

 2            THE COURT:  All right.  That -- that objection is

 3   overruled.

 4            Anything from Defendant?

 5            MS. VREELAND:  Yes, Your Honor.

 6            We do believe that the -- the Georgia-Pacific

 7   factors that have been given, that several of them should

 8   have a small amount of additional language consistent with

 9   the Ericsson versus D-Link case; and I can propose that

10   language to the Court.

11            THE COURT:  Is this something that was included in

12   your last joint submission that we talked about in the

13   informal charge conference, or is this -- this subsequent to

14   that?

15            MS. VREELAND:  I think it's different, Your Honor.

16   Your Honor chose the Georgia-Pacific factors that the

17   Plaintiff had proposed, and we had some small modifications

18   that we'd like to propose to this version of the

19   Georgia-Pacific factors.

20            THE COURT:  All right.  Give me those proposed

21   modifications.

22            MS. VREELAND:  So for the first factor, we would

23   propose adding the words "if any," "the royalties received by

24   the patentee, comma, if any."

25            THE COURT:  All right.  What else?
```

1          MS. VREELAND:  For the fourth factor, Your Honor,

2     we would suggest adding the clause at the end "taking into

3     account only the value of the patented technology and not the

4     value of the standard."

5          THE COURT:  All right.  What other additions to the

6     Georgia-Pacific factors that I've listed here do you want to

7     propose?

8          MS. VREELAND:  The others are on Page 26, Your

9     Honor.  So Georgia-Pacific Factor 6 on Page 26, we would

10    propose --

11         THE COURT:  You understand these are not the

12    factors -- this is not 6 as to the Georgia-Pacific cases.

13    This is 6 from this instruction because all 15 factors are

14    not here.

15         MS. VREELAND:  Yes.  I apologize.  What you've

16    labeled as the sixth factor is the one --

17         THE COURT:  Just so we're clear what we're talking

18    about.

19         MS. VREELAND:  Yes.  I think it's Georgia-Pacific

20    11; but in these instructions, 6.

21         And we would also propose adding the same language

22    at the end, "taking into account the value of the patented

23    technology and not the value of the standard."

24         THE COURT:  What else?

25         MS. VREELAND:  On the next factor in the Court's

| | |
|---|---|
| 1 | instructions, Factor 7, we would propose adding at the end |
| 2 | the clause, "also covered by standard essential patents." |
| 3 | THE COURT:  All right.  What else? |
| 4 | MS. VREELAND:  For the Court's Factor 8, we would |
| 5 | propose adding at the end "or the value of the |
| 6 | standardization of the patented technology." |
| 7 | THE COURT:  What else? |
| 8 | MS. VREELAND:  And for the Court's Factor 10, we |
| 9 | would propose adding -- midway through the first sentence |
| 10 | where it begins "if both sides had been reasonably and |
| 11 | voluntarily trying to reach an agreement," we would propose |
| 12 | changing that to, "if both sides were considering the FRAND |
| 13 | commitment and its purposes and both were -- both had been |
| 14 | reasonably and voluntarily trying to reach an agreement." |
| 15 | THE COURT:  Anything else? |
| 16 | MS. VREELAND:  No, Your Honor. |
| 17 | THE COURT:  All right.  Those objections are |
| 18 | overruled. |
| 19 | Anything else on Page 26 from either party? |
| 20 | MS. CURTIS:  No, Your Honor. |
| 21 | MS. VREELAND:  No, nothing from Apple. |
| 22 | THE COURT:  All right.  Then we'll turn to Page 27. |
| 23 | Any objections from either party here? |
| 24 | MS. CURTIS:  Nothing, Your Honor, from Plaintiffs. |
| 25 | MS. VREELAND:  No objections from Apple. |

1          MS. CURTIS:  With -- sorry -- with the exception

2   that the italicized words will also be --

3          THE COURT:  All of the italics will come out.

4          MS. CURTIS:  Thank you.

5          THE COURT:  Anything else on Page 28 then?

6          MS. CURTIS:  Yes, Your Honor.  Core Wireless

7   objects to the first paragraph, which is the inclusion of the

8   lump-sum instruction as we believe that there has not been

9   any evidence in the record about lump sum.

10          THE COURT:  All right.  That objection is

11  overruled.

12          Anything else from either Plaintiff or Defendant on

13  Page 28?

14          MS. VREELAND:  No objections, Your Honor.

15          THE COURT:  All right.  Turning to Page 29, any

16  objection there?

17          MS. CURTIS:  Your Honor, I guess the -- sorry.

18          This goes to Page 28 and 29 for Plaintiffs.  We

19  just want to note that we object to the inclusion of the

20  Court's instruction on contract claims for Apple's

21  breach-of-contract allegation on our basis that we don't

22  believe that they have stated the -- or provided the evidence

23  for that claim; and, of course, object to the Court's

24  deletion of our contract claim for Core Wireless, which was

25  part of the previous submission.

1          THE COURT:  Well, we discussed that at length in

2    the informal charge conference.  While I note your

3    objections, your objections are overruled.

4          MS. CURTIS:  Thank you.

5          THE COURT:  Then we'll turn to Page 29 to make sure

6    there's not anything else there.  Any objection from

7    Plaintiff or Defendant to anything on Page 29 not previously

8    mentioned?

9          MS. CURTIS:  No, Your Honor.

10          MS. VREELAND:  No objections from Apple.

11          THE COURT:  Page 30?

12          MS. CURTIS:  No objection.

13          MS. VREELAND:  No objection.

14          THE COURT:  And Page 31?

15          MS. CURTIS:  No objection, Your Honor.

16          MS. VREELAND:  No objection from Apple, Your Honor.

17          THE COURT:  All right.  Then I'll ask you to turn

18    to the proposed verdict form.  Likewise, this was discussed

19    at length in the informal charge conference, and we'll --

20    we'll address this in the same way that we addressed the

21    final jury instructions.

22          Is there objection from either party as to Page 1

23    of the verdict form?

24          MS. CURTIS:  No objection, Your Honor.

25          MS. VREELAND:  No objection.

1              THE COURT:  Page 2, which contains Question 1 to

2   the jury, any objection from either side?

3              MS. CURTIS:  No objection.

4              MS. VREELAND:  No objection.

5              THE COURT:  Page 3 of the verdict form?

6              MS. CURTIS:  No objection.

7              MS. VREELAND:  No objection.

8              THE COURT:  Page 4?

9              MS. CURTIS:  No objection.

10             MS. VREELAND:  No objection.

11             THE COURT:  Page 5?

12             MS. CURTIS:  No objection.

13             MS. VREELAND:  Your Honor, we would have an

14  objection to the sentence at the top, which instructs the

15  jury that they should consider this question if they answered

16  yes to 1.

17        We believe they would only need to answer this

18  question if they had answered yes to 1, which is the

19  infringement question, and no for 2 or 3, which are the

20  invalidity questions.

21        So they would only need to answer this if they had

22  found both that it was infringed and it was not invalid.

23             THE COURT:  Okay.  That's at the top of Page 5?

24             MS. VREELAND:  Yes, Your Honor.

25             THE COURT:  Are you offering me specific language,

1    Ms. Vreeland?

2            MS. VREELAND:  Yes, Your Honor.  It would be:

3    Answer this question only as to those claims you answered yes

4    for in Questions -- in Question 1 and no for Questions 2 and

5    3.

6            THE COURT:  Is there objection to that from Core

7    Wireless?

8            MS. CURTIS:  I think -- I think that that was the

9    reason we had submitted our proposed verdict form in the

10   order that we discussed this morning for clarity for the

11   jury.  But I think it's up to Your Honor if you decide that

12   it's too confusing for the jury one way or the other.

13           THE COURT:  All right.  I'll grant that suggested

14   change, and I'll adjust the instruction at the top of Page 5,

15   prior to Question 4, to include a negative answer to

16   Questions 2 and 3.  I mean, I'll use exactly the verbiage you

17   gave me, but I'll adopt the substance of what you suggested,

18   Ms. Vreeland.

19           MS. VREELAND:  Thank you.

20           THE COURT:  All right.  Let's turn then to Page 6

21   of the verdict form.  Is there objection from either party

22   here?

23           MS. CURTIS:  No objection to the content.  I do

24   notice that there's a typographical error, that Core Wireless

25   should not be pluralized, but no objection to the content.

 1          MS. VREELAND:  Your Honor, we would object and ask

 2    that the question refer to fairly, reasonably, and

 3    non-discriminatory compensation.

 4          THE COURT:  Okay.  So let's back up a bit.

 5          The Plaintiffs raised a typographical error as to

 6    the pluralization of Core Wireless?  You're suggesting that

 7    it just have an apostrophe and no S at the end?

 8          MS. CURTIS:  Well, it should just say:  Fairly and

 9    reasonably compensate Core Wireless for infringement of the

10    Core Wireless patents.

11          THE COURT:  Okay.  I'll delete the apostrophe and

12    the S at the end of the second line.

13          Ms. Vreeland, you want me to say fairly,

14    reasonably, and non -- non-discriminatorily is what you're

15    asking?

16          MS. VREELAND:  Per -- perhaps better phrased, Your

17    Honor, would be, would provide fair, reasonable, and

18    non-discriminatory compensation.

19          I think, Your Honor, our original proposed

20    language -- I was just looking at our original proposal was:

21    What sum of money do you find by a preponderance of the

22    evidence would be a fair, reasonable, and non-discriminatory

23    royalty award to be paid by Apple to Core Wireless for any

24    infringement by Apple you have found?

25          THE COURT:   Well, I'm going to overrule the

1   Defendant's objection to Question 5.

2         The Court has clearly charged the jury

3   instructions -- or will charge the jury, instructions on the

4   FRAND obligations; and that's been repeated multiple times.

5         And the omission of the phrase "non-discriminatory"

6   here, I don't think, causes any confusion given the

7   repetitiveness of the FRAND instructions in the charge

8   itself.

9         I will singularize the reference to Core Wireless

10  that the Plaintiff raised.  I think that is a typographical

11  error.

12        But other than that, Question 5 will stay as it is.

13        All right.  Any objections to Question 6 on Page 7

14  of the verdict form?

15        MS. CURTIS:  Yes, Your Honor.  I think this goes

16  hand-in-hand with our objections to the lump-sum instruction

17  to the jury.  We believe this question should be out

18  completely.

19        THE COURT:  And consistent with my prior ruling,

20  I'll -- I'll overrule, or deny Plaintiff's objection in that

21  regard.

22        MS. VREELAND:  No objections from Apple, Your

23  Honor.

24        THE COURT:  All right.  Page 8 of the verdict form

25  where Question 7 is located?

1           MS. CURTIS:  And, again, this goes to our objection

2    to the inclusion of the contract instructions for Apple's

3    claims, so we believe this should not be included.

4           MS. VREELAND:  Apple has no objections, Your Honor.

5           THE COURT:  All right.  Plaintiff's objection is

6    overruled.

7           The last page, Page 9, where Question 8 is located.

8           Is there objection?

9           MS. CURTIS:  I guess that would be the same

10   objection for us, Your Honor -- Your Honor, that it includes

11   Apple's claim and also that there's an omission of any

12   question to the jury regarding Core Wireless's breach of

13   contract claims.

14          MS. VREELAND:  And Apple has no objection, Your

15   Honor.

16          THE COURT:  Well, the Court is convinced that the

17   Plaintiff failed to offer adequate proof to -- to support the

18   question that you've objected to not being included in here.

19          And I made that clear, I think, in our informal

20   charge conference.  And consistent with that, I'll overrule

21   the Plaintiff's objection, both as to the inclusion of

22   Question 8 and as to the failure to include a reverse

23   question applicable in the opposite direction.

24          All right.  That's the last page of the verdict

25   form.  I'll make the changes in both the final jury

1   instructions and the verdict form as just covered on the

2   record.

3            It's 13 minutes until noon.  I think I can get that

4   done by noon.  I'll be back at approximately that time.  At

5   that time, I intend to bring in the jury to give them the

6   Court's final instructions and to hear closing arguments from

7   counsel.

8            Mr. Bunsow, who's going to present closing

9   arguments for the Plaintiff in this case?

10           MR. BUNSOW:  I will present the initial closing

11   argument, Your Honor, and Mr. Ward will present the rebuttal.

12           THE COURT:  Do you have a predetermined division of

13   your total time?

14           MR. BUNSOW:  I do, but you know how it goes.  If

15   you could give me a warning with 15 minutes remaining, my

16   intention would be to wrap it up and leave as much of that

17   for Mr. Ward as possible.

18           THE COURT:  All right.  So after you've used -- or

19   at the point you've used 25 minutes of your 40?

20           MR. BUNSOW:  That's correct, Your Honor.

21           THE COURT:  We'll warn you after the use of 25

22   minutes.

23           MR. BUNSOW:  Thank you.

24           THE COURT:  Mr. Ward, with whatever Mr. Bunsow

25   leaves you, would you like a warning?

1          MR. WARD:  One minute.

2          THE COURT:  One-minute warning?

3          Mr. Mueller, are you going to present the entire

4   closing for the Defendant?

5          MR. MUELLER:  Yes, I am, Your Honor.

6          THE COURT:  Would you like a warning before the

7   expiration of your time?

8          MR. MUELLER:  Yes, please, two minutes.

9          THE COURT:  Two minutes.  All right.

10          All right.  With that, the Court will stand in

11   recess while these changes are made, and then we'll proceed

12   to bring in the jury and give them the final jury

13   instructions.

14          The Court stands in recess.

15          COURT SECURITY OFFICER:  All rise.

16          (Recess.)

17          (Jury out.)

18          COURT SECURITY OFFICER:  All rise.

19          THE COURT:  Let's bring in the jury, please.

20          COURT SECURITY OFFICER:  All rise for the jury.

21          (Jury in.)

22          THE COURT:  Please be seated.

23          Ladies and Gentlemen of the Jury:  You've now heard

24   the evidence in this case.  I will now instruct you on the

25   law that you must apply.

1        Each of you will have a copy of these final jury

2   instructions for your review when you retire to deliberate in

3   a few minutes.

4        Accordingly, there's no need for you to take

5   written notes on these written -- on these final jury

6   instructions unless you particularly want to do so.

7        It's your duty to follow the law as I give it to

8   you.  On the other hand, as I've said previously, you, the

9   jury, are the sole judges of the facts in this case.

10       Do not consider any statement that I have made in

11  the course of the trial or I may make in these instructions

12  as an indication that I have an opinion -- any opinion about

13  the facts of the case.

14       You're about to hear closing arguments from the

15  attorneys.  Statements and arguments of the attorneys are not

16  evidence, and they are not instructions on the law.  They're

17  intended only to assist the jury in understanding the

18  evidence and the parties' contentions.

19       A verdict form has been prepared for you.  You'll

20  take this to the jury room; and when you've reached a

21  unanimous agreement as to your verdict, you will have your

22  foreperson fill in the blanks in the verdict form, date it,

23  and sign it.

24       Answer each question in the verdict form from the

25  facts as you find them to be.  Don't decide who you think

1  should win and then answer the questions accordingly.  Again,

2  your answers and your verdict in this case must be unanimous.

3       The parties have stipulated or agreed to some facts

4  in this case; and when the lawyers on both sides stipulate to

5  the existence of a fact, you must, unless otherwise

6  instructed, accept the stipulation as evidence and regard the

7  fact as proved.

8       In determining whether any fact has been proven in

9  this case, there are two types of evidence that you may

10  consider in properly finding the truth as to the facts in

11  this case.

12       One is direct evidence, such as the testimony of an

13  eyewitness.

14       The other is indirect or circumstantial evidence;

15  that is, the proof of a chain of circumstance that indicates

16  the existence or non-existence of certain other facts.

17       As a general rule, Ladies and Gentlemen, the law

18  makes no distinction between direct or circumstantial

19  evidence; but simply requires that you find the facts based

20  on the evidence presented, both direct and circumstantial.

21       You may, unless otherwise instructed, consider the

22  testimony of all witnesses regardless of who may have called

23  them and all the exhibits received and admitted into evidence

24  regardless of who may have introduced them in answering any

25  of the questions.

1           By allowing the testimony or other evidence to be

2   introduced over the objection of an attorney, the Court did

3   not indicate any opinion as to the weight or effect of such

4   evidence.

5           As I've said before, you're the sole judges of the

6   credibility of all the witnesses and the weight and effect to

7   give to the evidence in this case.

8           When the Court sustained an objection to a question

9   addressed to a witness, you must disregard that question

10  entirely; and you may draw no inference from or speculate

11  from its wording about what the witness would have said if he

12  or she had been permitted by the Court to answer the

13  question.

14          Now, at times during the trial, it's been necessary

15  for the Court to talk with the attorneys here at the bench

16  and outside of your hearing or by calling a recess and

17  talking to them while you were out of the courtroom.

18          This happened because during the trial, things

19  often arise that do not involve the jury.  You shouldn't

20  speculate about what was said during such discussions that

21  took place outside of your presence.

22          Certain testimony in this case has been presented

23  to you through depositions.  A deposition is the sworn,

24  recorded answers to questions asked to a witness in advance

25  of trial.

1          If the witness cannot be present to testify in

2    person from the witness stand, then that witness's testimony

3    may be presented under oath in the form of a deposition.

4          Before the trial, the part -- the attorneys,

5    rather, representing the parties for both sides of the case

6    questioned these deposition witnesses under oath.  A court

7    reporter was present, and their testimony was recorded.

8          Deposition testimony is entitled to the same

9    consideration as testimony given by a witness in person under

10   oath from the witness stand in open court.

11         Accordingly, you should judge the credibility and

12   weigh the importance of deposition testimony to the best of

13   your ability just as if the witness had testified personally

14   in open court.

15         Ladies and Gentlemen, while you should consider

16   only the evidence in this case, you are permitted to draw

17   such reasonable inferences from the testimony and exhibits as

18   you feel are justified in the light of common experience.

19         In other words, you may make deductions and reach

20   conclusions that reason and common sense lead you to draw

21   from the facts that have been established by the testimony

22   and the evidence in the case.

23         Unless I instruct you to the contrary, the

24   testimony of a single witness may be sufficient to prove any

25   fact, even though a greater number of witnesses may have

1    testified to the contrary, if, after considering all of the

2    evidence, you believe that single witness.

3            When knowledge of a technical subject may be

4    helpful to the jury, a person who has special training or

5    experience in that technical field, called an expert witness,

6    is permitted to state his or her opinions on those technical

7    matters.

8            However, you're not required to accept the opinion

9    or the opinions of any expert witness.  As with any witness,

10   it's solely up to you to decide whether to rely or not rely

11   upon what they say.

12           In any lawsuit, the facts must be proved by a

13   required amount of evidence known as the burden of proof.

14           The burden of proof in this case is on the

15   Plaintiff, Core Wireless, for some issues and on the

16   Defendant, Apple, for other issues.

17           As I mentioned at the beginning of the trial, there

18   are two burdens of proof that you will apply in this case.

19           The first is preponderance of the evidence, and the

20   second is clear and convincing evidence.

21           A third burden of proof, beyond a reasonable doubt,

22   is the burden of proof or standard used in a criminal case;

23   and it has no application in a civil case such as this.

24           The Plaintiff, Core Wireless, has the burden of

25   proving patent infringement and damages by a preponderance of

 1    the evidence.

 2         The Defendant, Apple, has the burden of proving

 3    breach of contract by a preponderance of the evidence.

 4         A preponderance of the evidence means evidence that

 5    persuades you that a claim is more probably true than not.

 6    More probably true than not true.  Sometimes this is talked

 7    about as being the greater weight and degree of credible

 8    testimony.

 9         Apple, the Defendant in this case, has the burden

10    of proving invalidity by clear and convincing evidence.

11         And Core Wireless, the Plaintiff, has the burden of

12    proving willfulness by clear and convincing evidence.

13         Clear and convincing evidence means evidence that

14    produces in your mind an abiding conviction that the truth of

15    the parties' factual contentions are highly probable.

16         Although proof to an absolute certainty is not

17    required, the clear and convincing evidence standard requires

18    a greater degree of persuasion than is necessary for the

