1                   IN THE UNITED STATES DISTRICT COURT

2                   FOR THE EASTERN DISTRICT OF TEXAS

3                            TYLER DIVISION

4   CORE WIRELESS LICENSING,        )(

5   S.A.R.L.                        )(     CIVIL DOCKET NO.

6                                   )(     6:12-CV-100-JRG

7   VS.                             )(     MARSHALL, TEXAS

8                                   )(

9   APPLE INC.                      )(     JULY 6, 2015

10                                  )(     1:31 P.M.

11                          MOTIONS HEARING

12            BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13                   UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16  FOR THE PLAINTIFF:  (See sign-in sheets docketed in
                         minutes of this hearing.)
17

18  FOR THE DEFENDANT:  (See sign-in sheets docketed in
                         minutes of this hearing.)
19

20  COURT REPORTER:     Shelly Holmes, CSR-TCRR
                        Official Reporter
21                      United States District Court
                        Eastern District of Texas
22                      Marshall Division
                        100 E. Houston Street
23                      Marshall, Texas  75670
                        (903) 923-7464
24

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)

I N D E X

July 6, 2015

                                                    Page

     Appearances                               1

     Hearing                                   3

     Court Reporter's Certificate             62

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              All right.  This is the time set for argument of

 4    post-trial motions in the Core Wireless versus Apple case.

 5    This is Civil Action 6:12-CV-100.

 6              The Court will call for announcements.  What says the

 7    Plaintiff, Core Wireless?

 8              MR. HILL:  Good afternoon, Your Honor.  Wesley Hill,

 9    Henry Bunsow, and John Ward on behalf of the Plaintiff, Core

10    Wireless.  We also have with us, Your Honor, our client

11    representative, Mr. Scott Burt, for the record.  We're ready.

12              THE COURT:  All right.  What says the Defendant?

13              MS. SMITH:  Good afternoon, Your Honor.  Melissa Smith

14    on behalf of Apple.  I'm joined today by Mr. David Prichard,

15    Ms. Cindy Vreeland, Mr. Joe Mueller, Mr. Chip O'Neill, and also

16    in-house for Apple, Mr. Andy Song.  And, Your Honor, we're

17    ready to proceed.

18              THE COURT:  Thank you, Ms. Smith.

19              All right.  Counsel, we'll start with Core Wireless's

20    motions for JMOL regarding non-infringement.  Coupled with that

21    is Core Wireless's motion for new trial on the '321 and '850

22    patents.  I don't see any reason we can't -- the Court can't

23    hear argument on both of those at the same time.  So I'll hear

24    from the moving Plaintiff when you're ready.