19    preponderance of the evidence standard.

20         If proof establishes in your mind an abiding

21    conviction in the truth of the matter, then the clear and

22    convincing evidence standard has been met.

23         In determining whether any fact has been proved by

24    a preponderance of the evidence or by clear and convincing

25    evidence, you may, unless otherwise instructed, consider the

stipulations of the parties, the testimony of all the witnesses, regardless of who called them, and all the exhibits received into evidence, regardless of who may have produced them.

As I did at the start of the case, I will give you a summary of each side's contentions.  I'll then provide you with detailed instructions on what each side must prove to prevail on each of its contentions.

As I previously advised you, this case concerns United States patents:  Patent No. 6,266,321, referred to as the '321 or the '321 patent; Patent No. 6,978,143, referred to as the '143 or the '143 patent; Patent No. 7,383,022, referred to as the '022 or the '022 patent; Patent No. 7,599,664, referred to as the '664 patent or the '664 patent; and Patent No. 7,804, 5 -- excuse me -- 7,804,850, referred to as the '850 or '850 patent.  I will collectively refer to these five patents as the patents-in-suit.

The Plaintiff, Core Wireless, seeks money damages from the Defendant, Apple, for allegedly infringing the patents-in-suit by making, using, selling, or offering for sale certain iPhones and iPads.

Core Wireless contends that Apple made, used, offered to sell, or sold within the United States or imported into the United States products and/or a system that are operable on the GSM and/or the UMTS networks that infringe at

1    least one of the following claims:  Claims 7, 9, and 10 of

2    the '022 patent; Claims 14, 16, and 17 of the '664 patent;

3    Claims 17 and 21 of the '143 patent; Claim 14 of the '321

4    patent; and Claims 1, 10, 21, and 27 of the '850 patent.

5           The claims listed in this paragraph are sometimes

6    referred to as the asserted claims.

7           Core Wireless has accused the following Apple

8    products of infringing the '850 patent:  The iPhone 5, iPhone

9    5S, iPhone 5C, iPad 3, iPad 4 with retina display, iPad Mini,

10   iPad Air, and iPad Mini with retina display.

11          Core Wireless has also accused the following Apple

12   products of infringing the remaining patents-in-suit:  The

13   iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4S, iPhone 5, iPhone

14   5S, iPhone 5C, iPad, iPad 2, iPad 3, iPad 4.

15          Collectively, these products are referred to as the

16   Apple accused products.

17          Apple denies that it has infringed any asserted

18   claim of the asserted patents.  Apple contends that during

19   the term of these patents, Apple did not make, use, sell,

20   offer for sale, or import products and/or a system that

21   infringed any of the asserted claims of Core Wireless's

22   patents.

23          Core Wireless also contends that Apple has

24   actively -- or Apple is actively inducing their customers

25   and/or end users to directly infringe certain claims of the

1    patents-in-suit.  Core Wireless is seeking damages for the

2    alleged infringement by Apple.

3           Separately, Apple also contends that the asserted

4    claims of Core Wireless's patents are invalid.  Apple

5    contends that the asserted claims of the '143 and the '321

6    patents are anticipated and rendered obvious by prior art

7    that existed before Core Wireless's -- Core Wireless's

8    alleged invention; and, therefore, the '143 and '321 patents

9    are invalid.

10          Apple contends the remaining patents are

11   anticipated by prior art that existed before Core Wireless's

12   alleged invention, and, therefore, Core Wireless's asserted

13   patent claims are invalid.

14          Invalidity is a defense to infringement.

15   Invalidity and infringement are separate and distinct issues

16   that must be separately decided by you, the jury.

17          Your job is to ask whether the asserted claims of

18   the asserted patents have been infringed and whether any of

19   the asserted claims of those patents are invalid.

20          If you decide that any claim of a patent has been

21   infringed and that claim is not invalid, you will then need

22   to decide any money damages to be awarded to Core Wireless as

23   compensation for that infringement.

24          Before you can decide many of the issues in the

25   case, you'll need to understand the role of the patent

claims.  Patent claims are the numbered sentences at the end of the patent.  Claims are important because it's the words of the claim that define what a patent covers.

The figures and the text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage.

Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than any other claim.  Therefore, what a patent covers collectively depends on what each of its claims cover.

Claims may describe apparatuses, devices, or products such as machines.  Such claims are called apparatus claims.

Claims may also described processes or methods for making or using a product.  Those claims are called method claims.

In this case, Core Wireless has asserted both apparatus claims and method claims.

Each patent claim sets forth in words a set of requirements in a single sentence.  The requirements of a claim are usually divided into parts called limitations or elements.

If a device satisfies each of the requirements in the claim's sentence, then it is said that the device is

covered by the claim or falls under the claim or infringes

the claim.

For example, a product claim that covers the

invention of a table, may recite the tabletop, four legs, and

the glue that secures the legs to the tabletop.  In this

example, the tabletop, legs, and glue are each a separate

limitation or element of the claim.

If a device is missing or does not practice even

one limitation or element of a claim, it does not meet all of

the requirements of a claim and is not covered by the claim.

If a device is not covered by the claim, it does

not infringe the claim.

You first need to understand each claim in order to

decide whether or not there is infringement of the claim and

decide -- and to decide whether or not the claim is invalid.

The first step is to understand the meaning of the

words used in the patent claim.

The law says that it is my role, as the Judge, to

define the terms of the claims, and it's your role, as the

jury, to apply my definitions to the issues that you're asked

to decide in this case.

Therefore, as I explained to you at the beginning

of the case, I have determined the meanings of certain claim

terms, and I have provided my definitions to you of those

certain claim terms, and those definitions are in your juror

notebooks.

You must accept my definitions of these words in the claims as being correct.  It's your job to then take these definitions that I have supplied and apply them to the issues that you are asked to decide, including both the issues of infringement and invalidity.

For claims that I have not construed or defined, you are to use the plain and ordinary meaning of the terms as understood by one of ordinary skill in the art, which is to say in the field of technology of the patent at the time of the invention.

This case involves two types of patent claims: Independent claims and dependent claims.

An independent claim does not refer to any other claim of the patent.  An independent claim sets forth all the requirements that must be met in order to be covered by that claim.  It's not necessary to look at any other claim to determine what an independent claim covers.

In this case, Claim 14 of the '321 patent, Claim 17 of the '143 patent, Claim 7 of the '022 patent, and Claims 14 and 27 of the '664 patent and Claims 1 and 21 of the '850 patent are independent claims.

The rest of the claims being -- being asserted in this case are dependent claims.  A dependent claim does not itself recite all of the requirements of the claim but refers

1   to another claim for some of its requirements.  In this way,

2   the claim depends on another claim.

3          The law considers a dependent claim to incorporate

4   all of the elements -- all of the requirements of the claims

5   to which it refers.  The dependent claim then adds its own

6   additional requirements.

7          To determine what a dependent claim covers, it's

8   necessary to look at both the dependent claim and any other

9   claims to which it refers.  A product that meets all of the

10  requirements of both the dependent claim and the claims to

11  which it refers, is covered by that dependent claim.

12         The beginning portion, or preamble, of a number of

13  Core Wireless's asserted claims, use the word "comprising."

14         The word "comprising," when used in the preamble,

15  means, including but not limited to, or containing but not

16  limited to.

17         When comprising is used in the preamble, if you

18  decide that an accused product includes all of the

19  requirements of that claim, the claim is infringed.  This is

20  true even if the accused instrumentality contains additional

21  elements or performs additional steps.

22         For example, a claim to a table comprising a

23  tabletop, legs, and glue would be infringed by a table that

24  includes a tabletop, legs, and glue, even if the table also

25  includes wheels on the ends of the table's legs.

1          A patent owner has the right to stop others from

2   using the invention covered by its patent claims in the

3   United States for the life of the patent.

4          If a person makes, uses, sells, or offers to sell

5   within the United States or imports into the United States

6   what is covered by a patent claim without the patent owner's

7   permission, that person is said to infringe the patent.

8          In reaching your decision on infringement, keep in

9   mind that only the claims of a patent can be infringed.  You

10  must compare the asserted patent claims, as I have defined

11  each of them, to the accused products and determine what --

12  and determine whether or not there is infringement.

13         You should not compare the accused products with

14  any specific example set out in the patent or with the prior

15  art.  The only correct comparison is between the language of

16  the claim itself and the accused products just as I've

17  explained it to you.

18         You must reach your decision as to each assertion

19  of infringement based on my instructions about the meaning

20  and scope of the claims, the legal requirements for

21  infringement, and the evidence presented to you by both of

22  the parties.

23         Also, the issue of infringement is assessed on a

24  claim-by-claim basis.  Therefore, there may be infringement

25  as to one claim but no infringement as to another claim in

the patent.

In this case, there are two possible ways that a claim may be infringed.  I'll explain the requirements of each of these types of -- of these types of infringement to you.

The two types of infringement are called direct infringement and indirect infringement.

In order to prove direct infringement of a patent claim, Core Wireless, the Plaintiff, must show by a preponderance of the evidence that the accused product or method includes each and every requirement of that claim.

In determining whether an accused product or method directly infringes a patent claim in this case, you must compare the accused product with each and every one of the requirements of that claim to determine whether the accused product contains each and every requirement recited in the claim.

A claim requirement is present if it exists in an -- in an accused product just as it is described in the claim language, either as I have explained the language to you; or if I did not explain it, as it would be understood by one of ordinary skill in the art.

If an accused product omits any element recited in a claim, then you must find that that particular product does not literally infringe that claim.

1          A patent can be directly infringed even if the

2 alleged infringer did not have knowledge of the patent and

3 without the infringer knowing that what it was doing was

4 infringement of the claim.

5          A patent may also be directly infringed even though

6 the accused infringer believes in good faith that what it is

7 doing is not infringement of the patent.  Infringement does

8 not require proof that a party copied the asserted patent

9 claims.

10          The elements used in Claim 17 of the '143 patent

11 are interpreted by the Court and are listed in Table 1 -- in

12 Tab 1 of your juror notebooks.  These elements are a special

13 form called a means-plus-function format.  These elements

14 require a special interpretation.

15          These words do not cover all means that perform the

16 recited functions but cover only the described structures in

17 the patent specification and drawings that perform the

18 functions or an equivalent of those structures.

19          The table in Tab 1 of your juror notebooks lists

20 the recited functions and structures in this patent -- in the

21 patent specification that performs those functions as

22 interpreted by the Court.

23          You must use my interpretation of the

24 means-plus-function elements in your deliberations regarding

25 infringement and validity, as further discussed below.

1              The Court has instructed you that Claim 17 of the

2    '143 patent contains means-plus-function elements.  To show

3    infringement, Core Wireless must prove that it is more likely

4    than not that the structures in the Apple accused products

5    that perform the functions listed in the table in Tab 1 are

6    identical to or equivalent to the structures described in the

7    specification for performing the identical function.

8              In deciding whether Core Wireless has proven that

9    Apple's accused products include structures covered by a

10   means-plus-function requirement, you must first decide

11   whether the Apple accused products have any structures that

12   perform the functions listed in the table at Tab 1 of your

13   juror notebooks.

14             If not, the claim containing that

15   means-plus-function requirement is not infringed.

16             If you find that the Apple accused products perform

17   the -- perform the claimed functions, you must next identify

18   the structures in the Apple accused products that perform

19   these functions.

20             After identifying those structures, you must then

21   determine whether Core Wireless has shown that those

22   structures are either identical to or equivalent to

23   structures of the means-plus-function limitations which the

24   Court determined as part of the claim construction and are

25   listed in the table in Tab 1 of your juror notebooks.

1        If the structures in the Apple accused products are

2   the same or equivalent to the structures I identified, the

3   Apple accused products meet the requirements of that

4   limitation.

5        Whether the structures of the Apple accused

6   products are equivalent to structures described in the patent

7   specification, is decided from the perspective of a person of

8   ordinary skill in the art.

9        If a person of ordinary skill in the art would

10  consider the differences between the structures found in the

11  Apple accused products and the structures described in the

12  patent specification to be insubstantial, the structures are

13  equivalent.

14       Core Wireless alleges that all of the claims of the

15  '022, '664, '143, and '850 patents reside -- recite,

16  rather -- recite the capability to perform a function.

17       To infringe a claim that recites the capability to

18  perform a function, an apparatus needs only to have the

19  recited capability to perform that function.

20       Actually showing the performance of the function is

21  unnecessary, and evidence that the apparatus is reasonably

22  capable of satisfying the claim limitation is sufficient to

23  find the limitation is met, even though it may be capable of

24  non-infringing modes of operation.

25       Language -- language claiming capability includes

1    adapted to, configured to, and means for.

2            A plaintiff may show direct infringement by

3    comparing the claims of the accused products and showing that

4    each and every element of the claims is present therein.

5            Alternatively, a plaintiff may prove direct

6    infringement through standard compliance only where a patent

7    is shown to cover every possible implementation of that

8    standard.

9            Direct infringement requires that a party perform

10   every step of a claimed method.

11           Where no single party does so but multiple parties

12   com -- combine to do so, the claim is directly infringed if

13   Apple has control over all the multiple parties such that all

14   the infringing acts are attributable solely to Apple.

15           Mere arm's length cooperation between parties is

16   insufficient to prove direct infringement.  Rather, the

17   accused infringer must control or direct the actions of third

18   parties if those actions are to be attributed to the accused

19   infringer.

20           Where Apple does not itself perform every step of

21   the claimed method, Core Wireless must prove by a

22   preponderance of the evidence, (1), that all the steps of the

23   claimed method were performed in the United States, and, (2),

24   that Apple controls or directs third parties to perform the

25   steps not performed by Apple.

1          Core Wireless has raised two issues under the

2     Doctrine of Equivalents for the '321 patent.

3          First, it contends that scrambling is equivalent to

4     spreading.

5          Second, it contends that changing the power level

6     after spreading, is equivalent to changing the power level

7     before spreading.

8          I'll now instruct you on the Doctrine of

9     Equivalents to use in assessing these two issues.  For your

10    deliberations on all other infringement issues, you should

11    consider only literal infringement.

12         If you decide that an accused product or method

13    does not literally infringe an accused patent claim, you must

14    then decide whether it is more probable than not that such

15    product or method infringes the asserted claim under what is

16    called the Doctrine of Equivalents.

17         Under the Doctrine of Equivalents, the product or

18    method can infringe the asserted patent claim if it includes

19    parts or steps that are equivalent to those requirements of

20    the claim that are not literally present in the product or

21    method.

22         If the product or method is missing an equivalent

23    part or step to even one part or step of the asserted patent

24    claim, the product or method cannot infringe the claim under

25    the Doctrine of Equivalents.

1      Thus, in making your decision under the Doctrine of

2  Equivalents, you must look at each individual requirement of

3  the asserted patent claim and decide whether the product or

4  method has an equivalent part or step to that individual

5  claim requirement that are not literally present in the

6  product or method.

7      A part or step of a product or method is equivalent

8  to a requirement of an asserted claim if a person of ordinary

9  skill in the field would think that the differences between

10 the part or step and the requirement were not substantial as

11 of the time of the alleged infringement.

12     One way to decide whether any difference between a

13 requirement of an asserted claim and a part or step of the

14 product or method is not substantial, is to consider whether,

15 as of the time of the alleged infringement, the part or step

16 of the product or method performed substantially the same

17 function in substantially the same way to achieve

18 substantially the same result as the requirement in the

19 patent claim.

20     In deciding whether any difference between a claim

21 requirement and the product or method is not substantial, you

22 may consider whether at the time of the alleged infringement

23 persons of ordinary skill in the field would have known of

24 the interchangeability of the part or step with the claimed

25 requirement.

1          The known interchangeability between the claim

2     requirement and the part or step of the product or method is

3     not necessary to find infringement under the Doctrine of

4     Equivalents.

5          Further, the same element or method step of the

6     accused product or method may be -- may satisfy more than one

7     element of a claim.

8          In addition to alleging direct infringement of the

9     asserted patent claims, the Plaintiff, Core Wireless, alleges

10     that the Defendant, Apple, induces infringement of its

11     asserted patent claims.

12          The act of encouraging or inducing others to

13     infringe a patent is called inducing infringement.

14          Core Wireless alleges that Apple is liable for

15     infringement by actively inducing another party or parties to

16     directly infringe its patents.

17          As with direct infringement, you must determine

18     whether there has been active inducement on a claim-by-claim

19     basis.

20          Apple is liable for active inducement of a claim if

21     Core Wireless proves by a preponderance of the evidence that:

22          (1) the acts are actually carried out by Apple's

23     customers using the accused products and directly infringe

24     that claim.

25          (2) Apple took action during the time the patent

1  was in force, intending to cause the infringing acts by

2  Apple's customers using the accused products.

3          And (3) Apple was aware of or willfully blind to

4  the patent and knew that the acts, if taken, would constitute

5  infringement of the patent or that Apple was willfully blind

6  to that infringement.

7          To prove willful blindness, Core Wireless must

8  prove by a preponderance of the evidence that there was a

9  high probability that a fact exists and that Apple took

10  deliberate acts to avoid learning of that fact.

11          In order to establish active inducement of

12  infringement, it's not sufficient that the other party or

13  parties themselves directly infringe the claim, nor is it

14  sufficient that Apple was aware of the acts by its customers

15  using the accused products that allegedly constitute the

16  direct infringement.

17          Rather, you must find that Apple specifically

18  intended its customers, using the accused products, to

19  infringe -- to infringe the patent or that Apple believed

20  there was a high probability that its customers would

21  infringe the patent but deliberately avoided learning the

22  infringing nature of its customers' acts.

23          In this case, Ladies and Gentlemen, Core Wireless

24  contends that Apple has willfully infringed its patents.  If