25              MR. BUNSOW:  Thank you, Your Honor.
```

1          Your Honor, I have prepared some slides to help with

2    the argument today.  Those have been sent up to the bench.

3          THE COURT:  I have them.

4          MR. BUNSOW:  There are basically four motions being

5    brought by Core Wireless, a motion for judgment as a matter of

6    law that the '143 asserted claims are infringed, motion for

7    judgment as a matter of law that the '022 and '664 asserted

8    claims are infringed, motion for new trial on infringement of

9    the '321, and motion for new trial on infringement of the '850

10   patent.

11         And if it please the Court, I'll take those in order.

12         The first deals with the '143 patent.  Apple's only

13   defense to infringement was that the channel selection portion

14   of the claims of the '143 patent must take place in the handset

15   using a dedicated channel.  That was the argument that Apple

16   made to the jury, and that was also an argument that was

17   explicitly rejected during the Markman process.

18         There is no requirement that the channel selection

19   actually occur at all in Claim 17 and 21, and there is no

20   requirement that the channel selection allocate a dedicated

21   channel at all.

22         There are two modes of operation in these devices.

23   One of them uses a random access channel when the volume -- the

24   traffic is below a certain amount.  When it reaches a certain

25   amount, a request is generated.  And that is as far as Claims

1   17 and 21 go.

2          There is no need that a selection actually take place

3   or that a dedicated channel is actually assigned, much less

4   that the dedicated channel must be assigned by the handset,

5   which was the crux of Apple's defense in this case.

6          Apple violated the claim construction as a matter of

7   law by arguing that channel selection must take place in the

8   handset using a dedicated channel.  That's the basis upon which

9   the jury found non-infringement.  That's the only basis upon

10  which they could have found non-infringement.

11         Core Wireless's evidence of infringement, on the other

12  hand, followed the claim construction and fully supported a

13  finding of infringement absent the misleading arguments that

14  were presented.

15         And in addition, it was conceded and not disputed that

16  the accused products transmit on a common channel known as the

17  RACH, R-A-C-H, random access channel, if the traffic was below

18  a certain threshold.  That is covered by Claims 17 and 21 and

19  is an infringing mode of operation.

20         The important thing to realize about Claims 17 and 21

21  is that infringement occurs upon the request, not upon a

22  decision being made, not upon the assignment of a dedicated

23  channel.

24         Claim 18 is the claim that deals with the actual

25  assignment of a dedicated channel, not Claims 17 and 21.

1          Apple's expert did not contest that the request is

2    generated and occurs in the accused products.  And for those

3    reasons, we move for judgment as a matter of law on

4    infringement of the '143 patent.

5          Unless the Court has questions, I'll move to the next.

6          THE COURT:  Let's -- let's move to the next.

7          MR. BUNSOW:  The '022 and the '664 patents, you'll

8    remember that these patents deal with a parameter called B-E-P,

9    underscore, period2 or BEP_period2.

10          Apple's own expert conceded infringement.  We cover

11   that on our brief at Pages 15 and 16, because the Apple devices

12   follow the relevant standard.  The devices are configured to

13   capable of receiving the indication of signal quality.

14          The Claim that we asserted for infringement of the

15   '022 and '664 patents is an apparatus claim.  All the apparatus

16   has to do to infringe is be considered -- be configured to

17   receive the BEP_period2 parameter which they are.  The fact

18   that they do or don't do anything upon receipt is irrelevant.

19   The products are configured to receive it.  It is a requirement

20   of the standard, which is why they are configured to receive

21   it.

22          And the testimony was that this is a measure of signal

23   quality that while not implemented yet in the networks is

24   available and able to be implemented and likely will be

25   implemented.

1          Apple's semantic argument about finite is not infinite

2     was not supported in the claims or in the claim construction.

3     Again, it was a way to mislead the jury.  Given admitted use of

4     what was called a forgetting factor by the Apple devices, there

5     is no difference at all.

6          The file history makes clear that the specification

7     defines the filter.  The filter is one that uses a forgetting

8     factor, and that is exactly how the Apple's -- the Apple

9     accused products work.

10         In the real world, that's how they work, and there is

11    no difference.  Infringement exists in the Apple accused

12    products because these claims are apparatus claims.  And we

13    move for judgment as a matter of law finding infringement of

14    the '022 and the '664 patents.

15         The next is our motion for new trial on the '321

16    patent, and this revolves around the testimony that Dr. Stark

17    gave concerning what's called the R99 voice mode of operation.

18         Dr. Stark had expressed no opinions in his expert

19    report or in his deposition, and, in fact, he stated in his

20    deposition that we played at trial that he had no opinion on

21    whether or not the claims were infringed in the R99 voice mode

22    of operation.

23         The Court will recall, I'm sure, that the R99 voice

24    mode is the legacy mode of operation that must be available in

25    the base stations in order for legacy devices, prior devices to

1   operate.  So it is available.  It is in the Apple accused

2   products.  It is operative.

3          We asked Dr. Stark:  So you have no opinion whether or

4   not the accused products meet the two-channel limitation in the

5   voice mode, do you?

6          Answer:  I didn't express an opinion on that, correct.

7          Question:  No opinion, right?

8          Answer:  Correct.

9          This was a point that we made to the jury, that

10  basically Apple had put up an expert who had no opinion on a

11  particular mode of infringing operation.

12         In response during closing argument, counsel put up an

13  excerpt from his expert report, an expert report that was not

14  in evidence and was not admissible into evidence, and then

15  quoted a misleading quote about Dr. Stark's opinion of

16  Mr. Chandler's expert report.  It did not meet the issue that

17  we had extracted from Dr. Stark on cross-examination.  But it

18  did give the jury the impression that I had misled them, that

19  indeed Dr. Stark did have an opinion on the R99 mode, and

20  obviously, they found non-infringement, we believe, at least in

21  part on that basis.

22         That misleading argument, we believe, was prejudicial

23  to the jury, and we would ask for a new trial on infringement

24  of the '321 patent as a result.

25         THE COURT:  Despite the fact that you say Apple's

1    expert was short-handed, if you will, in coming forward with

2    opinions and evidence, clearly, as the Plaintiff, you bear the

3    burden of proof on each and every element.  And at this stage,

4    the showing to the Court would have to be that no reasonable

5    jury could have concluded other than you met each and every

6    element of the asserted claims.

7            That's a pretty high burden, Mr. Bunsow.  Other

8    than -- other than casting aspersions at Apple's expert, what

9    else have you got to show me that no reasonable jury could have

10   reached any other conclusion but that each and every element

11   has been met and the claim's been infringed?

12           MR. BUNSOW:  Your Honor, our -- Your Honor, it is a

13   high burden.  What we have is the testimony of the -- the Core

14   Wireless expert that went through the analysis as to the R99

15   mode and confirmed that the claims did cover that mode.  And we

16   have the standard, which is admittedly adopted by Apple, which

17   practices the R99 mode.  So you put those two together, and you

18   have their expert that gives an opinion that he has no opinion

19   on the R99 mode, and the result is that the only -- the only

20   evidence in front of the jury is that the R99 mode would

21   infringe.

22           THE COURT:  All right.  What else do you have for me

23   on this?

24           MR. BUNSOW:  I have nothing else on the '321 patent,

25   Your Honor.

1          THE COURT:  All right.  Let's move on to the next.

2          MR. BUNSOW:  On the '850 patent, the basis for Apple's

3    non-infringement was a mode of operation that was not accused

4    of infringement, the so-called continuous mode.

5          If you remember in our presentation, there were two

6    modes of operation.  There was what we called the daylight mode

7    and the nighttime mode.  The whole purpose of the '850 patent

8    was to accommodate nighttime traffic -- in other words, the

9    paucity of traffic, very low-level traffic.

10          Apple's expert opined on the continuous mode, which

11   was not the DRX mode of operation that we accused of

12   infringement.  The difference basically is day and night, the

13   difference between the invention and a simple method of

14   operation during normal operating conditions.

15          So we believe that there was no evidence of

16   non-infringement presented by Apple, and there was ample

17   evidence of infringement in the DRX mode, the -- the lower

18   traffic mode from which the jury should have found

19   infringement.  There simply was no countervailing evidence

20   presented to the jury on the DRX mode of operation.

21          THE COURT:  Is it not possible that though you say

22   there was no countervailing evidence to the contrary, it's

23   clearly within the jury's purview to believe or disbelieve, to

24   give weight to or give no weight to the testimony of your

25   witnesses, and should the jury have chosen within its rightful

1   parameters to have afforded no weight or no credence to one of

2   your witnesses, even without offering anything, you don't make

3   your burden of proof and the Defendant still prevails?

4         So I understand your argument about nothing to the

5   contrary.  I understand your argument about the only evidence

6   before the jury is on my side.  How do I get over the hurdle of

7   they might not have believed your side?

8         MR. BUNSOW:  I think that the hurdle must be overcome

9   by some showing of a basis for the jury to disregard that

10  testimony.  When the record evidence is wholly on one side

11  without any contrary evidence whatsoever, there would have to

12  be a substantial showing that -- that the jury would be

13  justified in disregarding the only evidence before them.

14        And I haven't seen that in the briefing.  I haven't

15  seen anything presented by Apple that could support a

16  reasonable -- reasonable juror in disregarding the only

17  testimony of record in the case.

18        THE COURT:  All right, sir.  What else?

19        MR. BUNSOW:  That's all I have, Your Honor.

20        THE COURT:  Okay.  Let me have a response from the

21  Defendant.

22        MR. MUELLER:  Good afternoon, Your Honor.  Joe

23  Mueller.  May I proceed?

24        THE COURT:  You may.

25        MR. MUELLER:  Ms. Vreeland will address the '321 and

1    '850 issues --

2           THE COURT:  All right.

3           MR. MUELLER:  -- with Your Honor's permission.

4           THE COURT:  Okay.

5           MR. MUELLER:  On the '143 patent, Your Honor, five

6    points.

7           First, these claims at issue provide the context, are

8    directed to a system in which the mobile makes a decision

9    between using a dedicated and a common channel.

10          And if Your Honor will recall at trial, Core Wireless

11   took the position that this patent, along with the others, had

12   been incorporated into the standard.  This was the one where a

13   proposal had been made to ETSI by the inventor, and Core

14   Wireless's expert, Dr. Olivier, conceded that proposal had been

15   rejected.  That's the backdrop for the claims.

16          The particular claims at issue have two

17   means-plus-function limitations.  One is a means for sending,

18   and one is a means for comparing.  Both were construed by Judge

19   Love.  Both were reviewed by Judge Davis.  And both Judge Davis

20   and Judge Love concluded that the corresponding structure for

21   those claims included various parts of the control unit within

22   the mobile device.  That's the control unit 803, according to

23   the patent specification.

24          The description in the specification with respect to

25   how that control unit works explicitly states in a passage that

1  the Court adopted in the construction that it advantageously

2  performs channel selection.  And I would note, Your Honor, that

3  that was also a section of the specification that Core Wireless

4  proposed as part of the means for sending construction and did

5  not object to when Magistrate Judge Love adopted that language

6  as part of his claim construction and Judge Davis approved

7  that, as well.

8          So we have a corresponding structure that involves

9  channel selection and is bound up in the means for comparing

10  and the means for sending.  And there's really no dispute at

11  all at trial that the mobile unit does not do that.  The

12  control unit within the mobile unit does not do that.  The

13  decision is made the network side of the larger cellular system

14  so that channel selection requirement that was in both the

15  means for sending corresponding structure and the means for

16  comparing corresponding structure is not met.

17          Moreover, there was another second -- a second

18  non-infringement defense that we offered at trial, and the jury

19  was entitled to credit.  And that is that the means for

20  comparing limitation was not satisfied because the alleged way

21  in which the Apple products were satisfying that limitation did

22  not relate to channel selection.

23          The claim language is means for comparing four bases

24  of said channel selection, and the proof that was offered by

25  the Plaintiff was a measurement report.  And the evidence was

1   clear at trial that measurement report can be used for multiple

2   potential purposes by the network, and it wasn't necessarily

3   being used for channel selection.

4           So the bottom line is we have multiple ways in which

5   the claim language was construed to require particular

6   structure, two different ways in which the jury could have

7   decided that it was not being met in the Apple products.  And

8   this really has no basis to -- to conclude that every

9   reasonable juror would conclude both of those defenses lacked

10  merit.  A reasonable juror can conclude that at least one, if

11  not both of those defenses, sufficed to find non-infringement

12  of the '143.

13          And with Your Honor's permission, I'll move on to the

14  '022 and '664.

15          THE COURT:  That's fine.

16          MR. MUELLER:  With the '022 and the '664, there were

17  two defense that we offered at trial.  The first was the claims

18  explicitly required a finite length filter, and the undisputed

19  proof, including from the Plaintiff's own expert, was what --

20  that the accused filter functionality was mathematically

21  infinite.  And so the argument that was made was

22  notwithstanding it being mathematically infinite, it somehow

23  could satisfy a finite length filter.

24          Well, Dr. Stark disagreed, and certainly the jury was

25  entitled to decide that dispute against Core Wireless, the

1    plain language of the claim said finite length filter and the

2    undisputed evidence that it was mathematically infinite.

3           So from that ground alone, the jury could properly

4    conclude that there was no infringement.

5           There was a second ground, though, as well, and that's

6    the claims required an indication of signal quality.  And with

7    respect to that, the accused functionality was a parameter

8    called BEP_period2.  And it was conceded that BEP_period2 was

9    not actually sent, or at least there was no evidence of it

10   being sent.  I think Mr. Bunsow admitted as much just now.

11          So the argument was that the products are capable of

12   using it.  Well, there's two responses to that.  First, it has

13   never been sent, and there's no evidence that it will be sent.

14   It's at least a fact question as to whether that satisfies a

15   capable of requirement.

16          Second, there was not sufficient evidence that even if

17   it were sent, it was an indication of signal quality.  And, in

18   fact, Dr. Stark testified he'd seen no evidence it was, and the

19   Plaintiff's own expert offered no evidence that it was being

20   used as an indication of signal quality.

21          So as with the '143, for the '022 and '664, we have

22   two independent grounds for non-infringement, each of which a

23   reasonable juror could have concluded sufficed to find

24   non-infringement of those two patents.

25          THE COURT:  All right.

```
1            MR. MUELLER:  Thank you, Your Honor.

2            THE COURT:  Thank you.

3        Ms. Vreeland?

4            MS. VREELAND:  Thank you, Your Honor.

5            I'd like to start with the '321, and we think there

6    are three strong reasons to deny the motion with respect to the

7    '321.

8            And the first is that these arguments have been

9    waived.  And this is quite significant here.  There's a -- the

10   basis of the complaint is this statement in the closing that

11   Mr. Mueller made that -- that there had -- that -- to respond

12   to the suggestion in Core Wireless's closing that -- that

13   Dr. Stark had offered no opinion on this key issue.

14           And, in fact, the very same part of the report that

15   was shown in the closing was also shown in Dr. Stark's redirect

16   when the same issue was raised during his testimony.  So we

17   have a situation here where not only was a claim of error

18   waived, but it was waived twice.

19           If Core Wireless thought there was something wrong

20   about the use of that part of the report to rehabilitate during

21   Dr. Stark's testimony, then it should have and was required to

22   raise an objection.  It should have raised during that redirect

23   testimony that the claimed use of the report was -- was hearsay

24   and that it should not be permitted.  But they waived it twice.