25  you've decided that Apple has infringed, you must address the

1    additional issue of whether or not that infringement was

2    willful.

3          Willfulness requires you to determine by clear and

4    convincing evidence that Apple acted recklessly.

5          To prove that Apple acted recklessly, Core Wireless

6    must prove by clear and convincing evidence that Apple

7    actually knew or it was so obvious that Apple should have

8    known that its actions constituted an unjustifiably high risk

9    of infringement of a valid patent.

10          To determine whether Apple had this state of mind,

11    consider all facts which may include but are not limited to:

12          (1) whether or not Apple acted in accordance with

13    the standards of commerce for its industry.

14          (2) whether or not there is a reasonable basis for

15    Apple to have believed that it did not infringe or had a

16    reasonable defense to infringement.

17          And (3) whether or not Apple tried to cover up its

18    infringement.

19          None of these factors alone is determinative, and

20    this list of factors is not an exhaustive list of things that

21    you should consider.

22          Your determination of willfulness should

23    incorporate the totality of the circumstances based on the

24    evidence presented during the trial.

25          Core Wireless has the burden of proving willfulness

1    by clear and convincing evidence.

2         I'll now instruct you on the rules that you must

3    follow in deciding whether or not Apple has proven the

4    asserted claims of the patents-in-suit are invalid.

5         An issued patent is accorded a presumption of

6    validity based on the presumption that the United States

7    Patent and Trademark Office, which you've often heard

8    referred to during this trial simply as the PTO, acted

9    correctly in issuing the patent.

10        This presumption of validity extends to all issued

11   patents, including those that claim the benefit of an earlier

12   filed patent application, such as so-called continuations or

13   continuations-in-part.

14        To prove that any claim of a patent is invalid,

15   Apple must persuade you by clear and convincing evidence that

16   the claim is invalid.

17        Like infringement, validity is determined on a

18   claim-by-claim basis.  You must determine separately for each

19   claim whether that claim is invalid.

20        If one claim of a patent is invalid, this does not

21   mean that any other claim is necessarily invalid.  Claims are

22   construed in the same way for determining infringement as for

23   determining invalidity.

24        Apple has challenged the validity of the asserted

25   claims on a number of grounds.  In making your determination

1    as to invalidity, you should consider each claim separately.

2            Apple contends that all asserted claims of the

3    patents-in-suit are invalid for being anticipated by prior

4    art.  Apple bears the burden of establishing anticipation by

5    clear and convincing evidence.

6            A patent claim is invalid if the claimed invention

7    is not new.  For a claim to be invalid because it is not new,

8    all of its requirements must have existed in a single device

9    that predates the claimed inventions or must have been

10   described in a single previous publication or patent that

11   predates the claimed invention.

12           In patent law, a previous device, publication, or

13   patent that predated the claimed invention is called a prior

14   art reference.

15           If a patent claim is not new, we say that it is

16   anticipated by the prior art or by a prior art reference.

17           Anticipation requires that a single reference not

18   only disclose all elements of the claim within the four

19   corners of the document, but it must also disclose those

20   elements arranged or combined as -- in the same way as in the

21   claim.

22           Apple must prove with clear and convincing evidence

23   that an asserted patent claim was anticipated by the prior

24   art reference.

25           In determining whether or not the invention is

1  valid, you must determine the scope and content of the prior

2  art at the time the invention was made.

3       For prior art to anticipate a claim of a patent,

4  the disclosure in the prior art reference does not have to be

5  in the same words as in the claim; but all the elements of

6  the claim must be there, either stated or necessarily

7  implied, so that someone of ordinary skill in the field of

8  the invention, looking at the one prior art reference, would

9  be able to make and use at least one embodiment of the

10  claimed invention.

11       Anticipation can occur when the claimed invention

12  inherently and necessarily results from practice of what is

13  disclosed in the written reference, even if the inherent

14  disclosure was unrecognized or unappreciated -- unappreciated

15  by one of ordinary skill in the field of the invention.

16       If you find that a patent claim is not new, that it

17  is anticipated as explained above, you should find that claim

18  invalid.

19       Apple also contends that the asserted claims of the

20  '143 patent and the '321 patent are invalid as obvious.

21       Even though an invention may not have been

22  identically disclosed or described in a single prior art

23  reference before it was made by an inventor, the invention

24  may have been obvious to a person of ordinary skill in the

25  field of the technology of the patent at the time the

1    invention was made.

2            Apple bears the burden of establishing obviousness

3    by clear and convincing evidence.

4            In determining whether a claimed invention is

5    obvious, you, the jury, must consider the level of ordinary

6    skill in the field of the technology of the patent that

7    someone would have had at the time the claimed invention was

8    made, the scope and content of the prior art, any differences

9    between the prior art and the claimed invention, as well as

10   the ordinary knowledge of the person of ordinary skill at the

11   time of the invention.

12           The skill of the actual inventor is irrelevant

13   because inventors may possess something that distinguishes

14   them from workers of ordinary skill in the art.

15           Keep in mind that the existence of each and every

16   element of the claimed invention in the prior art does not

17   necessarily prove obviousness.  Most, if not all, inventions

18   rely on building blocks of prior art.

19           In considering whether a claimed invention is

20   obvious, you should consider whether, as of the priority date

21   of the patents-in-suit, there was a reason that would have

22   prompted a person of ordinary skill in the field to combine

23   the known elements in a way that the claimed invention does,

24   taking into account such facts as:

25               (1) whether the claimed invention was merely the

predictable result of using prior art elements according to their known function;

(2) whether the claimed invention provides an obvious solution to a known problem in the relevant field:

(3) whether the prior art teaches or suggests the desirability of combining elements in the claimed inventions;

(4) whether the prior art teaches away from combining elements in the claimed invention;

(5) whether it would have been obvious to try the combination of elements, such as when there is a design need or market pressure to solve a problem, and there are a finite number of identified predictable solutions;

And, (6) whether the change resulted more from the design incentives or other market forces.

In determining whether the claimed invention was obvious, consider each claim separately.  Consider only what was known at the time of the invention.

In making these assessments, Ladies and Gentlemen, you should take into account any objective evidence -- objective evidence, sometimes called secondary considerations, that may have existed at the time of the invention and afterwards that may shed light on non-obviousness, such as:

(1) whether the invention was commercially successful as a result of the merits of the claimed

inventions, rather than the -- the result of design needs or

market pressure, advertising, or similar activities;

(2) whether the invention satisfied a long-felt

need:

(3) whether others had tried and failed to make the

invention;

(4) whether others copied the invention

understanding that there is no contention in this case that

Apple copied the patented technology;

(5) whether there were changes or related

technologies or market needs contemporaneous with the

invention;

(6) whether the invention achieved unexpected

results;

(7) whether others in the field praised the

invention;

(8) whether persons having ordinary skill in the

art of the invention expressed surprise or disbelief

regarding the invention;

(9) whether others sought or obtained rights to the

patent from the patentholder;

And (10) whether the inventor proceeded contrary to

accepted wisdom in the field.

In support of obviousness, you may also consider

whether others independently invented the claimed invention

1  before or about the same time as the named inventor thought

2  of it.

3          If you find that Apple has proved obviousness by

4  clear and convincing evidence, then you must find that claim

5  is invalid.

6          Several times in my instructions to you I have

7  referred to a person of ordinary skill in the field of the

8  invention.  It is up to you to decide the level of ordinary

9  skill in the field of the invention.

10          You should consider all the evidence introduced at

11  trial in making this decision including:

12          (1) the level of education and experience of

13  persons working in the field;

14          (2) the types of problems encountered in the field;

15          And (3) the sophistication of the technology.

16          A person of ordinary skill in the art is presumed

17  to have known of the relevant prior art at the time of the

18  claimed invention.

19          If you find that Apple has infringed any valid

20  claim of Core Wireless's patents-in-suit, then you must

21  consider what amount of damages to award to Core Wireless.

22          I'll now instruct you about the measure of damages.

23          By instructing you on damages, I'm not suggesting

24  which party should win this case on any issue.

25          The damages you award must be adequate to

1   compensate Core Wireless for any infringement you may find.

2           However, you must not award Core Wireless more

3   damages than are adequate to compensate for the infringement,

4   nor should you include any additional amount for the purpose

5   of punishing Apple or setting an example.

6           Core Wireless has the burden to establish the

7   amount of its damages by a preponderance of the evidence.

8           The patent owner is not entitled to damages that

9   are remote or speculative.

10          Core Wireless seeks damages in the form of a

11  reasonable royalty.  A reasonable royalty is defined as the

12  money amount Core Wireless and Apple would have agreed upon

13  as a fee for Apple's use of Core Wireless's invention at the

14  time the infringement began.

15          The determination of a damage award is not an exact

16  science, and the amount need not be proven with unerring

17  precision.  You may approximate, if necessary, the amount to

18  which the patent owner is entitled.

19          In such case, while damages may not be determined

20  by mere speculation or guess, it is proper to award a damages

21  amount if the evidence shows the extent of the damages as a

22  matter of just and reasonable inference.

23          I'll give you more detailed instructions regarding

24  damages in just a minute.  Note, however, that under the

25  patent laws, Core Wireless is entitled to recover no less

than a reasonable royalty for each infringing sale or use of
its inventions.

A royalty is a payment to a patentholder in
exchange for the right to make, use, sell, or import the
claimed invention.

A reasonable royalty is the amount of money to be
paid for a license to make, use, or sell the invention that a
willing patent owner and a willing prospective licensee would
have agreed to immediately before the infringement began as a
part of a hypothetical negotiation.

In considering this hypothetical negotiation, you
should focus on what the expectations of the patentholder and
the infringer would have been had they entered -- had they
entered into an agreement at that time and they acted
reasonably in their negotiations.

In determining this, you must assume that both
parties believed the patent was valid and infringed, and the
patentholder and infringer were willing to enter into an
agreement.

The reasonable royalty you determine must be a
royalty that would have resulted from this hypothetical
negotiation and not simply a royalty that either party would
have preferred.

Evidence of things that happened after the
infringement first began may be considered in evaluating the

reasonable royalty only to the extent that the evidence --
evidence aids in assessing what royalty would have resulted
from a hypothetical negotiation.

Where the parties dispute a matter concerning
damages for infringement, it is Core Wireless's burden to
prove that it is more probable than not that Core Wireless's
version is correct.  Core Wireless must prove the amount of
damages with reasonable certainty, but need not prove the
amount of damages with mathematical precision.  However, Core
Wireless is not entitled to damages that are remote or
speculative.

If you find that any of the patents-in-suit are
both infringed and not invalid, you must award damages to
compensate for any such infringement.
The amount of damages Core Wireless can recover regarding the
infringement of the '850, the '022, the '664, and the '143
patents is limited to those acts of infringement that
occurred after Apple received notice that it infringed those
patents.

Actual notice means that the patent owner
communicated to Apple a specific charge of infringement of
those patents by a specific accused product or device.

In determining when damages begin with regard to
method claims of patents, such as the '321 patent, the law
does not have a notice requirement.  Therefore, the

calculation of damages for method claims of the '321 patent

should begin as of the later of the date the patent was

issued or when the infringement began.

A reasonable royalty must reflect that Core

Wireless declared the asserted patents to be essential to the

cellular standards of the European Telecommunications

Standards Institute, sometimes called ETSI.

Further, Core Wireless committed to license the

patents on fair, reasonable, and non-discriminatory, or FRAND

terms.

By referring to standard essential patents, the

Court is not instructing you that the asserted patents are

actually essential to any standard.

Again, it is up to you, the jury, to decide whether

or not Core Wireless has proven the patents are standard

essential and infringed.

Core Wireless submitted a written commitment to

ETSI covering each of the patents-in-suit in which it agreed

to be prepared to grant irrevocable licenses on fair,

reasonable, and non-discriminatory terms and conditions.

You must make sure that any reasonable royalty

determination takes into account Core Wireless's FRAND

obligations, as the Court has just read them to you.

In determining what amount is a FRAND royalty, you

may consider any evidence of patent hold-up and royalty

stacking.  A reasonable royalty in this case cannot exceed the amounts permitted under Core Wireless's FRAND obligations.

I'll provide you with additional instructions on how the FRAND commitment for the asserted patent affects your determination of a reasonable royalty.

In determining a reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you should consider in making your determination are:

(1) the royalties received by the patentee for licensing of the patents-in-suit proving or tending to prove an established royalty.

(2) the rates paid by a licensee for the use of other patents comparable to the patents-in-suit.

(3) the nature and scope of the license as exclusive or non-exclusive or as restricted or non-restricted in terms of territory or with respect to the parties to whom the manufactured products may be sold.

(4) the effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales.

1          (5) the duration of the patent and the term of the

2   license.

3          (6) the extent to which the infringer has made use

4   of the invention and any evidence probative of the value of

5   that use.

6          (7) the portion of the profit or of the selling

7   price that may be customary in the particular business or in

8   comparable businesses to allow for the use of the invention

9   or analogous inventions.

10         (8) the portion of the realizable profits that

11  should be credited to the invention as distinguished from

12  non-patented elements, the manufacturing process, business

13  risks, or significant features or improvements added by the

14  infringer.

15         (9) the opinion and testimony of qualified experts.

16         And (10) the amount that a licensor, such as the

17  patentee, and a licensee, such as the infringer, would have

18  agreed upon at the time the infringement began, if both sides

19  had been reasonably and voluntarily trying to reach an

20  agreement -- that is, the amount which a prudent licensee who

21  desired as a business proposition to obtain a license to

22  manufacture and sell a particular article embodying the

23  patented invention would have been willing to pay as a

24  royalty and yet be able to make a reasonable -- reasonable

25  profit and which amount would have been acceptable to a

1    prudent patentee who was willing to grant a license.

2          No one factor is dispositive.

3          Ladies and Gentlemen, you can and should consider

4    the evidence that's presented to you in this case on each of

5    these factors.

6          You may also consider any other factors which in

7    your minds would have increased or decreased the royalty the

8    infringer would have been willing to pay and the patent owner

9    would have been willing to accept, acting as normally prudent

10   business people.

11         When dealing with standard essential patents, there

12   are two special apportionment issues that arise.

13         First, the patented feature must be apportioned

14   from all of the unpatented features reflected in the

15   standard.

16         Second, the patentee's royalty must be premised on

17   the value of the patented feature, not any value added by the

18   standard's adoption of the patented technology.

19         These steps are necessary to ensure that the

20   royalty award is based on the incremental value that the

21   patented invention adds to the product, not any value added

22   by the standardization of that technology.

23         This is particularly true for standard essential

24   patents.  When a technology is incorporated into a standard,

25   it is typically chosen from among different options.  Once

incorporated and widely adopted, that technology is not always used because it is the best or the only option; it is used because its use is necessary to comply with the standard.

In other words, widespread adoption of a standard essential technology is not entirely indicative of the added usefulness of the innovation over the prior art.

To ensure that a FRAND royalty rate reflects the incremental value of the patented technology, you must consider the following two factors in setting a FRAND royalty rate:

(1) any royalty for the patented technology must be apportioned from the value of the standard as a whole;

And (2) the FRAND royalty rate must be based on the value of the invention, not any value added by the standardization of that invention.

In the case of multicomponent products like smartphones and tablet computers where demand for the entire product is not attributable to the patented feature, you may not base the royalty on the price or revenue of the entire product; but instead must use a more realistic starting point for the royalty calculation, often the smallest salable unit, and at times, even less.

One way to calculate a royalty is to determine a one-time lump-sum payment that the infringer would have paid

1    at the time of the hypothetical negotiation for a license

2    covering all sales of the licensed -- licensed product, both

3    past and future.

4           This differs from payment of an ongoing royalty

5    where a royalty rate is applied against future sales as they

6    occur.

7           When a one-time lump-sum is paid, the infringer

8    pays a single price for a license covering both past and

9    estimated future infringing sales.  It is up to you, based on

10   the evidence, to decide what type of royalty, if any, is

11   appropriate in this case.

12          The European Telecommunications Standards

13   Institute, ETSI, is a standard-setting organization made up

14   of member companies.  ETSI adopted the cellular

15   communications standards that are at issue in this case.

16          Apple contends that Core Wireless breached its

17   contract with ETSI, as made to ETSI in its licensing

18   declaration, to be prepared to grant irrevocable licenses on

19   fair, reasonable, and non-discriminatory, FRAND, terms.

20          Core Wireless disagrees with Apple's interpretation

21   of Core Wireless's alleged obligations, and disputes that it

22   has breached a FRAND commitment.

23          I'll now instruct you regarding the standards to

24   apply for such breach a contract -- for such

25   breach-of-contract claims.

1          Core Wireless has obligated itself through its

2    contract with ETSI to license its technology on a fair,

3    reasonable, and non-discriminatory, or FRAND, basis to third

4    parties, including Apple.

5          You must now determine whether Core Wireless has

6    breached its obligation.

7          To find a breach of contract, you must conclude

8    that the party bound by the contract did not fulfill its

9    obligations under the contract.

10         If you find that Core Wireless breached its

11   contractual obligations and Apple was harmed as a result, you

12   must award nominal damages.  Nominal damages must be greater

13   than zero but may not exceed $1.

14         Ladies and Gentlemen, with those instructions, we

15   are ready to hear closing arguments from the attorneys in

16   this case.

17         However, I'm going to allow for a strict 10-minute

18   recess for the jury and those present, before we begin the

19   closing arguments of counsel.

20         Do not discuss anything about my instructions.  Do

21   not begin your deliberations.  Do not discuss anything about

22   the case with each other.  And we'll have you back in here in

23   approximately 10 minutes to continue with closing arguments

24   from counsel.

25         The jury is excused for recess at this time.