25   They didn't object during the testimony, and they didn't object
```

1   during the closing.

2          So we think first, it's been waived.  And we think

3   secondly, that Apple's use of that part of Dr. Stark's earlier

4   report was entirely proper under Federal Rule of Evidence 801,

5   which is the hearsay rule.  As Your Honor knows, a prior

6   consistent statement is entirely admissible to rehabilitate a

7   witness's testimony, and that was exactly the use of this part

8   of the report.

9          And as Your Honor will recall, the -- one of the

10  primary disputes for this patent was whether Apple's products

11  ever transmitted over exactly two channels.  And this was a

12  significant issue because the part of the standard that Core

13  Wireless was relying on, as you'll recall, was a part of the

14  standard that was only in effect for six months during a

15  six-month period in 1999, eight years before Apple even

16  introduced the iPhone.

17         So on his direct testimony, Dr. Stark testified that

18  he had seen no evidence that Apple's products ever used that

19  very old part of the code that was in effect for six months in

20  1999.

21         During cross-examination, his testimony was impeached.

22  He was impeached on the -- on the grounds that in his

23  deposition he had said that he had no opinion on the issue.

24  And so it was -- once there was a suggestion made that

25  Dr. Stark had no opinion on this issue, it was entirely proper

1    to rehabilitate that testimony with the prior inconsistent --

2    the prior consistent statement in his report.  He said in his

3    report the very same thing he said on direct, that he had seen

4    not -- no evidence that Apple's accused products ever used that

5    very old part of the standard in effect for six months.

6         So we have a situation here, we think, where what's

7    complained about was entirely proper.  It was a prior art

8    consistent statement, admissible under Rule 801.  It was not

9    objected to when it came in during the redirect.  It was not

10   objected to when it was referred again in the closing.

11        And finally, we just underscore that we think that

12   even if Core Wireless could prove an error, and we don't think

13   they can because of the waiver and because of the proper use of

14   the statement, but even if they could show an error, there's no

15   way that that rose to the level of prejudice that would be

16   required for a new trial.  This was one statement in a

17   40-minute closing.  It was -- Your Honor instructed the jury

18   that closing arguments were not evidence.

19        And I think most telling of all is the fact that in

20   its reply brief on this issue, Core Wireless concedes that

21   Apple could have used Stark's testimony, rather than reshowing

22   his report.  And, of course, there can really be no difference

23   between testimony and a report that said the same thing.

24        And, Your Honor, we'd also underscore that this was

25   but one of multiple issues.  There were three -- Dr. Stark gave

1   three reasons why this patent was not infringed.  He -- he

2   testified that Apple's products didn't use the exactly two

3   channels that was required by the claims.  He explained that

4   Apple's products didn't use the two spreading codes required by

5   the claims.  He required -- he explained that Apple's products

6   didn't change power levels as required by the claims.

7        So this was one statement in a closing related to one

8   of multiple issues, and we think clearly waived.

9        And I would move on to the '850, unless Your Honor has

10  any questions?

11       THE COURT:  Go ahead, move to the '850.

12       MS. VREELAND:  And on the '850, Your Honor, we think

13  that here, Dr. Knightly's evidence strongly supported the

14  jury's finding of non-infringement.

15       Core Wireless said in its briefs and it said here

16  again, it's made the claim that Apple only showed evidence

17  of non-infringement in continue -- what Core Wireless has

18  called the continuous mode of operation.  And they repeatedly

19  claimed that Apple produced no evidence of non-infringement

20  in this dis -- what they call the discontinuous mode of

21  operation.

22       And Your Honor may remember references to something

23  called the MAC inactivity threshold timer at trial.  Core

24  Wireless's theory at trial was after that timer expires, then

25  the products go into something that Core Wireless called

1   discontinuous mode.  And they claim that there was infringement

2   in this discontinuous mode.

3         But there was strong evidence from Dr. -- Dr. Knightly

4   that that was not the case.  And I would refer Your Honor for

5   example, to Dr. Knightly's testimony on March 13th, on Page 36.

6   He was asked about exactly this situation where Core Wireless

7   claims that there's infringement, the situation where the MAC

8   inactivity timer has expired.  And he explained how in that

9   situation, the products wouldn't infringe.

10         So there was strong testimony from Dr. Knightly

11   supporting the jury's conclusion of no infringement, both in a

12   situation when the products are in what Core Wireless calls

13   continuous mode and when the products are in what Core Wireless

14   has called discontinuous mode.

15         And, in fact, he offered multiple grounds for that

16   conclusion.  As you may remember, there were three key parts of

17   the claims.  You've got to determine one of these virtual TTIs,

18   you've got to check to see if there's a transmission in a

19   current TTI, and then there's a conditional step, if there's no

20   transmission, you've got to impose a waiting associated with

21   the virtual TTI.  And Dr. Knightly explained how those steps

22   are not met by the products.  So there were multiple grounds

23   for the conclusion of non-infringement by the jury.

24         THE COURT:  Thank you.

25         MS. VREELAND:  Thank you.

1          THE COURT:  Mr. Bunsow, do you have anything else --

2    anything else to add before we move on?

3          MR. BUNSOW:  I do, Your Honor, briefly.

4          As to the '143, the problem was stated again by

5    Mr. Mueller, respectfully, when he said -- and I wrote it

6    down -- the decision is in the handset.

7          If you look at Claim 17 and 21, the decision is not in

8    the handset.  It is not required in the handset at all.  And

9    yet that was their basis for non-infringement.  All that has to

10   happen in the handset is that a request is generated, and the

11   claim language is specifically the following:  A request is

12   generated for basis of channel selection.  There is no actual

13   channel selection in the handset.

14         And that argument is wrong, and that's the argument

15   that was used with the jury in order to support

16   non-infringement.

17         On the '022 and the '664, BEP_period2 is in the

18   standard.  It is required that the products be configured in

19   order to receive that parameter.  There is no dispute about

20   that.  There was no dispute about that.  Apple's witness

21   admitted that.  Our witness proved it.  Compliance requires it.

22         So since the '022 and '664 patent claims are apparatus

23   claims and the accused products are configured to receive that

24   parameter, there is infringement.

25         On the '321, we're not talking about rehabilitation

1   here of anything.  Dr. Stark said in his deposition and in

2   direct testimony that he had no infringement -- or he had no

3   opinion on whether the R99 mode infringes.  What they offered

4   from his expert report is that he did not believe Mr. Chandler

5   had proven infringement.  Those are two totally separate

6   considerations.  This wasn't a situation of rehabilitation at

7   all, although it was presented as that, and certainly they

8   attempted to use it as that.

9       THE COURT:  Aren't you asking me to grant a new trial

10  there based on attorney argument during closing?

11      MR. BUNSOW:  Based on attorney argument in part, but

12  also based on the display to the jury of a document that was

13  not admitted into evidence and a mischaracterization of that

14  document.  Obviously, displaying the document carries a lot

15  greater weight than the attorney simply saying it.

16      THE COURT:  What's -- what's your response to

17  Defendant's argument that there was no objection raised, and,

18  therefore, that was waived?

19      MR. BUNSOW:  It wasn't waived because the document was

20  never offered into evidence.  We obviously would have objected

21  to it if it was offered into evidence.  Your Honor's

22  instructions were very clear that to the extent that there was

23  anything -- anything in the closing arguments that might be

24  controversial, that was to be brought up in advance.  This

25  wasn't.  Had it been brought up in advance, obviously, we would

 1   have dealt with it, but it wasn't.

 2         And so I don't believe there was any waiver here.

 3         THE COURT:  Anything else, Mr. Bunsow?

 4         MR. BUNSOW:  No, Your Honor, that's it.

 5         THE COURT:  Okay.  Thank you.

 6         MR. BUNSOW:  Thank you.

 7         THE COURT:  All right.  Any additional reply from

 8   Defendant?

 9         MR. MUELLER:  No, Your Honor.

10         THE COURT:  All right.  Then let's move on to Apple's

11   motion for JMOL of invalidity, or in the alternative for a new

12   trial on invalidity.

13         MR. MUELLER:  Thank you, Your Honor.  Just briefly on

14   this, I think we'll primarily rest on our papers, but this is a

15   conditional request.  To the extent that the jury verdict of

16   non-infringement is left undisturbed, then our motion is moot.

17         THE COURT:  I understand.

18         MR. MUELLER:  And we believe that only in that

19   circumstance where it were disturbed, that the logic that would

20   require disturbing it would also invalidate the claims because

21   we believe we demonstrated at trial that for each of the

22   patents-in-suit, to the extent the accused functionality were

23   covered by the claims, there was prior art that would equally

24   cover the claims under the same theory.

25         And so we'll rest on our papers in terms of how that