```
 1              COURT SECURITY OFFICER:  All rise for the jury.
 2              (Jury out.)
 3              THE COURT:  All right, Counsel.  It's 14 minutes
 4  after 1:00.  We will reconvene at 24 minutes after 1:00.  We
 5  stand in recess for the next 10 minutes.
 6              (Recess.)
 7              (Jury out.)
 8              COURT SECURITY OFFICER:  All rise.
 9              THE COURT:  Bring in the jury, please.
10              COURT SECURITY OFFICER:  All rise for the jury.
11              (Jury in.)
12              THE COURT:  Please be seated.
13              Ladies and Gentlemen, with the instructions that
14  I've just given you, we're now prepared to hear closing
15  arguments from counsel for both the parties.
16              The Plaintiff may present its first closing
17  argument at this time.
18              You may proceed, Mr. Bunsow.
19              MR. BUNSOW:  Thank you, Your Honor.
20              Good afternoon, Ladies and Gentlemen.  Nice to see
21  you again.  I want to thank you on behalf of everybody at
22  this table for your service in this case.
23              Last week was a long week.  I'm sure there were
24  times you felt you were drinking from a fire hose.
25              In the next few minutes, I hope that I can bring
```

1   some clarity to what you heard last week and help you to

2   decide this case.

3          Let me start by what we heard in the beginning of

4   the case.  The first issue in this case that we heard about

5   was whether or not the Core Wireless and Nokia patents are in

6   the standard.

7          In fact, here's what Apple's lawyer told you in his

8   opening statement:

9               Now, you might think from Mr. Bunsow's

10  presentation about Nokia's history in the industry and the

11  standards themselves that you're going to see evidence of

12  proposals being made to ETSI that match the patents and that

13  ETSI voted to approve those.

14              Well, you won't see that.  There's no evidence

15  of any proposal being made to ETSI that matches these five

16  patents and that was accepted by ETSI.

17              We're going to bring to you the former

18  chairman of the board of ETSI, Dr. Michael Walker, who is

19  actually here today, and he will testify how ETSI works, how

20  the rules work, and how they operate.

21          And then they showed you Dr. Walker's photo, and

22  Dr. Walker was in the gallery.

23              Our first witness was Mr. Antti Toskala.

24              Mr. Toskala was the chairman of the working group

25  in the mid-'90s that established these standard

1    specifications.  He was there.  He was in the room.

2           And he told you in no uncertain terms that the '321

3    patent is in the ETSI 3GPP standard.  He told you that the

4    '143 patent is in the ETSI standard.  He told you that the

5    '850 patent is in the ETSI standard.

6           And then we didn't hear from Dr. Walker, did we?

7    Apple's primary defense in this case, the one they touted in

8    their opening statement, disappeared with the first witness

9    in this case.

10          But that's not all.  On Thursday, Dr. Stark, their

11   expert witness, admitted that Nokia put the '022 and the '664

12   patents in the GSM standard as well.  The evidence stands

13   uncontradicted that all five patents-in-suit are in the

14   standards.

15          And let me just pause for a second and let that

16   sink in, because this is important.  For three years, Apple

17   denied that its products practiced the standard.

18          In this courtroom last week, Apple admits that its

19   products complied with the standards, the same standards that

20   those five patents cover.  That's why it was so important

21   that those patents not be in the standard, but they are.

22          But we're not just relying on that.  We brought you

23   evidence from source code, we brought you evidence from

24   Apple's own testing that they paid over $5 million for, and

25   we brought you testing from the standards as well.

1          Dr. Trevor Smedley spent 700 hours analyzing the

2     actual source code in the Apple products, and his testimony

3     stands uncontradicted.

4          Dr. Knightly's response to my question about his

5     source code review was:  I thought I referred to it in one

6     answer.  That's it.  That's the sum and substance of Apple's

7     experts trying to contest what Dr. Smedley did.  There is no

8     dispute.

9          The CETECOM testing from Apple, reliable,

10    independent testing -- and let me tell you something

11    important about this.  You see where those CETECOM tests say

12    "pass"?  It has to say that, in order for Apple to sell its

13    products to AT&T and the other network providers.

14          If that said "fail," they wouldn't be able to sell

15    them.

16          And the only reason it says "pass" is because

17    they're using the technology of the patents in this case.

18    These are tests that establish that.

19          We have the burden of proving infringement by a

20    preponderance of the evidence.  I like to use a football

21    analogy.  If we get the football -- the nose of the football

22    beyond the 50 yard line, we have proven it by a preponderance

23    of the evidence.  That is the test in this case.

24          Let's talk about infringement of the '321 patent.

25          You remember that's the one that controls the power

amplifier in the device.  We brought you detailed testimony
from Mr. Chandler based on the source code that's in the
products.

We also showed you Apple documents, Qualcomm and
Intel documents, CETECOM tests, and the standard documents
themselves.  We have proven infringement of the -- Claim 14
of the '321 patent for both the voice mode and what's called
the PRACH mode.

We showed you the constellation diagram.  And even
the one that Dr. Stark drew, matches the drawings in the
patents.

Dr. Stark admitted that the voice mode in these
products is being used today, and it's widely being used
today.  Voice transmission is very important; and when voice
is being used, they match the claims of this patent.

In addition, Dr. Stark admitted that Apple products
comply with the standard covered by the '321 patent.  This is
not just any standard.  This is the standard covered by the
'321 patent.  They use it.  They infringe.

So what did they say?  They say Apple products do
not use two standards.  Apple products use one code, not two.
Apple products do not change the power level before
compiling.

Let's look at the evidence.  The source code from
Dr. Smedley, uncontested, shows two channels.

1          Dr. Stark, when asked whether he had an opinion on

2   whether the products have two channels or not, said, quote:

3   I have no opinion.

4          This is the man that Apple hired to defend them

5   against these serious charges of infringement; and all he can

6   offer to you is:  I have no opinion.  That's it.

7          Well, let's look at what else he showed us.  This

8   is a diagram of the Qualcomm device; and when you're

9   wondering whether it has two codes, you can see them right

10  there.  Those are the two codes, the Q and I codes that Mr.

11  Chandler talked about and that I asked Dr. Stark about.

12         And their argument about not changing the power

13  level before compiling, well, Ladies and Gentlemen, this is

14  shown in the patent.  It's the preferred embodiment of the

15  patent.  There is no way that that is not covered by the

16  claims.

17         Well, we -- we know more, because the '321 patent

18  is in the ETSI standard, the very standard that they all

19  now -- now, three years later, concede that they practice.

20  The '321 patent, Claim 4, is infringed.

21         Let's look at the '850 patent.  You remember the

22  '850 patent was controlling the transmissions when there's a

23  slowdown, such as in the evenings.  We showed you that

24  analogy.  We proved infringement with Mr. Chandler's

25  testimony.

1            Again, the source code analysis, very, very

2    important, because these are the actual Apple products.   The

3    CETECOM testing and the 3GPP standards, their response, they

4    claim that there's no virtual transmission time interval;

5    there's no predetermined delay period; there's no checking of

6    the current TTI.   They are wrong.

7            Here is the source code that shows exactly that.

8    The space between the two green blocks is the virtual

9    transmission time interval.   The blue blocks on the bottom

10   are the predetermined period, when the predetermined period

11   and the transmission takes place.

12           And Apple products do checking in the current

13   transmission time interval.   This is from the source code.

14   It is uncontested.

15           And the '850 patent is in the standard, the very

16   standard that they must comply with in order to sell these

17   devices.

18           The '850 patent, Claims 1, 10, 21, and 27, is

19   infringed.

20           Let's look at the '143 patent.   This is the patent

21   with -- on the dedicated channel.   You remember we talked

22   about that.

23           Again, Dr. Olivier's testimony, the source code

24   analysis, Apple documents, CETECOM testing, 3GPP standards;

25   and in his testimony, Dr. Stark admitted that all of these

1    functions are found in the accused devices, all of them.

2           Apple's defense, they say the decision to change

3    the channel is made in the network on the right side, not the

4    handset side on the left.

5           Remember they had that drawing?  They all came over

6    to the screen, and they said the decision is on the right

7    over the network.  It's not on the left.  Wrong.  That is not

8    a position we have ever taken.

9           The claim says:  Means for comparing the threshold

10   of the channel selection parameter to a current value of the

11   channel selection parameter for the basis of the channel

12   selection.

13          And that is exactly what happens.  The comparing,

14   the comparing is done in the handset on the left side of

15   those drawings that you saw.

16          And Dr. Stark had to admit that in his testimony.

17   There it is.  There's the drawing, and it's on the left side.

18          And Dr. Stark said:  It's not Core Wireless's

19   position that the channel selection in the '143 is the

20   decision on the right-hand side of that chart?

21          And he said:  I guess that's -- that's true.

22          And that is true.  This argument about all of the

23   channel selection being done on the right side is a

24   red-herring argument created by Apple in an attempt to avoid

25   infringement in this case.  That's all it is.

1              And we know that because the '143 patent is in the

2    standard.  The requirements of the '143 patent, in order to

3    meet the standard, leads you directly to infringement in this

4    case.

5              Apple products meet the '143 standard.  Dr. Stark

6    admitted that.  Is there any dispute that the products

7    support the standards in terms of what's being accused in the

8    '143?

9              Not just any standard, we're talking specifically

10   about these patented standards.  And he said, no, there's no

11   dispute.

12             '143, Claims 17 and 21 are infringed.

13             Let's talk about the '022 and '664 patents

14   together.  You'll recall that they are the ones that control

15   the channel -- the quality of the channel and transmissions,

16   particularly in urban areas.

17             We brought you Dr. Olivier's testimony, again, the

18   source code analysis, Apple documents, CETECOM testing, 3GPP

19   standards, Qualcomm deposition testimony.  And here, Dr.

20   Stark, again, admitted that all the functions are found in

21   the accused products.

22             Their defense, Apple products use an infinite

23   filter, not a finite filter.  And the BE period --

24   BEP_period2 is not an indication of signal quality.  That's

25   what their defenses are to infringement of this patent.

1          Let's take a look -- in questioning Dr. Stark,

2   Apple showed him the upper part of this page, and that's all

3   they showed him.  This is a tactic that we've seen throughout

4   this trial.  They did not show the whole story.  If they had,

5   they would have shown the parts that we have highlighted

6   here.

7          In other words, this change to the claim is not to

8   imply that the claims are limited only to a running average

9   filter.  In other words, these claims are directed to both

10  infinite filters and finite filters.

11          In addition, the last sentence, none of the changes

12  are seen to change the scope of the claims as compared to the

13  previous language.

14          So all this argument about how we added a -- a

15  phrase, a word to the claims and thereby limited them, they

16  didn't show you what was really said in the Patent Office.

17          And there's no difference anyway.  Dr. Stark

18  admitted on cross-examination that an infinite filter and a

19  finite filter are fundamentally the same.  Diminishing

20  returns.  You very quickly reach the point of diminishing

21  returns.

22          What about the BEP_period and whether it's a

23  channel selection component?  Take a look.  This is from the

24  specification.  It says that it is a channel quality

25  measurement.  That basis for non-infringement that Apple told

1    you about is contrary to what the standard says.

2            The '664 patent and the '022 patents, all of the

3    asserted claims are also infringed.  We confirmed that

4    infringement by source code, by testing, and by the standard

5    itself.

6            What did Apple bring to you?  Apple brought to you

7    no evidence.  Mr. Schell said that they have world-class

8    laboratories out in Cupertino.  They brought you no engineer.

9    They brought you no testing.

10           Dr. Stark has never even spoken to an Apple

11   engineer about the accused products in this case.  The

12   closest he's ever been to Apple is when he and his son drove

13   by when his son was visiting colleges out in California.

14   That's it.  That's it.  Why would they shield their technical

15   people from the engineers that know how these devices

16   operate?

17           Apple presented no significant defenses to its

18   infringement in this case.

19           Let me turn to the question of validity.  Validity

20   is Apple's burden because these patents were issued by the

21   United States Patent and Trademark Office, and they are

22   presumed valid.  That burden requires an abiding conviction

23   that invalidity is highly probable.  They haven't even come

24   close to making that showing here.

25           On the '321 patent, the question is:  Does the

1   prior art that they're asserting clearly show two and only

2   two transmission channels?  It does not.  They're referring

3   to an Odenwalder patent that has more than two channels.

4         When you look at the drawings, it has five channels

5   in one drawing, it has three in another.  It doesn't show a

6   two-channel configuration anywhere.

7         Now, they're going to say, well, that's just like

8   the accused products because the accused products have eight

9   channels.  And they do.

10        But we're talking about a particular mode of

11  operation.  We're talking about voice operation, and we're

12  talking about what's called the PRACH operation.

13        And in those two modes of operation, the devices

14  use two channels and only two channels.  And you will never

15  find that suggested or described in this reference.  Take a

16  look if you don't believe me.

17        The prior art does not show two and only two

18  channels.  Apple has failed to prove the '321 patent invalid.

19        What about the '850 patent?  On the '850 patent,

20  they offer the Kayama reference.

21        And I asked Dr. Knightly:  So the Kayama patent is

22  directed toward high-volume traffic?

23        And he said:  It's trying to prevent overload.

24        That's exactly the opposite of what the '850 patent

25  is for.  The '850 patent is for times when there is very

1   little transmission or no transmission.  We showed you that.

2          The '850 patent is when things are going slowly, a

3   few people arrive, they get in the bus, they take off.

4          Kayama relates to an overloaded situation,

5   something that the '850 patent is not even addressed to.

6          This reference is not even close to supplying

7   invalidity by clear and convincing evidence.  The '850 patent

8   has not been proven invalid.  It is a valid patent.

9          Let's look at the '143.  First of all, the

10  reference that they cite was considered by the Patent Office,

11  not only the examiner but the Patent Office Board of Appeals,

12  and they found that it did not lead to invalidity.  That's a

13  three-panel member of the Board of Appeals.

14         They also want to talk about an ETSI proposal cited

15  by Apple that shows the switch decision on the network side,

16  not in the mobile phone.

17         Well, I told you for infringement, we're relying on

18  the decision made -- being made on the left side in the

19  mobile phone.

20         For invalidity, we're relying on the decision being

21  made in the left side on the mobile phone.  Our positions are

22  perfectly consistent here.  You're going to hear about

23  stretching the fences.  That is not happening.

24         The ETSI references are irrelevant if the decision

25  is being made in the handset, and that's what Dr. Stark told

1   you, and that is the truth.

2            The '143 patent has not been proven invalid by

3   clear and convincing evidence.

4            What about the '022 and the '664?  Dr. Stark only

5   said that prior art contains the same filter that the -- as

6   the standard, but here's the key distinction for the '022 and

7   the '664.

8            This parameter that's sent from the network, this

9   BEP_period2, it used to be sent to all mobiles at the same

10  time.  The invention of the '022 and '664 is that I get my

11  own BEP_period2 indication of signal quality, and you get

12  one, and you get one, and you get one, and each of us gets a

13  separate one.

14           So my phone benefits from it.  Not some generalized

15  approach.  That's what the '022 and the '664 patent are

16  about, and they have not shown that in any prior art

17  reference.

18           Those patents have not been proven invalid by clear

19  and convincing evidence.  Apple has failed to make its burden

20  of proof in this case that any of the patents are invalid.

21           All of these patents are infringed, all of these

22  patents are valid.  They were issued by the Patent Office.

23  They remain valid today.

24           These are important patents.  They are incorporated

25  into the standard; and that alone is strong evidence of --

 1    that they are not invalid.

 2            Patents that are unique enough that their

 3    technology is in the standard, is a clear indication that

 4    they are not invalid.

 5            What about willful infringement?  Well, what did