```
 1   was accomplished.  I'm happy to answer any questions Your Honor
 2   has --
 3            THE COURT:  No.
 4            MR. MUELLER:  -- but otherwise it's really a
 5   conditional motion.
 6            THE COURT:  So said another way, if Mr. Bunsow gets a
 7   new trial on infringement, you want a new trial on in -- on
 8   validity?
 9            MR. MUELLER:  Correct.  Thank you, Your Honor.
10            THE COURT:  All right.  Mr. Bunsow, do you have
11   anything on this motion?
12            MR. BUNSOW:  I do, Your Honor.
13            We have taken the time to go through the bases for
14   invalidity, and basically the showing at trial would not
15   support an invalidity finding in this case.  We briefed that.
16   I'd be glad to articulate our arguments in that respect, but
17   fundamentally, the invalidity position for the '143 patent is
18   insufficient to prove invalidity by clear and convincing
19   evidence.  It's -- it's really as simple as that.
20            THE COURT:  All right.
21            MR. BUNSOW:  And we've detailed that argument in our
22   briefing, as well.
23            THE COURT:  All right.  Thank you.
24            Okay.  I'll next hear argument on Apple's motion to
25   lift the stay and dismissal and/or summary judgment on the
```

1  portfolio contract and the unjust enrichment claims.

2          MR. MUELLER:  Thank you, Your Honor.

3          As context, these claims were heard in part at trial

4  and decided by Your Honor, but I'll -- if I could, I'll go back

5  before trial.

6          THE COURT:  Yeah, we're talking about the claims that

7  were not heard at trial that were stayed by Judge Love,

8  correct?

9          MR. MUELLER:  Correct.  But importantly, Your Honor,

10  the same contract theory underlies the ones that were heard at

11  trial.  So if I could back up to the pre-trial proceedings to

12  put these in context.

13          Midway through discovery, Core Wireless amended their

14  pleadings to add these claims, and they added contract claims

15  and unjust enrichment claims based on the theory, if I could

16  summarize it, that Apple had an obligation to either negotiate

17  to take a license, or to actually take a license to the Core

18  Wireless patents, both the full portfolio and the

19  patents-in-suit, by virtue of Core Wireless and Nokia having

20  declared those patents to be standard essential.

21          And based on that premise, there was breach of

22  contract arguments, as well as unjust enrichment arguments with

23  the latter based on the theory that Apple was being unjust --

24  unjustly enriched by its use of the patents without engaging in

25  negotiations and taking a license.  That, I think, is a fair

1    characterization of the thrust of the -- the theories.

2         Judge Love decided before the trial to stay the

3    portfolio claims and to stay the unjust enrichment claims in

4    their entirety.  And he did so in response to a motion to

5    dismiss that we had brought in which we argued there is simply

6    no basis for the contract at issue in this case, and there's

7    multiple problems with the unjust enrichment claims, including

8    that they're preempted by the Patent Act.

9         And, again, Judge Love, in response to that motion,

10   stayed the portfolio claims and stayed the unjust enrichment

11   claims in their entirety.  And what proceeded to trial was the

12   contract claims as applied to the five patents that went to

13   trial before Your Honor.  And Your Honor, after hearing all the

14   evidence at trial, and they had a full and fair opportunity to

15   present their view of that contract, concluded there was no

16   contract sufficient to go to the jury.

17        And, in fact, there really is no contract.  There was

18   never an agreement between Apple and anyone, but in particular,

19   Core Wireless, to pay them under a license or to negotiate a

20   license to patents simply because Nokia had declared these

21   patents as essential.

22        And I think the case has demonstrated one of the

23   reasons why that theory never really made a lot of sense

24   because the theory would require a -- a product supplier to go

25   take a license or to negotiate a license just because a

1    patentholder said itself that its patents were essential.

2          The -- the first time that a decisionmaker -- a

3    third-party decisionmaker conclusively decided one way or the

4    other if these patents were essential were in this case where

5    the jury, subject to Your Honor's review, decided they were not

6    essential and not infringed.

7          So it wouldn't make a lot of sense to agree to pay

8    someone just because they said to you their patents are

9    essential without any gatekeeper verifying that statement or

10   any third party testing it.  So there really was no contract.

11   The evidence at trial demonstrated there was no contract, and

12   we believe Your Honor properly refused to send that claim to

13   the jury.

14         The portfolio claims, which have been stayed, are

15   based on exactly the same theory, exactly the same theory.

16         THE COURT:  Let me ask you this, Mr. Mueller.  For

17   purposes of argument, assume that you're exactly right, that

18   the stayed claims or portfolio claims are based on the same

19   theory, does the fact that they're based on the same theory

20   mean that I should grant judgment against the Plaintiff without

21   them having their day in court, without them being able to

22   present evidence?  I mean, how does -- how does the

23   adjudication of the claims that were tried in and of itself

24   dispose of claims that were stayed and by the nature of being

25   stayed were precluded from going through the dispositive trial

1    process?

2           MR. MUELLER:  Yes, Your Honor, for three reasons.

3           The first is the contract that's been alleged for the

4    portfolio is precisely the same contract that was alleged for

5    the five patents-in-suit, precisely the same contract.  And

6    they had a chance to prove up that contract at trial and

7    didn't.

8           I'd also note, Your Honor, they did not move in

9    post-trial proceedings to alter Your Honor's decision to not

10   send that claim to the jury.  There's been no request for

11   post-trial relief on that.

12          And, in fact, this morning we were before Judge Love

13   on very similar issues.

14          THE COURT:  So I understand.

15          MR. MUELLER:  And Mr. Bunsow, I believe, stated to

16   Judge Love that judgment should properly enter for Apple on

17   those contract claims in light of the failure to move.

18          The failure to move on those claims and Your Honor's

19   decision on those claims was predicated on precisely the same

20   contract.  And if it doesn't exist for the five, it doesn't

21   exist for the 1,200.  There's never been any showing by Core

22   Wireless that there's some other contract that would apply to

23   the portfolio that didn't apply to the five.

24          And the third point, Your Honor, is if there had been

25   a contract, if there had been a contract, Your Honor could

1   properly conclude that the application of that contract to the

2   1,200 patents has not yet been the subject of discovery in

3   trial.  We agree.

4          But the threshold question is, is there a contract?

5   And on that threshold question, there is none.  It's exactly

6   the same theory for both the five and the portfolio.  They had

7   a full and fair opportunity to prove up that claim, didn't do

8   so, and have not moved for any form of post-trial relief.

9          And so we believe judgment, as it enters against the

10  five, will foreclose the portfolio, as well, because there's

11  never been any suggestion whatsoever that there would be a

12  different separate contract applicable to that larger

13  portfolio.

14         THE COURT:  So you're saying that judgment on the five

15  that were not stayed is based on there being no contract -- no

16  underlying contract at all, therefore, whether it's those five

17  or the remainders of the portfolio that were stayed, the result

18  is the same?

19         MR. MUELLER:  That's --

20         THE COURT:  Is that your argument?

21         MR. MUELLER:  As we understand Your Honor's order,

22  that's exactly what we think happened at trial, and we believe

23  the logical implication of that would be to foreclose the

24  portfolio claim.  And, again, that decision has not been the

25  subject of any post-trial relief.  And we think it does

1   foreclose the larger portfolio.

2        If they had prevailed on that claim at trial, there

3   would be a further question as to how do you apply that

4   contract to the 1,200.  But if there is no contract for the

5   five, there can't be any contract for the 1,200.

6        THE COURT:  All right.

7        MR. MUELLER:  On --

8        THE COURT:  Go ahead.

9        MR. MUELLER:  -- on unjust enrichment, Your Honor,

10   we've briefed the issues, but there's multiple problems,

11   including the -- the real premise of the claim is that Apple is

12   being unjustly enriched by virtue of using patents, but that's

13   a patent infringement claim under a different label, and it's

14   preempted.

15        There's also additional problems, as well, but we'll

16   rest on our papers with respect to those.

17        THE COURT:  All right.  Mr. Bunsow?

18        MR. BUNSOW:  Thank you, Your Honor.

19        First, I think it's important to understand what the

20   contract is for the portfolio claims for the stayed claims and

21   how that impacts both the contract claims and the unjust

22   enrichment claims.

23        Basically, there are 1,200 patents that were declared

24   essential to ETSI.

25        Now, counsel just said that the five patents-in-suit

1    were found not infringed, and, therefore, there was no

2    obligation to take a license to those five patents.  And on the

3    state of the record, that is true.  To the extent that patents

4    are not infringed, there is no obligation to take a license.

5           However, the obligation that we're talking about

6    actually starts many steps before that because if it was the

7    intention of ETSI that an IPR holder like Nokia must prove

8    infringement five patents at a time, nobody would live long

9    enough to come to the end of that process.  That is clearly not

10   what the ETSI obligation is all about.

11          Section 6.1 of the ETSI regulations state that IPR

12   holders who declare standard essential patents are entitled to

13   fair compensation.  Apple --

14          THE COURT:  So let -- let me interrupt you a minute.

15          What you're telling me is that because there was no

16   infringement, there was no breach of contract?

17          MR. BUNSOW:  Yes.

18          THE COURT:  And as to the remainder of the stayed

19   patents, there's not been a determination of infringement or

20   non-infringement, therefore, they're entitled to be litigated?

21          MR. BUNSOW:  Yes.

22          THE COURT:  How do you respond to Mr. Mueller's

23   argument that it's not conditioned on infringement or

24   non-infringement that there was no underlying contract, and if

25   there's no underlying contract of part of the portfolio,

1   there's no underlying contract to all of the portfolio?

2          MR. BUNSOW:  Well --

3          THE COURT:  There's a -- there's a disconnect here

4   somewhere.

5          MR. BUNSOW:  There -- there is.  And the -- the

6   disconnect is what I described in the beginning, that you don't

7   negotiate under the ETSI IPR rules five patents at a time.

8   That's the whole point.

9          An IPR owner like Nokia with 1,200 patents commits

10  those for license on the understanding that there will be good

11  faith negotiation by a user like Apple for a license on fair,

12  reasonable, and non-discriminatory terms.

13         The whole purpose is to avoid this piecemeal five

14  patents at a time type of determination.  So the -- the

15  underlying obligation is a good faith negotiation vis-a-vis the

16  companies on a broad basis, not on an individual

17  patent-by-patent basis.

18         THE COURT:  Let me ask --

19         MR. BUNSOW:  Nokia would never ask that -- that Apple

20  negotiate FRAND rates on one patent at a time.

21         THE COURT:  Let me --

22         MR. BUNSOW:  Now, Apple asked that.

23         THE COURT:  -- let me ask you this --

24         MR. BUNSOW:  Sorry.

25         THE COURT:  -- let me ask you this.