 6    Apple do when it learned of these patents back in 2009?

 7    Nothing.

 8            What did they do when they were told in 2011 that

 9    these were patents that they were not getting a license to?

10    Nothing.

11            What did they do after we filed suit and sent them

12    a letter asking for a meeting to discuss their need for a

13    license to these patents?  Nothing.

14            In fact, we sent them a letter on May 10th of 2012.

15    They did nothing.

16            We sent them a letter on July 24th.  They did

17    nothing.

18            We sent them a letter on November 14th.  They did

19    nothing.

20            We sent them a letter on January 30th, 2013.  They

21    did nothing.

22            We sent them a letter on February 22nd, 2013.  They

23    did nothing.

24            And we gave up.  We quit trying.  Two years later,

25    we finally got a meeting with them, and they told us they

1   would settle for $200,000 if we would go away and leave them

2   alone.  And that was an insult.

3        We got one letter from them in October of 2012, and

4   this is very interesting, because this is before the Apple

5   executive that wrote this letter had talked to any of the

6   experts in this case.

7        In fact, the experts in this case have never talked

8   to Mr. Teksler, who wrote this letter.

9        Apple said, without the benefit of expert opinion,

10  quote:  Apple intends to establish non-infringement and

11  invalidity of the patents.

12       Basically, they were telling us:  You jabbed the

13  wrong bear.  That's just the way it is.  We're going to

14  destroy your patents.  We're going to find that they're not

15  infringed.  And we're going to spend as much as it takes to

16  get there.  And you can tell that this has cost a lot.

17       They had no basis for doing that.  You heard some

18  testimony about:  Well, look, you know, you can't just read

19  the letters, because the lawyers in the case were talking to

20  each other during these time periods.

21       And that's true.  And here's what I, one of the

22  lawyers, was being told by him, one of the lawyers for Apple.

23       Mr. Bunsow reached out a few weeks later, in

24  mid-March, to Apple's local counsel, Eric Albritton, again,

25  indicating Core's interest in meeting; and the response back

1   from Apple was that a discussion would be premature.

2           This is nine months after we filed suit, and it's a

3   month after they sent us a letter saying:  We're going to

4   destroy your patents.  And yet a discussion is premature.

5           Apple is a willful infringer in this case.  Their

6   tactics -- I'll let you decide what adjective to put at the

7   end of that sentence.  They're not the kind of business

8   tactics that any of us should be subjected to.

9           Let's talk about damages in this case, because

10  damages are ultimately what this case is all about.  Apple

11  knows it infringes.  It was going to continue to infringe

12  until somebody stopped them, and we came along and decided to

13  do it.

14          Now that they've been caught, now that they've been

15  caught with their hands in the standards, they want you to

16  let them off.  They want you to let them off for $500,000 for

17  patents that they need in order to sell 129 million products.

18          They want to pay us less than 2 cents apiece.

19          That's not the way it works.  Damages, under the

20  United States patent law, require that you award no less than

21  a reasonable royalty for the use made of the invention by the

22  infringer.  That's the use made by Apple in over 129 million

23  products.

24          THE COURT:  You've now used 25 minutes, Counsel.

25          MR. BUNSOW:  Thank you, Your Honor.

1          Now, Apple is going to ask you to award a lump sum

2     in this case.   There is no evidence of what a lump sum would

3     be.   We're asking you to award damages up to the time of

4     trial.   That's the evidence that's before you.

5          And the reason they want a lump sum is because they

6     want to get off paying for the continued use of these

7     products into the future.   A running royalty will allow them

8     to potentially pay for the use that they make of these

9     patents.

10          So I'm asking you to reject Apple's request for a

11     lump sum and to do what the statute says:   Give us damages of

12     no less than a reasonable royalty.

13          We know that all patents are not the same.   Patents

14     are not eggs.

15          I asked Dr. Stark:   For example, a patent that's

16     valid and infringed is far more valuable than a huge number

17     of patents that are either not valid or not infringed.   Would

18     you agree with that?

19          And his answer:   I would think so.

20          I would think so, too.   And these are five patents

21     that are valid and infringed that are standard essential that

22     Apple needs to use in order to sell its products on the

23     networks.

24          These are important patents; they're valuable

25     patents; and we deserve to be paid for them.

1            In fact, Apple has known for a long time that these

2    are quality patents.  Mr. Jeff Risher, their director of

3    licensing, who, by the way, is another Apple employee who

4    couldn't come to the trial, couldn't come here and testify.

5    Fortunately, we had his deposition.

6            There's a different kind of likelihood for Nokia

7    than for other people that they have valid and enforceable

8    standard essential patents.

9            He knows Nokia was a pioneer in this business.  He

10   knows these are good patents.  That's why he didn't come here

11   and take the witness stand and tell you why he didn't license

12   these patents.

13           He knows they're at risk, and they are at risk,

14   because these are high-quality, fundamental patents.

15           So what should the royalties be?  We did two

16   calculations of royalties based on different royalty rates.

17           And the important thing here to understand is those

18   five license agreements that Mr. Weinstein used, those are

19   FRAND license agreements, fair, reasonable, and

20   non-discriminatory.

21           So this idea about allocating or cutting down some

22   on those, first of all, you didn't hear any expert testify --

23   you didn't hear anybody testify about that.  But those

24   numbers in those license agreements are reliable numbers that

25   you can rely upon for your decision in this case.

1          Mr. Weinstein took those numbers and came up with a

2   royalty range from $84 million to $101 million.

3          Now, here's something that's pretty interesting.

4   Those licenses were negotiated at arm's length with the

5   patentholder claiming infringement and Apple saying that the

6   patents were invalid and not infringed.

7          There was never a determination on any of those

8   license agreements that there was actual infringement or that

9   the patents were invalid.

10          For the purposes of damages in this case, you are

11   required by law to assume that these patents are valid and

12   infringed.  And, in fact, we've shown you that these patents

13   are valid and infringed.  They're standard essential.  Apple

14   needs them to sell their products.

15          That makes Mr. Weinstein's numbers pretty

16   conservative.

17          Now, everybody always thinks that the Plaintiff's

18   numbers are inflated because juries compromise.

19          Apple knows that, at least that's what they

20   believe.  That's why they put a 500,000-dollar number up.

21   They think, if they make their number low enough, you're

22   going to compromise somewhere in between.  50 million.  60

23   million.

24          Don't do it.  There's no reason to do that.  These

25   damage numbers are conservative considering the quality of

 1    these patents and the massive amount of infringement that's

 2    occurred in this case.

 3            At the end of this case, I wish you God speed in

 4    determining your verdict.  You need to find infringement of

 5    all claims.

 6            Apple is a willful infringer.

 7            And damages of at least $101 million, which is

 8    reasonable royalty damages up to the time of trial.

 9            I want to thank you very much for your time in this

10    case.  You are the reason that this system works.  You're the

11    reason that a company like Apple can't just stonewall us and

12    refuse to talk to us forever.

13            Your Honor, I'd like to reserve the rest of my

14    time.

15            THE COURT:  All right.  We'll now hear closing

16    arguments from the Defendant in the case, Apple.

17            MR. MUELLER:  Thank you, Your Honor.

18            May I proceed?

19            THE COURT:  You may.

20            MR. MUELLER:  Good afternoon.

21            It's my last chance to talk to you, and I want to

22    start by thanking you on behalf of myself, Ms. Vreeland, Mr.

23    Albritton, and Mr. Casanova.

24            It's been a lot of information over the last week,

25    and you've paid close attention, and we appreciate that.  We

1    appreciate that, because when you pay attention, you learn

2    the facts.

3         And we believe the facts strongly support us in

4    this case, and we very much appreciate the care that you've

5    brought to your service as jurors.

6         We've tried to help as much as we can by bringing

7    you a 25-year employee of Apple, Mr. Casanova, sitting right

8    here; a 33-year professor from the University of Michigan,

9    Dr. Wayne Stark; the chairman of the Department of Electrical

10   and Computer Engineering at Rice, Dr. Knightly.  They are

11   teachers, and they were here to assist you as best they could

12   in understanding the technology.

13        We also brought you Dr. Stephan Schell, the

14   recently retired chief wireless architect at Apple, and many

15   other witnesses by videotape.

16        Any time you saw a witness by videotape, including

17   during Core Wireless's case, that included our designations,

18   as well.

19        And I respectfully submit to you that every witness

20   who testified by video, supported our side of the case.

21        Now, His Honor has given you the law that binds us

22   all.  And in my remaining time with you, I'm going to review

23   the facts.

24        I'm going to calmly and respectfully walk through

25   the evidence piece-by-piece.  I'm going to use real documents

1    that were introduced into evidence.

2            I'm going to give you the exhibit numbers.  I'm

3    going to give actual testimony that you heard.  I'm going to

4    show it to you.  I'm going to use a couple of slides that you

5    saw.

6            At the end of the day, it's the facts and the law

7    that His Honor has given you that must determine this case.

8            And I'm going to try my best to review those facts.

9            Now, as you consider the facts on issue after

10   issue, I ask that you bring your common sense to this

11   process.  That's one of the most valuable attributes you have

12   as jurors, your good judgment and your common sense.  And on

13   issue after issue, Core Wireless's case fails basic common

14   sense.

15           For the '143 patent, which claims a selection

16   process occurring in the phone, they're trying to accuse a

17   process in which it occurs in the network.

18           And you've seen the signaling diagrams.  In the

19   accused products, it happens on the right.  In the patent,

20   it's on the left.  Left is not the same as right.  And that's

21   just basic common sense.

22           For the '022 and '664 patents, the claims require a

23   finite length filter, and there's no dispute that the accused

24   standard has an infinite filter.  Finite is not the same

25   thing as infinite.  And, again, that's just common sense.

1          For the '321 patent, the patent requires two and

2     only two channels.  The actual standard uses far more than

3     two channels.  More than two is not the same as two, and

4     that's just common sense.

5          For the '850 patent, the patent requires a virtual

6     time transmission interval between different transmissions,

7     and it's used for slowing down transmissions.

8          Well, as you've seen, the real standard isn't

9     trying to slow down anything; at all and it doesn't use this

10    virtual technique.  The virtual approach is not the same as

11    the real approach, and, again, that's just common sense.

12         Now, those are just the beginning of the problems

13    with the patents, and we're going to discuss additional

14    problems in a bit.  But the critical issue at the heart of

15    this case is whether these patents cover portions of the

16    standard created by the European Telecommunications Standards

17    Institute.

18         You've seen these boxes over here.  It's 18 boxes

19    or more for the full standard.  And the question at the heart

20    of this case is do these five patents cover portions of the

21    standard?

22         And you know the process by which that standard was

23    created.  You've heard it from witness after witness.

24         Companies get together and send their engineers.

25    They make proposals in writing -- written proposals.  Those

1    are considered, along with alternatives, and then they're

2    voted on.

3            And if you have a proposal that's accepted and

4    that's voted on in favor of the proposal, it becomes part of

5    the standard.  If it matches your patent, you now have a

6    standard essential patent.

7            If you don't have a proposal that's voted on and

8    accepted into the standard and that matches your patent, you

9    don't.  It's as simple as that.

10           The only other way you can get a standard essential

11   patent is by luck, and there's been no argument in this case

12   about luck.

13           The argument is that Nokia was there, Nokia

14   participated.  But you've seen no proposal in writing at any

15   point in this case that was accepted by ETSI and that matches

16   the patents.  Not one.

17           So why are we here?

18           Well, the facts begin in late 2010 and early 2011.

19   Nokia was beginning to struggle in the marketplace.  It had

20   been the largest seller of cell phones.

21           But it was beginning to struggle thanks to some new

22   competition from Apple and other competitors.  And it began

23   to explore a partnership with Microsoft which they eventually

24   entered into.

25           And part of that partnership involved a plan, a

1    plan to use some old Nokia patents to make some money.

2              In March 2011, someone from Microsoft contacted Mr.

3    Lindgren here and asked for a secret meeting.  And at that

4    meeting, they let him know that they wanted to enforce some

5    Nokia patents.  They let him know that they were looking for

6    a fight.

7              Who was the target?  Well, Mr. Lindgren told us

8    that at the very first meeting, the name Apple came up.

9              Now, let's get a few things straight right now.  As

10   a general matter, there's nothing wrong with patents at all.

11   Patents can be a great thing.  They can protect innovations.

12             And properly used, Apple has no quarrel with the

13   patent system whatsoever.  There's nothing wrong with

14   licensing patents or joining with others to license patents;

15   or when all else fails, enforcing patents in court.  There's

16   nothing wrong with any of those things.

17             There is something wrong with being misleading.

18   There is something wrong with demanding money for unwanted

19   bottom-of-the-barrel patents that no one is using.

20             You heard during Mr. Casanova's cross-examination,

21   Mr. Ward suggested that Apple is throwing stones in a glass

22   house and referred to the Rockstar licensing collaboration

23   that included Apple and some other companies, including

24   Microsoft.

25             Core Wireless has not suggested that Rockstar did

anything wrong, and the facts have made clear that Apple is
not living in a glass house or talking out of both sides of
its mouth or anything else.

Apple believes in the patent system and believes in
licensing and believes in collaborations with other
companies.  But it must be done in the right and proper way,
not by misleading other folks about what you're doing and not
by asserting patents that are not used by anyone and
demanding unfair royalties for them.  That's wrong.

And what's even more -- what's even worse is
feeling entitled to do all those things.

Now, let's review the facts.  At the same time
these secret meetings were occurring between Microsoft and
Conversant and Nokia, there was a whole other negotiating
unfolding.  Apple was negotiating Nokia for a cross license.
You heard all the details about how that happened.

Mr. Lindgren admitted in cross-examination that
negotiation for the cross license occurred at the very same
moment in time that this plan was being set in motion against
Apple.

So think about that.  On the one hand, you have
Nokia negotiators at the table with Apple negotiating a cross
license.  And they know that they've been having meetings
with Microsoft and Conversant to target Apple.  But they say
not one word about any of that, not a word about Microsoft, a

1   word about Conversant, a word about Core Wireless.

2          On the other side, you have Apple, who is trying to

3   negotiate a cross license and, in fact, it eventually was

4   concluded and they're told not a thing.

5          Now, eventually the agreement was concluded between

6   Apple and Nokia.  It's Defendant's Exhibit 119.  In that

7   agreement, Nokia received the right to certain Apple patents.

8   And Apple received the right to certain Nokia patents.  It

9   was a cross license.  Apple agreed to pay some money to Nokia

10  as part of the deal.

11         And during Mr. Casanova's examination, we walked

12  you through some parts of that agreement and showed you the

13  license grant from Nokia to Apple.

14         And you saw, that as part of that deal, Apple

15  received the rights to essential patents that Nokia had for

16  the standards that were -- have been created by ETSI,

17  including the very same standards in this case.

18         So all this talk about Core Wireless -- I'm sorry,

19  all this talk by Core Wireless about Nokia being a cellular

20  pioneer and having strong cellular patents, ignores a simple

21  fact, Apple has a license.  It's right here.  You can read

22  it.  It's Defendant's Exhibit 119.  They have a license to

23  the essential patents that Nokia claimed to have.

24         We're not talking about those patents in this case.

25  We're talking about a different set of patents, the divested

1    patents that were transferred over to Core Wireless, the

2    unwanted, unused, never proposed or proposed and rejected

3    patents.  Those are the patents that we're dealing with in

4    this case, not the stronger patents that Nokia kept and Apple