```
 1            If these remaining stayed claims were to be litigated,
 2   would you intend to submit substantially the same testimony in
 3   evidence in support of them, or are you telling me that having
 4   lost on these five, you'd go out and find other evidence, other
 5   witnesses, and other testimony?  I mean, are we talking about
 6   the exercise of hearing the same things if these do survive,
 7   just to come to the same result, or is there something
 8   different out there that would come to trial, if there was a
 9   trial, on these stayed claims at a later date?
10            MR. BUNSOW:  There -- some of the evidence,
11   admittedly, is the same.  Apple's actions, for example,
12   would -- would likely be the same.  But the presentation would
13   include the value and derivation of the portfolio.
14            When we're talking about the portfolio, we're talking
15   about something far more expansive and different than we're
16   talking about in terms of the five claims.
17            THE COURT:  And that -- that's a valid point.  I'm not
18   saying would the damages component be the same.  I'm saying
19   would the liability component be the same?
20            MR. BUNSOW:  And I don't believe it would be the same,
21   Your Honor, and the reason --
22            THE COURT:  You do or you don't?
23            MR. BUNSOW:  I don't believe it would be the same, and
24   the reason it would not be the same is that the lia --
25   liability component would include the -- the portfolio
```

1    evidence, and -- and not -- obviously portfolio from a quantity

2    standpoint goes to damages, but it also goes to liability and

3    whether Apple was reasonable in refusing to negotiate.

4           For example, Apple could have been very reasonable in

5    refusing to negotiate for one, two, three, four, five patents,

6    but when you have a company like Nokia with a decade's old

7    history of developing these technologies and you have 1,200

8    patents, that is a totally different consideration.  We never

9    were able to take discovery on Apple's view of the portfolio of

10   Nokia or -- or Nokia's view of the portfolio for that matter.

11          But the reason that ETSI imposes this obligation is to

12   avoid exactly what happened in this case and relieve the

13   parties from the necessity of going through what we went

14   through in this case.

15          So the evidence is different, and it certainly very

16   easily and I believe would result in a different determination.

17   And I would just point out that in this case, the -- the jury

18   was asked to find whether Core Wireless, aka Nokia, had acted

19   properly, and they found that we had acted properly.

20          The flip side of that that they didn't decide is that

21   Apple did not act properly.  So I think that would support the

22   argument also that in the -- in the portfolio context, they

23   could very easily come to a different conclusion.

24          THE COURT:  All right.  Thank you.

25          Mr. Mueller, anything else to add?

1        MR. BUNSOW:  The unjust enrichment, may I address that

2   briefly?

3        THE COURT:  Yeah.  That's my mistake.  Let's go ahead

4   and cover the unjust enrichment.

5        MR. BUNSOW:  So on the unjust enrichment, the -- the

6   benefit is that from 2009, when the first iPhone was released,

7   Apple has been able to represent to networks, to users, to

8   interchanges that these patents practice the standards.

9        THE COURT:  How is your unjust enrichment claim

10  anything other than a patent infringement claim in state law

11  clothing?  I mean, how is it anything different?

12       MR. BUNSOW:  It is a benefit that they have received

13  by the representation that they cover the standard.  It is not

14  a patent infringement claim.

15       By saying that they are authorized and able to comply

16  with the standard, they have received certain benefits.  That's

17  irrelevant to whether or not they infringe the patents.  It has

18  nothing to do with the patents.

19       The fact of the matter is they should have been

20  negotiating with Nokia at that time in order to make those type

21  of representations.  They were not.  They chose to stonewall

22  Core Wireless for over two years while they continued to make

23  those representations.  They continue to make them through

24  today.  So it's -- it's a different benefit.  It's not centered

25  in a patent infringement claim.

```
1            THE COURT:  Well, I thought in your briefing you said
2    it was based on the failure to pay?
3            MR. BUNSOW:  Yes.
4            THE COURT:  But now it sounds like you're telling me
5    that it's some kind of a misrepresentation theory.  So which --
6    which is it?
7            MR. BUNSOW:  It's both, Your Honor.  It's both.
8            THE COURT:  All right.
9            MR. BUNSOW:  It's -- it's a failure to pay in order to
10   properly make the representation.
11           THE COURT:  Okay.  Anything else on unjust enrichment?
12           MR. BUNSOW:  No, Your Honor.
13           THE COURT:  Let me hear from Apple in response on the
14   stayed claims and anything else on unjust enrichment and then
15   we'll move on.
16           MR. MUELLER:  Thank you, Your Honor.
17           A few points on the stayed claims.  The first is the
18   premise of this set of claims from the beginning has been that
19   it would be a way for Core Wireless to obtain a remedy without
20   proof of infringement.
21           Now, I think there was a statement made just now that
22   the claims failed because of non-infringement.  That's not how
23   we have understood those claims and how they've been presented.
24   In fact, they've been consistently argued over the last two
25   plus years as claims that don't require a merits showing on the
```

 1    patents.  That is to say the thrust of these claims is that

 2    once Nokia and Core Wireless declared the patents to be

 3    essential, Apple became obligated to take a license or to

 4    negotiate a license with Nokia and Core Wireless without proof

 5    of infringement and validity on the merits and an adjudication

 6    of such.

 7            Our understanding of these claims from the beginning

 8    has been that they do not turn necessarily on patent judgments,

 9    in terms of infringement and validity, but instead that they

10    are triggered -- these duties, according to the Plaintiff, are

11    triggered by declaring a patent to be essential.

12            No Court has ever adopted that logic, no one.  ETSI

13    has never said that.  No standards organization that I'm aware

14    of has ever said that a contractual obligation arises by virtue

15    of a patentholder itself unilaterally declaring patents as

16    essential.

17            If you have a patent and you want a remedy on it, you

18    have to prove your case in court.  And nothing that ETSI has

19    said, nothing that any Court has ever said changes that basic

20    requirement of proof.

21            And there's a good common sense reason for it.  You

22    don't necessarily have to accept at face value what a

23    patentholder says with respect to their patents.  They may say

24    to you these are important, these are essential, and you can

25    have a discussion about that.  If you choose to disbelieve the