5    licensed.

6           So let's review a few facts about the patents in

7    this case.

8           First, Nokia never said that Apple infringed them

9    during the license negotiations.  You know that.  You saw the

10   testimony from the Nokia licensing executives by videotape.

11          They admitted they had never even seen these five

12   patents.  It's pretty tough to accuse someone of infringing

13   patents that you've never seen.  But you heard them ask

14   one-by-one had they seen these patents, and they hadn't.

15          You've also seen references to these correspondence

16   between Nokia and Apple, and Mr. Bunsow just mentioned some

17   in his closing argument just a few moments ago.  You can take

18   a look at these if you'd like.  They're Plaintiff's Exhibits

19   46 and 47.  Try to find the patents.  These are lists of

20   hundreds and hundreds of patents.

21          The five patents in this case are not marked out in

22   any way.  They're not identified as infringed.  There's no

23   claim chart.  There's nothing there.  These are just long

24   lists of declared essential patents.  And, again, you can

25   look at them, Plaintiff's Exhibit 46 and 47.

1          Now, they say on each page of that list "declared

2     essential," but you know that declared essential doesn't mean

3     actually essential.

4          Mr. Toskala admitted that.  Dr. Olivier admitted

5     that.  Mr. Chandler admitted that.  Mr. Lindgren admitted

6     that.  Mr. Weinstein admitted that.  You're not entitled to

7     money just because you declare yourself that your patents are

8     essential.  You have to prove it.

9          Second, for those who participated in creating

10    standards, you know the rules.  You make a proposal.  It's in

11    writing.  There's a written document that reflects it.

12    There's a vote; and if it's accepted, it becomes part of the

13    proposal.

14         If there were any Nokia proposal that had matched

15    the patents and had been accepted, you would have seen it.

16         But over the course of this one-week trial, you

17    never once saw a written proposal voted on, accepted, made

18    part of the standard.  You never saw that.

19         Now, it is absolutely true that in my opening

20    statement, I told you:  We're going to bring you Dr. Michael

21    Walker, the former chairman of the board of ETSI, and it is

22    also true that he was here all week.

23         And there's a reason why we didn't call him, and

24    the reason is the rules were undisputed.  Everyone agreed on

25    them.  We wanted to wrap this case up and get it to you as

1   quickly as possible, because that was an uncontested point,

2   how these rules operate.

3           Mr. Toskala agreed.  Dr. Olivier agreed.  There was

4   no disagreement.  The way the process works is you make a

5   written proposal, a vote is taken; and if it's voted on and

6   accepted, it becomes part of the standard.  That's what

7   Dr. Walker would have told you, but you'd already heard it.

8           Now, the best that Core Wireless has done is to

9   have Mr. Toskala come to you from Nokia in this case to

10  testify that he thinks proposals were adopted, or so he says

11  to you.  He's a paid fact witness, paid more per hour than

12  Mr. Chandler or Dr. Olivier.  But at trial, he came here and

13  told you these proposals were made and adopted.

14          Now, again, this is where you bring your common

15  sense to bear, your good judgment to bear, to evaluate Mr.

16  Toskala's credibility on this critical claim.  He had never

17  once said that, before he arrived at trial.  But he arrives

18  at trial; and all the sudden, he says the patents had been

19  accepted into the standard.

20          Well, how do we know that he's right?  There's not

21  a shred of evidence to support his account.  His books don't

22  support his account.  They never mentioned the patents.  Not

23  the first edition, the second edition, the third edition, or

24  any edition.  No mention of the patents whatsoever.

25          Dr. Olivier and Mr. Chandler admitted they weren't

1    relying on Mr. Toskala or his books.

2           Now, if -- if he really had this information, if he

3    really knew that there were proposals made that supported the

4    patents that were accepted, why didn't he tell Mr. Chandler?

5    Why didn't he tell Dr. Olivier?  Why didn't they have any

6    conversation with him about this?

7           And most important, where were they?  Where were

8    these written proposals?  If he so vividly recalled them and

9    Core Wireless wanted to rely on his account, where is the

10   proof?  Where are the written proposals?

11          They never showed up, and the answer is, they never

12   were made.  His account is simply not incredible, not

13   believable.  It fails basic common sense.

14          And there's another reason why.  Dr. Olivier and

15   Mr. Chandler testified to us that the only proposal they

16   remembered was Mr. Vialen's proposal for the '143 patent,

17   which was rejected; and Dr. Olivier conceded exactly that.

18          Mr. Chandler admitted during cross-examination that

19   he hadn't identified any proposals at all.

20          So we have the two lead technical experts for Core

21   Wireless coming to you, the Ladies and Gentlemen of the Jury,

22   and one expert, Dr. Olivier, can only identify a rejected

23   proposal, and Mr. Chandler identifies no proposal at all.

24          That's the evidence.  That's their opinions that

25   they offered to you in support of Core Wireless's claims.

1          Mr. Toskala told us that when Nokia had truly

2    essential patents, they prepared claim charts, which would

3    have the claim language on the left and the evidence on the

4    right.

5          Well, again, we never saw a claim chart.  There was

6    never a Nokia claim chart brought to you in this case.  The

7    documents, once again, were not there to support the claims

8    being made.

9          The inventors themselves did testify, but they

10   couldn't recall anything about the patents.

11         Do you recall that series of inventors that you

12   heard by videotape?  One after the other couldn't remember

13   their patents, couldn't remember the inventions, couldn't

14   remember the supposed benefits, one after the other.

15         The bottom line is that these are not essential

16   patents.  They were never proposed or they were proposed and

17   rejected.  They are unwanted and unused patents,

18   bottom-of-the-barrel patents that Nokia divested into a plan

19   to target Apple.

20         Nokia kept its better patents, and those patents

21   are licensed pursuant to the cross license with Apple.  This

22   is the divested set.  This is the never proposed or proposed

23   and rejected set.

24         Now, the up-front payment made by Conversant is

25   actually a pretty good indicator of their value.  It was

1    about $20,000 for about 2,000 patents for like $10 a patent.

2          Now, Mr. Lindgren here accused me of being

3    dishonest when I told you that the up-front payment was

4    $20,000 for those 2,000 patents.

5          And, in fact, you know I told the truth.  And you

6    know I told the truth because I proved it to you using their

7    own words, their public securities filing made to their own

8    investors at a time when the company was called MOSAID.

9          And if you look at this document, you can see that

10   they told their inventors that MOSAID paid just $19,975 up

11   front to buy Core Wireless.  That's exactly what I told you.

12         Now, was there more to the deal?  Of course there

13   was, and we'll go through those facts in a moment.  But one

14   fact is the up-front price paid was about $10 a patent, and

15   they're now seeking $100 million for five of them.

16         Now, as for the rest of the deal, Conversant agreed

17   to take on the effort to license or enforce these patents;

18   and according to Mr. Lindgren, they've spent over $30 million

19   in licensing and litigation efforts, including, presumably,

20   for the folks here at this table.

21         If Core Wireless doesn't hit -- or if Conversant

22   doesn't hit certain targets, there can be consequences; and

23   you know what those consequences could be, including a

24   financial penalty.

25         Well, let's see how much success they've had thus

far in this campaign they've mounted to license these patents.

Question:  But as of today, not a single company has signed a license, correct?

Answer:  Correct.

Not one.  We have the entire industry being told that these are standard essential patents.

As Mr. Bunsow just said, everyone must use them. They're part of the standard.  But no one, no one has signed up to use them.

Now, think about that.  We've been told at this trial that these patents are wonderful.  They improve battery life.  They do all sorts of great things.  You can't practice the standard without them.

And Conversant is pouring millions of dollars into this licensing campaign.  Yet no one, no one in the industry has licensed these patents.  If they were really that good, wouldn't one company have taken a license?

Now, look, Mr. Lindgren here is a sophisticated licensing attorney; and Conversant, as he's told us, is very experienced in these matters.  And its principal owner is Sterling Partners, a private equity firm.

These are experienced investors, but the fact is they made a bad deal.  They bought a fight that they couldn't win, a fight with bad patents that aren't actually being

1   used.

2           That was their decision, and they should bear the

3   responsibility of that decision.  They are not entitled to

4   demand money from Apple for a mistake that they made; yet

5   that is what they are asking you to do.

6           In February of 2012, Core Wireless sued Apple

7   without even the courtesy of a phone call or an email

8   beforehand.  It issued a press release the same day.  You've

9   seen that press release.

10          They sued first, and they issued the press release

11  to put pressure on Apple, to try to get Apple to pay money to

12  go away.  And then and only then the letters started.  And

13  let's talk a little bit about those letters.

14          They're written in strong language, and

15  Mr. Lindgren and Mr. Bunsow gave us a dramatic reading of

16  them last week.  But facts speak louder than words, and let's

17  review the facts.

18          To begin, these letters were written by Phil Shaer.

19  You saw him testify at the very end of the case.  He was that

20  witness who testified by videotape right near the end.

21          He said he couldn't explain the inventions in a

22  million years.  And he admitted that Apple didn't need to

23  license the whole portfolio.  Yet he sent self-righteous

24  letters in which Core Wireless demanded billions of dollars

25  from Apple.  And that's how much their demands translated

1   into.

2           And there's a more fundamental problem.  The

3   letters were based on an assumption that Core Wireless was

4   entitled to money, entitled to quick responses, entitled to

5   Apple meeting Core Wireless's demands, entitled to have Apple

6   disprove infringement.

7           And look at some of the back-and-forth between Mr.

8   Bunsow and Mr. Lindgren.  The questions were posed to Mr.

9   Lindgren as if -- as if Apple had to disprove infringement

10  just because Core Wireless had sued them and sent some

11  letters.

12          Well, that's not how it works.  The burden is on

13  Core Wireless -- and Mr. Lindgren here is a lawyer and he

14  understands that.

15          The burden is on Core Wireless to prove

16  infringement.  They have to actually prove their case before

17  they can recover a penny, and they've never done that.

18          Apple didn't have to disprove infringement or

19  respond at the drop of a hat because Core Wireless said so.

20          But, in fact, we did disprove infringement, and we

21  did communicate with Core Wireless.

22          In these supposed gaps that you saw in the

23  timeline, Mr. Bunsow and I were communicating, as well as our

24  respective teams.  Mr. Lindgren admitted that.

25          Now, you've seen Ms. Vreeland and Mr. Albritton and

1    I for a week now, and I think you can see that we take these

2    sorts of claims very seriously and we -- we investigate the

3    facts very deeply.

4           And if there's an argument put to you that Apple is

5    saying it had no -- saying things for which it had no basis,

6    you should judge the credibility of that claim.

7           Bottom line is these letters prove nothing,

8    absolutely nothing.  The burden is on Core Wireless to show

9    actual facts to support their claim.

10          Now, in addition to all the communications that we

11   had, Apple did write back.  And in 2014 actually offered

12   $200,000 to make them go away -- to make this burdensome

13   litigation go away.

14          Was it an acknowledgement of infringement,

15   absolutely not.  And Mr. Lindgren conceded exactly that.  He

16   knows it wasn't.  It was an attempt make a burdensome

17   litigation go away.

18          In fact, can you read the letter.  It's Plaintiff's

19   Exhibit 63, and it lays out all the problems with Core

20   Wireless's case on the merits, on the facts, and I encourage

21   you to read it.

22          But Core Wireless chose to persist with this case

23   with these bottom-of-the-barrel patents, and here we are.

24   And now the burden is on Core Wireless to actually prove it

25   to you.

1          So how did they try to -- to meet their burden at

2    this case?  First, who did they call to testify?  No one from

3    Core Wireless.  Not a single person from the actual Plaintiff

4    in this case took the stand, no one.

5          They did call Dr. Olivier and Mr. Chandler and Dr.

6    Smedley, all professional testifying experts in litigation.

7    But here's the remarkable thing.  They had the chance to come

8    back to you a second time during what's known as a rebuttal

9    case.

10          They could come back and explain why they believe

11   Dr. Knightly and Dr. Stark were wrong if they sincerely

12   believed that they were wrong, but they never did.  They

13   never came back and told you that Dr. Knightly and Dr. Stark

14   were wrong on one issue.  They could have, but they didn't.

15          During this trial, Core Wireless has never targeted

16   anything that makes Apple's products different or special.

17          It's accusing chips -- baseband chips that are

18   supplied by Qualcomm and Intel.

19          Now, I mention that not to make an excuse.  Apple

20   stands by every part in it products, and that certainly

21   includes the baseband chips.  But the fact that they're

22   accusing the baseband chips speaks to a very interesting

23   issue.

24          If their theory was right and if they were -- truly

25   had these standard essential patents, then every baseband

1    chip that practices those standards would also infringe the

2    patents.  Because every phone has a baseband chip.  Every

3    phone has that component that supports the standard.

4           So if the theory was right, then every phone

5    manufacturer who uses the standards would have to take a

6    license.

7           But, again, as of today, not a single company has.

8    The industry has spoken as to the credibility of the theory

9    that they're offering to you, and not one company has

10   validated and agreed with what they're saying.

11          Now, at several points during the trial, Core

12   Wireless made a big deal out of Dr. Smedley looking at source

13   code.  He actually testified on the standard only for a few

14   minutes, and the code just showed that the products support

15   the standards.

16          Same thing with the CETECOM testing.  Showed that

17   Apple's products support the standards.

18          The real issue here is whether the patents actually

19   covered the standards and whether certain optional parts of

20   the standards or out-of-date parts of the standards are still

21   being used.  And on those critical questions, Core Wireless's

22   case falls apart.

23          Let's go through the patents one-by-one.

24          '143 patent covers a process for making a selection

25   process -- a selection decision, I should say, in the phone.

1          The asserted claims are 17 and 21, both of which

2     require doing a comparison process for basis of channel

3     selection.  That's the claim language and the words matter.

4          But not only that, His Honor has given us his

5     interpretations of the claims and we're all bound to follow

6     those to the letter.  He set out the function and the

7     structure that we're required to have.

8          Part of it is channel selection is advantageously

9     performed in the control unit 803.  Channel selection.

10         That's what His Honor said, channel selection.  Not

11    the decision to report.  Not the decision to send the

12    measurement report.  Channel selection, part of the required

13    structure.

14         Control unit 803 is in the phone.  There's no

15    dispute about that.  Everything on the left-hand side of this

16    figure is in the phone.  The right-hand side is the base

17    station that you'd see on the side of the road.

18         That's what Mr. Vialen proposed to ETSI in

19    Defendant's Exhibit 232.  In his approach, which you've seen

20    several times, the decision is made on the left-hand side in

21    the user equipment or cell phone side of the signaling

22    diagram in the phone.

23         In the actual standard, the -- the decision is made

24    at the network side on the right.  That decision is made on

25    the right.  Left doesn't equal right, but more fundamentally,

1    the phone is not the same as the network.

2         The proposal was rejected, and there's no

3    infringement.  And, in fact, Dr. Olivier admitted that the

4    proposal was rejected, and he also admitted that rejected

5    proposals are not part of the standard.

6         Now, let's talk about the '022 and '664.  The

7    asserted claims in these patents all require a filter with

8    finite length.

9         Now, Mr. Bunsow just told you a few moments ago,

10   the patents cover both infinite and finite filters.  They

11   don't.  They cover finite length fighters.

12        The claims say that the word "finite."  Finite does

13   not mean the same thing as infinite.

14        You have to follow the actual claim language that

15   was chosen by the inventors, and they chose the word

16   "finite."

17        You've seen, in fact, where they chose it.  The

18   Patent Office rejected the claims that didn't have that

19   restriction, and they added it.  A filter having a finite

20   filter length.  They chose those words.  Infinite does not

21   mean the same thing as finite, and that's just basic common

22   sense.

23        Now, there's another problem with these claims, as

24   well.  Every claim in the patent requires something called an

25   indication of signal quality; and what Dr. Olivier has