```
 1   patentholder and not to take a license, you're leaving yourself
 2   at risk.  They could sue you for infringement, and that's the
 3   risk you take.  But you're not obligated to accept at face
 4   value their representation.
 5         And I think the suggestion is being made that how
 6   could you possibly put patentholders to the trouble of suing
 7   five at a time.  Well, this case shows exactly why.  They
 8   started out with 14 patents -- 14 patents in this case, and
 9   have prevailed on none.
10         And so if Apple had accepted at face value the
11   representation made at the beginning, you need our 14 patents,
12   they would be paying money for patents that they're not using.
13   As time has gone on and the proof has come in, it's
14   demonstrated that all 14 are not being used.
15         It's very good common sense reason why this contract
16   would never exist, but it doesn't exist, and that's the
17   important point.
18         The same contract theory underlies the five and the
19   1,200.  I don't think Mr. Bunsow suggested there be any new
20   evidence on the contract.  I think what he was saying, if I
21   understood him correctly, is that the application of that
22   theory to the 1,200 might be different if you were to allow the
23   case to proceed.
24         But the threshold question is, is there a contract?
25   Your Honor concluded after they were given a full and fair
```

1   opportunity to present that contract that there was none.  And

2   if there's no contract for the five, there's none for the 1,200

3   either.  And the claim fails necessarily because they were

4   unable to prove that threshold question of the existence of a

5   contract and have not moved for post-trial relief on Your

6   Honor's determination that it was insufficient to send to the

7   jury.

8           So for those reasons, we think the contract claims

9   should be dismissed, and that would allow for final judgment in

10  the case as a whole.

11          On unjust enrichment, the only thing I would add is

12  this.  The statement that Apple has advertised its products as

13  supporting the standard without paying suggests that Core

14  Wireless has a right to the standard.  They don't.  They don't

15  own the standard.  Nokia doesn't own the standard.

16          What they own are patents.  And to the extent they can

17  prove in court that those patents cover portions of the

18  standard, they can request patent remedies for those patents.

19  They've not been able to do so to date, but if they were ever

20  able to do it, they could request a patent remedy.

21          Unjust enrichment law does not provide any opportunity

22  to otherwise go after Apple for using the standard.  The only

23  rights they have are patent rights.  And to the extent that

24  they use unjust enrichment to go after the same conduct, it's

25  preempted by the Patent Act.

 1              THE COURT:  All right.

 2              MR. MUELLER:  Thank you, Your Honor.

 3              THE COURT:  Anything else, Mr. Bunsow?  Isn't unjust

 4    enrichment an equitable remedy --

 5              MR. BUNSOW:  It is, Your Honor.

 6              THE COURT:  -- if I remember that far back to law

 7    school?

 8              MR. BUNSOW:  Yes.  Yes, it is.

 9              THE COURT:  And why would an equitable remedy prevail

10    here when a legal remedy has been found to be absent or

11    wanting?  Are you telling me that there is no remedy at law

12    here, and, therefore, equity should be invoked?

13              MR. BUNSOW:  I believe that you can have both equity

14    and legal remedies for different causes of action.  So the

15    legal remedy would be the breach of contract claim.  The unjust

16    enrichment claim really goes to a different set of facts and --

17    and a different legal theory.

18              If I might, counsel said that you're not entitled to

19    compensation until you prove validity and infringement, and

20    that's certainly true in an arm's length situation.  We're not

21    talking about an arm's length situation.  We're talking about

22    people who have joined an organization called ETSI and who have

23    committed -- committed to honor the obligations that ETSI

24    imposes.

25              Section 6.1 specifically says that IPR holders are

1  entitled to fair, reasonable, and compen -- fair, reasonable,

2  and non-discriminatory compensation for their intellectual

3  property rights.  There is an obligation by ETSI owners that

4  use these standards that those IPR rights support to make that

5  compensation.  This is not an arm's length situation in the

6  normal -- normal situation.

7         THE COURT:  But, I mean, my experience has always been

8  that unjust enrichment is asserted as an alternative theory to

9  breach of contract, and either you say that the Defendant's

10 breached our contract, and if for some reason there's a

11 technical flaw that keeps the contract from being enforceable,

12 then based on rules of equity, you're still entitled to recover

13 because otherwise, the Defendants received an unjust

14 enrichment.

15        Now, as to the five claims that went forward at trial,

16 you alleged breach of contract, but to my knowledge, you never

17 alleged unjust enrichment there.

18        MR. BUNSOW:  I believe you're correct, Your Honor.

19        THE COURT:  And yet you're wanting to -- so by --

20 does -- does the fact that you failed to assert unjust

21 enrichment in the alternative to your breach of contract

22 theories as to those that have been put to trial and resolved,

23 does that in any way preclude you from trying to raise it in

24 the future?

25        MR. BUNSOW:  No, I don't believe it does because the

1   unjust enrichment claim is based on the benefit to Apple of

2   representing itself to be authorized and standard compliant,

3   and that really is a much more pervasive representation that

4   goes to the portfolio claim.  It's -- it's -- it's much more

5   based in the portfolio claim as -- rather than individual

6   patents, per se.  So that's one significant difference --

7            THE COURT:  Tell me --

8            MR. BUNSOW:  -- but the --

9            THE COURT:  Tell me, again, how the portfolio claim --

10  the entire portfolio should be thought about by the Court

11  differently than the five that have been tried.  Tell me why if

12  there are 1,200 in the portfolio, why it's not 1,200 widgets

13  and five widgets have already been taken out of the box and

14  dealt with, and the same thing will happen to the other 1,195

15  widgets that are left in the box.  Tell me why part and parcel

16  of being the portfolio makes that different than the five

17  claims that have been to trial.

18           MR. BUNSOW:  Well, there's -- first of all, there's

19  been no determination vis-a-vis actual infringement of the

20  1,200 claims.

21           THE COURT:  Granted.  They were stayed.  I understand

22  that.

23           MR. BUNSOW:  Okay.  All right.  And the other thing is

24  that the 1,200 claims in the context of IPR dec -- declarations

25  to ETSI is far different than a -- an IPR declaration under

1    five claims.  And what -- what we're saying is that the

2    obligation would be far different.  The -- not only the

3    magnitude of the obligation, but the -- the fact of that

4    obligation would be far different.

5         We've never been able to do any discovery on Apple's

6    approach to a portfolio of 1,200 patents and whether or not

7    they believe they had a contractual obligation.  It's -- it's a

8    difference in magnitude, but it's also a difference in fact.

9         THE COURT:  All right.  Anything else?

10        MR. BUNSOW:  Nothing else, Your Honor.

11        THE COURT:  All right.  Let's go on to Apple --

12    Apple's motion for attorney's fees and bill of cost.  And I

13    assume this is under 285?

14        MR. MUELLER:  Yes.

15        THE COURT:  All right.

16        MR. MUELLER:  Thank you, Your Honor.

17        And on our motion for fees and costs, as we've

18    articulated in the papers, we believe under the Octane

19    standard, we meet the standard, both as a matter of the

20    substantive strength of the case and also the manner in which

21    it was litigated.

22        The Supreme Court's test asked us to look at both what

23    happened, the outcome in the case, and how we arrived at that

24    outcome.  And we think taking both of those criteria in the

25    balance, we meet the standard for fees.

1          In terms of what happened, this is a case in which 14

2    patents were asserted, and not just for brief periods of time,

3    but 14 patents for long periods of time over the course of the

4    last three years.  Over 170 claims were asserted in those 14

5    patents, and Core Wireless prevailed on -- on none of them,

6    subject to Your Honor's review today.

7          We're not aware of a case in which that many claims

8    have been asserted -- that many patents have been asserted with

9    zero being found to be infringed and valid.  So the magnitude

10   of the outcome in the case alone demonstrates that this is a --

11   an exceptional case that is set apart from others in the words

12   of the Supreme Court.

13         That's also true with respect to these contract

14   claims, as we already discussed in the last -- in the context

15   of the last motion.

16         A theory was advanced of a breach of contract for

17   which no contract existed, and we believe that also is properly

18   considered as part of the outcome of the case.

19         In terms of how we arrived at this outcome, as our

20   papers articulated, over the course of the last three years,

21   we've had to deal with moving target allegations on a series of

22   different issues.  And you don't have to take my word for it,

23   there's been rulings on these issues.

24         So, for example, a Daubert ruling that struck a

25   damages theory that then was submitted again in a supplemental

1  report which Judge Love struck on the ground that it was an

2  attempt to redo a theory that he had precluded.

3       Judge Love also struck a Doctrine of Equivalents

4  argument that was made without any preservation of Doctrine of

5  Equivalents being made previously.

6       We had an instance where a new expert opinion was

7  offered at 7:00 p.m. on the night of a deposition on redirect

8  testimony from Plaintiff's counsel after the expert had

9  admitted an error earlier in the day.  We had a report being

10  served to us on Day 3 of an expert deposition -- a supplemental

11  expert report being submitted on Day 3.

12       THE COURT:  What kind of sanctions did Judge Love

13  impose at these various steps along the way?

14       MR. MUELLER:  The sanction for what I just described,

15  Your Honor, was to strike the report; to strike the technical

16  DOE opinion, the Doctrine of Equivalents opinion; to strike the

17  damages report.  There were no other sanctions imposed, but

18  there was a -- a strike of the relevant expert testimony.

19       THE COURT:  But nothing declared by the Court to be a

20  sanction per se attributable to the tenor of the conduct you're

21  now highlighting for me?

22       MR. MUELLER:  Correct.  That's correct, Your Honor.

23  That's correct.

24       As we've also noted in our brief, Your Honor, there

25  was the violation of Your Honor's motion in limine rulings at

1  trial.  And I won't belabor some of the other issues that we've

2  laid out, but we do think that some of the accusations that

3  have been made don't rise to the level of professionalism that

4  we all try to meet.

5      So we think if you put it all in the balance, the how

6  the case was litigated prong also supports a determination of

7  fees taken along with the outcome in the case, and -- that for

8  both of those reasons, what happened in terms of the number of

9  patents that were found to be non-infringed, the 170-plus

10  claims found not infringed, as well as the conduct the

11  litigation would serve to increase the fees and the burden on

12  the parties and the Court.

13      THE COURT:  Let me ask you this, Mr. Mueller.  Under

14  your reading of the Supreme Court's opinion in Octane Fitness

15  and your reading of the Apple statute under Section 285, is it

16  an all or nothing proposition for the Court, or does the Court

17  have the latitude and discretion to award fees at something

18  less than a hundred percent?

19      MR. MUELLER:  I believe Your Honor does have the

20  discretion to do that and -- and could in Your Honor's

21  discretion decide to award something less than what we have

22  requested.

23      THE COURT:  And if the Court granted your request and

24  shifted fees to the Plaintiff, unless the Court, exercising its

25  discretion reduced that, what would a hundred percent of the

1    fees be in this case in a dollars and cents figure?

2            MR. MUELLER:  We've submitted, I believe, under seal

3    the -- the answer to that question.  I -- with my -- may I

4    confer with my client briefly, Your Honor, just to --

5            THE COURT:  I mean, we're talking about millions of

6    dollars, right?

7            MR. MUELLER:  The answer is yes, Your Honor.  The

8    number that we've submitted for Your Honor for the three years

9    of litigation is approximately $10 million.  That, I would

10   note, Your Honor, is less than the actual fees incurred.  And

11   we've made an effort to cut back in two respects.  One we've

12   been very, very careful to exclude fees attributable to patents

13   that were dropped that we promised not to seek fees for as part

14   of a stipulation with Core Wireless.

15           Second, we've also tried to be conservative in our

16   request and have accordingly limited the request to the time

17   keepers that spent the most time on the case, not all of them.

18           I will note, Your Honor, that at trial, there was

19   testimony from Core Wireless that they had spent substantially

20   in excess of that figure.  And so I think imbued in the context

21   of that evidence, it -- it's further corroborating its

22   reasonableness.

23           THE COURT:  Let me ask you this, Mr. Mueller.  Last

24   week, interestingly enough, I heard argument on post-trial

25   motions in another case involving your client, not represented

1  by your firm, nor any of the counsel at counsel table present.

2  But there, the jury returned a verdict -- a sizeable verdict in

3  favor of the Plaintiff, and the Plaintiff stood where you are

4  today asking me to declare that that was an exceptional case

5  and to order Apple to pay the fees of the Plaintiff which were

6  also several million dollars.

7        Apple argued, I think, fairly eloquently that

8  exceptional is exceptional, and it's not the every day push and

9  shove of litigation that results in a winner and a loser, but

10 it's got to be beyond that, and it is, to quote the Supreme

11 Court, truly rare.

12       Were they wrong there given that to the casual

13 observer the overall -- the overall scope and tenor of the two

14 trials is not that different?  Certainly there are differences,

15 but in a -- from a high level view, they were two well fought,

16 hard fought cases that came down with completely opposite

17 results.  But why is -- why is Apple right here, but they're

18 not right there or vice versa?

19       MR. MUELLER:  Absolutely, Your Honor.  Two points.

20 First, it absolutely is a high standard, and I think that it

21 was appropriate for counsel to say that last week, and I'm not

22 saying anything different today.  It is a high bar to meet.  It

23 is the unusual case, but we do think this is the unusual case.

24 And this -- it was not a case in which one or two or three

25 patents were asserted and there was a loss on those.  It's 14

1   patents asserted for a period of years.

2          Moreover, we believe we demonstrated much earlier than

3   trial that there were problems and deficiencies with those

4   patents that required them to be dropped, yet the case