```
1    identified as meeting that requirement, is called

2    BEP_period2.

3             Now, BEP_period2 is not actually in the patent.  So

4    if you look through the patents -- I encourage you to do

5    so -- you'll never see the word "BEP_period2" anywhere.

6             But, moreover, Dr. Olivier conceded -- well, he

7    first conceded that the filters were infinite.  We can all

8    agree on that.  But he also conceded that the BEP_period2

9    parameter could be created for a variety of reasons.  Didn't

10   necessarily have anything to do with signal quality at all.

11            And then he went on to concede that he had no

12   evidence that anyone anywhere in the U.S. was actually using

13   it.  So take that claim and think about it for a minute.  We

14   have them asserting patents in this case and asking for $101

15   million.

16            And, in fact, Mr. Weinstein said his theory would

17   apply even if you only found one patent infringed.  $101

18   million for one patent.  And their technical expert says

19   there's no evidence that this BEP_period2 is even being used.

20            The argument is the products are capable of using

21   it, but how can you be capable of using something that's

22   never being sent?  And how important can this be if no one is

23   even using it?

24            So their case fails on multiple levels for the

25   '022/'664.  But, again, it fails at the level of basic common
```

1    sense.

2            Next patent is the '321 patent.  This covers a

3    transmitter which uses two and only two channels.

4            As you've seen, the Apple products do not use two

5    and only two channels.  The inventors had to say they used

6    two and only two channels to get the patent out of the Patent

7    Office.

8            This is a representation they made to the Patent

9    Office to distinguish themselves from certain older prior

10   art, including from Qualcomm.  They said exactly two

11   channels.

12           The problem is the Qualcomm chips and the Intel

13   chips have eight channels, and eight is a lot more than two.

14   Dr. -- or Mr. Chandler admitted that, during

15   cross-examination by Ms. Vreeland.  In this testimony you see

16   on the screen, he conceded that both the Qualcomm chips and

17   the Intel chips have eight channels.

18           So the only way they can get to two is to zero out

19   six of them.

20           But there's a problem there, as well.  You can't

21   zero out channels for purposes of infringement, but then not

22   zero out channels for purposes of invalidity.

23           So if you're going to zero them out, that means the

24   patent is invalid because the older prior art, including the

25   Qualcomm prior art, had more than two channels.  If you zero

1    them out there, you end up invalidating the patent.

2            Dr. -- Mr. Chandler couldn't get his story straight

3    on this.  It changed over the course of the trial, and he

4    never came back to you in rebuttal to explain himself.

5            What's more, the theory about how the products

6    could sometimes perhaps maybe use two channels was based on

7    the 1999 version of the standard that was in place for about

8    six months.  You can see the sentence that Mr. Chandler was

9    relying on right here.

10           Here's the standard on the left that he's relying

11   on.  It was changed six months later to make clear that the

12   standard was going to use more than two channels.

13           So he needs to show that someone now, years and

14   years later -- and remember, the iPhone was introduced in

15   2007, eight years later -- was still using this outdated

16   approach from 1999.  And he can't show that.  He never did.

17           And this is an important point.  You were told just

18   now that Dr. Stark had no opinion on this issue; and, in

19   fact, you saw his opinion on this issue.  It's right here.

20   This is an excerpt from his report.

21           Quote:  Nowhere in his report does Mr. Chandler

22   provide actual proof showing that any of these mechanisms

23   were actually carried out by accused Apple products with

24   Qualcomm baseband processors to simultaneously transmit

25   exactly two channels.

1              And then he went on to say the same thing for the

2     Intel chips.  So his opinion was there's no evidence of this

3     actually being used.  That's exactly what he told you.  It's

4     entirely consistent.

5              Not only that, Dr. Smedley said the same thing.

6              During cross-examination, he admitted he had found

7     no evidence of actual use on two and only two channels.

8              So at the end of the day, we have no proof that

9     anyone is doing this theory they've articulated.  And even if

10    they were, it would only work for them if they zero out

11    channels.  And zeroing out channels creates invalidity

12    problems.

13             So they can't have it both ways.  Mr. Chandler

14    could have tried to reconcile it, but he never did.  He never

15    came back and took the stand in rebuttal.

16             Now, there's other problems as well.  Dr. Stark

17    explained how, beyond the two channels issue, Apple's

18    products don't use two spreading codes.  They use a single

19    complex scrambling code.

20             And on issue after issue, it's Core Wireless's

21    burden to prove infringement; and on issue after issue, for

22    the '321 patent, they've fallen short.

23             The last patent is the '850.  The inventors claimed

24    they came up with a new way of slowing down transmissions.

25             You can see the title of the patent:  Slow.

1    Slowing down transmissions using this virtual TTI.

2            And they said that by doing this -- or Core

3    Wireless has told you that by doing this, you could save

4    battery life.  Well, again, there's problem after problem

5    with the case.

6            The first problem is, what they're accusing is

7    something called uplink DRX, and Mr. Chandler admitted that

8    there's no battery savings from using that uplink DRX.

9            What's more, uplink DRX is not covered by this

10   patent.

11           Now, Mr. Bunsow tried to ask Dr. Knightly some

12   questions in his cross-examination to suggest the idea came

13   from Nokia.  He was using a document that had a Nokia

14   indicator on it.

15           But, in fact, Nokia was the reporter of some ideas

16   of others.  And as Dr. Knightly explained, uplink DRX was

17   proposed by Ericsson.  Not Nokia.  Ericsson.

18           Once again, there's no evidence of any proposal by

19   Nokia that matches the patents in the case.

20           The actual uplink DRX is right here.  It's two

21   paragraphs out of these 18 boxes of paper.  These are the two

22   paragraphs they're accusing.

23           Dr. Knightly explained to you how it works.

24   There's a timer to keep track of inactivity.  It's an

25   inactivity timer, not a virtual TTI.  And if the phone is

1  inactive, it has to wait for a new MAC cycle, one of the

2  black bars in this figure.  But it can transmit as much as it

3  wants any other time.

4          There's no reference to virtual TTIs anywhere, and

5  there's no need to wait a predetermined period of time.  It

6  doesn't meet the patent.  There's no infringement.

7          Now, for patent after patent in this case, you saw

8  Qualcomm engineer testimony; and time and again, their

9  testimony directly supported the positions we've taken in

10  this case.

11          They told you the phone didn't channel select

12  between dedicated and common channels.  They told you they

13  used infinite filters.  They told you that there was no use

14  of two and only two channels or two spreading codes.  They

15  told you they didn't use virtual TTIs.

16          So the actual folks who built these chips -- which

17  was not Apple, it was Qualcomm for the Qualcomm chips -- came

18  before you by video again and again and directly supported

19  Apple's arguments in this case.

20          Now, one side -- one sign of how far they've tried

21  to stretch -- Core Wireless has had to stretch in this case

22  is this PA Consulting report, which we've heard nothing about

23  until just now, so I won't say much about it either.

24          As you know, the actual entries don't mention the

25  '022 and '664, call the '143 obvious, call the '321 unclear,

1     call the '850 not relevant to one release and might be

2     essential to another; and as you know, the authors of that

3     report didn't have His Honor's claim construction and weren't

4     even looking at the right claims for some of the patents in

5     issue.

6           It's irrelevant to this case.  It's a data point

7     that Apple has used in some licensing negotiations.  It is

8     not a basis for an infringement claim, and it's been

9     misrepresented to you as such.  You should look at the actual

10     entries.  They provide no support for the claims in this

11     case.

12           The bottom line, Apple is not infringing any of

13     these patents.  And if you find non-infringement, you are

14     done with the patent issues in this case.

15           If you look at the verdict form, if you answer

16     non-infringement, your work is over with respect to the

17     patent issues, and all you would need to address are the

18     contract issues at the end of the verdict form.

19           If you find, however, that the patents -- any of

20     the patents are infringed, you do need to consider

21     invalidity, because the only way any of these patents could

22     be infringed is by stretching them beyond their proper

23     boundaries.

24           And once you do that, they cover prior art, the

25     ideas of others.  You can't stretch your patents and move the

1   fence for infringement and then try to escape the

2   consequences for invalidity.

3           So the only way they can get to the Apple products

4   is by stretching them beyond recognition; and once you've

5   done that, they become invalid.

6           But if you find non-infringement, Core Wireless can

7   keep its patents, and your work would be done.

8           Damages.  First thing right off the bat, there

9   shouldn't be any damages at all in this case.  None.  There's

10  no damages for patents that are not infringed and

11  non-essential.  None.  The right number here is zero.

12          But I do think that looking at their damages claim

13  shows just how far they're stretching.  Mr. Weinstein is

14  asking for $101 million for these five patents that were

15  never proposed or proposed and rejected.

16          And as you saw during the cross-examination of Mr.

17  Weinstein, the way that he accomplishes this is by looking at

18  five Apple licenses, doing an average, a simple average of

19  the amounts made under each, and giving no consideration

20  whatsoever to what was received under those licenses.

21          Those licenses covered hundreds of patents.  Mr.

22  Weinstein is suggesting to you that the proper price for the

23  five patents in this case or even four or even three or even

24  two or even one would be the average paid under those

25  licenses for hundreds.  It doesn't make any sense.

1        And as you saw during his cross-examination, you

2    can see that even through the simple analogy of eggs.  You

3    don't pay -- you pay less when you get less.  It's a basic

4    common sense point, but it wasn't used by Mr. Weinstein.  And

5    this shows just how unfair and unreasonable they've been.

6        If you were to actually take his approach and

7    adjust it for the number of patents, you arrive at

8    essentially what Dr. Lynde did, $500,000, about $100,000 a

9    patent.

10       Now, remember, that would be if they were infringed

11   and valid, because those are the assumptions damages experts

12   need to make under the law when they're conducting a damages

13   analysis.  Under that approach, they'd be worth about

14   $100,000 each or $500,000 total.

15       But, in fact, the right number is zero, and I want

16   to be very clear about one thing.  We're not asking you to

17   compromise.  The right number is zero.  Zero.

18       THE COURT:  Two minutes remaining.

19       MR. MUELLER:  Finally, the contract claims.  We

20   have proven to you that Core Wireless made a contract to

21   ETSI.  They promised to be fair and reasonable and

22   non-discriminatory.  And they broke it.

23       One easy way to know they broke it is by taking the

24   quiz that Conversant, the company that Mr. Lindgren is chief

25   executive officer of, set up.  Learn to take a stand against

1    bogus patent claims.

2         And if you are to follow that bogus patent claim

3    quiz, you will see that the very second -- I'm sorry -- the

4    third red flag that they raise is:  A legitimate claim should

5    suggest licensing first, not litigation.

6         Well, that's exactly what they did here.  They sued

7    first.  They didn't engage in licensing first.  It was a

8    bogus patent claim under their own test.  They broke their

9    contract.

10        Not a matter of money.  We're not asking for money

11   at all.  It's a matter of principle.  They broke their

12   contract, and you should find exactly that.

13        This is my last chance now to talk to you.  I won't

14   have a chance to respond to Mr. Ward, but I ask that when you

15   listen to him, you keep a couple of things in mind.

16        First, you've been with me for a week.  You've been

17   with Ms. Vreeland and Mr. Albritton.  Ask yourself, when you

18   hear his arguments:  What would Mueller say?  What would Ms.

19   Vreeland say?  What would Mr. Albritton say?  What facts

20   would they point us to?

21        Because at the end of the day, it's the facts that

22   should decide this case.  It's the facts that we've tried to

23   focus on from the opening statement until now.  It's the

24   facts that we believe support our positions.

25        And ask yourself, when you hear his arguments, what

1    are the things that Ms. Vreeland and Mr. Albritton would

2    point us to on the facts?

3            Second thing is ask yourself some questions.  How

4    can left equal right?  How can finite equal infinite?  How

5    can two channels mean eight?  And how can there be a virtual

6    transmission and a real technique that says not a word about

7    it?  And how can Core Wireless explain this?

8            It has the burden of proof, as Mr. Lindgren

9    admitted, and as he conceded:

10            Question:  No evidence of proposals made to ETSI

11    that match the patents?

12            Answer:  Correct.

13            There's no evidence.

14            THE COURT:  Your time has expired, Counsel.

15            MR. MUELLER:  Thank you.

16            And I, respectfully, request you return a verdict

17    in favor of Apple.

18            THE COURT:  All right.  We'll hear the Plaintiff's

19    final closing at this time.

20            You may proceed, Counsel.

21            MR. WARD:  All right.  Let me too thank y'all for

22    your -- your time and your services.

23            Two pieces of good news for you.  One is I'm not

24    going to talk about RACH or MAC inactivity levels during the

25    next ten minutes.

1        The last piece of good news is you-all are about to

2   finally get back to the jury room and get to discuss this

3   case.  And we're looking forward to hearing your verdict

4   because it's an important case.

5        You can tell it's important because of all the

6   folks that are here watching -- who are watching to see what

7   you-all do with your verdict.

8        What I want to do as we end here is just to give

9   you some -- some things to think about to help you in what

10  might be a difficult decision, because what you just heard

11  was a little bit confusing.  And I think that's been Apple's

12  goal during this case is to confuse you and to confuse these

13  issues.

14       The Judge instructed you that you're the sole

15  judges of the credibility of the witnesses and the

16  credibility of the facts.  And that's what I want to talk to

17  you about.  What are the things that tell you who is being

18  credible?  Who is it that's giving you credible evidence?

19       And I want to start off with DX 47.

20       That's the one document that I pulled out in -- in

21  all the documents that have been in this case because I

22  suspected that Mr. Mueller, who knew that he had been caught

23  and told you that Core Wireless had paid $10 a patent and

24  then there was a fight about that, right?

25       And he just got up here and it looked like he was

1    staring at Mr. Lindgren saying, it was Mr. Lindgren that said

2    that.  He's the one who said we only paid $20,000.

3              Let's flip five pages later in this same document.

4              No -- sorry, Structure of the Deal, Slide 25.

5              Five pages later in that same document, what is Mr.

6    Lindgren telling his inventors?  The company pays the

7    licensing program operating costs estimated at 8 million to

8    15 million per year over 10 years.

9              Yet he wants to get up here in front of you and say

10   it was Mr. Lindgren who said these patents were worth $20,000

11             You can go ahead and take that down.

12             That's the type of credibility question you've got

13   to be asking yourself when you go back to the jury room.

14   Who's telling me the truth?  Because Apple has thrown up

15   every defense they can think of.

16             First, they say we don't infringe.  But if you

17   don't believe that, then the patents are invalid.  If you

18   don't believe that, Core Wireless has breached its contract

19   to us.

20             And now I've heard a new defense because for 25

21   minutes of his 40 minutes, he talked about this grand

22   conspiracy about how patents were held back and Core Wireless

23   was working behind the scenes to work with Nokia and

24   Microsoft.

25             What evidence is there of that?  Who from Apple

1   came and said we've been hood-winked?

2           What witness took the stand and said we've been

3   tricked?  Because you know this sophisticated company would

4   have filed a counterclaim or some type of claim against Nokia

5   for fraud if that's what it really felt.

6           But that's the story that they'll tell you to try

7   and avoid responsibility for using these patents that they

8   now get up here and say are bottom-of-the-barrel patents.

9           That's lawyer argument.  First time we've heard

10  that.

11          So what are the issues?  Infringement.

12          Dr. Walker -- well, now they say, oh, well, there's

13  no need to hear from Dr. Walker.  Yeah, we told him we were

14  going to bring him.  Yeah, he was our first witness.  You'd

15  think that might be important to Apple.

16          But once it became apparent that Dr. Walker

17  couldn't refute that these patents were in the standard,

18  Dr. Walker said, Ladies and Gentlemen at Apple, I'm not going

19  to take the stand and lie.

20          These patents are in the standard.  Dr. Toskala has

21  proven that.  You all need to get me out of this courtroom

22  because that jury -- I'm not going to help you with the jury.

23  You're not going to like what I have to say.  And they sent

24  him out of town.  That's why Dr. Walker is gone.

25          And they want to talk about Intel and Qualcomm.

1    This is another -- you know, maybe we infringe, but it's the

2    baseband processor so look to Intel and Qualcomm, don't look

3    to us.

4           These patent claims go to the apparatus.  Those

5    baseband processors don't operate without the battery, the

6    processor, the amplifier, and the antennas, and they know it.

7           Validity.  I can be real brief because they were

8    real brief, weren't they?  Maybe a minute, a minute and a

9    half that they told you that these patents were invalid.

10          And they want to say, well, if we infringe, then

11   they're invalid.  Right?  They say, well, they're stretching

12   the claims.  His Honor just instructed you, invalidity is a

13   defense to infringement.  They know they infringe.

14          They throw up a quick Hail Mary of, well, they're

15   changing the claims.

16          We're not changing the claims.  The Court has given

17   you the constructions for how these claims are to be

18   construed.  They're not our claims.  They're not Apple's.

19   It's the Court's constructions, and you're to apply them.

20          They certainly haven't met this clear and

21   convincing evidence.

22          And in your verdict form, the first question is

23   infringement.  I suggest the answer to all those questions

24   are yes.

25          Questions 2 and 3 are invalidity.  I suggest that

1    the correct answer to those questions are no.