5   continued and the fees continued to run.  And we think that if

6   you take a magnitude -- that number of patents, 170 plus

7   claims, and continue to litigate them for years in the face of

8   substantive deficiencies that were laid out in our discovery

9   responses and our invalidity contentions, that at the

10  conclusion of that case, there needs to be a -- a consequence

11  for continuing to litigate at that level of volume of patents.

12         It's -- we're not aware of any case in which this many

13  patents and this many claims resulted in nothing, resulted in

14  zero claims found infringed and valid.  So we do very much

15  agree, it's a high bar, it's a high standard.  But this is the

16  unusual case that meets that standard because of the outcome of

17  the case and the way in which it was litigated.

18         THE COURT:  You're not telling me that it's unusual in

19  patent litigation for there to be an early assertion of patents

20  that through the discovery process are shown not to be

21  applicable and drop out along the way so that you go to trial

22  on a fewer number than the initial assertions represented?

23         MR. MUELLER:  Not at all.  Not the all.  That's

24  obviously very common.

25         What is unusual, Your Honor, is to have this number of

1    patents go all the way through without any claims being found

2    infringed and valid.  It's also unusual to see this level of

3    moving target allegations throughout the course of the case

4    which we think was attributable to the weakness of the

5    assertions in the first instance.

6            And not all of these are a function of discovery,

7    revealing that the facts weren't there.  As Your Honor saw at

8    trial, the premise of the case was that the patents cover the

9    standard which are public documents.  And although there is

10   certainly a question as to whether the standard sections at

11   issue were implemented in the Apple products and the chips

12   supplied by Qualcomm and Intel, there's also the threshold

13   question of whether the patents cover the standard at all.

14           And we articulated in discovery responses early in the

15   case reasons why they didn't, and yet the case continued, the

16   case continued.

17           THE COURT:  All right.  Thank you, Mr. Mueller.

18           MR. MUELLER:  Thank you, Your Honor.

19           THE COURT:  Mr. Bunsow, a response?

20           MR. BUNSOW:  Thank you, Your Honor.

21           I'd like to use my slides in responding to this one,

22   so if I can have a moment bring them up?

23           THE COURT:  Certainly.

24           MR. BUNSOW:  So the -- the seminal case in this

25   district so far on post-Octane Fitness is Judge Dyk's decision

1   in August of 2014, Stragent versus Intel Corporation.   And

2   Judge Dyk makes several observations and sets the standards for

3   considering attorney's fees motions.

4           First, awards of attorney's fees in patent cases

5   should be reserved for rare and unusual circumstances.   It

6   seems we all agree on that.

7           Second, consider the totality of the circumstances.

8   No kitchen sink approach.   I believe the litany that you just

9   heard is exactly that, simply a kitchen sink approach of

10  complaints.

11          Third, mere losing is not a relevant consideration.

12  The fact that we did not win on any of the asserted patents or

13  asserted claims is not a relevant consideration.

14          Fourth, independently sanctionable conduct is not

15  enough.   And let me digress here and say that I was very

16  chagrined by the sanctions that we received at trial.   I'm

17  going to talk about that in a few minutes.   It had a dramatic

18  impact on the case.   And I just want to assure you we have

19  other trials coming up that I have personally taken action that

20  will ensure that that does not happen again.   But we were

21  sanctioned for that, and -- and it hurt us substantially.

22          And Judge Dyk observes in the fifth consideration

23  individual actions or arguments such as those that merit

24  sanctions should not be addressed by a Section 285 finding.   It

25  is the case as a whole.   And, of course, the reason is it would

1  be duplicate punishment.

2          Sixth, conduct of the winning party is relevant.

3  Awarding fees is a matter of equitable discretion.  And I'm

4  going to be talking about some of Apple's actions in this case,

5  starting with the very beginning of the case.  And I believe

6  they fully explain why this case wasn't reduced quicker in the

7  context of the case as it approached.

8          So Apple's arguments are really a kitchen sink

9  approach.  They've come up with a dozen or so complaints about

10  how the case was litigated.  In fact, the case was litigated in

11  a collegial and cooperative manner.

12          We had two motions to compel that we brought in this

13  case over three years, two motions to compel.  And our first

14  motion to compel was granted because Apple refused to make

15  production of documents.  And that motion to compel was

16  granted.

17          The second one that they complain about resulted as a

18  result of the PA Consulting reports.  That was the only matter

19  that we were not able to come to agreement on between counsel.

20  I mean, Mr. Mueller and I talked frequently in this case, and I

21  think he would agree that on almost every situation, we were

22  able to come to agreement in a collegial and cooperative

23  manner.  That's the way I litigate.  That's the way this case

24  was litigated.

25          PA Consulting reports was different.  A, because they

1    were hidden, and, B, because we found out about them very late

2    in the process, and they initially refused to produce them.

3    They claim PA Consulting did not want them to produce and that

4    they were confidential.  We contacted PA Consulting.  They said

5    no such thing.  We got permission from PA Consulting.  Apple

6    still refused to produce them.  That's when we brought our

7    motion to compel.  Before the motion to compel, they did

8    produce them, which mooted the motion.  It was as simple as

9    that.

10           But let me talk about the history of this case and how

11   it began.  Core Wireless conducted an extensive analysis of the

12   asserted patents in this case looking at the publicly available

13   standards that Apple says it uses.

14           We filed the biggest complaint that I have not only

15   personally produced but ever seen.  We had over 1,200 specific

16   paragraphs asserting standards that we claimed Apple used in

17   their products.  And we asked Apple at the outset, if you do

18   not use these standards sections, tell us, and -- and we'll

19   take that into consideration going forward.

20           What did they do?  Incredibly, they said that they

21   lacked sufficient information and belief to admit or deny

22   whether they used those standard sections.  1,200 paragraphs of

23   standard sections.  That's the response that we got.

24           They didn't admit a single standard specification as

25   being in their products.  They denied that they knew how

1    they -- the most important products in their history worked.

2          Core Wireless spent almost a million dollars on expert

3    source code analysis because Apple would not admit compliance

4    with the standard.  It's as simple as that.

5          That was how this began.  From the beginning, Apple

6    wanted Core Wireless to reduce the number of patents and the

7    number of claims.  And we said we would do that at the

8    appropriate time.  There was never a refusal to do that.  We

9    knew you couldn't try 14 patents realistically in a case like

10   this, but we needed to know the information, the information

11   that Apple had refused to give us, the admissions that they had

12   refused to make.

13         They brought a motion early on in front of Judge Love

14   to force a reduction, and Judge Love agreed with us and said

15   that while it might be appropriate later on to reduce the

16   number of patents, the number of claims, it was premature.

17         We followed the normal practice in this court and

18   other courts.  After we had had sufficient discovery, after we

19   had had an opportunity, after we had spent hundreds of

20   thousands of dollars analyzing source code that we shouldn't

21   have had to analyze, we offered Apple first a dismissal of some

22   of the claims without prejudice.  That was accepted.  Those --

23   those patents can still be asserted today.

24         And in a second round, we offered a dismissal with

25   prejudice as to certain other claims.  And as part of that

1   dismissal, Apple agreed not to seek fees or costs as to the

2   dismissed patents.

3           Now, I think it's a little bit disingenuous to stand

4   up now and say the -- the process of reducing patents and

5   reducing claims should be a basis for awarding attorney's fees

6   in this case when they agreed at the time we stipulated to

7   dismiss those claims that they would not be the subject of

8   attorney's fees.  Their contention is that they have carved out

9   fees for those particular patents, but nonetheless the fact of

10  the dismissals should support, I guess, attorney's fees for

11  others.

12          I think the stipulation is clear, and they shouldn't

13  be able to be heard today that dismissal of patents along the

14  way in the orderly course of litigation very similar to the

15  local rules that are in place in this court now, as a matter of

16  fact, makes us subject to paying attorney's fees and makes this

17  an exceptional case.

18          Apple resisted discovery from the beginning.  We filed

19  a motion to compel which was granted during discovery.  As I

20  said, we've had the PA Consulting report.  We tried through

21  numerous meet and confer sessions to resolve that issue, and

22  only brought it to the Court when we were unable to do that.

23          I would submit that the kitchen sink approach here

24  doesn't make this case exceptional.  Two motions to compel, one

25  of which was granted, is not an exceptional situation for a

1   case that lasted over three years.  Reducing the number of

2   patents happens in most cases these days.  Asserting evolving

3   theories is -- is not except -- exceptional.

4        Let's take their complaint about the damages theories

5   in this case.  As the Court knows, the damage theories in

6   patent cases has been evolving over the last several years and

7   is still evolving today.

8        Apple's own expert had three damage theories and

9   presented one at trial.  That's not unusual.  We're not

10  complaining about that.

11       There's nothing about this case that makes it

12  exceptional.  There is no suggestion that during this

13  litigation, Core Wireless hid any evidence.  We didn't.

14  There's no suggestion that we destroyed evidence.  We didn't.

15  There's no suggestion that we sequestered witnesses.  We

16  didn't.  In fact, we cooperated in making witnesses available.

17       There's no argument that perjury was committed.

18  There's no argument that we frustrated discovery with improper

19  tactics or otherwise acted improperly.  There's simply no basis

20  to take this case out of the realm and make it an exceptional

21  case.

22       And as for the sanctions at trial, interpreting 285 to

23  provide a duplicate remedy for conduct that is already

24  sanctionable would render these other sources of fee shifting

25  superfluous.  That's what Judge Dyk case said in the Stragent

1    case.

2           We were hurt by the sanction that the Court assessed

3    against us at trial.  We lost our opportunity to bring a

4    rebuttal case.  And what did Apple say?  Apple told the jury

5    that we did not bring a rebuttal case because our case was so

6    weak that we couldn't bring a rebuttal case.  That was in

7    closing argument.

8           Now, I'm not going to stand up and say that's wrong,

9    we didn't bring a rebuttal case because we got sanctioned.  But

10   the fact of the matter is, not only were we injured, but Apple

11   exploited that injury, I think, in an improper way.

12          To award attorney's fees here and find this an

13   exceptional case would be a duplicate remedy.  And we believe

14   we acted appropriately in this case from filing to verdict, an

15   unfortunate verdict in our view, but we think the case had

16   substantial merit, which is reflected at least in our

17   post-trial motions.  And we would ask the Court to deny the

18   request for fees in this case.

19          On the question of costs, we agree that Apple should

20   be entitled to some costs.  The question is how much.  The

21   focus of the dispute is real -- and I think this is premature

22   because judgment hasn't really been entered yet.  I don't think

23   the time for contesting the cost bill has come, but --

24          THE COURT:  Well, maybe not on a specific basis, but

25   on a high level basis, I think the Court would benefit by

 1   hearing the parties' positions.

 2          MR. BUNSOW:  That's great.  So the -- the thing that

 3   we object to is $300,000.00 in costs attributable to graphics

 4   presentation -- or preparation, I'm sorry.  We're not objecting

 5   to a technician in the courtroom making those presentations.

 6   What we're objecting to is the bill from a company called

 7   Fulcrum that is a company that makes PowerPoint slides and the

 8   art work that went along with that.  We don't think that that's

 9   allowed by statute.  We think the law is pretty clear on that.

10          Other than that, I believe Mr. Mueller would confirm

11   that we have agreement on the other matters.

12          THE COURT:  All right.  Thank you, Mr. Bunsow.

13          MR. BUNSOW:  Thank you.

14          THE COURT:  Anything else, Mr. Mueller?

15          MR. MUELLER:  Briefly, Your Honor.

16          THE COURT:  Proceed.

17          MR. MUELLER:  Thank you, Your Honor.

18          Just a few final points.  First, to start at the

19   beginning of the case for just a moment, the complaint did

20   indeed recite specific standards sections, and we didn't say

21   that -- we did indeed plead that Apple lacked knowledge with

22   respect to those particular sections.  I think the reason why

23   is clear to Your Honor having seen the trial.

24          The functionality in the Apple products that supports

25   the standard is from Qualcomm and Intel.  And at that stage of

1   the case, there had not been discovery into the Qualcomm and

2   Intel chips.  As discovery unfolded, both sides did analysis of

3   their source code, the Qualcomm and Intel code, and that was

4   a -- that was a -- a process that was required to see what

5   portions of the standard were being implemented in the

6   products.

7          Second, the issue is not dropping patents.  We're not

8   arguing that we're entitled to fees because they dropped

9   patents.  In fact, in some ways dropping patents earlier would

10  have been a better thing.

11         Our point is that of the 14 patents that were asserted

12  in the case, the problems were clear from an early stage and

13  not just because of code issues but the threshold question of

14  whether the patents covered the standard itself.  We believe it

15  was clear that they did not from an early stage in the case.

16  And that as a consequence of that, the -- the better course

17  to save all sides expenses would have been to drop patents

18  sooner.

19         So we're not criticizing Core Wireless for dropping

20  patents.  It's, in fact, the opposite, that they persisted with

21  claims long after the weaknesses in those claims were apparent.

22         Third, one distinguishing characteristic of this case,

23  as we laid it out in the briefs, is the shifting theories

24  throughout the case.  And it was not simply a matter of

25  articulating multiple theories and proceeding on one to trial.