2         The fourth question is willful infringement.  Apple

3    clearly has known about these patents since 2009 -- since

4    2011 when they were told here are the patents.  You need a

5    license to them.

6         Apple did nothing.  They never wrote back and said,

7    those divested patents are the bottom of the barrel.  We

8    don't need a license to them.  They never said anything.

9    They ignored them.  They were reckless.  They're willful

10   infringers.

11        Damages.  As Mr. Bunsow told you at the beginning

12   of this case, this is a case about money because that's all

13   Apple understands.  And I want to tell you why.

14        If you -- more evidence is in this verdict form

15   because there's something in here that you-all have never

16   seen before that has never been argued.  It's Question 6.

17   Question 5 is damages.  Mr. Bunsow told you what we think

18   damages are, $101 million.

19        But when you get back there, look at Question 6.

20   If you don't write anything else down that I tell you,

21   Question 6 is something that you want to look at.

22        Because that's a question that says:  Is the amount

23   of money you found in Question 5 a one-time lump sum for past

24   and future sales or a royalty for past sales only?  One box

25   is one-time lump sum.  The other is royalty for past sales.

1          I can guarantee you one thing, we don't think the

2    answer is one-time lump sum.  That's Apple who wants that in

3    there.  That's Apple who wants you to check that box yes,

4    one-time lump sum because these bottom-of-the-barrel patents

5    they tell you about, they want to get a license to them for

6    the life of the patents, not just for past sales.

7          That's Apple putting them in there.  These

8    bottom-of-the-barrel patents, they want them.  That's proof

9    that they want them.  They want you to answer that question

10   yes so that they have a license to these patents.  The answer

11   to that question is a royalty for past sales only.

12         Did Apple prove by a preponderance of the evidence

13   that Core Wireless breached its contract?  They said that we

14   have somehow breached our contract.  You've seen all the

15   opportunities they've had to license these patents, 2009,

16   2011.  We notify them once the lawsuit gets filed.  We write

17   them for two years.

18         Yet now they want to say we've breached our

19   contract to them.  We needed to offer them fair, reasonable,

20   and non-discriminatory rates before we sued them.  Mr.

21   Casanova told us what the answer would have been to our

22   question if we had contacted them before.

23         It's the same -- same answer we would have gotten

24   now, and that is we don't want a license to your patents.

25         We're Apple.  We're big enough.  We've got enough

 1   licenses.  We don't have to pay for intellectual property

 2   anymore.  That's their answer.  That's their answer to this

 3   question.

 4              Clearly, we didn't breach any contract to them.

 5   They say it's a penny to a dollar the damages they want.

 6   They want -- they want authorization to ignore folks, by Core

 7   Wireless.

 8              THE COURT:  One minute.

 9              MR. WARD:  That's what they're looking for.

10              This is an important case, and you-all are going to

11   get to send a message with your verdict, because at the end

12   of the day when you all return your verdict, if it's today or

13   if it's tomorrow, whenever it is, Apple's in-house counsel

14   who has been sitting here watching this case, they're going

15   to make a phone call.

16              And they're going to make a phone call back to

17   Cupertino, and it's going to be one of two calls.

18              It's going to be we got away with it.  Jury said we

19   don't have to negotiate with folks who have portfolios of

20   licenses to valuable intellectual property, keep doing

21   business as usual, keep those early retirement parties going.

22              Or it's going to be we've got to change the way

23   we're doing business.

24              And you-all have an opportunity to decide which

25   call gets made.

1          We hope y'all make the right decision, and we look

2     forward to receiving your verdict.

3          Thank you.

4          THE COURT:  All right.  Ladies and Gentlemen, I'd

5     like to provide you with a few final instructions before you

6     begin your deliberations.

7          Again, you must perform your duty as jurors without

8     bias or prejudice as to any party.  The law does not permit

9     you to be controlled by sympathy, prejudice, or public

10    opinion.

11         All the parties expect that you will carefully and

12    impartially consider all the evidence, follow the law, as I

13    have given it to you, and reach a just verdict regardless of

14    the consequences.

15         Answer each question in the verdict form from the

16    facts as you find them to be.  Don't decide who you think

17    should win and then answer the questions accordingly.

18         Your answers and your verdict, I remind you, must

19    be unanimous.

20         You should consider and decide this case as a

21    dispute between persons of equal standing in the community,

22    of equal worth, and holding the same or similar stations in

23    life.  This is true in patent cases between corporations,

24    partnerships, and individuals.

25         A patent owner is entitled to protect its patent

 1  rights under the United States Constitution.  This includes

 2  bringing a suit in the United States District Court for money

 3  damages for infringement.

 4       The law recognizes no distinction among types of

 5  parties.  All corporations, partnerships, and other

 6  organizations stand equal before the law, regardless of size,

 7  regardless of who owns them, and they are to be treated as

 8  equals.

 9       When you retire to the jury room to deliberate on

10  your verdict, you will each have a copy of this charge to

11  take with you.  If you desire to review any of the exhibits

12  which the Court has admitted into evidence during the trial,

13  you should advise me by a written note delivered to the Court

14  Security Officer, and I will send that exhibit or those

15  exhibits to you.

16       How -- however, certain documents that were shown

17  to you during the trial are what we call demonstratives.

18       Demonstratives are a party's description, picture,

19  or model that's used to describe something involved in the

20  trial.

21       If your recollection of the evidence differs from

22  the demonstrative, rely on your recollection, because

23  demonstratives are not evidence, and they're not available

24  for you to review during your deliberations.

25       However, a witness's testimony that references a

1  demonstrative is evidence.

2         Once you retire, you should first select your

3  foreperson and then conduct your deliberations.

4         If you recess during your deliberations, follow all

5  the instructions the Court's given you about your conduct

6  during the trial.

7         After you've reached a verdict, your foreperson is

8  to fill in the verdict with your unanimous answers to the

9  questions found therein, date it, sign it, and deliver it to

10  the Court Security Officer, who will bring it to me.

11         Contrary to my earlier instructions, which I gave

12  you repeatedly throughout the trial, now it is your sworn

13  duty to discuss the case among each other to see if you can

14  reach an agreement.

15         Each of you must decide the case for yourselves,

16  but only after a full consideration of all the evidence with

17  the other members of the jury.

18         While you're discussing the case, don't hesitate to

19  re-examine your own opinions and change your mind if you

20  become convinced that you're wrong.

21         However, don't give up your honest beliefs solely

22  because others might think differently or merely to finish

23  the case.

24         Do not reveal your answers until such time as you

25  are discharged, unless otherwise directed by me.  And you

1    must never disclose to anyone, not even to me, your numerical

2    division on any question.

3            Any notes that you've taken during the trial are

4    aids to your memory only.  If your memory should differ from

5    your notes, then you should rely on your memory and not your

6    notes.  The notes are not evidence.

7            And a juror who has not taken notes, should rely on

8    his or her own independent recollection of the evidence and

9    should not be unduly influenced by the notes of other jurors.

10           Notes are not entitled to any greater weight than

11   the recollection or impression of each juror about the

12   testimony.

13           If you want to communicate with me at any time

14   during your deliberations, please give a written message or

15   question to the Court Security Officer, who will then bring

16   it to me.

17           I will then respond as promptly as possible either

18   in writing or by having you brought back into the courtroom

19   where I can address you orally.  I will always first disclose

20   to the attorneys in this case your question and my response

21   before I answer your question.

22           After you've reached a verdict and I have

23   discharged you from your service as jurors, I want you to

24   understand that you are not required to talk with anyone

25   about the case unless I order otherwise, which is highly

1  unlikely.

2          However, at that time, when you have been

3  discharged, you will be free to discuss the case with anyone

4  of your choosing.

5          Whether or not you wish to discuss your service as

6  jurors in this case is strictly up to you and you alone.  It

7  is your decision alone.

8          I'll now hand eight copies of these final jury

9  instructions and one clean copy of the verdict form to the

10 Court Security Officer, who will deliver them to the jury

11 once they retire.

12         Ladies and Gentlemen, you may now retire to

13 deliberate.

14         We await your verdict.

15         COURT SECURITY OFFICER:  All rise for the jury.

16         (Jury out for deliberations.)

17         THE COURT:  The Court will stand in recess either

18 awaiting a note from the jury or a verdict.

19         The Court stands in recess.

20         (Recess taken.)

21         (Jury out.)

22         COURT SECURITY OFFICER:  All rise.

23         THE COURT:  Be seated, please.

24         The Court has received the following note from the

25 jury -- I'll read it for you, Counsel.

1         It says:  Can we please have a highlighter?  And

2  it's signed by Toby Gowin, who apparently is the Foreperson.

3         And he would have been Juror -- or is Juror No. 8

4  on the panel.

5         My intent, rather than respond to them in writing,

6  is simply to send in two or three highlighters with the Court

7  Security Officer.

8         Does Plaintiff have any objection to that?

9         MR. BUNSOW:  No objection, Your Honor.

10         THE COURT:  Defendant have any objection?

11         MR. MUELLER:  No objection.

12         THE COURT:  All right.  Mr. Blanton, if you'll come

13  forward, the -- the Courtroom Deputy has three yellow

14  highlighters.  If you'll take those into the jury.

15         COURT SECURITY OFFICER:  Yes, sir.

16         THE COURT:  Also, I will mark this note as

17  Note No. 1, and I'll hand it to the Courtroom Deputy to be

18  filed amongst the papers of this cause.

19         And we will recess awaiting either an additional

20  note or a verdict.

21         I'd like to see lead and local counsel in chambers

22  in the meantime.

23         We stand in recess.

24         COURT SECURITY OFFICER:  All rise.

25         (Recess.)

1          (Jury out.)

2          COURT SECURITY OFFICER:  All rise.

3          THE COURT:  Be seated, please.

4          Counsel, we just met in chambers, and I showed you

5   a proposed note to the jury asking whether they wanted to

6   continue to work or whether they wanted to recess for the

7   evening.

8          Counsel on both sides expressed no objection to

9   such a note; and immediately after you left chambers, the

10  Court Security Officer came in and told me that the jury has

11  reached a verdict.

12         So the note is no longer necessary.

13         And, Mr. Blanton, if the jury is ready, please

14  bring them in.

15         COURT SECURITY OFFICER:  Yes, sir.

16         All rise for the jury.

17         (Jury in.)

18         THE COURT:  Please be seated.

19         Mr. Gowin, I understand that you're the Foreperson

20  of the jury; is that correct?

21         FOREPERSON:  Yes, sir.

22         THE COURT:  Has the jury reached a verdict?

23         FOREPERSON:  We have.

24         THE COURT:  All right.  In that case, would you

25  hand the signed and dated jury verdict form to the Court

1    Security Officer who will bring it to me.

2          Ladies and Gentlemen of the Jury:  I'm going to

3    announce the verdict at this time.  And I'd like to ask each

4    of you to listen very carefully because after I've announced

5    the verdict, I'm going to ask each of you if this is your

6    verdict so that we can confirm on the record that it is

7    unanimous.

8          Turning to the verdict form, I first note on the

9    last page that it is date -- dated today's date, March the

10   16th; and it's signed by Mr. Gowin as the Jury Foreperson.

11         Turning to Page 2 of the verdict form, Question 1:

12         Did Core Wireless prove by a preponderance of the

13   evidence that Apple infringed the following claims of the

14   following patents:

15         Patent '143, Claims 17:  No.

16         Claim 21:  No.

17         '664 patent, Claim 14:  No.

18         Claim 16:  No.

19         Claim 17, no.

20         The '022 patent, Claim 7:  No.

21         Claim 9:  No.

22         Claim 10:  No.

23         The '321 patent, Claim 14:  No.

24         The '850 patent, Claim 1:  No.

25         Claim 10:  No.

1              Claim 21:  No.

2              And Claim 27:  No.

3              Question 2 is not answered per the instructions in

4  the verdict.

5              Question 3 is not answered per the instructions in

6  the verdict.

7              Question 4 is not answered per the instructions in

8  the verdict.

9              Question 5 is not answered per the instructions in

10  the verdict.

11              Question 6 is not answered per the instructions in

12  the verdict.

13              Question 7:  Did Apple prove by a preponderance of

14  the evidence that Core Wireless breached its contractual

15  obligation to license the patents-in-suit on a fair,

16  reasonable, and non-discriminatory, FRAND, basis?

17              The answer is:  No.

18              Question 8 is left blank because they answered

19  Question 7 no.

20              Again, the verdict form is signed today's date,

21  March the 16th, 2015 and executed by the foreperson of the

22  jury, Mr. Toby Gowin.

23              Ladies and Gentlemen, let me poll you at this time

24  and make sure that the verdict that I just read is the

25  unanimous verdict of all eight members of the jury.

1             If this is your verdict as I have read it, would

2    you please stand at this time?

3             Thank you.  You may be seated.

4             Let the record reflect that all eight members of

5    the jury immediately rose and stood in response to the

6    Court's question to poll the jury.

7             Ladies and Gentlemen, this now completes the trial

8    of this case.  From the very beginning, I repeatedly

9    instructed you about not discussing the case with anyone and

10   not discussing it among yourselves until you retired to

11   deliberate.

12            I'm releasing you from those obligations, and I'm

13   discharging you from your duty as jurors in this case.

14            You're now free to talk about your service as

15   jurors and your experiences in this case to anyone

16   yourselves, among yourselves, members of your family, members

17   of the community, your friends, anyone you choose to discuss

18   it with.

19            But by the same token, you are equally free not to

20   discuss it with anyone or not to say anything to anybody

21   about it at all.

22            It is completely and solely your decision, each

23   member of the jury personally for yourselves.

24            I know that the lawyers here on both sides will be

25   interested to talk to you if you want to talk to them.

1        However, you need to understand that the Court's

2    practice is they cannot come up to you and initiate a

3    conversation about your service as jurors.

4        If you want to talk with any of the lawyers in this

5    case, you will have to initiate a conversation with them.

6    They will not initiate a conversation with you.

7        Also, Ladies and Gentlemen, I want to let you know

8    how much the Court appreciates your service as jurors in this

9    case.  This is an important case to both parties.  This has

10   been a difficult week.  You have shown great concentration,

11   great focus.

12       I see a lot of juries, and you have done a -- a

13   great job in watching the witnesses, considering the

14   evidence, viewing what's been placed on the screens before

15   you, listening to my instructions.  I commend each and every

16   one of you for the job you serve -- the job you've rendered

17   as jurors in this case.

18       I tell juries every time I have a lawsuit like this

19   that I am privileged to preside in, that there are certain

20   pillars to the citizenship of each and every American; and

21   one of those important pillars is jury service when you're

22   called.  And each of you have responded admirably --

23   admirably and have served exceptionally in this regard, and

24   you have the sincere appreciation of the Court, the Court

25   staff, the members of the -- the members of the bar that are

1   here, and everyone present.

2       Our system just couldn't simply work without your

3   participation and your dedication.  And as I told you at the

4   beginning of this process, you have done very real and

5   significant public service; and every one of you should feel

6   very justly proud about what you've done in this case.

7       One other thing before I let you go, it's my

8   practice since I've been on the bench after I receive a

9   verdict and discharge the jury, that before you leave the

10  courthouse, I ask you to go back to the jury room for just a

11  couple minutes and give me the opportunity to come in and

12  shake each one of your hands in person and tell you

13  face-to-face how very much I appreciate the service that

14  you've rendered.

15      You're not under any obligation to do that.  You

16  have been discharged as jurors.  You're free to leave.  But

17  if before you would leave, if you'd give me just a couple

18  minutes, I will not keep you long, but I believe that what

19  you've done warrants and justifies a word of personal thanks

20  from the Court and an opportunity to shake your hands and let

21  you know that these are just not empty words; that I very

22  much, on behalf of myself, my staff, and the court as an

23  institution, we very much appreciate what you've done.

24      So if you're agreeable, I'll ask you to retire to

25  the jury room, and I'll be in in just a minute to thank you,

1    and you can be on your way.

2          Again, you're not required to wait; but if you

3    would do me that personal privilege, I'd appreciate it.

4          With that, Ladies and Gentlemen, you're discharged

5    in this case from your responsibilities as jurors; and if

6    you'll do me that privilege, I'll see you in the court -- in

7    the jury room in just a minute.

8          COURT SECURITY OFFICER:  All rise for the jury.

9          (Jury out.)

10          THE COURT:  Counsel, for the record, I'm going to

11    hand the original and an executed verdict form to the

12    Courtroom Deputy.  We'll make it a part of the papers in this

13    case.

14          That completes the trial of this case.  Counsel,

15    thank you for your hard work.  This case is at a conclusion,

16    and you are excused.

17          (End of trial.)

18

19

20

21

22

23

24

25

1                      CERTIFICATION

2

3              I HEREBY CERTIFY that the foregoing is a true

4    and correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of our

6    abilities.

7

8

9    /s/_____

     SHEA SLOAN, CSR, RPR                    March 16, 2015
10   Official Court Reporter
     State of Texas No.:  3081
11   Expiration Date:  12/31/16

12

13

14

15

16   /s/_____

     SHELLY HOLMES, CSR, TCRR
17   Deputy Official Court Reporter
     State of Texas No.:  7804
18   Expiration Date  12/31/16

19

20

21

22

23

24

25