```
 1   The problems were in the vein of not articulating theories in
 2   an expert report, unveiling that theory midway through a
 3   deposition, or unveiling that theory in a supplemental report
 4   served untimely.  That's what we meant by shifting theories,
 5   not narrowing theories that had been properly preserved in an
 6   initial report.
 7          What we saw were experts making mistakes in their
 8   analysis of the code, for example, and then being asked by
 9   their counsel for effectively new opinions after those problems
10   had surfaced.  And that type of contact -- conduct, we believe,
11   was unreasonable and drove up the costs from Apple's
12   perspective.  Those shifting theories were an important part of
13   the conduct that we believe supports our request for fees.
14          And at the end of the day, the outcome of the case is
15   170 plus claims on the patents and contract claims, as well,
16   none of which prevailed and all of which we believe were
17   pursued in ways that we think served to drive up the cost for
18   Apple.
19          So it's a very high bar.  We absolutely concede it is
20   a high bar for attorney's fees.  We think on these facts and
21   with this outcome, it's met.
22          THE COURT:  What's your position on the cost issue,
23   the -- particularly the 300,000 that Mr. Bunsow mentioned?
24          MR. MUELLER:  So on the cost issue, we cited the Eolis
25   case -- if I'm pronouncing it correctly -- that did endorse the
```

1   idea of graphics vendors being a proper source of cost.  We put

2   in our submission as to what those costs were.  It's up to Your

3   Honor's discretion as to how much to award us.  But we do think

4   that there's legal precedence supporting graphics being

5   properly recoverable under the cost statute.

6           THE COURT:  All right.

7           MR. MUELLER:  Thank you, Your Honor.

8           THE COURT:  And just for the record, Mr. Mueller, I

9   don't fault you at all for taking advantage in closing argument

10  of an opportunity.  I'm quite confident Mr. Bunsow would have

11  done the same thing if the roles had been reserved.

12          All right.  These are all the matters the Court has

13  before it for argument today.  I will take each of them under

14  submission and give them additional review, considering your

15  arguments and presentations from today.  I'll attempt to get

16  you a ruling as soon as practical.

17          But for the record, that completes argument on these

18  matters today.  And, counsel, you're excused.

19          COURT SECURITY OFFICER:  All rise.

20          (Hearing concluded.)

21

22

23

24

25

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8

9      /s/ Shelly Holmes                       7/12/15
       SHELLY HOLMES, CSR-TCRR                  Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25